## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHANNA S. GEORGIA,<br><br>          Plaintiff,<br>VS. | CIVIL ACTION<br>NO. 3:01 CV-00717 (AVC) |
| ELIZABETH SCHILLER,<br><br>          Plaintiff,<br>VS. | CIVIL ACTION<br>NO. 3:01 CV-00452 (AVC) |
| CITY OF BRIDGEPORT; DONALD DAY, IN His Official Capacity As Fire Captain And In His Personal Capacity; EARL PETTWAY, In His Official Capacity As Deputy Fire Chief And In His Personal Capacity; MICHAEL MAGLIONE, In His Official Capacity As Fire Chief And In His Personal Capacity,<br><br>          Defendants. | (CONSOLIDATED)<br><br>October 14, 2003 |

## DEFENDANTS', CITY OF BRIDGEPORT'S, EARL PETTWAY'S AND MICHAEL MAGLIONE'S, REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

The Memorandum filed by Plaintiffs' counsel to oppose the above-named Defendants' protective order request ("Plaintiffs' Memo") is replete with factual misrepresentations, unsupported slanders, legal misstatements, false assertions of misconduct, detailed discussions of the irrelevant and a general tone of unreasoning and illegitimate venom. Unfortunately, these attributes also infect many filings, much correspondence and many remarks about this case made on Plaintiffs' behalf. Perhaps, in some instances, this is no more than brash overstatement; perhaps some results from error and misunderstanding, rather than malice. Whatever the

explanation for such statements may be, they are inappropriate, and it is useful, indeed necessary, however distasteful, to explore this issue here, because this pattern of demagoguery strongly supports the Defendants' protective order request.

The federal discovery process is intended to provide the parties with knowledge of the evidence that supports each side's case.  It is to help ensure the fair administration of justice by establishing an informationally level playing field in the course of a litigation and, ultimately, in the courtroom.  Courts frown on the use of the fruits of federal discovery to inflame public opinion.  Joy v. North, 692 F.2d 880, 893 (2d. Cir. 1982), cert. denied, 460 U.S. 1051 (1983); also see, Welch v. Welch, WL 21689656, *4 (Conn. Super. 2003).  While the potential for such a misuse of information is just one of several grounds raised to support Defendants' protective order request; it is an important problem that is highlighted by Plaintiffs' Memo.

## FACTUAL BACKGROUND

The inaccuracies begin in the second paragraph of the memorandum with a false accusation that the Defendants are guilty of "numerous failures and refusals ... to comply with the Plaintiffs' discovery requests and the Court's orders for compliance." (Plaintiffs' Memo at 2.)  This statement has been a theme throughout this proceeding.  It was false when first raised and is false now.  (In truth, it is the Plaintiffs who have declined to comply with either the Defendants' discovery requests or this Court's repeated orders that they do comply, a situation that has compelled Defendants to take the unusual step of requesting a contempt citation against Plaintiffs and their counsel.)  We need not burden the Court with a detailed recital of what has transpired in this regard over the last several months in view of its direct involvement in the process.

Just under three pages of Plaintiffs' Memo rails against the Bridgeport Firefighters For Merit Employment ("BFME"), a complete irrelevancy to the case before this Court; a discussion important to the Defendants' protective order request only because it illustrates the Plaintiffs' pattern of throwing around unsupported aspersions, indeed, outright slanders to inflame the public in an apparent effort to garner support for their case against the Bridgeport Fire Department ("BFD").

Plaintiffs' Memo cavalierly describes BFME as "a secretive White male-only organization," working, "to maintain the supremacy of White males in this [the Bridgeport] Fire Department."  Plaintiffs' Memo, alleges that BFME has even taken over the Bridgeport Firefighters Union to serve its own, presumably racist, interests and concludes that it is a, "rogue all-White male group that opposes many of the core tenets the labor union is supposed to be enforcing for its members, in a non-discriminatory manner."  (Plaintiffs' Memo at 2-4.) Plaintiffs' attack concludes by stating that, "[n]o situation could more urgently militate against it [the Defendants' protective order request] than a secret race-based society controlling virtually all personnel decisions and the union grievance process." (emphasis in the original) (Plaintiffs' Memo at 10.)  This vicious slander, *made without reference to any  evidence of wrongdoing whatsoever*, defames honorable firefighters based on nothing more than shrilly voiced conjecture.[1]  It is race-baiting at its worst.[2]  More pertinent to this motion is the fact that without

---

[1]    Plaintiffs' Memo offers no evidence of wrongdoing by the BFME or any of its members.  It points to only one record fact to support its attack, BFME's intervention in several legal actions that directly impacted the jobs and career prospects of its members.  Nothing but rank conjecture supports a charge that BFME's intervention was intended to limit or stop minority participation in the Fire Department rather than to compel judicial attention to the BFME members' clearly stated vested interest in a Civil Service system that was under attack.  (At least some of those legal actions were brought by the Firebirds Society of Bridgeport, Inc., a largely minority Bridgeport Firefighters' group dedicated to the perceived employment interests of its members.)  Banding together to petition the courts for redress in an orderly and civil fashion

presenting any cognizable evidence as to the actions and intentions of the BFME (aside from its participation in previous and current legal actions), Plaintiffs' Counsel has participated in a public newspaper assault on the group. This attack has intertwined the instant action and the BFME issue. See Exhibit 1, attached. In fact, late this past summer, Plaintiffs' Counsel was part of a long presentation to a Bridgeport political body regarding the BMFE during which it was reported that she distributed a memorandum obtained by documents discovery in this case. See, Exhibit 1, (article entitled "Fire Dept. Controversies Continue Instead of Just Going Away, the Story Matasticizes", Fairfield County Weekly, August 14, 2003). It was this misuse of documents obtained in discovery that led to the filing of this protective order request.

Maligning the BFME by labeling it a racially discriminatory group is irrelevant to the merits of this sex discrimination case brought by White females. Plaintiffs and their counsel have every right in the world to make any point that they want about any issue that they see in the BFD. They have that right whether it is supported by any facts or not, whether it represents a truth or a delusion (subject, of course, to the limits imposed by the law of libel and slander), but they do not have the right to use materials obtained *only* through the coercive power of this Court's discovery rules to wage their war of invective. The attached series of articles, Exhibit 1,

---

is not the hallmark of a "rogue" group of viscious White supremacists. Plaintiffs' Memo. at 4. It is rather, an exercise of the Constitutionally protected rights of association and to seek judicial redress. E.g., B & K Construction Co. v. NLRB, 536 U.S. 516, 524-25 (2002).

