UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELIZABETH SCHILLER                    :        NO: 3:01cv00452(AVC)
    Plaintiff                              (ALL CASES)

                        :

JOHANNA S. GEORGIA
    Plaintiff                         :

v.                                    :

CITY OF BRIDGEPORT; ET AL.
    Defendants                        :        OCTOBER 22, 2003


**PLAINTIFFS' OPPOSITION TO CITY OF BRIDGEPORT'S**
**MOTION FOR ORDER DATED SEPTEMBER 30, 2003,**

I.      FACTS AND BACKGROUND

    A.      Background

The above-captioned matters are consolidated civil rights actions brought by two female

firefighters alleging unlawful discrimination, harassment and retaliation in their employment in

the Bridgeport Fire Department.

    Discovery is still in process, due to numerous failures and refusals of the defendants and a

nonparty (Roger Kergaravat) to comply with the Plaintiffs' discovery requests subpoena duces

tecum and various orders for compliance. Pending decision on the defendants' and Kergaravat's

Motion seeking a blanket protective order on all discovery in this action, the Court granted a stay

on further discovery. Despite the stay of discovery order that the defendants sought, the City of

Bridgeport subsequently filed the instant Motion seeking additional discovery. Moreover, despite

the defendants' pending demand for a comprehensive protective order, and the existence since

<u>May 2003 of an order in this action prohibiting public disclosure of the plaintiff's medical information and records adduced in discovery, including deposition testimony thereof, and requiring sealed filings of any pleadings containing this information</u>, the City has now revealed this information and records on the public court record, through the text and exhibits in its instant Motion.

To wit, the City seeks an order "requiring Plaintiff, Johanna Georgia, to authorize those health care providers identified by her in the course of her deposition on April 22, 2003, as doctors treating her at the time of said deposition, to testify at deposition and to reveal records of said treatment relevant to the question of Plaintiff Georgia's competency to testify." Included as attachments to said Motion are several pages of the transcript of Johanna Georgia's deposition of April 22, 2003, containing examination pertaining to her confidential medical history and treatment (<u>see</u> Exhs. A and C of Df's Motion), and copies of correspondence between counsel and with Chambers, again containing Firefighter Georgia's confidential medical history and treatment (<u>see</u> Exh. C of Df's Mot.). The City also attaches what appear to be copies of pages from internet websites describing various medications that Firefighter Georgia has been or is being treated with (<u>see</u> Exh. B of Df's Mot.). The body of the Motion also discusses and discloses, on the public court record, Firefighter Georgia's confidential medical history and treatment (Df's Mot., p. 2).

The substantive question before this Court is whether the City is even entitled to this information, which it never requested in discovery, and which it does not even claim has any relevance to any claim or defense.

2

There is also the question of whether the City should be permitted to open this new area of discovery some six months after they learned of this medical information in Georgia's April 2003 deposition, but moreover, many months, <u>years</u> even, after having obtained this medical information repeatedly as the self-insured provider of Workers' Compensation benefits to Georgia for the workplace injury this treatment is for.

But these questions, and the question of sanctions, are answered by a Protective Order entered by this Court in these consolidated cases on May 5, 2003, "prohibiting dissemination and public disclosure in any manner of the deposition tapes, transcripts, exhibits, including treatment reports and records, and confidential and otherwise legally protected information contained therein, which has been or will be released to the defendants and their counsel by the plaintiffs' respective medical and psychological treatment providers, with the exception of:

    (a) dissemination to expert witnesses, with reasonable steps taken by the disseminating party to instruct such expert witnesses to protect the documents and information from further dissemination and public disclosure;

    (b) depositions and court filings in the above-captioned consolidated cases, provided that <u>any introduction into court prior to trial shall be on an in camera or other basis which will reasonably protect the privacy of such documents and information</u>" (emphasis added).

The City's conduct in filing Plaintiff Johanna Georgia's deposition transcript and exhibits pertaining to her medical and psychological treatment reports and records on the open court record, with no prior notice to the plaintiff, no effort to reasonably protect the privacy of such

documents and information, and especially when the matter was already being considered "in camera," in Chambers, is a blatant total violation of the aforesaid protective order. In addition, in order to effectively oppose the instant Motion for Orders placed upon the open record, Georgia is forced to repeat and disclose her protected treatment information and records upon the public record. The harm is irreparable.

