UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELIZABETH SCHILLER | : | NO: 3:01cv00452(AVC) |
|     Plaintiff | | (ALL CASES) |
| | : | |
| JOHANNA S. GEORGIA | | |
|     Plaintiff | : | |
| | | |
| v. | : | |
| | | |
| CITY OF BRIDGEPORT; ET AL. | | |
|     Defendants | : | NOVEMBER 3, 2003 |

**MEMORANDUM IN SUPPORT OF: FIREBIRD SOCIETY OF
BRIDGEPORT, INC.'S MOTION TO INTERVENE, OPPOSITION TO
MOTION FOR PROTECTIVE ORDER DATED AUGUST 27, 2003,
AND OPPOSITION TO MOTION FOR PROTECTIVE ORDER
AND OBJECTION TO DISCLOSURE DATED SEPTEMBER 4, 2003**

## I. FACTS AND BACKGROUND

The Firebird Society of Bridgeport, Inc. ("the Firebirds"), a fraternal organization of City

of Bridgeport firefighters and fire officers, moves to intervene in this action for the purpose of

opposing the Motions for Protective Orders dated August 27, 2003 and September 4, 2003, filed,

respectively, by the defendants and in the name of Roger Kergaravat.

At issue is a Protective Order sought by the defendants City of Bridgeport, Fire Chief

Michael Maglione, and Deputy Chief Earl Pettway and by a nonparty in the name of "Roger

Kergaravat" which would place a blanket seal on and restrain speech about all records and the

contents thereof obtained through the discovery process.

**ORAL ARGUMENT IS REQUESTED
TESTIMONY IS REQUIRED**

The Firebird Society applied to intervene by Motion dated September 30, 2003. It

opposes the Motions for Protective Orders for the reasons set forth in the Plaintiffs' Opposition

thereto (see Plaintiffs' Opposition and Supporting Memorandum dated September 30, 2003), and

for such additional reasons as are set forth herein.

## II. LAW AND ARGUMENT

### A.    PROCEDURE FOR SEEKING INTERVENTION.

Fed. R. Civ. Pro. 24 (c) provides that "[a] person desiring to intervene shall serve a

motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds

therefor and shall be accompanied by a pleading setting forth the claim or defense for which

intervention is sought."

### B.    THE FIREBIRD SOCIETY OF BRIDGEPORT, INC., SATISFIES ALL REQUIREMENTS TO INTERVENE TO OPPOSE THE MOTIONS FOR PROTECTIVE ORDER.

#### 1.    The Firebird Society meets the standard for "intervention as of right."

Fed. R. Civ. Pro. 24(a)(1), "Intervention of Right," provides that:

Upon timely application anyone shall be permitted to intervene in an action … when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(a)    The Firebirds have a direct and substantial interest in the subject matter of the proposed Protective Order.

For almost three decades, the Firebirds have been an approved §501(3)(c) fraternal and

charitable organization of employees of the Bridgeport Fire Department. Their activities are

open and community-based, including raising funds for charitable events, scholarships, community education and outreach, and morale support and information for their members, and support of diversity in their workplace. Their § 501(3)(c) financial reporting is available to the public, and they have an internet website.

The Firebirds had their origin in a group of persons of color who brought a case under Title VII in this Court in the 1970's and '80's successfully challenging the City's hiring and promotional practices in its Fire Department as discriminatory against Black and Hispanic persons, in favor of White males. See Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 710 F.2d 69 (2d Cir. 1983); Association Against Discrimination in Employment, Inc., et al. v. Robert W. Weeks, Jr., et al., 479 F. Supp. 10 (D. Conn. 1978). See also Association Against Discrimination in Employment, Inc., et al. v. Robert W. Weeks, Jr., et al., 454 F. Supp. 751 (D. Conn. 1978).

This litigation wound its way through the courts over the course of a decade, repeatedly challenged by a group called "Bridgeport Firefighters for Merit Employment, Inc." ("BFME"), which intervened despite no showing that its members' rights were adversely affected by the hiring of persons of color as Bridgeport firefighters. BFME opposed every effort by this Court to remedy the discrimination. The Second Circuit found that BFME is "a nonprofit organization *representing nonminority firefighters within the Bridgeport Fire Department"*; that *"BFME opposed the [remedy ordered by this District Court, Daly, U.S.D.J.] principally on grounds that [it] would increase the number of minority candidates hired by the City,"* and deemed *"all of BFME's attacks on that order ... entirely meritless."*

<u>Assoc. Against Discrimination in Employment, Inc. v. City of Bridgeport</u>, 710 F.2d 69, 98 (2d Cir. 1983).

