Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   DISTRICT OF CONNECTICUT
 3   - - - - - - - - - -
 4   ELIZABETH SCHILLER,        *
 5       Plaintiff,             *
 6   JOHANNA S. GEORGIA,        *
 7       Plaintiff,             *
 8       vs.                    *   CIVIL ACTION
                                    No. 3:01 CV-00452
 9   CITY OF BRIDGEPORT, et al, *   (AVC)
10       Defendants.            *
11   - - - - - - - - - -
12                   Hartford, CT
13                   January 16, 2004
14                   10:10 a.m.
15       - - -
16   DEPOSITION OF JOHN COLLIGAN
17   APPEARANCES:
18       FOR THE PLAINTIFFS:
19       BY: SUSAN V. WALLACE, ESQ.
20           11 Blue Orchard Drive
             Middletown, CT 06457
21
22       FOR THE DEFENDANTS CITY OF BRIDGEPORT,
         et al:
23
         PULLMAN & COMLEY, LLC
24       BY: ROBERT MITCHELL, ESQ.
             850 Main Street
25           Bridgeport, CT 06601-7006
```

Page 2

```
 1   Deposition of JOHN COLLIGAN, taken on
 2   behalf of the Defendant herein, for the purpose of
     discovery and for use as evidence in this cause,
 3   pending in the United States District Court for the
     District of Connecticut, pursuant to Notice, before
 4   Lorraine Calabro, Licensed Shorthand Reporter, No.
     ###, and a Notary Public within and for the
 5   State of Connecticut, at the United District
     Courthouse, 450 Main Street, Hartford, CT on January
 6   16, 2004 at 10:10 a.m., at which time counsel
     appeared as herein before set forth...
 7
 8
 9           STIPULATIONS
10
11   IT IS HEREBY STIPULATED AND AGREED TO by and
     among counsel for the respective parties hereto that
12   all technicalities as to the proof of the official
     character of the authority before whom the
13   deposition is to be taken are waived.
14   IT IS FURTHER STIPULATED AND AGREED TO
     by and among counsel for the respective parties
15   hereto that any objections to the sufficiency of the
     Notice are waived.
16
17   IT IS FURTHER STIPULATED AND AGREED TO
     by and among counsel for the respective parties
18   hereto that all objections, except as to form, are
     reserved to the time of trial.
19
20
21
22
23
24
25
```

Page 3

```
 1   Whereupon:
 2       JOHN COLLIGAN, whose business address is 45
 3   Lyon Terrace, Bridgeport, Connecticut, being first
 4   duly sworn, as hereinafter certified, was examined
 5   and testified as follows:
 6           MR. MITCHELL: Note for the
 7   record that Plaintiff's Exhibit 10 will be
 8   the first deposition exhibit for this
 9   witness.
10           We'll reserve objections,
11   except as to form at trial. And I do want
12   him to read and sign.
13           This is a Rule 30-B6
14   deposition, City of Bridgeport.
15           (Plaintiff's exhibit for
16   identification marked City 10: Renotice of
17   Deposition.)
18   DIRECT EXAMINATION BY MS. WALLACE:
19   Q. Mr. Colligan, I'm Attorney Susan
20   Wallace. I represent Johanna Georgia and
21   Elizabeth Shiller O'Connell in their lawsuit
22   against the City of Bridgeport regarding the
23   fire department.
24           Can you state your full name and spell it
25   for the record, your address and your job title.
```

Page 4

```
 1   A. John C-O-L-L-I-G-A-N, personnel
 2   director, City of Bridgeport, 45 Lyon
 3   Terrace, Bridgeport, Connecticut.
 4   Q. That's your business address?
 5   A. Yes.
 6   Q. And how long have you been employed
 7   by the City of Bridgeport?
 8   A. Thirty-four years.
 9   Q. What positions have you held?
10   A. Personnel assistant 1 and personnel
11   assistant 2, assistant personnel director
12   and personnel director.
13   Q. Have you ever worked for any other
14   municipality in Connecticut?
15   A. No.
16   Q. Do you have any advanced degrees
17   beyond a bachelor's?
18   A. No.
19   Q. Do you have a bachelor's?
20   A. Yes.
21   Q. What is it in?
22   A. Secondary education.
23   Q. Do you sit on any boards or
24   commissions?
25   A. No.
```

Page 5

```
 1   Q. Have you ever been deposed before?
 2   A. Yes.
 3   Q. What occasions?
 4   A. During the course of my employment
 5   there have been several lawsuits where I've
 6   taken depositions.
 7   Q. Do those include a series of
 8   lawsuits in the 1970's regarding the hiring
 9   of non whites or blacks and minorities on to
10   the fire department?
11   A. Are you referring to the ADE versus
12   City of Bridgeport lawsuits, 1972-73?
13   Q. Presided over by Judge Daley,
14   United States Federal Court in Hartford,
15   Connecticut?
16   A. Yes. If your question is have I
17   ever had a deposition in those cases, not
18   sure about a deposition. I don't think so,
19   but I did testify in court.
20   Q. Okay. And what did you testify in
21   court about, do you recall?
22   A. The city's hiring practices.
23   Q. All right. Now explain your job
24   duties in your current position?
25   A. The personnel director essentially
```

Page 6

```
 1   is the director of Civil Service in the City
 2   of Bridgeport. There are three broad areas
 3   of responsibility.
 4       One is to administer the Civil Service
 5   system.
 6       The second is to administer the payroll for
 7   all Civil Service employees in the City of
 8   Bridgeport.
 9       And the third is to administer the
10   retirement division for all Civil Service and grant
11   employees for the City of Bridgeport.
12   Q. Do you preside over any meetings of
13   the Civil Service Commission of the City of
14   Bridgeport?
15   A. Yes.
16   Q. You do so as a voting member?
17   A. No. I serve as secretary to the
18   commission.
19   Q. Does that commission hear appeals
20   from various job decisions and employment
21   decisions?
22   A. Yes.
23   Q. Do you have anything to do with
24   setting job qualifications for particular
25   jobs within the City of Bridgeport?
```


EXHIBIT 6

Page 7

    A. Not quit sure what you mean by setting.
    Q. Establishing what the job qualifications would be for particular positions?
    A. I contribute to that. I'm not the sole authority as far as setting qualifications.
    Q. Who does that?
    A. Civil Service Commission.
    Q. Is there any committee or group that has input in establishing what particular qualifications will be for particular positions?
    A. No.
    Q. When you say Civil Service is the final input, what happens before they have input?
    A. There would be discussions with department heads, discussions with experts in the field, subject matter experts. I would have some input.
    And then we would make recommendations to the Civil Service Commission and the commission

Page 8

would be the final authority as to setting the qualifications for the position.
    Q. Would a department head such as fire chief be able to simply write what they want for a particular position as far as job qualifications and job duties?
    A. The fire chief could make suggestions and the commission would take them under advisement.
    Q. Does the commission use any experts in making determinations about what the job qualifications for a particular position will be?
    A. They could, yes.
    Q. Who are the experts that the city has used in the last ten years?
    A. For what?
    Q. The fire department, any jobs within the fire department.
    A. Is your question directed towards the qualifications for being able to be in a certain position?
    Q. Required qualifications to attain a position. Of course, there are a number of positions within the fire department, but if

Page 9

the city has used any experts to set qualifications for any position within the fire department, I'd like you to tell me who the experts they have used are?
    A. In the last ten years, I would say no, there have been no outside.
    Q. Have there been any revisions to any of the job qualifications for any positions within the fire department in the last ten years?
    A. Permanent?
    Q. Well, do you see a distinction perhaps between a permanent position and non permanent position?
    A. I see distinctions between permanent qualifications and non permanent qualifications.
    Q. Can you explain that?
    A. Yes. In the past, for positions in the fire department, particularly the fire captain and fire assistant chief, there were agreements on a one-time only basis to lower the time-in-grade requirement for eligibility for the examination from three years time-in-grade to one year

Page 10

time-in-grade.
    They were struck as labor agreements and they were on a one time only basis with the understanding that the qualifications would revert to the three-year time-in-grade.
    Q. What year was that done?
    A. I don't recall.
    Q. And this is for chief of the department and for assistant chief?
    A. Assistant chief and for fire captain.
    Q. Okay. And this is pursuant to an agreement with the union?
    A. That's correct.
    Q. Was there an agreement --
    A. That's correct.
    Q. -- approved by any body such as the State Labor Relations Board or city relations board?
    A. There was an agreement between the city's labor representative and the director of labor relations and the union.
    Q. Who was the director of labor relations when this was done?
    A. I don't recall.

Page 11

    Q. Just for the record, you understand that you're here today to testify as a representative of the City of Bridgeport, correct?
    A. That's correct.
    Q. And are you taking any medications today or any drugs that would affect your ability to recall and testify accurately?
    A. No.
    Q. Do you have any medical conditions that impact your ability to recall and testify accurately today?
    A. No.
    Q. What is the Griffin Hagen study?
    A. Griffin Hagen is a study that was conducted back in 1958, and it basically was a classification and compensation study.
    Q. Who ordered the study done?
    A. I believe that would have been the common council of the City of Bridgeport.
    Q. Was it put out to bid?
    A. I don't believe so.
    Q. Were you employed by the City of Bridgeport at the time it was done?
    A. I wasn't. I was in seventh grade

Page 12

at the time that was done.