Plaintiffs' Memo conveniently overlooks the facts that BFME membership is open to any Bridgeport Firefighter, regardless of race, sex, color, heritage or creed, that this point was publicly made by the BFME in open correspondence to Bridgeport's Mayor this last summer, see exhibit 2, attached, Letter to Bridgeport Mayor Fabrizi, dated July 22, 2003, by Richard D'Onofrio, and that while few minority firefighters have chosen to join BFME, it may be because they prefer to join the Firebirds (a largely African-American organization) or the Hispanic Firefighters' Assoc. of Bridgeport.

[2]   Plaintiffs' Memo also neglects to point out that two of the three named individual Defendants in the case at bar are African-Americans, Retired Deputy Fire Chief Earl Pettway and Retired Fire Captain Donald Day.

culminating in the piece quoting an internal BFD memorandum relating to depositions taken in this action stand as a stark example of how discovery-produced materials may be misconstrued, twisted and misused to support malicious demagoguery.

Plaintiffs' Memo also launches unwarranted and irrelevant invective at the Defendants' attorneys, charging both John Mitola and the undersigned with making various misrepresentations to the press and/or this Court. Both attorneys firmly deny these base lies.

As to the issue of Mr. Mitola's, "reckless, if not knowing disregard for the truth" in stating that Donald Day's alleged sexual harassment contributed to his retirement from the Fire Department, anyone who has observed or worked with any municipal government would understand the basis for, and accuracy of, his comment. (Plaintiffs' Memo. at 11-12.) [3]

The undersigned is outraged at the charge that he has ever misrepresented anything to this Court. (Plaintiffs' Memo at 13.) [4]

---

[3]    Retired Captain Day is the Fire Department Officer Plaintiffs charge referred to women in the BFD as "Cunts" (Georgia Complaint ¶ 73, Schiller Complaint ¶ 56), the event that triggered the present lawsuit. Confronted with an investigation and probable discipline for that comment and his subsequent retaliation against the Firefighter who reported him, as well as against the other members of that command, Day suddenly developed a severe stress disorder. He was unable to be interviewed about the charges for several months. He, of course, provided medical certification of his illness and inability to meet with the City's investigators. When he recovered sufficiently to permit an interview, the investigation was completed, the matter considered by the City and he was disciplined with an unpaid 60-day suspension for his misconduct. Day fought to overturn the suspension through the union grievance-arbitration process. The City contested his efforts all the way to the State Labor Board. Afterward, he decided to retire. After his inexcusable remark and attempt at retaliation, no one wanted him in the Department. What reasonably experienced or informed person would or could seriously contend that the sex harassment incident had nothing to do with this decision to retire? Mr. Mitola's remark to the press was just a statement of what everyone, with the apparent exception of Plaintiffs and their Counsel, already knew.

[4]    Plaintiff's Counsel has maligned Retired Deputy Fire Chief Shevlin in the press. She seems to feel that so long as she is not quoted, nothing can be attributed to her. She is wrong. There can be no doubt that she supplied the information and materials that were relied upon by the press to attack Shevlin. The articles mentioning Shevlin reveal Plaintiffs' Counsel's collaboration with the reporter to even the most casual observer. See Exhibit 1, article entitled "Fire Dept. Controversies Continue Instead of Just Goin Away, the Story Matasticizes", Fairfield County Weekly, August 14, 2003. The invective and accusations against Mr. Shevlin in Plaintiffs' filings with this Court reinforce the picture. See Plaintiffs' Motion for Contempt and

All of the points discussed above underscore the high probability of misuse of the fruits of discovery.  A protective order is needed and appropriate in this case and despite Plaintiffs' Memo's contrary claims, that request is also supported by the applicable law.  There is no First Amendment right either for Plaintiffs to disseminate discovery materials or for Public access to them.

## ARGUMENT

**1.    The proposed Protective Order does not unfairly weigh in favor of one party over the other.**

Plaintiffs claim the Order would limit their ability to interview witnesses, develop evidence, and discover other potential civil rights victims.  (Plaintiffs' Memo at 18.)  This is not true.

---

Sanctions Re: Patrick Shevlin [docket no. 65] and supporting Memorandum [docket no. 68]; Transcript of 7/3/03 Discovery Conference, p. 48, ll. 6-15 [docket no. 87] The undersigned refused to retract his statement, because he believed and still believes that Plaintiffs' Counsel has maligned Shevlin and has sought to undermine his character, good name and service to the City of Bridgeport and its people through the press.  If it is shown that this is not true, then an apology will be forthcoming.

Plaintiffs' Counsel also claims that the author of this Memorandum threatened her and told her that "it would be his word against hers" if the matter was ever brought up to the Court or anyone else.  These statements are partially true, but so twisted out of context as completely to change their meaning and import.  Plaintiffs' Counsel has repeatedly threatened and abused both the individual Defendants and Defense Counsel during their now infrequent telephone discussions.  On one occasion, for example, she claimed that several members of the BFD were guilty of criminal and civil racketeering.  She charged that their illegal "conspiracy" likely included myself.  She threatened formal charges against all concerned.  The Court may recall another occasion when Plaintiffs' Counsel sought to have me arrested by a Marshal at the Hartford Federal Courthouse for purportedly making her fearful during a conference with the Honorable J. Read Murphy, PJO on June 10, 2003.  Her reactions then were as inexplicable, irrational and unwarranted as is the tenor of the Plaintiffs' Memo opposing this Defense protective order request.

It is true, much to my chagrin, that I have lost my temper with Plaintiffs' Counsel on several occasions.  Indeed, sometime after one of her threats to bring charges of one sort or another (I believe it was at the time of the racketeering exchange), I did respond that if she pursued me personally on such an outlandishly false claim, she had better win; that, if she did not I would expend all the resources necessary to "squish her like a bug."  I do not remember stating that I would ever deny anything I had said other than to deny her apparent view that I had made a physical, rather than a figurative, threat. My remarks were ill-chosen and uttered in the heat of a moment of gross provocation. I do not deny any of my statements, only Counsel's apparent misinterpretation of what was meant.

The Order does not prevent Plaintiffs from asking others about their own possible civil rights concerns (an issue that in any case has nothing to do with the preparation of the Plaintiffs' case in this Court). The proposed Order only prevents Plaintiffs from showing these potential witnesses or complainants materials obtained from Defendants through the discovery process, without prior Court permission.