The City's conduct is all the more egregious in that its instant Motion adds nothing of any substance to what it already provided the Court in camera, where the parties had the opportunity to each be heard, file exhibits, and file rebuttal statement to Chambers. Given the lack of any relevance of the requested medical treatment records and treating physician testimony to claims or defenses in this action, <u>the plaintiffs believe the reason the City filed the instant Motion does not lie within any good faith purpose in this lawsuit.</u>

To wit, throughout this lawsuit, the City has been attempting to terminate Firefighter Georgia. The first attempt came in the form of refusing to provide her light duty (which is routinely afforded to injured or ill male firefighters, for months, years, even permanently) as she recovered from a line-of-duty injury (following filing of this lawsuit). <u>See</u> Amended Complaint of Johanna Georgia, ¶¶ 152-158, 173-180. This has kept Georgia out of the workplace for the past two years, despite numerous demands by her to be returned to work.

A year ago, after having prohibited Firefighter Georgia from working for a year, the City claimed that because she had been out of work for a year, it had to terminate her employment by an involuntarily "medical retirement." Then-Deputy Chief Patrick Shevlin's testimony in his sworn deposition in this action on April 11, 2003, clearly shows that the City tried this without

4

any physician's opinion as to "maximum medical improvement" and whether or not Georgia could perform the essential functions of her job with or without reasonable accommodation, and based solely upon his own layperson's interpretation of unspecified medical treatment records. See Exh A appended hereto: Shevlin depo pp. 69-83. Shevlin testified that in his 27 years with the Bridgeport Fire Department, with over a decade as a union representative, he has never seen a Bridgeport firefighter involuntarily medically retired before reaching "maximum medical improvement." Exh A: Shevlin depo p. 76 lines 6-15. He testified that the proposal to "medically retire" her was withdrawn for that time. Exh A: Shevlin depo p. 81 lines 20-25, p. 82 lines 1-5.

The City resurrected the effort to terminate Firefighter Georgia by an involuntary "medical retirement" only after recent developments in the instant lawsuit favorable to her, i.e., a series of rulings and discovery conferences ordering the defendants (and the nonparty union president) to comply with the plaintiffs' discovery requests, coupled with improvement in Georgia's medical condition such that she can perform the essential functions of firefighter, with or without reasonable accommodation. Certainly, should Firefighter Georgia prevail on her claims in this action that she has been denied light duty and kept out of the workplace due to unlawful sex discrimination or retaliation for having pursued sex discrimination claims, this Court can order the City to allow her to return to work (with reasonable accommodations as necessary).

The City cannot deny that is has always had knowledge of Georgia's medical progress, as it is *self-insured* and its Fire Chief's staff officer managing her pending Workers' Compensation

claim (until his retirement this past month, Deputy Chief Patrick Shevlin) has throughout been receiving regular medical reports on her.

With the improvement in her condition, in August 2003, Georgia made another written request to Deputy Chief Shevlin to discuss reasonable accommodation for her to return to work. The City responded with a letter by Shevlin informing Georgia that the City is now formally petitioning the Bridgeport Board of Fire Commissioners to involuntarily medically retire her.

But the City now faces a significant obstacle to petitioning the Board of Fire Commissioners to medically retire Georgia. In April 2003, new provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA, Title II) went into effect. Specifically, HIPAA prohibits the City, its Workers' Compensation administrator, and Firefighter Georgia's medical treators from disclosing her medical history and records to the Board of Fire Commissioners and from using them in making decisions about her employment status, with substantial civil monetary penalties, and incarceration for criminal violations of this law (42 U.S.C. § 1320d-6).

In a letter dated September 3, 2003, sent by her counsel to the Bridgeport Board of Fire Commissioners, Johanna Georgia expressly claimed the protection of HIPAA and denied consent for said proposed release and use of her confidential medical information and records. This leaves the City only two ways to avoid HIPAA and get Georgia's confidential medical information and records before the Board of Fire Commissioners[1] without her consent: (a) obtain

---

[1] Or any forum other than the state Workers' Compensation Commission, which is partially exempt from HIPAA.

a court order for release, which is unlikely in the face of the clear directives of the statute; and/or (b) get her medical information and records onto a public record before its retirement petition comes before the Board of Fire Commissioners – which has already been accomplished in part by the instant Motion.