Since that time, BFME has continued to exist as a White-male-only "secret society" in the Bridgeport Fire Department, incredibly, funded by employee payroll deduction, intervening as a "defendant" or "aggrieved party" to disrupt every lawsuit that seeks to address disparate treatment or impact upon protected class members, now including women, and to maintain the supremacy of White males in this Fire Department. But this group's activities do not stop there.

BFME is represented by Attorney Richard Albrecht, who filed the subject Motion for Protective Order in the name of Roger Kergaravat. Through a union election in July 2003, BFME members assumed majority or total control of the union local officer positions and executive board, and, incredibly, Attorney Albrecht now represents both entities – the certified labor union, and the rogue all-White male group that opposes many of the core tenets the labor union is supposed to be enforcing for all its members in a nondiscriminatory manner.

Approximately two months before the election, three union bosses directly and expressly threatened Kergaravat with removal from union office and misconduct charges if he did not stop cooperating with the Plaintiffs' efforts to protect their rights. Two of these union bosses are Bridgeport Fire Department members and BFME members -- former union president and treasurer of the state level of the firefighters union, Patrick Shevlin, now retired, and the person who replaced Kergaravat as president, Robert Whitbread.

In fact, as the Plaintiffs state in opposition to their Memorandum in Support of Opposition to the Motion for Protective Order, before Attorney Albrecht became involved with

this case, Kergaravat was cooperative with what was supposed to have been a "friendly"

subpoena duces tecum from the Plaintiffs Schiller and Georgia. It was BFME counsel Albrecht

who directed Kergaravat not to comply, and who had Kergaravat put out a notice dated that day

inviting the Plaintiffs' fellow union members to contact Albrecht to take legal action to oppose the

subpoena. *Yet, there had not yet been any union notice and vote on retaining Albrecht to represent the union in any*

*matter at the time of these actions by Attorney Albrecht.* Attorney Albrecht then filed his appearance in the

instant action on behalf of <u>Kergaravat only</u>, and a Motion to Quash for <u>Kergaravat only</u> -- not

on behalf of the union.

True to the union bosses/BFME members' threats, Roger Kergaravat, *who refused to join*

*BFME,* was subsequently ousted from the union local presidency, and brought up on union and

department disciplinary charges. No one has yet entered an appearance in the instant action for

the union or moved for its intervention or joinder.

Moreover, according to Kergaravat, since July 1, 2003, he has not consented to Attorney

Albrecht representing him in any capacity and has not been informed of and does not consent to

or authorize any filings in this action on his behalf or using his name in this action after that date.

Exh. A hereto. <u>These unauthorized filings using Kergaravat's name include the subject Motion</u>

<u>for Protective Order.</u>

A number of the plaintiffs in the 1970's litigation that opened the door to minority

members in this workplace are still employed in the Bridgeport Fire Department and still

members of the Firebird Society seeking to intervene in the instant action. So, too, are a number

of the defendants and key City officials who opposed the litigation to integrate the Bridgeport

Fire Department still employed in positions of authority over personnel decisions, including John

Colligan,[1] then the Director of Personnel and now the head of the City's Civil Service

Commission, and the defendant Fire Chief Maglione who admits BFME membership for years.

Currently, the entire leadership of the Department is comprised of White male BFME members.[2]

The Firebird Society and the Bridgeport Hispanic Firefighters Association, which is also

applying to intervene in this action in opposition to the Motions for Protective Order, have had

to file numerous union grievances, charges of discrimination to the CHRO and EEOC, and

lawsuits battling ongoing discrimination in the recruitment, employment and advancement of

persons of color. They have also had to defend against litigation by BFME and its members

aimed at curtailing their employment and advancement.[3]

Appeal to the union is unavailing. As detailed above, the union's lawyer Richard Albrecht

is simultaneously representing the BFME group found by the Second Circuit to be opposing the

employment and advancement of people of color, in favor of preserving a White male-dominated

---

[1] This Court completely discredited Colligan's factual testimony on the issue of the City's "efforts" to recruit and hiring protected class members. Association Against Discrimination in Employment, Inc., et al. v. Robert W. Weeks, Jr., et al., 479 F. Supp. 10, 31-32 (D. Conn. 1978).