    Q. When was the last time you reviewed a copy of the Griffin Hagen study?
    A. Well, I think we have an understanding what the Griffin Hagen study was. It was a compensation study for positions that were existing back in 1958.
    So that was the money that was being paid for various positions and was a classification for positions that existed in 1958.
    So I don't review it as a general practice, because there is no reason. It is not relevant to my everyday duties.
    Q. When was the last time the city relied on that study to make any recommendations or changes or additions or deletions to the terms and conditions of employment for any position in the City of Bridgeport?
    A. Not sure the city ever referred to it in that manner.
    Q. Do you have a copy of that study?
    A. I do not.
    Q. Do you know who does?
    A. I do not.

Page 13

1  Q. Do you know if a copy exists within
2  the City of Bridgeport?
3  A. I have a document which I think is
4  the Griffin Hagen study; not really quite
5  sure it has to do with the compensation, the
6  salaries.
7  Q. Describe this document a little
8  more?
9  A. It's a photocopy, perhaps 15, 20
10 pages, and it seems to indicate what the
11 positions were in existence at that time,
12 and what the salaries were for those varies
13 positions.
14 Q. Did the Griffin Hagen study make
15 any recommendations as to race or racial mix
16 or racial balance or racial diversity within
17 the City of Bridgeport's employment base --
18 A. No.
19 Q. -- within the city's employees?
20 A. No.
21 Q. Did it make any recommendations
22 about gender --
23 A. No.
24 Q. -- in terms of employees?
25 A. No, it did not.

Page 14

1  Q. Did it make any recommendations as
2  to time-in-grade before promotion?
3  A. That would be the classification
4  aspect of it and why they did prescribe what
5  the time-in-grade for various positions
6  would be.
7  Q. What recommendation was made in
8  that study?
9  A. For which position?
10 Q. For any position within the fire
11 department.
12 A. As a general rule, they were all
13 pretty much three years time-in-grade.
14 Q. How do you know it was three years?
15 A. Because I have the classifications
16 as they existed. Those are classifications
17 that were generated as a result of Griffin
18 Hagen.
19 Q. How do you know that?
20 A. From working 34 years and from
21 information passed on to me by my
22 predecessors, Mr. Cohen and Mr. Gallagher.
23 Q. Are they still alive?
24 A. Yes.
25 Q. Where are they?

Page 15

1  A. They reside in Fairfield and in
2  Bridgeport.
3  Q. Which one is where?
4  A. Mr. Gallagher resides in Bridgeport
5  and Mr. Cohen resides in Fairfield.
6  Q. What is Mr. Cohen's first name?
7  A. Alan.
8  Q. Mr. Gallagher?
9  A. Raymond.
10 Q. Are they both retired?
11 A. They are.
12 Q. So you've never actually seen the
13 Griffin Hagen study's recommendation of the
14 three-year time-in-grade; is that correct?
15 A. I'm assuming that they are the job
16 descriptions as they exist today for those
17 positions in the fire department.
18 Q. But again, you've never actually
19 seen the study that you can recall?
20 A. No.
21 Q. The study report?
22 A. No.
23 Q. So do you have a specific
24 recollection of Mr. Cohen or Mr. Gallagher
25 telling you that Griffin Hagen set the

Page 16

1  time-in-grade requirements at three years?
2  A. I don't have a specific
3  recollection, no.
4  Q. Do you have any input into
5  establishing any policies or practices for
6  the City of Bridgeport in terms of their
7  employment rules?
8  A. Not really.
9  Q. When you say "not really," do you
10 have some at all?
11 A. No, I really don't.
12 Q. Does the Civil Service Commission
13 in Bridgeport work in any way or collaborate
14 in any way with the fire commissioners of
15 the City of Bridgeport?
16 A. You would have to define what you
17 mean by collaborate.
18 Q. Did they ever work jointly on any
19 tasks together?
20 A. No.
21 Q. Do they make recommendations to one
22 another regarding employees?
23 A. No.
24 Q. Does any one of the agencies or
25 commissions or boards or Civil Service

Page 17

1  Commission make any reports to the other?
2  A. The commissions, no.
3  Q. Do they ever meet together jointly?
4  A. No.
5  Q. When did you become the head of the
6  Civil Service Commission?
7  A. 1990.
8  Q. How did you attain that position?
9  A. By Mr. Cohen leaving, I was
10 appointed to the position.
11 Q. In that position are you familiar
12 with the functional job descriptions for
13 jobs within the Bridgeport Fire Department?
14 A. I've seen them, yes.
15 Q. Would you be able to identify
16 whether a functional job description is, in
17 fact, the correct functional job description
18 currently?
19 A. If it was shown to me, I could,
20 yes.
21      MS. WALLACE: Can we mark that
22 as No. 11.
23      (Plaintiff's exhibit for
24 identification marked City 11: Functional
25 Job Description of Fire Fighter.)

Page 18

1  BY MS. WALLACE:
2  Q. Showing you something that has been
3  marked Exhibit 11, nine pages, and I want
4  you to tell me if you've ever seen this
5  before today?
6  A. (Pause.)
7  Q. Have you ever seen that document
8  before today?
9  A. I believe I have.
10 Q. Where have you seen it?
11 A. I think that that is one of several
12 documents that was submitted to us by the
13 Bridgeport Fire Department for positions
14 within the department.
15 Q. When?
16 A. Approximately two to three years
17 ago.
18 Q. What is the process for adopting
19 any changes or revisions to any job
20 description for positions within the fire
21 department?
22 A. This description was never adopted
23 by the Civil Service Commission. This is a
24 functional job description that is used
25 within the fire department. The job

Page 19

1  description for fire fighter is the one that
2  we use as the Civil Service job description.
3      Q. So Civil Service would not hire or
4  terminate based on Exhibit 11, on that
5  document?
6          MR. MITCHELL: Object to the
7  form. That's two questions.
8          MS. WALLACE: I'll rephrase it.
9          MR. MITCHELL: Go ahead and
10 answer.
11 BY MS. WALLACE:
12     Q. You're saying it wasn't adopted by
13 the Civil Service Commission, correct?
14     A. This is not what we refer to as a
15 Civil Service job description for fire
16 fighter.
17     Q. Couldn't a person be refused to be
18 hired if they do not meet those requirements
19 in that document, which is marked No. 11,
20 that you're looking at?
21     A. This document is not relevant to
22 the hiring process. This is pretty much a
23 description of what a fire fighter does
24 after they're hired and then been trained.
25     Q. Do you know for a fact that is an

Page 20

1  accurate description of what they do?
2      A. I don't.
3      Q. You're assuming that's what it must
4  be?
5      A. I'm assuming it must be, yes.
6      Q. Could the Civil Service Commission
7  terminate someone for failure to meet any of
8  the requirements of that document?
9      A. The only reason Civil Service would
10 terminate an individual would be if it was
11 recommended during the probationary period
12 that the person be terminated by the fire
13 chief.
14         At that point the individual would be given
15 an opportunity for a hearing before the Civil
16 Service Commission, at which time there is a
17 tripartite vote. The commission would have one
18 vote. The chief would have one vote. And the
19 personnel director would have one vote.
20         If it was a majority vote, two votes would
21 mean they would be retained or terminated.
22     Q. In that process is this a document
23 that the Civil Service Commission, in your
24 opinion, could legally rely on to terminate
25 someone?

Page 21

1      A. Not sure.
2      Q. Okay. As far as the Civil Service
3  Commission is concerned, to be a fire
4  fighter in Bridgeport does a person have to
5  meet the requirements as specified in the
6  announcements for vacancies and for the
7  testing position?
8      A. Yes.
9      Q. So if a person can meet those
10 requirements, they can at least be hired as
11 a fire fighter, eligible to be hired as a
12 fire fighter?
13     A. There are other requirements as
14 well, but yes.
15         MS. WALLACE: I show you a
16 document that we'll mark as No. 12, Bates
17 stamped 001978 through 001983.
18         (Plaintiff's exhibit for
19 identification marked City 12: Announcement
20 for Position of Fire Fighter.)
21         MS. WALLACE: There is another
22 one that goes along with it that labeled
23 revised notice.
24 BY MS. WALLACE:
25     Q. Do you recognize that document?

Page 22

1      A. Yes, I do.
2      Q. What is it?
3      A. This is the legal notice or job
4  announcement for the position of fire
5  fighter.
6      Q. For what year's test?
7      A. 1993.
8      Q. And in it does it list a number of
9  physical tasks that have to be performed?
10     A. It lists the duties of a fire
11 fighter. And then it also lists the outline
12 for the fire fighter physical agility
13 examination.
14     Q. Now are those the basic
15 requirements that the person has to meet in
16 order to be eligible to become a Bridgeport
17 fire fighter?
18     A. To take that test, to be eligible
19 to take that test, yes.
20     Q. Now, aside from any more
21 specialized training, just looking at the
22 physical requirements of the agility test,
23 is there anything else that they have to do
24 to be hired as a fire fighter as far as,
25 again, just the physical agility test?

Page 23

1      A. No.
2      Q. Is there a requirement that fire
3  fighters meet any new physical standards
4  from time to time after they're hired, or is
5  there a base line default that they have to
6  at least meet?