Plaintiffs also claim that the proposed "Designated Persons" definition creates an unfair bias in favor of Defendants. It is unclear how this happens. Plaintiffs apparently assume that there is a loophole that would allow Defendants to share materials obtained from Plaintiffs through the discovery process with these non-party City employees. There is not. Moreover, Plaintiffs fundamentally misunderstand or misconstrue the proposed Order when they claim that these non-party witnesses would not be bound by the Order. The final paragraph of the proposed Order clearly states the exact opposite.

Finally, Plaintiffs claim that the proposed Order would hinder them in bringing future civil rights claims against Defendants by preventing them, for example, from sharing the materials with the CHRO. Again, however, Plaintiffs are free to petition the Court to allow the dissemination of documents for such purposes.

**2.      The proposed Order does not violate the free speech provisions of the Constitution.**

Plaintiffs cite to several cases for the proposition that the courts have long recognized a common law right of access to civil litigation records. Defendants do not object or disagree. These authorities just have nothing to do with the issue before this Court. (Under the Local Rules, discovery materials are NOT filed with the Court and are, therefore, NOT part of the civil litigation records at the pre-trial discovery stage. The cases Plaintiffs cite depend upon the

Court's having physical possession of the discovery res. Not true here.) None of the cases cited by Plaintiffs answer the fundamental question of whether pre-trial discovery materials are constitutionally open to the public. They are not.

Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984)[5], is the seminal case concerning the public's constitutional right to pretrial discovery materials. It concludes that no such right exists. Protective orders do not violate the First Amendment. Not surprisingly, Plaintiffs do not mention Seattle Times in their brief, relying instead on a false conclusory statement that the proposed Order would be an improper prior restraint on speech. The Court in Seattle Times, however, specifically stated that, "... an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny, " 467 U.S. at 33. The requested protective order would not violate any common law or constitutional right of access or free speech. "[A] protective order that is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment." Id at 37. Thus, Defendants reiterate the good

---

[5] Plaintiffs especially reference Public Citizen v. Liggett Group, Inc., 858 F.2d 775 (1st Cir. 1988). However, that decision just does not stand for the proposition that there is any constitutional public right to know that compels access to pretrial discovery materials prior to conclusion of a proceeding. Public Citizen addressed the question of whether a court can modify a previously existing protective order *after a case has been settled* to allow public access to previously protected evidence. It does not concern the issue of whether a protective order should be granted in the first instance. The Public Citizen Court noted that claims of constitutional public access rights to pretrial discovery materials had been foreclosed by the Supreme Court's decision in Seattle Times, supra. Given this language in a case cited by Plaintiffs it is interesting that Plaintiffs never mention Seattle Times.

Defendants are loathe to repeat their initial arguments, thereby wasting the Court's valuable time, however one misrepresentation in Plaintiffs' brief demands correction. Plaintiffs claim that, "the only case the movants can cite in support of the prior restraint and seal they seek is Rosado, 1994 WL 700344 *6." (Plaintiffs' Memo at 21.) This statement is false. Defendants cited to five cases which held that similar

cause reasons for such a protective order include: ensuring a fair and unbiased jury pool, giving the litigants their Constitutional right to try their case in court before a jury as opposed to in the press, and to protect the privacy of parties and non-parties by preventing them from being subject to embarrassment and undue harassment that could result from dissemination of emotionally charged and potentially irrelevant and inadmissible information.  Moreover, may it not be forgotten that "discovery involves the use of compulsory process to facilitate orderly preparation of trial, not to educate or titillate the public" and thus "protective orders are useful to prevent discovery from being used as a club by threatening disclosure of matters which will never be used at trial." Joy v. North, supra;  also see, Welch v. Welch, supra.  There is a compelling need for this proposed Order; to prevent abuse of the discovery process by misuse of the information to support the types of factual misrepresentations and demagoguery that permeates Plaintiffs' Memo.  Defendants' fear of such misuse of discovered information is real and reasonable in this case.

3.      **The proposed Protective Order does not violate the Connecticut Freedom of Information Act, and the issue is not relevant to this matter in any case.**

This case is a matter for determination under the Federal Rules of Civil Procedure. Defendants submit that this Court is not even bound to consider the confluence of the requested protective order with what is a mater of state law.  This is a federal issue.  However, the question is moot, because, again, the Defendants reiterate that the proposed Order would not and is not intended to prevent anyone from seeking public records pursuant to that statute.  As is clearly stated in Defendants' initial brief on this matter and as provided by the proposed Order itself,

---

protective orders were warranted and did not violate the Constitution, one of which was the Seattle Times decision.

nothing in the Order prevents a party from seeking access to specific records via the Connecticut Freedom of Information Act upon request to the Court. Finally, it should be noted that the proposed Order was intentionally drafted to address all legitimate concerns raised by Plaintiffs' Memo, and was based on several samples of similar protective orders granted and/or drafted by the courts. See Welch, 2003 WL 21689656 at *5; Rosado, 1994 WL 700344 at *7-8; In re Agent Orange Product Liability Litigation, 96 F.R.D. 582, 585-87 (E.D.N.Y. 1983).

## CONCLUSION`

Defendants request that their request for a protective order in this case be granted by the Court to prevent the misuse of the fruits of discovery by the Plaintiffs to the Defendants' undue and unjustified prejudice.

Done at Stamford, Connecticut, this 14th day of October, 2003.

By: _____
Robert B. Mitchell, ct02662
Margaret M. Sheahan, ct05862
For: Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601-7006
(203) 330-2000
Facsimile (203) 576-8888

ATTORNEYS FOR:
CITY OF BRIDGEPORT,
EARL PETTWAY and
MICHAEL MAGLIONE

BPRT/1.1/MMS/493981v1

10

**news** fairfield county weekly    fairfieldweekly.com | news, arts & entertainment weekly for the fairfield county area

home    news    music    film    geek    lifestyle    dining    calendar    columns    guides    classifieds    personals

## Secret Society Within Bridgeport Fire Dept.
### Mayor's office, fire chief in the dark regarding the Anglo-dominated, crypto-organization BFME

by Robert Masterson - July 17, 2003

F ollowing a meeting on Monday, July 14, with members of the Bridgeport Fire Department, Ned Winterbottom from Director of Labor Relations for the city and Caryn Kaufman, spokesperson for Mayor John Fabrizi, it was clear that neither Fire Chief Michael Maglione, Provisional Deputy Chief Patrick Shevlin nor the city's executive branch know any more about a secretive organization, The Bridgeport Firefighters for Fair Merit Employment Inc., than does this publication or the public.