City Attorney John Mitola, who has an appearance as counsel for all the defendants in the instant action, despite having been informed by plaintiffs' counsel at the start of this action that he is a material fact witness, and who has also appeared for the City as its designated representative and actually testified at its deposition (which is still open, after he walked out on it), is also simultaneously representing the Fire Chief in seeking the medical retirement of Johanna Georgia, while serving as counsel and legal advisor to the Board of Fire Commissioners as it hears the Chief's petition – which he (Mitola) will present to the Board. It is reasonable to conclude, given City Attorney Mitola's "finger in every pie" and the City's blatant violation already of the existing protective order on the medical information, that any of Georgia's confidential medical information and records pertaining to the injury that is the subject of the termination petition that are disclosed in discovery or placed on the public record in this lawsuit will end up before the Board of Fire Commissioners who, advised by Attorney Mitola, will use it to terminate her before she gets to trial in this case.

Moreover, following the notice that she was being put before the Board of Fire Commissioners for termination due to her injury, without any reasonable accommodation effort, Firefighter Georgia filed a Charge of disability discrimination with CHRO and EEOC, which is pending. It is reasonable to conclude that the City would use a retirement of Georgia, by what is

7

supposed to be an independent Board of Fire Commissioners, for "work incapacity" would be proffered as a defense to her disability discrimination Charges.

Georgia believes that the involuntary "medical retirement" the City is seeking and is furthering by the instant Motion is a pretext for unlawful sex and disability discrimination and retaliation against her. The various federal laws prohibiting retaliation for the exercise of rights, and the HIPAA, and fundamental notions of justice demand that the City's Motion for Order dated September 30, 2003, be denied, and appropriate remedial orders issue to prevent any further harm to the plaintiff.

WHEREFORE, the Plaintiffs seek the following:

1.  That the instant Motion for Order be denied; and

2.  An order of payment of reasonable attorney's fees and costs to the plaintiffs for opposing the Motion; and

3.  Removal of the instant Motion and all related pleadings from the public court record with any hearing on the matters therein held in camera; and

4.  An order restraining the City of Bridgeport and all its officials, agents, employees, and representatives from proffering or furnishing or quoting or referring to or otherwise using any medical information and records about Johanna Georgia contained in the Motion at bar and related pleadings, and all medical and psychiatric information and records which are subject to this Court's Order of Protection issued May 5, 2003, before any board, commission or tribunal outside this Court to involuntarily retire or otherwise limit or terminate the employment of Johanna Georgia by the City of Bridgeport, unless specific consent to such use is hereinafter given voluntarily and knowingly in writing by Johanna Georgia.

**FOR THE PLAINTIFFS,**

Susan V. Wallace, Esq.
11 Blue Orchard Drive
Middletown, CT 06457
Tel: (860) 704-0472  Fax: -0490
law4us@rcn.com
Fed Bar No. CT08134

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing "Plaintiffs' Opposition to City of Bridgeport's Motion for Order dated September 30, 2003" has been served upon:

Robert B. Mitchell, Esq.
Margaret M. Sheahan, Esq.
Thomas F. Maxwell, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006

John Mitola, Esq.
John P. Bohannon, Jr., Esq.
Office of the City Attorney
999 Broad Street
Bridgeport, CT 06604

Richard L. Albrecht, Esq.
Cohen & Wolf, P.C.
115 Broad Street
P.O. Box 1821
Bridgeport, CT 06601-1821

on this _22_ day of October, 2003, via

_✓_    Regular U.S. Mail, first class, postage prepaid

____    U.S. Priority Mail

____    U.S. Express Mail or other overnight mail service

____    Facsimile

____    Hand-delivery

_____
Susan V. Wallace, Esq.

**Plaintiffs' Exh. A**

1    *certain of that.*

2        Q.    What is the date of the letter?

3        A.    I would imagine it's approximately

4    November, December of 2002.

5        Q.    Is there anything else that would

6    be responsive to No. 4 besides what you

7    already testified about?

8        A.    No, not that I'm aware of.

9        Q.    Is there, in fact, a proposal

10   within the Bridgeport Fire Department to

11   terminate or retire Johanna Georgia?