[2] E.g., the recently retired Executive Officer Patrick Shevlin, the current executive Officer John Currivan, the Deputy Chief in charge of Administration and Recordkeeping Wallace Thomas, his deputy Lieutenant Gary Boros, Fire Marshal Bruce Collins, Assistant Chief in charge of Training Chief Brian Rooney, Assistant Chief Robert Petrucelli, Assistant Chief Frederick Haschak, Assistant Chief William Haug (BFME Treasurer), and the head of the engine repair facility Thomas Hanko (BFME Vice President), to name a few.

[3] See Joseph Vitale, et al., v. City of Bridgeport, et al., CV-00-0374431-S, Connecticut Superior Court at Bridgeport (judgment for defendants); Wallace Thomas, et al., v. City of Bridgeport, et al, CV-99-0361811-S, Conn. Super. Ct. at Bridgeport (dism.).

Bridgeport Fire Department, has been using at best questionable authority to make filings with this Court opposing the Plaintiff's efforts to obtain union records pertaining to discrimination, using the name of someone (Roger Kergaravat) whom he does not represent, who does not consent to his filings, and who is being subjected to threats and retaliation by Attorney Albrecht's other clients for having tried to do precisely what the instant Motion for Protective Order seeks to stop, i.e., provide the Plaintiffs in this action with information to assist the prosecution of their complaints of unlawful discrimination.

The recent events with this union local are the tip of the iceberg. The lack of fair representation and discrimination against Black, Hispanic, and female firefighters in preference of White males has been the subject of numerous complaints by Firebirds, culminating in their withdrawal *en masse* in 1998 of support and dues for the union, with a public statement and list of discriminatory incidents, which the City and union did nothing to remedy. Now, the very records of the union that are the subject of the Motion for Protective Order are *nothing but* possible evidence of unlawful discrimination, harassment and retaliation against women and other protected class members, to wit, the Court has already examined union records and ordered production of numerous documents that it found relevant to reports or complaints of discrimination, harassment or retaliation.

The Defendants herein argue that this Court should find that the Firebirds have no interest in the proposed Protective Order because their only interest would be discrimination on the basis of race or national origin, and "it is not obvious that [the Firebirds and the Hispanic Firefighters Association, also seeking intervention have] any interest in thse suits brought by two

white female firefighters alleging largely sexual harassment, and arguably, other kinds of sex discrimination.[4]

First, the defendants' whole argument against intervention rests on a presumption that smacks of stereotype or prejudice, i.e., that the Firebirds (and the Hispanic Firefighters Association), being composed in their majority of Black and Hispanic firefighters, can only have an interest in race or national origin discrimination against only Black and Hispanic persons. In fact, the Firebirds - unlike the all-White male Bridgeport Firefighters for Merit Employment – have a truly open membership, with White and female members.[5] The Firebirds aim to have a diverse workplace and fully support the rights of women to be hired and advanced, free of discrimination and harassment in the Bridgeport Fire Department. The Firebirds stand in solidarity with the aim of the Plaintiffs' suit in eliminating all unlawful discrimination in their workplace.

Second, the Amended Complaints of the Plaintiffs allege in detail many incidents and forms of disparate treatment based on sex, and moreover, retaliation against them for having attempted to exercise their rights to complain of it. The issue of the adequacy and retaliatory

---

[4] See Def's Memorandum in Opposition to Motions to Intervene by Firebird Society of Bridgeport, Inc. and Bridgeport Hispanic Firefighters Association, dated October 20, 2003, pp. 4-5.

[5] As evidence of its commitment to diversity and actual inclusive membership for all regardless of race, color, national origin, ancestry or sex, the Firebird Society took up the cause of its member, the recently deceased White female firefighter Kathy Denton, evidence of whose Title VII lawsuit in this Court (Denton v. City of Bridgeport, et al., 3:96-CV-01938, alleging gross sexual and racial harassment by one Lenny Fabrizi, brother of the current Bridgeport Mayor John Fabrizi's brother, and by officers who are still members of this department would be locked away from the Firebirds' view by the proposed Protective Order.

nature of the City's responses to their complaints, which they plainly allege, was the basis for the

Plaintiffs' subpoena for union records of reports or complaints of discrimination, harassment, and

retaliation again protected class members. The Court had already decided that such union

records are relevant to Plaintiffs' claims. The Firebirds stand in solidarity with the aim of the

Plaintiffs' suit of making the City respond to complaints of discrimination and harassment in a

non-retaliatory and meaningful manner.