7      A. After they're hired all of those
8  decisions and considerations would be a
9  departmental matter. As far as Civil
10 Service is concerned, these are threshold
11 requirements for admittance to the
12 examination and admittance to the position.
13         MS. WALLACE: I have another
14 one I want to mark No. 12, Bates stamped
15 001984 to 001988.
16         (Plaintiff's exhibit for
17 identification marked City 12: Notice of
18 examination for fire fighter, 1997.)
19 BY MS. WALLACE:
20     Q. What's been marked No. 12, I ask
21 you if you've ever seen that before, if you
22 recognize it?
23     A. Yes. I've seen it. Yes, I
24 recognize it.
25     Q. What year is that for?

Page 24

1      A. This is the notice of examination
2  for 1997.
3      Q. For fire fighter?
4      A. Yes.
5      Q. And similar to the last document
6  that you looked at, is that setting the base
7  line threshold requirements to be eligible
8  to be hired as a fire fighter in Bridgeport?
9      A. Yes
10         (Plaintiff's exhibit for
11 identification marked City 13: Notice for
12 Examination of Fire Fighter 2002.)
13 BY MS. WALLACE:
14     Q. And here is another one marked No
15 13, and I'll ask you the same question: Do
16 you recognize this document?
17     A. Yes, I do recognize this as the
18 examination notice for fire fighter and the
19 year of the examination is 2002.
20     Q. And again, that sets the basic
21 threshold for the requirements for a person
22 to meet to be eligible to be able to be a
23 fire fighter in Bridgeport?
24     A. It does.
25         (Plaintiff's exhibit for

Page 25

1 identification marked City No. 14:
2 Unidentified Document.)
3 BY MS. WALLACE:
4   Q. Back to No. 11. Exhibit No. 11, I
5 don't recall how you testified. Have you
6 seen that before today?
7   A. I believe I've seen it, yes.
8   Q. Is there any move underway right
9 now within Bridgeport to adopt that as a
10 standard of the fire department?
11       MR. MITCHELL: Referencing
12 what?
13       MS. WALLACE: Exhibit No. 11,
14 information contained in there.
15   A. I don't know.
16 BY MS. WALLACE:
17   Q. Does it apply to the current hiring
18 examination?
19   A. No. The current hiring examination
20 was the last one that you showed me, 2002.
21   Q. Okay.
22   A. The criteria set forth on that
23 notice.
24   Q. Okay. Do you recognize what has
25 been marked as Exhibit 14?

Page 26

1   A. No, I don't.
2   Q. You've never seen that before?
3   A. No.
4   Q. Does the typeset appear familiar to
5 you?
6   A. No.
7       (MARKED QUESTION #1)
8   Q. Okay. Tell me what you know about
9 an organization called Bridgeport Fire
10 Fighters Merit Employment, Inc.?
11       MR. MITCHELL: Objection. That
12 is outside the scope of what we're
13 presenting Mr. Colligan for.
14       MS. WALLACE: I don't know if
15 that can be determined as a form objection.
16       MR. MITCHELL: This is a Rule
17 30-B6 deposition. He's here to testify to
18 items listed next to his name and nothing
19 else. I will not permit him to answer any
20 questions outside the scope of those three
21 items.
22       If you want to ask the judge if
23 the judge believes that question falls
24 within the scope, that's fine. At this time
25 I would not want him to answer questions

Page 27

1 about that issue.(.
2       (MARKED QUESTION #2)
3 BY MS. WALLACE:
4   Q. Mr. Colligan, did you attend any
5 meeting within the last six months with
6 Blacks and Hispanics and Caucasians with the
7 Bridgeport City Counsel in your capacity as
8 the head of the Civil Service of the City of
9 Bridgeport regarding an organization called
10 City Fire Fighters Merit Employees, Inc.?
11       MR. MITCHELL: Objection.
12       Instruct him not to answer.
13       He's here for three very
14 specific purposes. This does not fall in
15 any way, shape or form within the scope of
16 those three purposes.
17       He will not answer any
18 questions regarding that, period.
19       MS. WALLACE: Shall we go get
20 the judge?
21       MR. MITCHELL: Get the judge.
22 It's your deposition.
23       MS. WALLACE: We'll adjourn the
24 deposition and go down to the clerk's office
25 and get the judge.

Page 28

1       I ask you to mark the record,
2 this portion of the transcript, so we can
3 find it later.
4       (Whereupon, a break was taken
5 from 10:30 to 10:40 a.m.)
6 BY MS. WALLACE:
7   Q. Mr. Colligan, in your capacity as
8 head of the Civil Service Commission in the
9 City of Bridgeport, have you received any
10 training in the rights of employees?
11   A. Could you define that a little
12 better, please?
13   Q. Well, I started out general.
14 Rights means any employment rights of the
15 employees in the City of Bridgeport.
16   A. That's pretty much my job, to
17 enforce laws and rules and regulations. But
18 as to specific training, we've had training
19 on sexual harassment. We've had training
20 for first line administration of the city
21 contracts.
22   Q. This is training that you've
23 received personally?
24   A. Yes.
25   Q. When was the last time —

Page 29

1   A. EEO training.
2   Q. Equal Employment Opportunity
3 training?
4   A. Yes.
5   Q. When was the last time you had
6 Equal Employment Opportunity training,
7 yourself?
8   A. Quite a few years ago. It was a
9 workshop conducted by the then director of
10 affirmative action, and also the police
11 department was involved in it as well. I
12 would suspect it was seven to eight years
13 ago.
14   Q. Who gave you the training?
15   A. The gentleman's name was Bishop
16 Walter Plummer. At the time Bishop Plummer
17 was affirmative action officer and it was
18 done at the Bridgeport Police Academy.
19   Q. Was he employed by the City of
20 Bridgeport at that time?
21   A. Yes, he was. And if memory serves,
22 it would have been longer than seven, eight
23 years ago, closer to ten years ago.
24   Q. Was there a place and time you had
25 training or anything to do with

Page 30

1 discrimination with employees?
2   A. No. There were courses that were
3 run by the Office of Policy and Management
4 regarding sexual harassment by the former
5 director, Robert Kochiss. Those training
6 sessions were, I would suspect, seven years
7 ago.
8   Q. Any other training that you have
9 received from the City of Bridgeport or
10 through the City of Bridgeport regarding
11 discrimination with employees?
12   A. No.
13   Q. Have you ever received any training
14 regarding the fire service?
15   A. What aspect of the fire service?
16   Q. Anything to do with the fire
17 service.
18   A. I never received any training in
19 that regard, no.
20   Q. You have no background working in
21 the fire service?
22   A. No, I don't.
23   Q. When a fire fighter is hired, at
24 what point does Civil Service no longer have
25 any control or authority over that

Page 31

1 individual?
2   A. I would say once the individual is
3 certified for permanent employment, up until
4 that point I think the commission has
5 significant control in that they can
6 determine whether or not the person passes
7 or fails the probation period.
8       I would say after the person passes the
9 probation period, there probably would be very
10 little control the Civil Service Commission would
11 have in terms of employment of that individual.
12   Q. So once they successfully pass
13 probation, authority and control over the
14 employee passes from Civil Service to whom?
15   A. They're then guaranteed their
16 rights under their union contract. So
17 therefore, it would be the union
18 representing them and the city's
19 representative, of course, would be the
20 labor relations office.
21   Q. So while they're in probation, the
22 job duties and functions and requirements
23 are determined by Civil Service?
24   A. No. They're determined by the fire
25 department. But if there is any

Page 32

1 controversy, for example, if an individual
2 is not recommended for permanent employment,
3 the commission has a final say.
4       There is a three-way vote. I get a vote.
5 The commission gets a vote, as well as the chief of
6 the department gets a vote as to whether or not that
7 person would have been made permanent or would have
8 been terminated.
9   Q. Tell me your job title again?
10   A. Personnel director.
11   Q. Are you considered to be an
12 employee of the City of Bridgeport proper or
13 an employee of the Civil Service Commission?
14   A. City of Bridgeport. I report to
15 the commission.
16   Q. You report to the commission?
17   A. Yes.
18   Q. Are you subject to Civil Service
19 rules yourself in your position?
20   A. Yes.
21   Q. Are you classified or unclassified?
22   A. Classified.
23   Q. Do you keep any statistical data on
24 applicants for employment in the Bridgeport
25 Fire Department?

Page 33

1   A. Not quite sure I know what you
2 mean.
3   Q. In your position, are you required
4 to keep statistical data on applicants for
5 employment in the Bridgeport Fire
6 Department?
7   A. Once again, I'm a little unclear
8 what you're saying about statistical data.
9 We keep records of individuals who apply for
10 positions. We have the capacity to break
11 down those statistics among race and gender
12 lines.
13   Q. That's what I'm asking. So you can
14 extrapolate that statistical data --
15   A. Yes.
16   Q. -- from the records --
17   A. Yes.
18   Q. -- that you keep?
19   A. Yes.
20   Q. Do you make those extrapolations?
21   A. Yes.
22   Q. Do you provide that statistical
23 date regarding applicants for employment
24 within the Bridgeport Fire Department to any
25 other agency, federal or state?