Despite being requested by both the mayor's office and the fire chief to attend the meeting in order to explain the BFME's purpose and goals, BFME President Lt. John MacNichol was a no-show. The BFME's attorney of record, Bridgeport's Richard Albrecht, has refused to provide any information in response to the *Weekly* 's numerous requests for the organization's mission and methodology.

A confidential source within the city's payroll department has provided the *Weekly* with a list of firefighters who pay $8 per week in BFME membership dues through a city payroll deduction plan. Nearly one-third of the city's uniformed firefighters are on that list (95 out of 331, a number confirmed by Mayor Fabrizi's office) and the majority of ranking officers, 60 percent of those holding the rank of captain and above (21 out of 35), are members. While the fire department's membership is approximately 40 percent minority (black, Latino, female) the members of BFME are all male and all but "one or two" were identified by the mayor's office as being Caucasian.

Among those high-ranking officers are the department's chief of operations, Brian Rooney, the administrative chief, Wallace Thomas, the head of the fire marshal's division, Bruce Collins, the head of the department's training division, Thomas Conner, and the head of BFD's maintenance division, William Bracket.

Still, Chief Maglione and his aide, Provisional Deputy Chief Shevlin (whose names do not appear on the payroll list), say they have never discussed this incarnation of BFME with anyone (including members Lt. Michael Shevlin, the deputy chief's brother, and Firefighter John Maglione, the chief's second cousin) at any time. Chief Maglione and Deputy Chief Shevlin admit to belonging to the organization in the past, and both say it has been years since the group was active and even longer since they'd participated in any of the group's activities. As to BFME's current role in the department, Maglione and Shevlin claim ignorance, saying that to the best of their knowledge, BFME has not done anything to affect the department in any way in years.

"Because we were not party to the most recent reactivation [of BFME] and the meetings that transpired recently, we really don't know that the object of their

search

GO

browse the archives    GO

**more in this section**

Liar in Chief
(07/17/03)
by By John Dean

Your Money and Your Life
(07/17/03)
by Carole Bass

What Does Future Hold for Our Water Supply?
(07/17/03)
by By Mimi Luse

Media Wars at Stamford Hospital
(07/17/03)
by Robert Nixon

Will Pilot Program Put An End to Absentee Ballot Abuse in Bridgeport?
(07/17/03)
by Joe Miksch

Getting Personal with Poor Saul
(07/17/03)
by Joe Miksch

section archives »

**in depth**

Behavior is Truth
(10/09/03)
by Robert Masterson

Censored!
(10/09/03)

existence is the same as it was "or 20 years ago," Shevlin said. Back th he continued, the purpose of BFME was "to preserve the civil service system as it existed."

Does it disturb them that the majority of the department's high-ranking officers currently belong to BFME?

"No," said Maglione. "But, and this is just my opinion, if I thought civil service was being threatened, I might become part of an organization working to protect civil service."

T he *Weekly* 's attempts to verify current BFME membership with fire department personnel on that list have been rebuked or met with a thunderous silence. The ranking fire officers identified on the payroll list as paying dues to the BFME and that the *Weekly* has attempted to contact have either refused to speak (often hanging up when I identified myself) or to return numerous telephone calls to their offices.

According to Kaufman and Winterbottom, there is an administrative process by which the payroll office implements any automatic deduction plan, a process for the city to confirm a group's legitimacy and verify its ability to accept funds. If firefighters (or any city employees) are allowed to have money deducted from their paychecks and electronically deposited into another bank account on behalf of another person or organization, that person or organization has to be city approved. The same is true for a charitable deduction, a claim against wages as part of a legal settlement or a political contribution.

The problem, say both Kaufman and Winterbottom, is that the city of Bridgeport's process has been "loose" and loosely overseen. The dearth of paperwork accompanying BFME's January 2003 request to reinstate its dormant payroll deduction plan gives no indication of the group's *raison detré* .

A recent decision from the 2nd U.S. Circuit Court of Appeals agreed with a lower court ruling that said the Connecticut State Employee Campaign Committee did not violate the Constitution when it removed the Boy Scouts of America from eligibility to utilize a payroll deduction system to accept donations. The Boy Scouts exclusion of homosexuals within its organization, a right protected by U.S. Supreme Court, nonetheless removes it from the kind of even playing field government-sponsored programs seek to create.

The BFME was vetted by the city and approved for business. It's just that no one seems to know what that business really is. Kaufman told the *Weekly* she'd try to find out, and, in a series of conversations lasting nearly a week, Kaufman admitted that not only did the mayor's office have no knowledge of BFME, it's purpose or goals, but that ranking fire department officers did not return her phone calls. Despite her assurance that she would gather information and relay it to the *Weekly* , as of press time, no information has been forthcoming from the mayor's office. Monday's meeting was arranged by Kaufman (acting on the mayor's authority) but, since BFME president MacNichol was absent, proved less than illuminating in regard to that organization.

I n the light of the recent appeals court decision, it seems likely that these questions and more need to be answered to determine if the BFME should be permitted to continue using a city payroll deduction plan.

Cited by Chief Maglione as the only public action he could attribute to the

By Camille T. Taiara

No Child Left Unharassed
(10/09/03)
by Adrian Brune

Politics archives »

related stories

Sexual Harrassment at BFD?
(08/28/03)
by Robert Masterson

by this author

ROBERT MASTERSON

Behavior is Truth
(10/09/03)
by Robert Masterson

A Secret History of Pain
(10/02/03)
by Robert Masterson

Sowing Seeds of Discontent
(10/02/03)
by Robert Masterson

author archives »

BFME, a letter sent on March [ ] BFME attorney Albrecht to his offic[ ] d the Fire Commission of the City of Bridgeport (and copied to Jack Colligan, personnel director for the Bridgeport Civil Service Commission) requested recognition of the group as an officially sanctioned lobbying group "to preserve and enforce the competitive Civil Service system...." Maglione told the *Weekly* that the Fire Commission asked for clarification and specifics regarding the group's mission and goal and, as that information has not been forthcoming, has withheld official recognition for the BFME.