12       A.    There was a proposal to retire her.

13       Q.    Who made that proposal?

14       A.    I did.

15       Q.    When did you make the proposal?

16       A.    Again, in the period of November,

17   December of 2002.

18       Q.    What was the basis of your

19   proposal?

20       A.    The medical documentation that I

21   had in my possession at the time.

22       Q.    What about the medical

23   documentation prompted you to propose

24   retiring Johanna?

25       A.    It appears she was not going to be

70

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    capable of performing firefighter duties any

2    longer.

3      Q.   Has anyone said she reached maximum

4   medical improvement?

5      A.   At that point I believe I had

6   information to that effect.

7      Q.   What do you mean to that effect?

8      A.   At the time I sent Miss Georgia the

9   letter and I actually had a telephone

10   conversation with her too in regard to it,

11   at that point in time I felt I had

12   sufficient documentation to suggest she had

13   reached MMI.

14      Q.   Well, did any doctor tell you that

15   she had been declared to have reached

16   maximum medical improvement?

17      A.   I based my opinion at that time on

18   the medical records that I had in my

19   possession, so the answer is yes.

20      Q.   Well, did any doctor say that, any

21   doctor use those words and say the patient

22   has reached maximum medical improvement and

23   this is the condition?

24      A.   My opinion.

25      Q.   Isn't it true that really what

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    you're doing is conjecturing based on what

2    you're reading in the doctor's file and the

3    conclusion reached regarding maximum medical

4    improvement?

5        A.   No, I don't offer medical opinions.

6        Q.   If the doctor used those words,

7    then where did you come to the conclusion

8    that she had reached, in fact, maximum

9    medical improvement?

10            MS. SHEAHAN:   Object to the

11   form.

12       A.   My interpretation of the documents

13   in my possession at the time I contacted

14   Miss Georgia led me to believe that she

15   would no longer be able to function as a

16   firefighter.

17       Q.   But no doctor gave that opinion,

18   correct?

19            MS. SHEAHAN:   Object to the

20   form.

21   BY MS. WALLACE:

22       Q.   Did any medical doctor give you an

23   opinion stating Johanna Georgia will no

24   longer be able to perform the essential

25   functions of fire-fighting?

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1      A.   Again, based on the materials that

2    I had in my possession at the time, I

3    believe that that was the case, that she was

4    no longer capable of being a firefighter.

5      Q.   I'm trying to get behind what you

6    are interpreting, what you are reading in

7    the documents between what the doctors

8    actually said and any opinions to date now

9    that Johanna Georgia had, in fact, reached

10   maximum medical improvement.

11     A.   I would not have reached that

12   conclusion myself.  So I based my

13   determination at the time on the medical

14   documentation that was in front of me at

15   that time.

16     Q.   Did any doctor ever to your

17   knowledge use the words maximum medical

18   improvement to describe Johanna Georgia's

19   present condition?

20     A.   I would have to quite honestly read

21   all of the documents that I have to say for

22   certainty whether or not that was there.

23     Q.   But you have no recall of that

24   right now?

25     A.   Again, my answer to you is that I

```
 1        used all of the medical documentation at my

 2        disposal at that time to make the

 3        determination that it was time we moved to

 4        retire Miss Johanna Georgia.

 5             Q.   Do you have any medical training?

 6             A.   No, ma'am.

 7             Q.   Do you have any medical records

 8        training?

 9             A.   No, ma'am.

10             Q.   Do you have a college degree?

11             A.   No, ma'am.

12             Q.   Are you in any way certified by the

13        state of Connecticut for any sort of medical

14        job?

15             A.   No, ma'am.

16             Q.   Have you had any training in the

17        Bridgeport Fire Department in interpreting

18        physician's records?

19             A.   No, ma'am.

20             Q.   Have you read any learned treatises

21        on Georgia Johanna Georgia's medical

22        condition?

23             A.   That's a difficult one to answer.

24        As I understand it today, I'm not sure that

25        anybody is certain what her condition is.
```

1    Q.   That wasn't my question.   My

2   question was:  Have you read any learned

3   treatises about her condition?

4    A.   And what I'm saying to you, my

5   knowledge of her case today is that I'm not

6   certain that anybody agrees on what her

7   condition is.