Third, it is reasonable to assume that a substantial number of the documents and

information sought to be sealed pertain to past or present members of the Firebirds, who thereby

have, in fact, the most direct interest in being heard on the proposed Protective Order possible.

Fourth, in a larger sense, with this long documented history of race and national origin

discrimination and litigation by fire officials and this union local against Firebird Society

members, it is indisputable that they have a direct interest in the constitutional, statutory,

common law, and other policy issues raised by their employer's and their union's motions seeking

to bar them from access to records and information, most of which is public record under the

Connecticut Freedom of Information Act, and to the pretrial proceedings in this case as it

concerns discrimination in their workplace.

    (b)    <u>The Firebirds' interests would be impaired by disposition of the Motion for Protective Order without their involvement.</u>

Clearly, the factual backdrop to the proposed Protective Order detailed above supports at

least a reasonable belief that there is intractable, institutionalized discrimination against protected

class members in this municipal workplace and from its union and the intertwining Bridgeport Firefighters for Merit Employment. To exercise the power of the judiciary to set up an unwarranted obstacle to the ability of protected class/minority employees (and employment applicants) to access what is already identified by this Court to fall within the ambit of what was sought in the subpoena – i.e., documentation of discrimination, harassment, and the City's and union's responses to complaints, and retaliation, *made and maintained by their own union*, and *about them* -- will seriously prejudice their abilities to pursue any avenue of redress for discrimination, whether through the labor relations process, through appropriate administrative agencies, the courts, and even the political process. This scenario would be all the more outrageous if the Firebird Society is not permitted to intervene to be heard on this matter before it is decided, and to b part of any effort this Court may make to fashion a suitable order, if necessary at all.[6]

(c)    The Firebirds' interests are not adequately represented by the existing parties to the litigation.

The Defendant simultaneously contend that the Firebirds have entirely separate interests from the Plaintiffs' that precludes their intervention, and that the Plaintiffs can somehow adequately protect the Firebird's interests. Neither posit is true, and certainly not both at the same time.

---

[6] The Firebird Society believes that no protective order on dissemination of anything other than materials already protected from public disclosure under the state Freedom of Information Act and so ruled necessary by this Court is warranted by fact or law, or in the interests of fairness and justice.

10

The proposed protective order would affect not only the rights of current Firebirds members, but also of all persons of color who are currently employed or seeking employment or advancement in the Bridgeport Fire Department.[7] Although the Firebird Society shares similar interests to the Plaintiffs and no conflict is apparent with regard to their respective positions on keeping this municipality's and the Court's records and proceedings open, the parties are focused upon litigating the merits of the substantive claims between them and not necessarily on the Firebirds' interests. Attorney Albrecht's nonparty clients in no way come into this Court with clean hands to seek this overly broad prior restraint on fundamental rights, largely because of their history with regard to discriminatory conduct aimed directly at Firebird Society members.

Thus, the Court should find that the Firebird Society is entitled to intervene in this case as of right.

### 2.  The Firebird Society meets the standard for "permissive intervention."

Alternatively, if the Court does not allow the Firebird Society to intervene as of right, it should allow it to intervene permissively.

Fed. R. Civ. Pro. 24(b)(2), "Permissive Intervention," provides in pertinent part that:

---

[7] The City of Bridgeport in fact currently has an open hiring process, in the testing stage, for the position of entry level Firefighter, as well as recently announced upcoming advancement tests for the positions of Assistant Fire Chief and Captain. There is also a pending advancement test process for the position of Pumper Engineer, which is the subject of pending litigation in the Connecticut Superior Court (Mattera, et al., v. City of Bridgeport, Conn. Super. Ct. at Bridgeport, CV-03-0402585-S), in which the plaintiffs, a group of minority/protected class firefighters, including the Plaintiff in the instant action, Johanna Georgia, allege that the City refused to allow them to test for the position in violation of the City Charter and union contract, and (as to all the Mattera plaintiffs except Johanna Georgia), *on the basis of race.*

Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common ...

The rule also directs that "[I]n exercising its discretion [whether to grant permissive intervention] the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

As to the first requirement, timeliness, there is no dispute that the applicant Firebird Society has made timely application to intervene, the Motion for Protective Order and Oppositions thereto not having been heard yet. The Firebirds' intervention for the limited purpose of opposing the proposed protective order in the discovery phase will not unduly delay or prejudice the adjudication of the rights of the original parties.