Page 34

1   A. We report to both the federal
2 government and state government in annual
3 surveys that are sent to us.
4   Q. Annual surveys sent to you from
5 whom?
6   A. The federal government.
7   Q. Are these from the EEOC?
8   A. I believe they are.
9   Q. When was the last time you
10 submitted a report to the EEOC regarding
11 statistical data about applicants for
12 employment in the Bridgeport Fire
13 Department?
14   A. It would not be statistical data
15 about applicants to the Bridgeport Fire
16 Department. It would be statistical data
17 for employees of the fire department and all
18 the other city departments.
19   Q. Are you the person who is
20 responsible for submitting those reports?
21   A. They go out under my signature,
22 yes.
23   Q. When was the last time you did one?
24   A. My staff does it, and I believe it
25 was last year.

Page 35

1   Q. Did that report include statistical
2 data regarding gender breakdown within the
3 Bridgeport Fire Department employees?
4   A. Yes.
5   Q. Any other categories?
6   A. No, I don't believe so.
7   Q. Where are those records kept today?
8   A. We retain copies and, of course,
9 the original is sent back to the federal
10 government.
11       MS. WALLACE: Counsel, I
12 believe this was asked for in discovery.
13       MR. MITCHELL: I doubt it. If
14 there's a copy, Ill give it to you. I don't
15 believe it falls within the scope of your
16 discovery request. I'll check.
17       MS. WALLACE: I want to say
18 that No. 2 in my original production request
19 early on, No. 2 or 3, somewhere around
20 there, I asked for statistical data
21 regarding gender.
22       MR. MITCHELL: We gave you
23 statistical data regarding gender. I don't
24 believe it's compacted within your request.
25 As I said, if it is, we'll get it for you.

Page 36

1 BY MS. WALLACE:
2   Q. Mr. Colligan, do you have any
3 problem accessing that information for the
4 last five years?
5   A. I don't believe so.
6   Q. Could it be provided without any
7 undue hardship to your office?
8   A. If we have it, we'll certainly give
9 it to you, absolutely.
10   Q. Is there any other federal or state
11 governmental agency that would make those
12 kinds of statistical reports to you, not
13 identical, but similar?
14   A. No.
15   Q. Do you make any reports like that
16 to any agency within the City of Bridgeport?
17   A. From time to time I believe the
18 Office of Affirmative Action had requested
19 those in the past, give us a statistical
20 breakdown of various departments and so
21 forth.
22   Q. Do you know what they use the
23 information for?
24   A. I don't.
25   Q. When was the last time your office

Page 37

1  provided such data to that office?
2     A. I don't recall.
3     Q. Does that office have any authority
4  over your functions in your position?
5     A. No.
6     Q. Does it have any authority over the
7  workings of the Civil Service Commission?
8     A. No.
9     Q. So if the Civil Service Commission
10 was doing something that potentially
11 violated equal employment opportunity laws
12 with affirmative action, would the
13 Affirmative Action Office in Bridgeport be
14 able to control or influence that?
15    A. Using that hypothesis, the
16 Affirmative Action Office certainly could
17 make suggestions. Could they order the
18 commission to take whatever action? No,
19 they could not.
20    Q. Can the Affirmative Action Office
21 demand documents or information from the
22 Civil Service Commission?
23    A. Sure.
24    Q. If the Civil Service Commission
25 declined to provide the information, who

Page 38

1  would arbitrate that dispute?
2     A. Well, if they're public records, we
3  would never refuse to make them public.
4  They're public records.
5     Q. Does the Affirmative Action Office
6  in Bridgeport, in fact, monitor the
7  activities of the Civil Service Commission?
8     A. The Affirmative Action Office in
9  the City of Bridgeport is in somewhat a
10 state of flux. There is no permanent
11 director now with the passing of the last
12 director. Actually, Mr. Penn's position had
13 been discontinued in the city budget.
14    Q. What year was that?
15    A. I don't recall, within the last two
16 or three years.
17    Q. So, there is no one occupying the
18 position now?
19    A. I don't believe so.
20    Q. Who monitors equal employment
21 opportunity compliance of the Bridgeport
22 Civil Service Commission?
23    A. Well, that's not part of my job.
24 It's part of the city attorney's job.
25    Q. What do you do to monitor EEO

Page 39

1  compliance of the Civil Service Commission?
2     A. To make sure that all of the
3  examinations that we give comport to federal
4  guidelines in the selection, make sure our
5  hiring standards are within the confines of
6  EEOC employment guidelines.
7     Q. Have you had any training from
8  EEOC?
9     A. I have not had training from EEOC.
10    Q. When was the last time you reviewed
11 EEOC guidelines regarding equal employment
12 opportunity?
13    A. I can't tell you specifically the
14 last time.
15    Q. Have you ever reviewed the EEOC
16 public internet website?
17    A. No.
18    Q. Do you have any documents in your
19 office regarding EEOC requirements that came
20 from the EEOC?
21    A. We have federal guidelines on
22 employee selection.
23    Q. Published by whom?
24    A. By the EEOC.
25    Q. Anything else?

Page 40

1     A. I don't think so.
2     Q. The Civil Service Commission and
3  you are both advised by the city attorney's
4  office?
5     A. Correct.
6        (MARKED QUESTION #3)
7     Q. Have you ever been sued?
8     A. Personally or in my official
9  capacity?
10    Q. Either way, have you ever been sued
11 in court?
12       MR. MITCHELL: Objection. Not
13 within the scope of what he's being
14 presented for. He has not been disclosed as
15 a representative of the City of Bridgeport
16 or any of its agents or designees.
17       I instruct him not to answer.
18       MS. WALLACE: I can ask him if
19 he's been sued.
20       Let's mark the transcript.
21       (MARKED QUESTION #4)
22 BY MS. WALLACE:
23    Q. Mr. Colligan, in your capacity as
24 Civil Service head or personnel director for
25 the City of Bridgeport, have you ever been

Page 41

1  the subject of a lawsuit?
2        MR. MITCHELL: Objection.
3  Don't answer.
4        Two grounds for that.
5        One, the notice of deposition
6  is very specific as to what kinds of
7  lawsuits we're supposed to provide
8  information regarding, and that is too broad
9  for that.
10       Secondly, he has not been
11 designated a representative of the city. In
12 that respect he's testifying on behalf of
13 the city, not in his own behalf.
14       MS. WALLACE: Asking him in his
15 capacity within the employ of the city.
16       MR. MITCHELL: He is not
17 designated as a representative of the city.
18       MS. WALLACE: Counsel, this is
19 an entirely frivolous objection.
20       MR. MITCHELL: We'll let the
21 judge decide that.
22       (MARKED QUESTION #5)
23 BY MS. WALLACE:
24    Q. Mr. Colligan, have you ever gone to
25 contract on behalf of the City of

Page 42

1  Bridgeport?
2        MR. MITCHELL: Objection.
3        Do not answer.
4        Same objection. I will read
5  for the record what Mr. Colligan has been
6  provided for in the notice sent to you
7  yesterday, for three specific purposes:
8        One, the job qualifications and
9  hiring processes or promotional policies and
10 practices within the Bridgeport Fire
11 Department for the Bridgeport Civil Service
12 Commission.
13       Secondly, qualifications and
14 evaluation issues relative to the
15 Plaintiffs' hiring into the Bridgeport Fire
16 Department as defined by the Civil Service
17 rules and regulations.
18       And three, policies, practices
19 and customs with respect to the terms and
20 conditions of employment that also arise
21 within classified services of the City of
22 Bridgeport.
23       Those are the three topics for
24 which he has been designated to testify.
25 Those are the only topics which I will

Page 43

1  permit him to testify by order of the court.
2     (MARKED QUESTION #6)
3  BY MS. WALLACE:
4     Q. Mr. Colligan, in your capacity as
5  personnel director for the City of
6  Bridgeport, have you ever presented any
7  information about the job qualifications and
8  hiring processes or promotional policies and
9  practices within the Bridgeport Fire
10 Department for the Bridgeport Civil Service
11 Commission to any court?
12    MR. MITCHELL: Objection.
13    Don't answer.
14    (MARKED QUESTION #7)
15 BY MS. WALLACE:
16    Q. Mr. Colligan, in your capacity as
17 personnel director for the City of
18 Bridgeport, have you ever presented any
19 information about the qualifications and
20 evaluation issues relative to the
21 Plaintiffs' hiring into the Bridgeport Fire
22 Department as defined by the Civil Service
23 rules and regulations by the City of
24 Bridgeport to any court?
25    MR. MITCHELL: Objection.

Page 44

1     Don't answer. Outside the
2  scope of the designation. In fact, it's
3  outside the scope of your notice of
4  deposition for that matter.
5     MS. WALLACE: I disagree.
6  These are relevancy objections.
7     MR. MITCHELL: They're not
8  relevancy objections. As to the scope of
9  the notice of deposition and the purpose for
10 which the witness has been designated, a
11 Rule 30-B6 deposition is much more limited
12 in the sense that the deponent, sitting in
13 this case, is permitted to provide and
14 designate certain persons to speak on
15 certain subjects.
16    The questioner is limited to
17 issues raised within the notice of
18 deposition and to issues for which those
19 individuals were designated.