The BMFE does exist, however, without the official recognition. Using that leaked payroll list of 95 firefighters, a small group of firefighters not affiliated with BFME did some number crunching on their own time and, without naming names, presented an analysis of the BFME's impact on current BFD personnel demographics to various interested parties around the city (including the *Weekly* and local firefighters associations).

The report's authors identified 98.9 percent of BFME's membership as white (94 out of the 95 known members; at the July 14 meeting, Kaufman said the mayor's office had identified two members as Hispanic). The total BFME membership paying dues through payroll deduction now stands at 28.8 percent of Bridgeport's uniformed firefighters. Three-quarters of BFD's deputy chiefs/provisional deputy chiefs or an equivalent rank belong to BFME; two-thirds of assistant chiefs/provisional assistant chiefs are BFME members; more than 50 percent of Bridgeport firefighters holding a rank of captain or its equivalent are members of this secret society (only 29 percent of firefighters holding the rank of lieutenant or below belong to the BFME).

No one from Local 834 would return phone calls. When we were able to finally speak, briefly, with acting union president Thomas Hanko on Friday, July 11, he claimed to have no knowledge of the organization. That is odd since Hanko's name appears on the list of firefighters, the list supplied by an confidential city source, paying BFME dues through payroll decuction.

BFME attorney Albrecht is also defending Local 834 in a federal sexual discrimination and harassment lawsuit now in litigation [see "House on Fire," June 12, and "BFD Case Propelled Forward," July 10]. Albrecht refuses to reveal his BFME's purpose or activities and denies any conflict of interest in representing a select and secret group of predominately white firefighters while simultaneously representing the union's all-inclusive membership.

Why all the secrecy? Perhaps the analysis of membership as presented in the aforementioned report speaks for itself.

A s to the chief's assessment that the BFME has no affect upon the department and seems not worth his curiosity, officers in other BFD organizations beg to differ.

"This is command staff," said Hispanic Firefighters Association President and Provisional Fire Marshal Ronald Morale. "They know about my organization, they know about the Firebirds organization. Two deputy chiefs and a fire marshal belong [to BFME] and [Maglione and Shevlin] say they don't know anything? That's ridiculous. What does that say about command? If they can't figure it out, if they don't know what's going on in their own department, they don't belong in command...."

And what affect does the existence of this secretive organization within the

department have on morale?

"[The BFME's existence] affects morale on a day-to-day basis," Morales continued. "You have white command officers who are members of this organization. The chain of command is composed of members of this secret organization...there's no trust. How does anybody know who is handling the issues that move through the chain of command? I'm concerned that, in 2003, the department has a secret, mostly white organization throughout the whole chain of command. As a Hispanic, as a Latino, I am uncomfortable having members of a secret organization... composing the majority of the upper ranks of chain of command and that the chief sees no problem with that."

Retired Lt. Ron Mackey, vice-president of Bridgeport's Firebird Society, the local chapter of the International Association of Black Professional Fire Fighters, likewise looks askance on the BFME.

"Particularly with the No. 2 and No. 3 chiefs in the department, one who is in charge of the budget and the other with sole discretion over transfers and assignments," he said.

"I've not talked to a single black firefighter on the job who has been approached to join the BMFE," added retired Capt. Donald Day, 1st assistant director for the Northeast Region of the International Association of Black Professional Firefighters. "When we asked about joining, we were told [by BFME members], 'You don't want to join this. You can join, but you don't want to.'"



Copyright © 1995-2003 New Mass Media. All rights reserved.
privacy | info | advertising | contact

**news** fairfield county weekly    fairfieldweekly.com | news, arts & entertainment weekly for the fairfield county area

home | news | music | film | arts | lifestyle | dining | calendar | column | guide | classifieds | personals

## Full Disclosure
### Mayor demands mission statement from secretive firefighters organization

by Robert Masterson - July 24, 2003

On Monday, July 21, State Sen. Ernest Newton called the *Weekly* to report that he'd had a discussion with Bridgeport Mayor John Fabrizi regarding the secretive society operating within the city's fire department, The Bridgeport Firefighters for Merit Employment Inc.

"I reminded the mayor that the Ku Klux Klan was a secret society," Newton said. "These were respectable people--doctors, lawyers, businessmen--and at night, they put the hoods on. There is no place in the 21st century for this kind of thing."

Newton said that he has also contacted Connecticut State Attorney General Richard Blumenthal to take a good hard look at the BFME and its status within a municipal entity.

WWW.SENATEDEMS.STATE.CT.US/



State Sen. Ernest Newton.

The mayor's spokesperson, Caryn Kauffman, confirmed that Mayor Fabrizi had set the deadline at the close of the business day, Tuesday, July 22, for the BFME to produce a mission statement and an explanation of the organization and its activities.

Originally scheduled to appear at a press conference on July 14, BFME President John MacNicholl was a no-show. Now, City Hall has set a deadline for the organization to explain itself to the public. Should such an explanation fail to appear, the city will suspend the BFME's use of its payroll deduction plan, Kauffman said.

Since MacNicholl skipped the July 14 meeting and refused to explain the purpose and goals of the BFME, the *Weekly* asked around and found two members of the Bridgeport Fire Department willing to discuss their experiences with the BFME.

Provisional Supervisor Ishmael Pomales, a 27-year veteran of Bridgeport Fire Department, shared his experience with the good old BFME of yore.

"This was 1985 or 1986. I was a rookie, just new on the job," Pomales

search
GO

browse the archives    GO
more in this section

American Gothic It's All Black & White (07/24/03)
by Brita Brundage. Photos by Caryn B. Davis. Photos by Caryn B. Davis. Photos by Caryn B. Davis. Photos by Caryn B. Davis. Photos by Caryn B. Davis

Studying War (07/24/03)
by Robert Masterson

A Well-Worked Sentence (07/24/03)
by Paul Bass

Republicans Tap Torres (07/24/03)
by Joe Miksch

Wreaking Vengeance on AOL (07/24/03)
by Joe Miksch

Body Count Up, Answers Few (07/24/03)
by Robert Masterson

section archives »

in depth

Behavior is Truth (10/09/03)

a weekday. I figured it had something to do with the union; I had no idea what it was. I was naïve. I walked into the hall and then-Chief DeCarlo looked at me and asked, 'What are you doing here? You have to be a paying member.'

"I said, 'How much?'"

"He said, 'A buck a week.'"