8    Q.   So your answer is that you --

9    A.   Not knowing what her condition is,

10   I cannot answer whether or not I've read any

11   documents regarding her condition.

12    Q.   I didn't ask you about any

13   documents.   I asked about learned treatises.

14              MS. SHEAHAN:  Which is what

15   kind of document, Counsel?

16              THE WITNESS:  That's right.

17   BY MS. WALLACE:

18    Q.   Are you familiar with Gray's

19   Anatomy?

20    A.   I heard of it.

21    Q.   Have you read it?

22    A.   No.

23    Q.   Is it the department's common

24   practice to retire firefighters before any

25   doctor has stated they've reached maximum

1    medical improvement?

2         A.   No, it's not.

3         Q.   To your knowledge in all of your

4    years of representing union employees in the

5    fire department, has any fire department

6    employee been medically retired when, in

7    fact, a doctor has not stated that they have

8    reached maximum medical improvement?

9         A.   I can only answer for the last year

10   and a half.

11        Q.   I'm asking for all of your years

12   spent representing employees as a union

13   representative in the Bridgeport Fire

14   Department, to your knowledge have you ever

15   seen a Bridgeport firefighter or fire

16   officer retired for medical reasons without

17   a doctor having said they have reached

18   maximum medical improvement?

19        A.   In my years as a union

20   representative, no, I have not.

21        Q.   Okay.  And in your years as a

22   firefighter, have you ever seen that happen?

23        A.   As a firefighter, outside of my

24   involvement for a seven-year period with the

25   union and outside of my involvement for the

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    past year and a half as an executive

2    officer, I would have no knowledge whether

3    or not that ever took place.

4         Q.   So your answer is no?

5         A.   Correct.

6         Q.   Have you ever seen that happen as a

7    fire chief?  Have you ever seen a

8    firefighter in the city of Bridgeport

9    medically retired without a doctor having

10   stated that they have reached maximum

11   medical improvement?

12        A.   I have no knowledge of that.

13        Q.   So your answer is no, you've never

14   seen that?

15        A.   Correct.

16        Q.   Who did you discuss terminating or

17   retiring Johanna Georgia with?

18        A.   I discussed her medical history

19   with Berkeley Associates who handles the

20   worker's comp claims for the city of

21   Bridgeport.  And as a result of those

22   discussions and my review of the files in my

23   possession, I made a recommendation to Chief

24   Maglione that they should start retirement

25   proceedings.

77

1    Q.   Did anybody at Berkeley tell you

2    that she had to be retired?

3    A.   No.

4    Q.   Did anybody at Berkeley tell you

5    she would never be able to work as a

6    firefighter again?

7    A.   My recollection is that my

8    discussion with the folks at Berkeley and

9    review of the records in my possession

10   suggested that she would never be capable of

11   being a firefighter again.

12   Q.   Okay.  Did anybody at Berkeley tell

13   you that she would never be able to work as

14   a firefighter again?

15   A.   All they did was offer the medical

16   documentation to me.

17   Q.   So the answer is yes or no; did

18   anybody at Berkeley tell you --

19   A.   I made the determination based on

20   the information I had.

21   Q.   Please, I just want the answer to

22   the question; yes or no?

23   A.   Nobody at Berkeley suggested to me

24   that I retire Johanna Georgia.

25   Q.   Anybody at Berkeley tell you she

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    would never be able to work as a firefighter

2    again?

3        A.    The people at Berkeley provided me

4    with the medical documentation from which I

5    made the determination.

6        Q.    I know that.  That's not my

7    question.  My question is:  Did anybody at

8    Berkeley tell you that she would never be

9    able to work as a firefighter again?

10            MS. SHEAHAN:  Is your question

11    whether they said those words or words to

12    that effect?

13            MS. WALLACE:  Exactly.

14    BY MS. WALLACE:

15        Q.    Did anybody at Berkeley say that

16    to you?

17        A.    No.

18        Q.    Did anybody at Berkeley put that in

19    writing to you --

20        A.    No.

21        Q.    -- this person will not be able to

22    perform the duties of firefighter work or be

23    a firefighter again?

24        A.    No.

25        Q.    In fact, did any physician ever

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    tell you that she would never be able to

2    work as a firefighter again?

3          A.    I believe, as I stated several

4    times now, the medical records at my

5    disposal at the time suggested that.