As to the second requirement, as discussed above, the applicant's claim or defense with regard to the Motions for Protective Order and the main action involve common questions of law or fact, to wit, the claims made by the applicant herein and by the Plaintiffs in their case-in-chief, of institutionalized discrimination and harassment of protected class employees of the Bridgeport Fire Department and an inadequate response and retaliation by City officials to attempts to complain of it, and of the entitlement of at least all persons affected by this (and the public, per the state FOI law[8]) to have unfettered access what is substantially or all public records thereof, *many of which pertain directly to their own employment and complaints of discrimination.*[9]

---

[8] Conn. Gen. Stat. § 1-200(5), defines "public records" as: "any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency, whether such data or information be handwritten, typed tape-recorded, printed, photostated,

The mandate to stop unlawful discrimination in employment, especially in public employment, in this country is unequivocal and it is axiomatic that it is to be given broad effect by the courts. A judicial denial to an interested group of directly affected protected class members of even the right to intervene to be heard would only contravene the clearly stated intent of the Congress in passing Title VII and the other civil rights laws implicated.[10]

Finally, Connecticut law allows intervention in a proceeding, at the discretion of the Court, if, as here, the applicant for intervention has moved in a timely manner, has a direct and

---

photographed or recorded by any other method." § 1-210(a) provides in relevant part, "[e]xcept as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency...shall be public records and every person shall have the right to inspect such records promptly during regular office or business hours or to receive a copy of such records in accordance with the provisions of section 1-212." §1-212(a) provides in relevant part that "[a]ny person applying in writing shall receive, promptly upon request, a plain or certified copy of any record."

[9] There has been no claim by the movants that the records sought to be sealed are confidential medical or personnel records. The City should know what constitutes an exception to the FOIA from a recent appeal against it which it soundly lost, with sanctions imposed and a rebuke to its counsel, Brown et al. v. Michael Lupkas, Comptroller, City of Bridgeport, et al., FIC No. 2002-034 (June 26, 2002): "In Perkins v. Freedom of Information Commission, 228 Conn. 158, 175 (1993), the Supreme Court set forth the test for the exemption contained in §1-210(b)(2) [for confidential medical and personnel records]. The claimant must first establish that the files in question are personnel, medical or similar files. Second, the claimant must show that disclosure of the records would constitute an invasion of personal privacy. In determining whether disclosure would constitute an invasion of personal privacy, the claimant must establish both of two elements: first, that the information sought does not pertain to legitimate matters of public concern, and second, that such information is highly offensive to a reasonable person" ... In Connecticut Alcohol and Drug Abuse Commission, et al, v. Freedom of Information Commission, et al., 233 Conn. 28 (1995), the Supreme Court further expounded on the test for the exemption contained in §1-210(b)(2), G.S. In determining whether the files in question are "similar" to "personnel" files, the claimant must establish that the "document or file contains material that under ordinary circumstances would be pertinent to traditional personnel decisions, such as whether an individual should be promoted, demoted, given a raise, transferred, reassigned, dismissed, or subject to other such traditional personnel actions."

substantial interest in the subject matter of the litigation, has an interest that would be impaired by disposition of the litigation without the applicant's involvement, has an interest that would not be adequately represented by the existing parties to the litigation, would not delay the proceedings or otherwise prejudice the existing parties, and would assist in resolving the dispute before the Court.[11] Permissive intervention of the Firebird Society in this action would be consistent with Connecticut state law, and thus would not present any derogation of any right the municipal defendants enjoy in their sovereign state's courts.

For the reasons already discussed above, Firebird Society satisfies the basic criteria to intervene with regard to the Motions for Protective Order. If not permitted to intervene as of right, the Court should permit it to intervene permissively.

### C. THE PROPOSED PROTECTIVE ORDER IS OVERLY BROAD, VAGUE, AND WILL HAVE A DISPARATE ADVERSE IMPACT ON THE APPLICANT AND ITS MEMBERS.

The proposed Protective Order would apply to what it defines as "Discovery Materials," i.e., "[a]ll documents and depositions produced to date and to be produced hereafter pursuant to discovery requests in the course of the pre-trial stage of these proceedings." The proposed Order would prohibit disclosure of documents and speech about their contents as follows:

---

[10] *Inter alia*, 42 U.S.C. §§ 1981, 1983, and the Connecticut Fair Employment Practices Act, § 46a-60, et seq.