20    If the questioner feels no one
21 has been designated to deal with the
22 subject, which has been raised within the
23 notice of deposition, that is an objection
24 to be made to the court.
25    (MARKED QUESTION #8)

Page 45

1     Q. Mr. Colligan, have you ever given
2  any information to any court regarding the
3  City of Bridgeport policies, practices and
4  customs respecting the terms and conditions
5  of employment that also arise within
6  classified services of the City of
7  Bridgeport?
8     MR. MITCHELL: Same objection.
9     Do not answer the question.
10    (MARKED QUESTION #9)
11 BY MS. WALLACE:
12    Q. Mr. Colligan, is there anyone who
13 would know better than you whether you have
14 given any information to any court regarding
15 any of the items that you are here to
16 testify about today?
17    MR. MITCHELL: Objection.
18    Do not answer the question.
19    MS. WALLACE: He certainly can
20 answer if there is anyone he knows who would
21 be able to give the information he can't
22 give.
23    MR. MITCHELL: I just made the
24 point.
25    (MARKED QUESTION #10)

Page 46

1     Q. Mr. Colligan, are you able to give
2  testimony, aside from your attorney
3  instructing you, that the city's attorney
4  instructed you not to answer, are you able
5  to give information about any information
6  you may have given to any court regarding
7  any of the information that you've been
8  designated to testify about today?
9     MR. MITCHELL: Objection.
10    Do not answer the question.
11 BY MS. WALLACE:
12    Q. Mr. Colligan, is there any
13 information regarding job qualifications and
14 hiring processes -- start with just one --
15 any information regarding job qualifications
16 within the Bridgeport Fire Department that
17 you are unable to testify about?
18    A. Could you repeat that?
19    Q. Is there any information regarding
20 job qualifications in the Bridgeport Fire
21 Department that you are unable to testify
22 about?
23    A. Job qualifications for admittance
24 to the examination, there is nothing that I
25 could not testify to.

Page 47

1     (MARKED QUESTION #11).
2  BY MS. WALLACE:
3     Q. What about job qualifications after
4  hire?
5     MR. MITCHELL: He wasn't
6  designated for that.
7     MS. WALLACE: I'm asking him
8  the scope here.
9     MR. MITCHELL: The scope is
10 within the notice I gave you.
11    MS. WALLACE: Counsel, please
12 stop interrupting. You have form objections
13 only.
14    MR. MITCHELL: I can object to
15 anything outside the scope of what he's been
16 designated to testify about.
17    I sent you a letter, the letter
18 you requested, where we specified he can
19 testify to job qualifications of BFD/Civil
20 Service. He's not going to testify about
21 anything outside of that.
22    MS. WALLACE: I'm trying to
23 determine what he can testify about. There
24 appears to be a discrepancy to what your
25 notice says and what this witness is able to

Page 48

1  say.
2     MR. MITCHELL: That's
3  irrelevant. The issue is what he's been
4  designated to testify about.
5     MS. WALLACE: Counsel, you
6  don't need to testify. I need him
7  testifying. Please, stop interrupting the
8  deposition, knowing the judge is not
9  available due to the funeral of another
10 judge.
11    MR. MITCHELL: I don't care why
12 the judge is not available. He's not
13 testifying about anything he's not
14 designated to testify about.
15    MS. WALLACE: I'm trying to ask
16 him --
17    MR. MITCHELL: In fact, at this
18 time we should mark this as Exhibit No --
19 whatever.
20    MS. WALLACE: I object. We're
21 not marking that. It's my deposition. I'm
22 not marking that.
23    MR. MITCHELL: Then we'll
24 terminate the deposition until the judge
25 gets back. If you're not going to play the

Page 49

 1  game according to the rules, I'll move for a
 2  protective order.
 3        You are referring to a document
 4  that is not in evidence. If you're saying
 5  you're not going to identify it and you're
 6  going to try to misrepresent it, I'm going
 7  to have to terminate the deposition or ask
 8  that you mark it. Either one.
 9        MS. WALLACE: Counsel, you're
10  being abusive.
11        MR. MITCHELL: No, I'm not.
12        MS. WALLACE: You're being
13  abusive.
14        MR. MITCHELL: If you wish to
15  make charges, make formal charges with the
16  appropriate authority. I'm not interested
17  in listening to your silliness.
18        MS. WALLACE: You're
19  grandstanding in front of your client.
20  Please, stop it.
21        MR. MITCHELL: Either you're
22  going to stop misinterpreting the letter,
23  which I sent, dated yesterday, regarding
24  what these people are designated to speak
25  to, or we're going to mark it as an exhibit

Page 50

 1  for the judge, or we're going to read each
 2  item into the record, or we're going to stop
 3  the deposition and move for a protective
 4  order as we're entitled to do.
 5        MS. WALLACE: Counsel, you need
 6  to have form objections only.
 7        MR. MITCHELL: Not in a Rule
 8  30-B6 deposition, in so far as you are
 9  seeking to go outside the scope of the
10  topics for which these witnesses are
11  designated, I have the right to instruct
12  them not to answer.
13        MS. WALLACE: I have the right
14  to seek counsel fees and sanctions for what
15  you're --
16        MR. MITCHELL: I don't care
17  what you try to do. The rules are rules.
18  You can't change the rules.
19        If you want to ask him
20  questions within the scope of what he's
21  designated to testify about, I have no
22  problem with that.
23        MS. WALLACE: I have to ask the
24  witness what the scope is.
25        MR. MITCHELL: I defined the

Page 51

 1  scope. The city defined the scope to the
 2  witness.
 3        MS. WALLACE: And I can ask the
 4  witness --
 5        MR. MITCHELL: I'm not going to
 6  allow you to do that and I suggest you move
 7  on to something else.
 8        MS. WALLACE: I suggest you
 9  stop interrupting and talking over me in a
10  rude manner --
11        MR. MITCHELL: You're the most
12  insulting and insufferable individual I've
13  run into in years.
14        Go ahead and ask your question.
15  If you want to move to something else, move
16  on.
17        If you want to continue, I'll
18  continue to object and instruct the witness
19  not to answer.
20        If you want to wait, terminate
21  the deposition until the judge is available,
22  that's fine also.
23        If you want to file charges
24  against me for something, do so.
25        MS. WALLACE: Are you done?

Page 52

 1        MR. MITCHELL: You're wasting
 2  your nine and a half hours.
 3        MS. WALLACE: Are you done?
 4        MR. MITCHELL: I'm done.
 5  BY MS. WALLACE:
 6     Q. Mr. Colligan, you previously
 7  testified there was some delineation between
 8  when, you as personnel director of the Civil
 9  Service Commission, have some kind of
10  authority or control over hirees into the
11  Bridgeport Fire Department and when the fire
12  department chief does, correct?
13     A. Correct.
14     Q. Are there any job qualifications
15  for employees within the Bridgeport Fire
16  Department that you as personnel director do
17  not have authority or control over?
18        MR. MITCHELL: Objection as to
19  form.
20        Go ahead and answer.
21     A. Not quite sure I understand it.
22  Could you please say that again.
23  BY MS. WALLACE:
24     Q. What is it that's confusing you?
25     A. The whole question. I didn't

Page 53

 1  understand anything.
 2        MS. WALLACE: Read the question
 3  back.
 4        (QUESTION READ: Are there any
 5  job qualifications for employees within the
 6  Bridgeport Fire Department that you, as
 7  personnel director, do not have authority or
 8  control over?)
 9     A. As I stated previously, the
10  requirements are set forth for admission to
11  the examination. Those are requirements
12  that we have control over.
13        Once the individuals are certified to the
14  fire department, all of the requirements set forth
15  and standards for training, those are all determined
16  by the Bridgeport Fire Department.
17        (MARKED QUESTION #12)
18     Q. So who would know about job
19  qualifications from that point where it
20  leaves your auspices?
21        MR. MITCHELL: Objection.
22        Don't answer.
23        There is a witness coming to
24  answer that point for you -- there are two
25  of them.

Page 54

 1        MS. WALLACE: I can ask him in
 2  his professional capacity and in his
 3  official capacity.
 4        MR. MITCHELL: I'm not going to
 5  allow him to respond to any questions
 6  regarding issues outside the scope of what
 7  he's designated to testify about.
 8        MS. WALLACE: I'm not asking
 9  for issues. Asking him to define for me the
10  scope of what he's prepared to testify
11  about, because your statements are not in
12  compliance or accurate in terms of his
13  actual testimony.
14        MR. MITCHELL: We've designated
15  him to speak about three subjects. He will
16  speak about those three subjects.
17        MS. WALLACE: He's already
18  testified that he, in fact, cannot provide
19  information about job qualifications in the
20  Bridgeport Fire Department/Civil Service at
21  all.
22        MR. MITCHELL: That's a
23  mischaracterization of his testimony.
24        (End of Marked Questions.)
25  BY MS. WALLACE:

Page 55

Q. Mr. Colligan, isn't it true that you simply do not have the capacity to testify today as to job qualifications within the Bridgeport Fire Department for employees once they are past the probationary period?

MR. MITCHELL: He's not designated to testify about that.

MS. WALLACE: Please, let him answer. You have a form objection. You can't keep telling him what to say.