"I said, 'Sign me up.' I felt extremely out of place; I was the only Latino in a room full of 50 or 60 white guys and it turned out that they were voting that day on whether to hire a lawyer and oppose [a federal consent decree] to integrate the Bridgeport Fire Department [Pomales was a plaintiff in the lawsuit that had resulted in that federal order].

"That was my first, last and only meeting with the BFME...I do really love my job. It's been almost 30 years of struggle and we've made a lot of progress. But there is still a long way to go."

Another Bridgeport firefighter who belonged to the BFME for three years questioned the organization's purpose when he asked for its help just two years ago.

"I scored first on a promotion examination," Inspector Frank Gerardi related, "but the job went to someone who scored lower than me...I went to BFME treasurer [Provisional Assistant Chief William] Haug and asked him what we could do about it and he just laughed at me. I was upset and he basically just said 'fuck you'..."

The BFME, an organization described by Deputy Chief Michael Shevlin as orignally created to "preserve the civil service system as it existed," seemed uninterested in taking up Gerardi's cause. What Shevlin and others who parrot that definition fail to mention is that the civil service system "as it existed" ensured an all-white, all-male fire department. It took a federal judge, T. Gilroy Daly, in the early 1980s to order an adjustment to the system to allow black, Hispanic and female citizens a chance at one of the most lucrative blue-collar careers. The BFME was formed following that decree.

Within a few days of the confrontation where Gerardi hoped the organization would support his claim for promotion based on civil service examination scores, he was dropped (with no notification or explanation) from the BFME payroll deduction plan. Gerardi credits his association with black and Hispanic firefighters, with black and Hispanic people in general, with alienating the BFME and leading to his dismissal from the organization.

So, now we wait on the BFME to explain itself, for the organization to step foward and away from the cloud of secrecy with which it has cloaked itself.

While the mayor and the fire chief and the public await the revelation, a BFME member, Firefighter Robert Whitbread, has just won the presidency of Local 834 as the union prepares for federal Judge Alfred V. Covello's personal visit to review its files in regard to the matter of Elizabeth Schiller and Johanna Georgia's sexual harrassment and sexual discriminiation lawsuit, the case around which all this controversy revolves.

Censored!
(10/09/03)
by Camille T. Taiara

News to Me
(10/09/03)
by Joe Miksch

Crime archives »
Politics archives »
Public Opinion
archives »

**related stories**

Who's More Qualified
to Lead Bridgeport?
(10/09/03)
by Joe Miksch

Battleground
Bridgeport
(09/18/03)
by Robert Masterson

Domino Effect Drops
Ball
(09/18/03)
by Brita Brundage

related archives »

**by this author**

ROBERT
MASTERSON

Behavior is Truth
(10/09/03)
by Robert Masterson

A Secret History of
Pain
(10/02/03)
by Robert Masterson

Sowing Seeds of
Discontent
(10/02/03)
by Robert Masterson

author archives »

**news** fairfield county weekly | fairfieldweekly.com | news, arts & entertainment weekly for the fairfield county area

home  news  music  film  arts  lifestyle  dining  calendar  columns  guides  classifieds  personals

BFME "Revealed"
The mayor and the chief are complacent; serious questions remain

by Robert Masterson - July 31, 2003

search
GO

browse the archives  GO
more in this section

I n answer to Mayor John Fabrizi's demand, the Bridgeport Firefighters for Merit Employment Inc. submitted a mission statement (of sorts) to avoid suspension of its use of the city's payroll deduction service that collects $8 a week from the city paychecks of its 95 members. Described by some nonmember and former member firefighters within the department as a racist organization whose purpose is to thwart so-called minority (female, black and Hispanic) inclusion or advancement within the fire service, BFME prepared and sent a letter to the mayor, just squeaking it in before his Tuesday close-of-business deadline (see sidebar).

ROBERT MASTERSON PHOTO



Ernest Newton: "The Ku Klux Klan was a secret society, too... I'm not against anyone having a club, but I am against anyone trying to roll back time."

"Mayor Fabrizi is satisfied to the point where he will not suspend the payroll deductions," said Caryn Kauffman, spokesperson for the mayor's office last Friday. "But he's still moving forward in setting some criteria that all organizations will have to meet to use that city service."

According to Kauffman, all organizations now using Bridgeport payroll deduction will be restructured and asked to comply with the new disclosure rules. No word from the mayor yet as to when any of this might occur.

As of Friday morning, July 25, two full days and counting after the BFME letter had been delivered to the mayor's office, Bridgeport Fire Department Chief Michael Maglione spoke briefly with the *Weekly* about his assessment of that letter's contents.

"I haven't seen it," Maglione said. "It doesn't concern me."

T he mayor is satisfied and the chief isn't concerned. That's odd because much of the Bridgeport community does not share their sentiments. In the third largest city in Connecticut where the population is 60 percent black/Hispanic, the fire department's lopsided composition (more than 60 percent white, most of whom actually live outside Bridgeport), the presence of an organization that is working, in the word's of Provisional Deputy Chief Patrick Shevlin, to "preserve civil service as it existed" is disturbing to say the least. More than half the officers holding the rank of captain or above in the department are members of the BFME and "civil service as it existed" required federal intervention to

Fixin' for a New Mayor
(07/31/03)
by By Brita Brundage & Joe Miksch

Know Your Rights
(07/31/03)
by Joe Miksch

Old Economy Republican
(07/31/03)
by Robert Nixon

Unions: We Need a Few Pro-Tax Republicans
(07/31/03)
by Robert Nixon

Credit Check: You're Worthless
(07/31/03)
by Joe Miksch

Picking and Choosing
(07/31/03)
by Robert Masterson

The CEO and the Security Guard
(07/31/03)
by By Patrick Whittle

section archives »

in depth

Behavior is Truth
(10/09/03)
by Robert Masterson

allow so-called minorities over 42-A the chance to enter the over whel mu 15/2003   Page 19 of 26
white, overwhelmingly male Bridgeport fire service.
Case 3:00-cv-00482-AWT   Document 111   Filed 10/15/2003

Other media (with the notable exception of the *Connecticut Post* , Bridgeport's daily "paper of record") have picked up the story. Local radio station WICC-600AM's afternoon talk show host Citizen Smith has devoted at least five segments over the last few weeks to the Bridgeport Fire Department and has invited this writer on the air twice to discuss the BFME. Local cable television's News12 Connecticut ran a story last week inquiring into the BFME and racism within the fire department.

More significantly, local politicians are beginning to ask questions about the BFME's existence and its role in the city's fire department.