6          Q.    But no doctor told you that?

7          A.    I did not talk to any physician.

8          Q.    Do you have expertise in

9    occupational health?

10          A.    No.

11          Q.    Have you ever been trained in

12    occupational therapy?

13          A.    No.

14          Q.    Have you ever been trained in

15    occupational studies on injured employees?

16          A.    No.

17          Q.    Is there an occupational expert

18    involved in reviewing Johanna Georgia's case

19    for the city?

20          A.    You know, I'm not sure.  I'd have

21    to look at the file.

22          MS. SHEAHAN:  I need a 5-minute

23    break to make a phone call sometime between

24    now and three, whenever is good for you.

25          MS. WALLACE:  What time is it

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1    now?

2                    MS. SHEAHAN:    2:36.

3    BY MS. WALLACE:

4        Q.    So are we done with No. 4?  Are

5    there any other documents in the Bridgeport

6    Fire Department that would be responsive to

7    No. 4?

8        A.    Not that I'm aware of.

9        Q.    Now this business about retiring

10   Johanna Georgia, you made a recommendation

11   to Chief Maglione.  When did you make the

12   recommendation to him?

13       A.    I believe it was sometime in

14   November, December.

15       Q.    Was anyone else present when you

16   made the recommendation to him?

17       A.    No.

18       Q.    Did you make it orally or in

19   writing?

20       A.    I made it orally and then prepared

21   a written document, which I believe was sent

22   to Miss Georgia.

23       Q.    Okay.  What did Chief Maglione say

24   in response to your proposal?

25       A.    He deferred to my judgment.

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES

1          Q.   So he left it in your hands to

2    decide whether or not my client would be

3    retired?

4          A.   Right.  He asked if I had any

5    documentation at the time to support it and

6    I said yes.

7          Q.   Did he mention it would be in some

8    way to the department's benefit to retire

9    Miss Georgia at that time?

10         A.   No.

11         Q.   Do you think it would be to the

12   department's benefit to retire Miss Georgia?

13         A.   No, I don't.

14         Q.   When you discussed retiring Johanna

15   Georgia, did you have a union representative

16   present?

17         A.   No.

18         Q.   Did you consult the union first?

19         A.   No.

20         Q.   Now at this point is there anything

21   still alive with the proposal to retire

22   Johanna Georgia or has that issue been

23   tabled?

24         A.   Well, tabled, withdrawn.

25         Q.   Okay.

1          A.   I was going to answer that's it's

2     been withdrawn at this time.

3          Q.   She's not under consideration at

4     this time to be medically retired?

5          A.   Not at this time.

6          Q.   Okay.  Is there any other way that

7     Johanna Georgia could be moved from the

8     department given the circumstances that we

9     know of today, in other words --

10               MS. SHEAHAN:  Object to the

11     form.

12     BY MS. WALLACE:

13          Q.   -- not that something else would

14     happen.  Given the circumstances that you

15     know of today, is there any other reason

16     Johanna Georgia could be removed at this

17     time from the fire department?

18               MS. SHEAHAN:  Object to the

19     form.

20          A.   Other than medical?

21          Q.   Right, other than medical injury.

22          A.   Not that I'm aware of.

23          Q.   Are you aware of any complaints or

24     problems with her performance as a

25     firefighter?

1       A.   No.

2       Q.   How about Elizabeth Schiller, are

3  you aware of any problems or complaints with

4  her performance as a firefighter?

5       A.   No, I'm not.

6            MS. WALLACE:   Counsel, can we

7  break?

8            MS. WALLACE:   Sure.

9            (Whereupon a break was taken

10  2:40 p.m to 2:50 p.m.)

11  BY MS. WALLACE:

12       Q.   To your knowledge, at this time

13  does Elizabeth Schiller O'Connell have a

14  union grievance filed for her maternity

15  leave?  I would add to that, or family

16  medical leave?

17       A.   I believe she may have.

18       Q.   Are there any documents in the

19  Bridgeport Fire Department that you know of

20  pertaining to that matter?

21       A.   To the grievance itself?

22       Q.   To the grievance.

23       A.   I would suppose if she filed a

24  grievance regarding her current leave, that

25  I would have documents relating to that in

CAMPANO & ASSOCIATES

COURT REPORTING SERVICES