[11] Conn. Rules of Court, § 9-19; Conn. Gen. Stat. § 52-108; Horton v. Meskill, 187 Conn. 187, 197 (Conn. 1982).

> Discovery Material and the contents or substance thereof, shall not be disseminated, made available for inspection or copying, paraphrased or otherwise disclosed, to any person other than a "designated person"…

Proposed Protective Order, p. 2, para. 1.

It would also require that "[a]ll documents produced after the date that the [sic] this Protective Order is entered which constitute Discovery Material shall be stamped "Confidential" (Proposed Protective Order, p. 4, para. 10), and that all filings in Court of "discovery materials" be made "under seal" (p. 2, para. 2). The Order would bind "Designated Persons," defined as the parties, their counsel (and counsel's partners, associates, paralegals, law clerks and clerical personnel), and "[p]ersons retained by counsel for the parties to this action to assist in preparation for trial or to serve as expert witnesses in this litigation." It does not list nonparty City employees, or the nonparty union Local 834 as an entity or its members and officers as "Designated Persons" subject to the Order. However, paragraph 11 would make the Order "binding on all Designated Persons *and all other persons having knowledge of its terms*," and "enforceable by any sanction deemed appropriate by the Court."

The provision about who would be subject to the Order is overly broad, vague, and incapable of fair and meaningful enforcement. It does not specify what type of "knowledge," i.e., actual or implied is necessary to hold someone accountable for a violation, and, as discussed above, the scope is so broad and vague that the most tangential knowledge in disseminating even *public* records and information could support sanctions. Given this lack of definition; the far-reaching breadth of the subjects and public records the defendants want subject to the Order; the allegations of systemic civil rights violations by dozens of City employees and officials; and the

15

fact that this lawsuit has already been publicized in the public press, it would be virtually, if not actually impossible to determine who possesses knowledge, or to determine the source of every public document and information about this City.

The "exceptions" in the proposed Order are, given its breadth, so vague as to be incapable of precise interpretation and application, and practically unavailing to those who wish to challenge or defend against an accusation of violation. While one provision of the proposed Order would allow counsel for the parties to discuss "in general terms what their claims are and what they believe they will be able to prove," it does not define what this Court should deem a discussion "in general terms." This same provision allows counsel to "mak[e] public any material obtained independently of the discovery process," but paragraph 9 provides: "This Protective Order applies to Discovery Material which has been disclosed prior to the execution of this Protective Order, as well as to Discovery Material which is disclosed after the execution of this Protective Order." Does this mean that a record obtained independently would become subject to the Order simply because it is also disclosed pursuant to a discovery request in this lawsuit? How then, could a "Designated Person" can prove that the document is not Discovery Material, especially when many documents are throughout this fire department and union, and, as the Plaintiffs claim, the City has not been indexing its production in this action?

The Firebird Society is concerned about getting drawn into endless litigation or disciplinary actions by the City based on this ambiguous proposed Order and that it is not clear its members, some of whom are officers in the Fire Department, are not bound by.

**D.    THE PROPOSED PROTECTIVE ORDER WOULD INFRINGE UPON THE RIGHTS OF FIREBIRD SOCIETY MEMBERS TO SEEK REDRESS FOR VIOLATIONS OF THEIR CIVIL RIGHTS, AND CHILL THE EXERCISE OF CIVIL RIGHTS BY THEM AND OTHER PROTECTED CLASS MEMBERS.**

**1.    Rights to free speech, association and to petition for redress.**

The proposed protective order would impermissibly burden the Firebirds' free speech and association rights under the First Amendment and article first, § 4 of the Connecticut Constitution, i.e., the rights to freely speak and associate with persons who would assist them in pursuing redress for violations of their civil rights, and their rights to assist the Plaintiffs in prosecuting the instant civil rights suit. All of this would run afoul of the broad protections for activities in assistance to the protection of employees' rights to be free of unlawful discrimination in their employment.