MR. MITCHELL: He's not been designated to testify about that. He's not responsible to answer that question, period. Don't answer it.

I take it back. Answer that question.

MS. WALLACE: Let's have the question read back.

(QUESTION READ: Mr. Colligan, isn't it true that you simply do not have the capacity to testify today as to job qualifications within the Bridgeport Fire Department for employees once they are past the probationary period?)

Page 56

MR. MITCHELL: I maintain that objection in this instance and I'm allowing him to answer to end the dialogue.

A. I stated previously, once they're certified, the fire department qualifications and requirements of their training are set forth by the department.

BY MS. WALLACE:

Q. Okay. Now as far as promotional policies, promotions would take place after someone has already been certified by the fire department?

A. Correct.

Q. They have to be past their probationary period to be talking about promotions?

A. That is correct.

Q. Are you able to testify about promotional practices for employees past the probationary period?

A. Yes.

Q. Are you able to testify about city policies, practices and customs respecting the terms and conditions of employment that arise from within the classified services of

Page 57

the city?

A. Perhaps some terms.

Q. What would those be?

A. I don't know what that means.

Q. I agree. What terms and conditions of employment that arise within the classified services of the city can you give testimony about?

A. Once again, I'm not quite sure I know what you mean when you say terms and conditions of employment. That's such a broad range of things. The terms and conditions of employment -- I don't know what you mean.

Q. So you just don't understand what that means, terms and conditions of employment?

A. I think it's kind of broad. If you can define it more narrowly, I think I can perhaps respond to it. I would like to answer your question. I think it's so broad I really don't understand what you're getting at.

Q. Do you know what the terms and conditions of employment are?

Page 58

A. Yes.

Q. What are they?

A. Terms and conditions of employment is pretty self-explanatory. You must perform in a satisfactory manner to retain your job.

The terms and conditions of employment are set forth many times in your employment document of record, which would be your union contract, and would set forth your hours, wages and conditions of employment.

Q. Okay. Now what of that category of information, terms and conditions of employment within the City of Bridgeport classified services, do you oversee in your capacity as personnel director?

A. We're talking with regard to the union contract definition of terms and conditions of employment, which would be specifically your hours, your wages and your conditions of employment. That could really be the purview of your labor relations department. Civil Service as such would not have much determination over those terms and conditions.

Page 59

Q. Okay. What about other terms and conditions. You just mentioned things that are set by labor contract. What about other terms and conditions that you, as personnel director, would have some kind of authority over?

A. Well, if you're speaking of terms and conditions for eligibility to promotion examination, then we, of course, would have control over that.

Q. What about any other terms and conditions of employment, as you define it, in other words, things an employee has to do to stay employed, do you, as personnel director, have authority over that?

A. Not really.

Q. So in other words, if an employee is coming late to work chronically, you have no authority over that?

A. No.

Q. If an employee is using drugs on the job, you have no authority over that?

A. No.

Q. If an employee is out on sick leave, whether they have sick leave and come

Page 60

back, do you have any authority over that?

A. Let me go back and retract what I'm saying. In a sense we are part of the grievance process of the Civil Service Commission in the fire contract, and it's relatively unique.

Most of the unions do not have this, but the fire contract does have the Civil Service as a step in the grievance process. So in that one limited area I suspect we would have control over those areas that you mentioned.

Q. Okay. Explain to me what the Civil Service Commission's role is with respect to the grievance process in Bridgeport?

A. We're step 2 in the process, that once the grievance is presented to the administrative head, that would be the fire chief, if it is not resolved, it could be moved by the second step, which would be the Civil Service Commission.

Q. Then what happens to the grievance with regard to the Civil Service role?

A. The commission would hear it and they could either grant the request of the union with respect to the grievance, or if

Page 61

1 they denied it, then it would go on to the
2 next step.
3   Q. What would the next step be?
4   A. I believe that's the labor board.
5   Q. The state --
6   A. State labor board.
7   Q. Is there any other avenue for
8 grievances to go within the City of
9 Bridgeport besides the Civil Service
10 Commission?
11   A. Any other avenue?
12   Q. Any other board or commission
13 within the City of Bridgeport that hears
14 grievances at that step besides the Civil
15 Service Commission?
16   A. First step would be the fire
17 commission.
18   Q. So the Civil Service Commission
19 reviews decisions of the fire commission?
20   A. If the grievance is not resolved,
21 the commission would get involved.
22   Q. And do they hear what is called de
23 novo?
24   A. Not sure I know what that means.
25   Q. Do they hear the facts all over

Page 62

1 again?
2   A. Yes.
3   Q. Or do they take a legal appeal of
4 the decision?
5   A. No, they hear the facts.
6   Q. Is the decision of the fire
7 commissioners binding on the Civil Service
8 Commission in any way?
9   A. No.
10   Q. Does it have any kind of weight
11 afforded to it by the Civil Service
12 Commission in making their review?
13   A. No. I think they go in with an
14 open mind and hear the grievance and judge
15 it again on its merit.
16   Q. Does the Civil Service Commission
17 control the activities of the Bridgeport
18 fire commissioners in any way?
19   A. No.
20   Q. Do they advise them?
21   A. No.
22   Q. Do they have oversight over them?
23   A. No.
24   Q. If the Bridgeport Board of Fire
25 Commissioners commits a violation of the

Page 63

1 Civil Service rules, who would oversee that?
2       MR. MITCHELL: Objection. You
3 want to change the question?
4       MS. WALLACE: I'll withdraw it.
5 BY MS. WALLACE:
6   Q. If the Board of Fire Commissioners
7 violated the Civil Service rules, who would
8 have authority to remedy that within the
9 City of Bridgeport?
10   A. I don't see how the fire commission
11 could ever violate Civil Service rules.
12   Q. The fire commissioner has the
13 authority to remove people from the job,
14 correct?
15   A. At what stage of their employment?
16   Q. They have the authority to
17 involuntarily retire fire fighters, correct?
18   A. I don't know.
19   Q. Do they have the authority to
20 terminate fire fighters?
21   A. I believe they do.
22   Q. They can do that without the Civil
23 Service Commission's approval?
24   A. If that fire fighter is a permanent
25 employee, yes. If that fire fighter is a

Page 64

1 probationary employee, no.
2   Q. So if the Board of Fire
3 Commissioners were to terminate someone in
4 violation of Civil Service rules, would the
5 Civil Service Commission have oversight over
6 that?
7   A. The rule you're referring to now, I
8 assume, would be a probationary fire fighter
9 designated outright?
10   Q. No, non probationary, beyond
11 probation, permanent employee of the
12 Bridgeport Fire Department.
13   A. That is governed under the terms
14 and conditions as set forth in the union
15 contract. Civil Service is not involved.
16   Q. Are you involved in any way in any
17 of the promotional examinations that are
18 currently open and have been announced in
19 the Bridgeport Fire Department?
20   A. Yes.
21   Q. What is your involvement?
22   A. We announce the examinations and we
23 administer them.
24   Q. What examinations are currently
25 open or pending?

Page 65

1   A. We have examinations that are in
2 temporary hold as a result of litigation
3 with the position of fire captain and fire
4 assistant chief.
5   Q. Have you been named as a party to
6 any those pieces of litigation that you just
7 mentioned?
8   A. I believe I have.
9   Q. Which one?
10   A. Both. It's my understanding
11 they've all been encompassed into one
12 lawsuit and that would be Mattera versus the
13 City of Bridgeport.
14   Q. When was the last time that the
15 application for examination for hire as a
16 Bridgeport fire fighter was reviewed by your
17 office?
18   A. The application itself?
19   Q. Just the form.
20   A. I don't know.
21   Q. Who made the application up?
22   A. Who made it? The application has
23 been in existence in various forms and there
24 have been modifications to it through the
25 years for many years. I don't know how

Page 66

1 many.
2   Q. When was the last time it was
3 modified?
4   A. The date, I don't know.
5   Q. Who would be responsible for
6 modifying it?
7   A. I would. There are areas that we
8 would request review from the city
9 attorney's office.
10   Q. When applications come in for an
11 open hiring process for fire fighter -- by
12 open I mean one that's been announced to the
13 public -- when applications come in, who
14 reviews the application?
15   A. I do.
16   Q. Do you personally review each one?
17   A. At some point, yes, I do.
18   Q. When you review them, what does
19 that review consist of?
20   A. To see if the candidates meet the
21 threshold requirements for admission to the
22 examination.
23   Q. Those requirements are set forth in
24 the announcement for the position?
25   A. Yes.

Page 67

1  Q. If someone does not meet the
2  threshold requirements, what do you do?
3  A. We disapprove their application.
4  Q. When you receive an application,
5  what happens to the application next in the
6  process?
7  A. Nothing.
8  Q. Nothing?
9  A. What happens to the application?
10 The application is a document. There is
11 nothing that happens to the application.
12      If a candidate is approved, the candidate
13 is invited to the examination. Nothing happens to
14 the application.
15 Q. The next step would be going to the
16 actual examination?
17 A. Yes.
18 Q. They're given notice they're
19 approved?
20 A. They're given a notice to attend
21 the examination if they've been approved.