S tate Sen. Ernest Newton cast his eye toward the BFME after reading "Secret Society within Bridgeport Fire Department" [July 17] and initiated meetings with the mayor to discuss the organization as well as contacting state Attorney General Richard Blumenthal's office about the role BFME plays in the city. Characterizing BFME Vice President Richard D'Onofrio's letter as "bogus," he spoke with the *Weekly* last Friday.

"[Firefighters] can have a club," Newton said. "But that club ought to promote inclusion, it ought to do something for the community like give scholarships, host dances...It ought to be more about bringing us together instead of dividing us. Yeah, you can have an organization, but spell it out, tell us, 'This is what we stand for.' Don't hide. The Ku Klux Klan was a secret society, too...I'm not against anyone having a club, but I am against anyone trying to roll back time."

Newton is working with Bridgeport City Council President Andres Ayala to clarify the situation.

"We're trying to set up a meeting with the three groups [the Firebirds, a black professional firefighters association, the Hispanic Firefighters Association and the BFME], the mayor, state Sen. Ernest Newton and myself," Ayala said. "We received the same letter you did. I find it curious that at the 23rd hour they fax over this letter when the organization was founded about 25 years ago...Right now, there appear to be serious problems with this organization...the [city council's] black and Hispanic caucuses are meeting with the leadership of the Firebirds and the HFA to learn more and we will meet formally soon, probably within a week..."

Whatever the BFME agenda may truly be, it seems as if just a modicum of transparency, just a bit of openness, would do much to relieve community concerns but, judging from the letter D'Onofrio sent to the mayor, there is a way to go before that particular organization reveals itself, its purpose, its goals and its methods.

As the sexual harassment and discrimination case of Georgia and Schiller v. The City of Bridgeport, et.al moves swiftly toward open court, the can of worms this case has opened continues to wiggle and squirm. As Federal Judge Alfred Covallo, in a highly unusual action, prepares to visit Bridgeport Firefighters Local 834 to personally review union files in answer to the plaintiffs' motion for discovery, a BFME member, firefighter Robert Whitbread, has won the union's presidency and, apparently, appointed another BFME member to prepare those files in anticipation of Judge Covallo's visit.

(10/09/03)
by Camille T. Taiara

No Child Left
Unharassed
(10/09/03)
by Adrian Brune

Politics archives »

**related stories**

Full Disclosure
(07/24/03)
by Robert Masterson

**by this author**

ROBERT
MASTERSON

Behavior is Truth
(10/09/03)
by Robert Masterson

A Secret History of
Pain
(10/02/03)
by Robert Masterson

Sowing Seeds of
Discontent
(10/02/03)
by Robert Masterson

author archives »

'Lack of concern from the mayor's and fire chief's offices may be in vain as it looks like, one way or another, the curtain of secrecy surrounding the BFME has a good chance of being opened.

**BFME's Mission Revealed?** *A copy of this letter was faxed from the law offices of Cohen & Wolf to the Bridgeport mayor's office late Tuesday afternoon, July 22. Another copy was hand-delivered to the mayor's spokesperson, Caryn Kauffman, that same day and a copy was faxed to the Weekly.*

July 22, 2003

Dear Mayor Fabrizi:

Please be advised that Bridgeport Firefighters for Merit Employment, Inc. is a non-profit, non-stock corporation. I serve as the organization's Vice-President and I am a member of its Board of Directors.

Bridgeport Firefighters for Merit Employment, Inc. was formed in 1976 and has recently reactivated. The organization is open to all firefighters in the City of Bridgeport who have an interest in maintaining the merit system in municipal employment. Its mission is to preserve and enforce the competitive Civil Service system, which was enacted to assure that employment and advancement by member public service employees is based on qualification rather than political favoritism or other improper practices.

The organization has decided to reactivate as a result of recent judicial decisions that impact the organization's mission. Further, in light of political changes occurring in the City of Bridgeport, it is expected that a new climate of openness will emerge, and one that is consistent with the organization's mission.

The organization has taken highly visible positions in furtherance of its mission. It is expected that the organization will continue to do so, with a resulting benefit to the entire Civil Service system.

Very truly yours,

*Richard D'Onofrio*



Copyright © 1995-2003 New Mass Media. All rights reserved.
privacy | info | advertising | contact



Fairfield County Weekly: Fire Dept. Controversies Continue    Page 1 of 3

Case 3:01-cv-00452-AVC    Document 109    Filed 10/15/2003    Page 21 of 26



**news** fairfield county weekly | fairfieldweekly.com | news, arts & entertainment weekly for the fairfi

Home | news | music | film | arts | lifestyle | dining | calendar | columns | contests | classified

Fire Dept. Controversies Continue
Instead of just going away, the story matasticizes

by Robert Masterson - August 14, 2003

Each week seems to bring some new twist to the unfolding drama surrounding
the Bridgeport Fire Department. And this week has been no exception.

Last Wednesday, the Bridgeport City Council's Black and Hispanic Caucus had
its first fact-finding meeting and a discussion regarding the Bridgeport
Firefighters for Merit Employment Inc., and that organization's role in the fire
department. Council president and caucus chair, Andres Ayala, councilmen
Anderson Ayala, Warren Blunt, Rafael Mojica, James Holloway, Edwin
Gomes, Charles Clemons and councilwoman Maria Valle met with members of
the Firebird Society of Bridgeport, the Black professional firefighters
association, the Hispanic Firefighters Association and attorney Susan Wallace,
who represents two female firefighters, Elizabeth Schiller and Johanna Georgia,
in their federal civil rights lawsuit against the city and the fire department.

"Racial tension in the Bridgeport Fire Department is high," retired Lt. Ron
Mackey, president of the Firebirds, told the caucus. "The chief has done
nothing; the mayor has done nothing and if we're here just to vent our
frustration, we're in the wrong place."

In a letter to Bridgeport Mayor John Fabrizi dated July 22, BFME Vice-
President Richard D'Onfrio stated that "political favoritism [and] other improper
practices" necessitate his organization's existence.

"We need to clarify these accusations," provisional Senior Inspector Ron
Morales told the caucus. "They just can't claim that there has been 'political
favoritism' or 'improper practices' in the department without backing it up. What
are the specifics?"