As public employees, the members of the Firebirds have the right to speak out and oppose rampant, longstanding, institutionalized discrimination in a municipal fire department, which is of public concern, and as such, is entitled to the highest protection.[12]

---

[12] "'The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.'" Connick v. Myers, 461 U.S. 138, 147 (1983), quoting Mine Workers v. Illinois Bar Assn., 389 U.S. 217, 223 (1967). A matter of public concern does not "lose its importance merely because it arises in an employee dispute.' Hall v. Ford, 856 F.2d 255, 260 (D.C. Cir. 1988). Dismissing [the plaintiff's] speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out." Rode v. Dellarciprete, 845 F.2d 1195, 1202 (3d Cir. 1988). See Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."); Howcroft v. City of Peabody, 747 N.E.2d 729 (Mass. App. Ct. 2001) (police officer's "[s]peech about official malfeasance or abuse of office by senior officers of the [municipal] police force, in failing to enforce [state anti-smoking statute], and thereby exhibiting an unexcused disinterestedness in a

As to their First Amendment right to petition for redress, "'[m]eaningful access' to the courts is the touchstone." <u>Bounds v. Smith,</u> 430 U.S. 817, 823, 97 S. Ct. 1491, 1495-96, 52 L. Ed.2d 72 (1977). <u>See also,</u> article first, § 4 of the Connecticut Constitution (right to seek a "remedy by due course of law, and right and justice administered without sale, denial or delay"). Access to the Courts or elected representatives is not going to be meaningful if potential civil rights victims are forever denied access by a judicial order to evidence of discriminatory employment practices and incidents of harassment and retaliation that is contained in what is supposed to be the public record of a municipal government. The point is especially acute because, of course, the alleged perpetrators (the City and the union) can then defend any claims knowing alone what evidence exists. The fact that Firebirds members, or other potential future litigants, can apply to the court for relief from a Protective Order offers little consolation, because, as a practical matter, the proposed Order would leave them to guess at what may exist (even in what is supposed to be a public record) to be able to ask for it in enough detail to make an adequate showing to ever modify or vacate it, and with all the associated costs that are already a deterrent to victims' access to the legal system.

Thus, the risk of irreparable and far-reaching harm to fundamental rights being great, Court must rigorously guard the First Amendment, including from seemingly innocuous uses of

matter of intense public interest, is speech which is of inherent public interest and obviates any need to consider [the employee's] motives or his personal concerns"). <u>See also</u> <u>O'Connor v. Steeves,</u> 994 F.2d 905, 913-915 (1st Cir.), <u>cert.</u> <u>denied</u> 114 S. Ct. 634 (1993); <u>Azzaro v. County of Allegheny,</u> 110 F.3d 968, 978 (3d Cir. 1997).

legal process that might interfere with protected speech and association.[13] "[I]n the First

Amendment context, courts must "look through forms to the substance" of government conduct.

Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963). Informal measures, such as "the threat of

invoking legal sanctions and other means of coercion, persuasion, and intimidation," can violate

the First Amendment ...." White v. Lee, supra.

To wit, as with the two subpoena duces tecums issued by the defendants in this case to

nonparties Roger Kergaravat and founding Firebird member/former Vice President Donald

Day, neither of which the defense has actually executed, the defense and Attorney Albrecht's

clients are using the seemingly innocuous legal process of seeking a protective order to chill

protected communications with the Plaintiffs and their counsel and deny other protected class

members and potential claimants – many of whom are Firebirds members -- access to documents

that contain possible evidence of the City's discriminatory practices toward them. None of these

tactics are necessary for a defense of the substantive claims in the case-in-chief, but these

unconstitutional purposes are largely accomplished merely by issuance of such subpoenas and

Motions. White v. Lee, supra.

No situation could more urgently militate against it than a secret race-based society

controlling virtually all personnel decisions and the union grievance process. The precedent that

---

[13] Compare White v. Lee, 227 F.3d 1214 (9th Cir. 2000) (*mere threats* by HUD, in an investigation of possible violations of the Fair Housing Act, *to issue subpoenas* to members of a neighborhood group opposing a housing project for their publications, minutes of meetings, and correspondence with other organizations "would have chilled or silenced a person of ordinary firmness from engaging in future First Amendment activities" Id., citing Mendocino Environmental Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999).

this broad proposed Order would set for future civil right litigants, for anyone seeking a

municipality's records, would be onerous and susceptible of great abuse.

No doubt the City and Attorney Albrecht's clients want to lock all the evidence away.

Whatever press coverage and public access there has been so far in this case has shone a light on

the BFME and city officials. This has galvanized the various organizations standing for diversity

in this Fire Department to exercise their First Amendment rights to use the political process to

approach elected representatives, who are now considering revocation of BFME's payroll

deduction funding mechanism. This is the way a democratic open society is supposed to work.