22 Q. Okay. When you are reviewing
23 applications for -- let's take the current
24 application -- the current announcement to
25 test for fire fighter in Bridgeport, there

Page 68

1  is one currently open, correct?
2  A. That examination was held quite
3  some time ago.
4  Q. It's still in the process of that
5  hiring cycle?
6  A. That's correct.
7  Q. 2003 was open?
8  A. 2002.
9  Q. When was that application process
10 closed?
11 A. The document you have.
12 Q. The document I have?
13 A. One of the exhibits, that would be
14 the 2185 examination held on 6/14/00, would
15 have the closing date for filing
16 applications.
17      (Plaintiff's exhibit for
18 identification marked City No. 13: 2185
19 examination held on 6/14/00.)
20 BY MS. WALLACE:
21 Q. Showing you what's marked Exhibit
22 13, is this the one that you're referring
23 to?
24 A. Yes.
25 Q. So that process closed what date?

Page 69

1  A. The process mark for filing the
2  application to take the written examination
3  closed July 26, 2002.
4  Q. Did you review all the applications
5  to take that test?
6  A. Yes.
7  Q. When you make your review of
8  applications, are you simply reviewing to
9  see that people meet the basic requirements
10 or are you reviewing for other information?
11 A. Basic requirements.
12 Q. Do you review in any way for
13 gender?
14 A. No.
15 Q. Do you review for race?
16 A. No.
17 Q. National origin?
18 A. No.
19 Q. Color?
20 A. No.
21 Q. Ancestry?
22 A. No.
23 Q. Disability?
24 A. No.
25 Q. Do you keep any statistical data on

Page 70

1  the gender composition of the applicant
2  pool?
3  A. Yes.
4  Q. Where is that kept?
5  A. It's notated right at the bottom of
6  the application.
7      MS. WALLACE: Let's mark that.
8      (Plaintiff's exhibit for
9  identification marked City 15: Photocopies
10 of Applications for Fire Fighter.)
11     MS. WALLACE: I've got a number
12 of documents, Mr. Colligan, that were
13 represented by the city attorney to have
14 come from your office, from Civil Service,
15 and I guess I want you to tell me if, in
16 fact, they have.
17     There are probably perhaps a
18 hundred documents here. I don't know any
19 better way to do it, unless counsel wants to
20 the stipulate these are, in fact, from the
21 Civil Service.
22     MR. MITCHELL: What I would
23 suggest is that you mark them all as one
24 exhibit and go through them quickly.
25     MS. WALLACE: That's what I'm

Page 71

1  thinking.
2      MR. MITCHELL: Let him take a
3  minute to go through and confirm they're
4  copies from his office.
5  BY MS. WALLACE:
6  Q. Mr. Colligan, showing you first a
7  batch of documents that have been marked
8  Exhibit 15. They're Bates stamped 001375
9  through 001677.
10     I want you to take a look through them and
11 tell me what they are. First, in general, what they
12 are.
13 A. They're photocopies of
14 applications.
15 Q. Applications for what?
16 A. Fire fighter.
17 Q. In Bridgeport?
18 A. Yes.
19 Q. This is the form that your office
20 uses for application for fire fighter for
21 Bridgeport?
22 A. It is.
23 Q. And this is for what year?
24 A. The documents that you gave me are
25 dated 1997.

Page 72

1  Q. Was there a test for fire fighter
2  given that year?
3  A. Yes.
4  Q. Is it fair to say those are the
5  applications or at least some of the
6  applications for the 1997 fire fighter test?
7  A. It would be, yes.
8  Q. Do you have statistical data as to
9  exactly how many people applied for each
10 test?
11 A. Yes.
12 Q. So you could match statistical data
13 to a number of documents here and determine
14 whether or not this is a complete set if
15 applications or not, correct?
16 A. Sure.
17 Q. Now you indicated that you keep
18 some kind of gender information or
19 statistical data from the form itself,
20 correct?
21 A. That is correct.
22 Q. You said that's on the bottom of
23 the form?
24 A. That is correct.
25 Q. Looking at the first form, I think

Page 73

1  it's Bates stamped 00 --
2     A. -- 1375.
3     Q. At the bottom of that document is
4  the statistical data that you're talking
5  about?
6     A. There is a box that asks male,
7  female, white, black, Hispanic, Asian,
8  Pacific Islander, American Indian or Alaskan
9  native.
10    Q. Does it have a statement below it?
11    A. Correct.
12    Q. What does that say?
13    A. "For purposes of affirmative
14 action, we're requesting that you fill out
15 the above data. This data will in no way be
16 used to influence your possible selection
17 for any position."
18       "The purpose of the data is statistical and
19 for helping this office determine whether
20 advertising is reaching all segments of the
21 community."
22    Q. Okay. Now do you then take this
23 data and put it somewhere else to keep it
24 statistically?
25    A. Correct.

Page 74

1     Q. Where is that kept?
2     A. All candidates who file for an
3  examination has their information entered
4  into a computer data base.
5     Q. Kept by whom?
6     A. Civil Service.
7     Q. Who does the input?
8     A. An office clerk.
9     Q. Do you review any input?
10    A. When the reports are generated, I
11 do.
12    Q. Who are the reports generated to?
13    A. Me.
14    Q. Is that information provided to the
15 EEOC?
16    A. No.
17    Q. Is that information provided to the
18 Affirmative Action Office in Bridgeport?
19    A. If they request it.
20    Q. Is that information provided to the
21 State of Connecticut?
22    A. No.
23    Q. At what point do you review the
24 data?
25    A. On a daily basis.

Page 75

1     Q. So as the applications are coming
2  in, you're looking at it on a daily basis?
3     A. Yes. I see the daily report early
4  on in the examination process. The
5  applications haven't come back at a very
6  rapid pace, so it might be weekly. But when
7  they're well into the recruitment period, I
8  like to see a daily report.
9     Q. Why is that?
10    A. I like to see if we're doing a good
11 job of recruiting.
12    Q. How would that indicate?
13    A. The number of applications back,
14 whether or not we have sufficient numbers of
15 women and minorities apply.
16    Q. What is a sufficient number of
17 women?
18    A. As many as we can get.
19    Q. There is no actual number set by
20 the City of Bridgeport, a target or goal?
21    A. No.
22    Q. What about what you call
23 minorities?
24    A. As many as we can get.
25    Q. There is no actual number set, a

Page 76

1  target or goal?
2     A. No.
3     Q. Who determines whether or not it
4  was a sufficient number of women?
5     A. Well, if we see there are no women
6  applying, then we call the chief and say
7  let's get going with that recruiting and see
8  what we can do.
9     Q. What if there are two women
10 applying?
11    A. Same thing.
12    Q. What if there are ten women
13 applying?
14    A. Same thing.
15    Q. What if there are fifty women
16 applying?
17    A. Same thing.
18    Q. What if there are 500 women
19 applying?
20    A. That would be a very good number.
21    Q. At what point would you decide you
22 have enough women applying?
23    A. Not a case of what point. I see
24 when we get a sufficient number of
25 applications returned to me. In my past

Page 77

1  experience between 1,700 and 2,000
2  applications is considered a pretty good
3  applicant pool.
4     Q. How much would you consider to be a
5  sufficient number of women?
6     A. As many as we can get.
7     Q. You're able to give a number of the
8  total applicant pool, but you can't give a
9  number that you consider to be sufficient
10 for women applicants?
11    A. Because there is no set number.
12 I'd like as many as possible.
13    Q. Do you want all the applicants to
14 be women?
15    A. That wouldn't be my choice. I know
16 from 34 years experience that's not
17 practical. That's not going to happen. As
18 I said, we like to get as many we could get.
19    Q. Would you like to have half of the
20 applicants women?
21    A. As many as we can get.
22    Q. As many as you can get, sort of
23 short of all applicants being women?
24    A. As many as we can get.
25    Q. Is there any target or goal set?

Page 78

1  Is there a target or goal set for the
2  current fire fighter exam of at least 100
3  women applicants?
4     A. No. There is no target or goal.
5     Q. Who would determine whether or not
6  the number of women applicants is sufficient
7  for any particular fire fighter hiring exam?
8     A. No one determines what specific
9  number is sufficient. We try to get as many
10 as we can get.
11    Q. Okay. But you said that you review
12 the data to see if you're on target, or if
13 you're getting a sufficient number of
14 applications returned?
15    A. Yes.
16    Q. Also you want the gender
17 information to see if you're getting a
18 sufficient number of women applicants?
19    A. Correct.
20    Q. So who determines whether it's a
21 sufficient number from a statistical data
22 review?
23    A. I would look at it, and if there
24 are none or two, as you suggested
25 previously, I would think that would not be

Page 79

1  a very good number. I would urge them to do
2  better.
3  Q. At what point would you be
4  satisfied that you have a sufficient number?
5  A. I'm never completely satisfied.
6  Q. So even if you get as far as total
7  numbers of applicants, suppose you get 5,000
8  people applying total, would that be to you
9  a sufficient total applicant pool?
10 A. That would be an overwhelmingly
11 successful recruitment.
12 Q. So you are able to say what is a
13 sufficient applicant pool in general?
14 A. For the applicant pool, yes. The
15 overall pool, absolutely.
16 Q. Okay. But you're unable to say
17 what is a sufficient number of women
18 applying?