Mackey, Morales, retired Capt. Donald Day of the International Association of
Black Professional Firefighters and attorney Wallace spent more than an hour
briefing the caucus on their perceptions regarding the actions, history, purpose
and goals of the BFME (see www.fairfieldweekly.com for numerous articles in
the last two months on BFME and the Bridgeport Fire Department). The upshot
of the meeting was a motion from Councilman Blunt to request a meeting
between the caucus, Mayor Fabrizi, Fire Chief Michael Maglione, the city's
director of civil service, John C. Colligan, and representatives from the minority
firefighter organizations to clarify the BFME's charges and motives.

search

browse the
more in thi

The Long V
of the Law
(08/14/03)
by Joe Mik

Unfinished
(08/14/03)
by Robert I

GE PCBs ii
Housatonic
(08/14/03)
by Robert I

Ill-Gotten T
(08/14/03)
by Joe Mik

Direct Dem
Action
(08/14/03)
by Robert I

Eject Bush
(08/14/03)

section arch

in depth

Behavior is
(10/09/03)
by Robert I

Censored!
(10/09/03)
by Camille

Fairfield County Weekly: Fire Dept. Controversies Continue    Page 2 of 3

Case 3:01-cv-00452-AVC    Document 109    Filed 10/15/2003    Page 22 of 26

Also at that caucus meeting, attorney Wallace distributed a fire department memo she had found during the discovery process preceeding her client's lawsuit going to trial in the next few months. Dated April 16, 2003, the e-mail memo is from provisional Deputy Chief Patrick Shevlin to Battalion Acting Chief Fredrick Haschak regarding Firefighter Roger Kergaravat who was at that time president of the firefighters union, Local 834.

"Your deposition [in the civil rights case brought by Schiller and Georgia against the city and the fire department] is back on for 9 a.m. on Thursday, April 17 at the offices of Pullman & Comley located in the People's Bank Building on Main St. You will be represented by Atty. Bob Mitchell as an agent of the City," the memo states. "You should also be aware that Roger Kergaravat has been assisting the attorney for Schiller and Georgia in her prosectuion of the case. I have made the Executive Board aware of this and am in the process of filing charges against him to the IAFF [International Association of Fire Fighters]. I say this because it is in your best interest to not allow him in the room while you are being deposed. Atty Mitchell [working for the city] is aware of this and he will assist you having Roger removed should you so choose."

While the *Weekly* could not find any evidence of any charges filed with IAFF, we did learn that Shevlin did bring charges against Kergaravat within the department for a completely unrelated procedural matter, the first time in his career that the former union president has been gigged. Still, for the second-in-command of the Bridgeport Fire Department to threaten punishment for a union official assisting union members in good standing in a legitimate grievance and quest for redress against the city says much about how the department is run.

"Clearly, union president Kergaravat was engaged in activity protected under a number of federal and state civil rights laws," noted plaintiffs' attorney Wallace.

Provisional Deputy Chief Shevlin declined comment.

On Friday, Aug. 8, the city's "paper of record," the *Connecticut Post* , finally deigned to publish an article regarding the current controversy surrounding the BFME. Cleverly headlined, "Fire fight spawned as group regroups" and written by Daniel Tepfer, the article presents a decidedly one-sided view of the issue and quotes only Fire Chief Maglione and BFME attorney Richard Albrecht (though the article does lift a statement by state Sen. Ernest Newton from this publication).

When the *Weekly* contacted Mackey and Morales to see if Tepfer might have spoken to them in preparing his article, both replied "no."

Tepfer also reported that "the Firebirds and the Hispanic association have for some time been demanding that Maglione's office circumvent the city's civil service regulations" and attributes the statement to BFME (and Local 834) attorney Richard Albrecht. A rather serious charge, that one, completely unsupported and vigorously denied by Maglione ("...[no] group has put pressure on him to circumvent civil service regulations," writes Tepfer). Mackey and Morales likewise deny Albrecht's accusations.

No Child L
Unharassed
(10/09/03)
by Adrian F

Investigativ
»
Politics arc

related stor

Who's Mor
to Lead Br
(10/09/03)
by Joe Mik

Battlegroun
Bridgeport
(09/18/03)
by Robert N

Domino Ef
Ball
(09/18/03)
by Brita Br

related arch

by this auth

MA

Behavior is
(10/09/03)
by Robert I

A Secret H
Pain
(10/02/03)
by Robert I

Sowing Se
Discontent
(10/02/03)
by Robert I

author arch



Copyright © 1995-2003 New Mass Media. All rights reserved.
privacy | info | advertising | contact



Bridgeport Firefighters for Merit Employment, Inc.
P.O. Box 320546
Fairfield, CT  06825

July 22, 2003

**Via Facsimile 576-3913**
**and U.S. Mail**
The Honorable John M. Fabrizi
City of Bridgeport
999 Broad Street
Bridgeport, CT  06604

Re:  **Bridgeport Firefighters for Merit Employment, Inc.**

Dear Mayor Fabrizi:

Please be advised that Bridgeport Firefighters for Merit Employment, Inc. is a non-profit, non-stock corporation.  I serve as the organization's Vice President and I am a member of its Board of Directors.

Bridgeport Firefighters for Merit Employment, Inc. was formed in 1976 and has recently reactivated.  The organization is open to all firefighters in the City of Bridgeport who have an interest in maintaining the merit system in municipal employment.  Its mission is to preserve and enforce the competitive Civil Service system, which was enacted to assure that employment and advancement by member public service employees is based on qualification rather than political favoritism or other improper practices.

The organization has decided to reactivate as a result of recent judicial decisions that impact the organization's mission.  Further, in light of the political changes occurring in the City of Bridgeport, it is expected that a new climate of openness will emerge, and one which is entirely consistent with the organization's mission.

The organization has taken highly visible positions in furtherance of its mission.  It is expected that the organization will continue to do so, with a resulting benefit to the entire Civil Service system.

Very truly yours,

Richard D'Onofrio

**CERTIFICATION**

Pursuant to Fed. R. Civ. P.5 (b), I hereby certify that a copy of the above was mailed on October 14, 2003 to all counsel and pro se parties of record.

Susan V. Wallace
11 Blue Orchard Drive
Middletown, CT 06457

John R. Mitola
John P. Bohannon, Jr.
Office of the City Attorney
999 Broad Street
Bridgeport, CT 06604

Richard L. Albrecht
Cohen and Wolf, P.C.
1115 Broad Street
P.O. Box 1821
Bridgeport, CT  06601-1821

_____
Robert B. Mitchell

BPRT/1.1/MMS/493981v1