The only "protection" afforded by the proposed Order would be for the City of

Bridgeport, wracked with nationally reported corruption emanating from its convicted mayor's

office, in the midst of federal investigations into crime in various City departments, for a City Fire

Department already found by this Court and the Second Circuit to have systematically

discriminated against protected class persons in its personnel practices, in favor of the White male

BFME group. The City's and its counsels' abuse of legal process and contempt for the open

records laws of this state was recently sternly sanctioned by the Connecticut Freedom of

Information Commission. See Brown et al. v. Michael Lupkas, Comptroller, City of Bridgeport,

et al., FIC No. 2002-034 (June 26, 2002).[14]

---

[14] Two city officials were fined one thousand dollars for noncompliance, and City Counsel were
"admonished for their unprofessional conduct throughout this case." Id.

### III.    CONCLUSION

There is no basis for allowing, and rather, every reason not to allow, the defense to use this lawsuit, brought to protect civil rights, to effectively seal forever all records of the City of Bridgeport of civil rights violations in its Fire Department. This would afford the City of Bridgeport an advantage over the public and those with claims against it, and relief from compliance with the state Freedom of Information Act that no other municipality in this state appears to enjoy, and would set a dangerous precedent in our largest City, which has a majority population of persons of color who look to this Fire Department for protection. The Court must not deny the members of the Firebird Society, found by this Court to be victims of institutionalized discrimination, who are protected class members under Title VII and 42 U.S.C. § 1981, and the Civil Rights Act of 1991, their rights to at least be heard on this matter, in order to continue and one day complete the work begun by this Court some 30 years ago to eradicate unlawful discrimination in the Bridgeport Fire Department.

**FOR THE PROPOSED INTERVENOR,**
**FIREBIRD SOCIETY OF BRIDGEPORT, INC.,**

11/3/03

By, _____
Susan V. Wallace, Esq.
11 Blue Orchard Drive
Middletown, CT 06457
Tel: (860) 704-0472  Fax: -0490
law4us@rcn.com
Fed Bar No. CT08134

21

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing "Memorandum in Support of: Firebird Society of Bridgeport, Inc.'s Motion to Intervene, Opposition to Motion for Protective Order dated August 27, 2003, and Opposition to Motion for Protective Order and Objection to Disclosure dated September 4, 2003" has been served upon:

Robert B. Mitchell, Esq.                John Mitola, Esq.
Margaret M. Sheahan, Esq.               John P. Bohannon, Jr., Esq.
Thomas F. Maxwell, Esq.                 Office of the City Attorney
Pullman & Comley, LLC                   999 Broad Street
850 Main Street                         Bridgeport, CT 06604
P.O. Box 7006
Bridgeport, CT 06601-7006

Richard L. Albrecht, Esq.
Cohen & Wolf, P.C.
115 Broad Street
P.O. Box 1821
Bridgeport, CT 06601-1821

on this 3rd day of November, 2003, via

_____   Regular U.S. Mail, first class, postage prepaid

_____   U.S. Priority Mail

_____   U.S. Express Mail or other overnight mail service

_____   Facsimile

_____   Hand-delivery

_____
Susan V. Wallace, Esq.

# FERGUSON & DOYLE, P.C.

### ATTORNEYS AT LAW

JAMES C. FERGUSON
BRIAN A. DOYLE

35 MARSHALL ROAD
ROCKY HILL, CT 06067

(860) 529-4762
FAX (860) 529-0339

October 27, 2003

Attorney Susan V. Wallace
11 Blue Orchard Drive
Middletown, CT 06457

Re:    **Case No. 3:01 CV 0452**

Dear Susan:

Please be advised that this office represents Roger J. Kergaravat and has done so since July 1, 2003.

It is my understanding that Attorney Richard Albrecht has filed papers in the above-referenced case on behalf of Mr. Kergaravat subsequent to July 1, 2003.  Mr. Albrecht does not, and has not, represented Mr. Kergaravat with regard to that case or any other case since July 1, 2003 and has no authority to do so.  Any papers filed on behalf of Mr. Kergaravat by Attorney Albrecht are without his knowledge and/or consent.

If you have further questions or concerns regarding this advice, please contact me.

Sincerely,

James C. Ferguson
FERGUSON & DOYLE, P.C.
Counsel for Roger J. Kergaravat

*Exb. A.*