19 A. I think I've said that, as many as
20 we can get.
21 Q. As many as you can get, how does
22 that offer guidance to someone, say, working
23 for you in terms of making a determination
24 as to whether there are enough women or not?
25 A. I don't know.

Page 80

1  Q. Does anyone else have input into
2  making a determination whether there is a
3  satisfactory number of women applying
4  besides you personally?
5  A. No.
6  Q. So it's up to you really what is a
7  sufficient number of women applying for any
8  fire fighter hiring exam in Bridgeport?
9  A. I think myself as well as the chief,
10 we share the information with the chief.
11 Q. Okay. Has the chief ever expressed
12 to you any opinion about what would be a
13 sufficient number of people for you to have
14 -- sufficient number of females for you to
15 have in the applicant pool?
16 A. The chief is a strong proponent of
17 recruitment of all members of the community,
18 particularly women.
19 Q. That's not my question.
20       MS. WALLACE: Would you read
21 the question back.
22       (Question read.)
23 A. As many as possible.
24 BY MS. WALLACE:
25 Q. That's what the chief said?

Page 81

1  A. Yes.
2  Q. He used those words?
3  A. Yes.
4  Q. How do you define minority?
5  A. Minority is defined, I believe, by
6  the federal government as a person who is
7  non white. Could be defined as African
8  American. Could be defined as Asian. Could
9  be defined as Hispanic.
10       And in today's multi-cultural society it is
11 getting harder and harder to define people because
12 we have people from multi-cultural backgrounds.
13 Q. So what if someone's father is
14 African American and their mother is
15 European, say, German Caucasian --
16 A. Yes.
17 Q. -- what box would they check on
18 this application?
19 A. That would be their choice.
20 Q. If they check the box "black,"
21 would they be treated differently on the
22 application than if they checked the box
23 white?
24 A. Application process, no.
25 Q. Would it change your determination

Page 82

1  as to whether you had a sufficient number of
2  minority applicants in the pool?
3  A. I'm not quite sure I understand
4  your question.
5  Q. Suppose you have ten people
6  applying total, and five people check white
7  and two people check black, and then that
8  leaves three, correct?
9  A. Yes.
10 Q. And of the three, all three of
11 those people have got a black father and a
12 white mother, but all three check the box
13 white. That would leave you a total of
14 eight out of ten applicants being white,
15 correct? As far as what is reflected on
16 your form, correct?
17       MR. MITCHELL: Object to the
18 form.
19 A. If that's what they mark, your math
20 would be correct.
21 BY MS. WALLACE:
22 Q. As far as you're concerned, in
23 viewing your applications, would you say you
24 had eight white applicants --
25 A. Yes.

Page 83

1  Q. -- out of ten total applicants?
2  A. That is correct.
3  Q. Now, if you had five of the ten,
4  you had five check the box white and you had
5  two check the box black, and then you had
6  three people who had a black father and
7  white mother, and all of those people check
8  the box black, you would wind up with five
9  white applicants and five black applicants?
10       MR. MITCHELL: Object to the
11 form.
12 BY MS. WALLACE:
13 Q. As far as what you see in the form,
14 correct?
15 A. Correct.
16 Q. You have one instance from where
17 you're seeing from what you review from your
18 form, you would have in either one of those
19 scenarios, have one scenario with 50 percent
20 white and 50 percent black?
21 A. Correct.
22 Q. One scenario would be 80 percent
23 white and 20 percent black?
24 A. Correct.
25 Q. Is there a difference in your

Page 84

1  conclusions about whether you have
2  sufficient candidates between 50 percent
3  white and 50 percent black or the 80 percent
4  white and 20 percent black scenario?
5       MR. MITCHELL: Objection to the
6  form.
7       Go ahead and answer.
8  A. Not sure I understand the question.
9  BY MS. WALLACE:
10 Q. You would be looking at two
11 different sets of circumstances then,
12 correct, between each hypothetical scenario
13 here?
14 A. Yes.
15 Q. When you do your review to
16 determine if you have a sufficient minority
17 application pool, you're looking for those
18 kinds of ratios, correct?
19 A. Correct.
20 Q. So you would be presented with two
21 very different scenarios, depending on who
22 checked what box, correct?
23 A. Correct.
24 Q. Do you make any attempt any further
25 to look and see whether people accurately

Page 85

1  check the boxes?
2     A. In an application process where you
3  have approximately 2000 candidates, there is
4  no proper way to do that.
5     Q. Now do you make different decisions
6  depending on -- you said you review to see
7  if you get a sufficient number of minority
8  applicants?
9     A. Yes.
10    Q. Suppose you don't have a sufficient
11 number of minority applicants, what do you
12 do? What are you using as your criteria to
13 determine that?
14    A. I would suspect if we ran the
15 examination and we have 5 percent minority
16 applying in the City of Bridgeport, that
17 would not be a very good number, and I would
18 request that the recruitment period be
19 extended.
20    Q. Have you ever done that, requested
21 a recruitment period be extended to try to
22 obtain more minority applicants?
23    A. Never had to.
24    Q. What about with regard to women, if
25 you determined by whatever criteria you're

Page 86

1  using that you did not attain a sufficient
2  number of women applicants for a fire
3  fighter hiring exam, what would you do about
4  it?
5     A. Well, if we ran a notice and there
6  are no females applying, then I would
7  suggest that we extend the recruitment.
8     Q. Have you ever extended the
9  recruiting period for gender purposes?
10    A. No.
11    Q. Is there any scenario besides zero
12 female applicants by which you would be
13 willing to extend the recruitment period to
14 try to attain more female applicants?
15    A. It's all hypothetical. I can't
16 answer. You're giving me hypothetical
17 question after hypothetical question. It's
18 very difficult to say. Give me some
19 concretes and perhaps I can respond.
20    Q. I'm asking you what your past
21 practice has been. You said you've never
22 extended the examination to try to obtain
23 more minority members or female applicants,
24 correct?
25    A. Correct.

Page 87

1     Q. You've also testified that you're
2  unable to state at what level you would feel
3  that there was not a sufficient number of
4  female applicants, correct?
5     A. Correct.
6     Q. Or any number that you would say
7  would not be a sufficient number of non
8  white applicants, correct?
9     A. Not sure I understand.
10    Q. Or minority applicants, you're
11 unable to state what number of minority
12 applicants would not be sufficient for a
13 particular exam?
14    A. It's difficult to give you a
15 specific number, yes.
16    Q. So why are you confused by the
17 question? You indicate you're confused
18 because I'm not giving you enough specifics.
19    A. Repeat your question.
20       (Question read.).
21    A. I can't say.
22 BY MS. WALLACE:
23    Q. Has anyone advised you as to how
24 you should make a determination of whether
25 you have a sufficient number of females

Page 88

1  applying for a fire fighter entry exam?
2     A. No.
3     Q. Has anyone advised you about how
4  you should make a determination as to
5  whether you have a sufficient number of
6  minority persons applying for a fire fighter
7  hiring exam?
8     A. No.
9     Q. Is there any treatise or scholarly
10 work that you have consulted to make these
11 determinations?
12    A. I would say based on my past
13 experience and past court cases.
14    Q. Which court cases have you
15 consulted?
16    A. I think we've had our share of
17 court cases in Bridgeport, ADE versus City
18 of Bridgeport, Association of Discrimination
19 of Employment and, of course, the series of
20 Guardian lawsuits.
21    Q. In the police department?
22    A. Yes.
23    Q. Any other litigation that you've
24 looked at that helps you make that
25 determination as to whether you attain a

Page 89

1  sufficient number of females or minority
2  candidates?
3     A. Not really, no.
4     Q. What in the ADE cases gives you
5  guidance?
6     A. Well, in those series of lawsuits
7  the court was critical of the City of
8  Bridgeport's recruitment of minorities and
9  urged the City of Bridgeport to do a better
10 job recruiting minority candidates.
11    Q. What things has the city done to do
12 a better job in recruiting minority
13 candidates from what occurred in the state
14 and ADE case?
15    A. Are you speaking in terms of the
16 fire department?
17    Q. Yes. That case was about the fire
18 department, correct?
19    A. That is correct. We have
20 recruitment teams that are diverse for fire
21 fighter. By that I mean we have African
22 Americans, Hispanics, females and Caucasians
23 on the recruitment team that go out and try
24 to get individuals to file applications for
25 the fire department.

Page 90

1        In our literature we try to portray diverse
2  participants in the Bridgeport Fire Department. In
3  the posters we have pictures of fire fighters who
4  are black, white, Hispanic and female.
5     Q. Anything else?
6     A. With regards to minorities, yes,
7  there are a number of minority publications,
8  and we advertise in the minority
9  publications. We indicate on all of our
10 literature that we are an equal employment
11 opportunity employer with the designation
12 M/F.
13    Q. M/F meaning what?
14    A. Male/female.
15    Q. What minority publications do you
16 publish in?
17    A. Well, I would have to review our
18 recruitment file, but one of those in the
19 northeast is Minority News.
20       There was a paper -- I'm not sure whether
21 it's still being published -- called MOJA. And
22 there are other newspapers as well.
23       We advertise on the radio as well. We
24 advertise on stations that have a programming format
25 that is directed towards the African American