Page 91

1 community.
2     We also advertise in the local Spanish
3 language station in Bridgeport.
4     Q. Which stations are directed towards
5 the African American community which you
6 advertise in?
7     A. I don't know. There is one up here
8 in the New Haven/Hartford way that we do
9 advertise in. I could get that information
10 for you.
11    Q. Has all that advertising that
12 you've indicated to all these sources
13 occurred with the current fire fighter
14 application?
15    A. Yes.
16    Q. How about the 1997 application?
17    A. I believe that's true as well.
18    Q. Who is responsible for placing
19 these advertisements?
20    A. The advertisements are placed out
21 of my office.
22    Q. Who negotiates the contracts for
23 those advertisements?
24    A. I do.
25    Q. What is your budget for those

Page 92

1 advertisements?
2     A. I have an advertising budget that
3 is encompassed within my overall examination
4 budget. This year it's $125,000 and the
5 previous years it's been twice as much,
6 $250,000.
7     Q. Why the reductions?
8     A. General reductions in the City of
9 Bridgeport overall department budget.
10    Q. Has this reduction, in your
11 opinion, affected the numbers of minorities
12 and/or women candidates or applicants for
13 the position of fire fighter for this
14 current exam?
15    A. Not at all, because for this
16 current examination, that exam was held in
17 2002. That was one of the years they had
18 250,000.
19    Q. So you have now $125,000?
20    A. My overall testing budget, and I
21 use a lot of that money to do my recruiting
22 and advertising.
23    Q. So you're talking numbers that are
24 your complete testing budget?
25    A. Correct.

Page 93

1     Q. What portion did you use for the
2 2002 exam? How many dollars did you use for
3 advertising to minority members?
4     A. I don't know.
5     Q. What portion did you use to
6 advertise to women?
7     A. I don't know.
8     Q. What about for 1997, what portion
9 of your budget, how many dollars did you
10 spend advertising for minorities?
11    A. I don't know.
12    Q. How about for women?
13    A. I don't know.
14    Q. Who keeps the records about the
15 expenditures on these matters?
16    A. I do.
17    Q. Do you cut the check yourself?
18    A. No.
19    Q. Who cuts the check for the City of
20 Bridgeport?
21    A. City controller, director of
22 finance.
23    Q. Okay. In 1997 was the entire
24 budget that you had for advertising
25 expended?

Page 94

1     A. I can't recall. I have to review
2 it.
3     Q. What about for the current
4 examination, 2002?
5     A. I have to review it.
6     Q. Now you indicated that you appealed
7 to some media outlets that you see directed
8 towards the minority community, correct?
9     A. Yes.
10    Q. What about such efforts to reach
11 women, what do you do?
12    A. We have women than are on a
13 recruitment team. We use posters which show
14 that women are fire fighters in Bridgeport.
15 And we indicate equal opportunity employee
16 M/F on the bottom of all our literature.
17    Q. Do you direct any advertising to
18 any media outlet that is directed toward
19 women?
20    A. We have not, no.
21    Q. Do you know of any one in the State
22 of Connecticut?
23    A. I don't.
24    Q. Do you contact any women's
25 organizations?

Page 95

1     A. I don't personally. I don't know
2 what the recruitment team does.
3     Q. Who controls the activities of the
4 recruitment team?
5     A. That would be the chief.
6     Q. Chief of the fire department?
7     A. Yes.
8     Q. Do you have any say so into what
9 activities the recruitment team conducts?
10    A. Not really.
11    Q. Do you know what they do?
12    A. I believe I have a general
13 understanding what they do.
14    Q. You don't know specifically?
15    A. No.
16    Q. What if the recruitment team were
17 doing something that violated federal or
18 state equal employment opportunity laws,
19 would you have the opportunity to stop that
20 kind of practice?
21    A. I would object to it very
22 strenuously, yes.
23    Q. Do you have any actual authority to
24 stop that kind of practice?
25    A. I would speak with the chief. I

Page 96

1 can't for the life of me imagine them doing
2 something like that, but if there was
3 something, some sort of violation, I
4 certainly would speak to the chief.
5       In my dealings with him in the past, he's
6 very responsible and I'm sure he would tell anyone
7 doing that to cease and desist.
8     Q. But could you make them make that
9 practice stop?
10    A. Not sure what you mean. Could I
11 make them physically?
12    Q. If a member of his recruitment team
13 was violating the state equal opportunity
14 laws in the use of their activities for
15 recruiting, do you have authority to make
16 them cease and desist from doing that?
17    A. I'm not sure. I certainly would
18 call it to their attention and ask them to
19 stop, in fact, order them to stop. Whether
20 they would stop or not, in this hypothetical
21 situation, I don't know.
22    Q. Does the chief of the fire
23 department answer to you in any way?
24    A. No.
25    Q. Do you have any authority to

**Page 97**

1 discipline him?
2   A. No.
3   Q. Who does he answer to?
4   A. Board of fire commissioners.
5   Q. If you want to take a break, tell
6 me.
7   A. I'm fine.
8       MS. WALLACE: I want to show
9 you another batch of documents and I'll just
10 indicate they are Bates stamped No. 001678
11 to 001970.
12      (Plaintiff's exhibit for
13 identification marked City 16: Applications
14 for Fire Fighter, Year 2002.)
15 BY MS. WALLACE:
16   Q. Do you recognize those documents?
17   A. I do.
18   Q. What are they?
19   A. They're photocopies of application
20 files for fire fighter for the year 2002.
21   Q. So that's for the current exam?
22   A. That's correct.
23   Q. That is currently in the cycle?
24   A. That's right.
25   Q. If you look through them, do they

**Page 98**

1 appear to be a compilation of women's
2 applications, all female applications?
3   A. No.
4   Q. They're not?
5   A. There is a gentleman, Mr. Edrick
6 D'Agosto.
7   Q. How many applicants did you have
8 total for the current examination?
9   A. I'm still looking at the rest of
10 the applications.
11   Q. Okay, you want take a look through
12 them and answer, that's fine.
13   A. (Pause).
14   Q. Let me ask you this. I'll give you
15 a chance to add more to the last question
16 about whether these appear to be all female
17 applicants.
18     Did you produce these records in response
19 to a request that came from my clients in this
20 lawsuit?
21   A. I did.
22   Q. Did you oversee the process of
23 compiling the records to make the response
24 to my clients' requests?
25   A. I did.

**Page 99**

1   Q. Did anyone assist you in compiling
2 the records?
3   A. Yes.
4   Q. Who was that?
5   A. Members of my staff.
6   Q. Anyone else?
7   A. No.
8   Q. So to your best knowledge and
9 belief, you provided everything that was
10 asked for that you have that your office
11 keeps?
12   A. I did, yes.
13   Q. Did you look beyond your office to
14 find anything from any other departments or
15 offices in the city?
16   A. Nothing that was requested of me
17 was outside the office.
18   Q. Your answer is no, you did not look
19 beyond your office?
20   A. That's correct.
21   Q. Did you look at the city archives
22 at all?
23   A. No.
24   Q. Have you had a chance to go through
25 that batch of documents?

**Page 100**

1   A. I've gone through about a third of
2 them. This is Exhibit 16.
3   Q. And you found?
4   A. With the exception of that one
5 gentleman, they would appear to be all
6 female, but I haven't had the opportunity to
7 look at those.
8   Q. When you put these together to give
9 to my client, were you looking for all
10 female applicants?
11   A. I believe that was the request.
12   Q. So it's fair to say, with the
13 exception of possibly a stray male
14 application that may have gotten copied in
15 there, these were primarily intended to be
16 female applicants for that particular exam
17 year, correct?
18   A. I provided you, based on your
19 request, with the applications of females,
20 but I don't know whether that's what I'm
21 reviewing here. That's why I was reviewing
22 it.
23   Q. That's what I'm asking. You say
24 that you were asked to provide and did
25 provide female applications for certain

**Page 101**

1 years?
2   A. Correct.
3   Q. And for what year?
4   A. For 2002.
5   Q. And how many applicants did you
6 have for the exam for 2002 total?
7   A. Gosh, I think there were in excess
8 of 2000 candidates, 2,100 candidates,
9 thereabouts.
10   Q. There is not 2000 applications in
11 the pile?
12   A. Thankfully, no.
13   Q. It's fair to say that is what you
14 had intended it to be, copies of female
15 applications?
16   A. I provided you with copies of the
17 female applications. You gave these to me
18 and asked me are they copies of female
19 applications. I was in the process of
20 determining whether they were, in fact.
21   Q. Do you need more information to
22 make that determination?
23   A. I'd like to look at them.
24   Q. Sure.
25   A. (Pause).

**Page 102**

1       MS. WALLACE: We're going off
2 the record to give him a chance to review
3 them.
4       (Whereupon, a break was taken
5 from 1:55 to 12:05.)
6       THE WITNESS: I've gone
7 through it.
8 BY MS. WALLACE:
9   Q. You had some additional information
10 to give about -- what is that exhibit
11 number?
12   A. Exhibit 16.
13   Q. Okay.
14   A. There are two applications in there
15 that were not female, at least by their
16 indication on their application.
17     One was for someone named Edrick D'Agosto
18 and the other name -- have to spell it
19 Y-O-H-A-N-C-E, last name, B-A-R-R-O-S-S.
20   Q. And both of those individuals had
21 checked male on their application?
22   A. Yes.
23   Q. So that was probably an inadvertent
24 inclusion by your office?
25   A. I don't know.

Page 103

1  Q. Well, you said that your intent in
2  providing documents from your office was to
3  provide documentation of female
4  applications, correct?
5     A. Which we did.
6     Q. Do you have any reason to believe
7  these are not the documents provided?
8     A. I don't know. They certainly look
9  like they are the applications. So whoever
10 photocopied them, I'm not ready to concede
11 Mr. D'Agosto or Mr. Barross are in there as
12 a result of our error. I don't know what
13 happened after they were given to you.
14        (Plaintiff's exhibit for
15 identification marked City No. 15:
16 Applications for 1997 Fire Fighter
17 Examination.)
18 BY MS. WALLACE:
19    Q. Fair enough. I'm going to ask you
20 to do the same thing with City Exhibit 15.
21 We'll be going off the record and you can
22 look through these and tell me if they
23 appear to be applications from your office
24 that your office keeps from female
25 applicants for the 1997 fire fighter hiring

Page 104

1  examination. (Handing documents.)
2     A. (Pause).
3        (Whereupon, a break was taken
4  from 2:10 to 12:20.)
5        (Plaintiff's exhibit for
6  identification marked City 17: Declaration
7  Sheets and Machine Scored Documents.)
8        MS. WALLACE: Exhibit 17 is
9  Bates stamped 00796 through 001173.
10 BY MS. WALLACE:
11    Q. You are done reviewing Exhibit 15,
12 correct?
13    A. Correct.
14    Q. I'll ask you some more questions
15 about those in a few minutes.
16       You've just been handed what's been marked
17 Exhibit 17 and I wanted you to look through those
18 documents and tell me what do they appear to be?
19 First of all, look at them in general.
20    A. Declaration sheets and photocopies
21 of declaration sheets and photocopies of
22 machine scores, written examination sheets,
23 machine scored.
24    Q. Those are for the tests for fire
25 fighter in the Bridgeport Fire Department?

Page 105

1     A. Correct.
2     Q. For what year?
3     A. 1997.
4     Q. Okay. And I want you to go through
5  them like you did the other batches of
6  documents to see that they appear to be
7  primarily the copies of applications of
8  females.
9     A. Okay.
10       MR. MITCHELL: You mean copies
11 of tests?
12       MS. WALLACE: Excuse me, tests
13 of female applicants.
14    A. (Pause.)
15       (Whereupon, a break was taken
16 from 12:15 to 12:30.)
17       MS. WALLACE: First of all,
18 there was, apparently, some discrepancy with
19 the marking. We're trying to fix it.
20       There were two exhibits marked
21 12. We'll make them 12-A and 12-B, but
22 we're going to identify them. Bates stamp
23 001978 to 001983 is 12-A.
24       (Plaintiff's exhibit for
25 identification marked City No. 12-A: Notice

Page 106

1  for Open Competitive Exam for Fire Fighter,
2  1993.)
3  BY MS. WALLACE:
4     Q. Mr. Colligan, showing you the
5  Notice for Open Competitive Exam for Fire
6  Fighter, August 14, 1993; you previously
7  looked at this?
8     A. Correct.
9        (Plaintiff's exhibit for
10 identification marked City No. 12-B: Notice
11 for Open Competitive Exam for Fire Fighter,
12 1997.)
13 BY MS. WALLACE:
14    Q. And the second one, which is now
15 12-B, Bates stamped 001984 to 001988. Mr.
16 Colligan, you looked at this previously.
17 That's the exam for fire fighter, 1997,
18 correct?
19    A. Correct.
20    Q. Your testimony about these remains
21 the same with these references straightened
22 out?
23    A. Correct.
24    Q. You just had the opportunity to
25 look through two sets of documents. The

Page 107

1  first was Exhibit 16, applications regarding
2  2002.
3        Did you identify these as coming from your
4  office?
5     A. I did.
6     Q. And the one that you just looked
7  at, Exhibit 17, starts with Bates stamp
8  00786 and ends with Bates stamp 001173. Do
9  you recognize those documents?
10    A. I do.
11    Q. What are they?
12    A. Several documents. They are
13 declaration sheets for the examination for
14 fire fighter.
15    Q. What does that mean, declaration
16 sheet?
17    A. When the candidates take the
18 examination, they're identified by number.
19 So what we have them do is fill out a
20 declaration sheet, which has a number on it
21 in the upper right-hand corner.
22       The sheets, upon completion of the
23 examination, are sealed and the candidate's
24 examination papers are scored only using the number
25 in the upper right-hand corner of their declaration

Page 108

1  sheet.
2     Q. It's a blind test as far as names
3  go?
4     A. Correct.
5     Q. Why is that?
6     A. Well, we don't want anything to
7  influence the rating of applications, plus
8  it's also a charter requirement.
9     Q. City charter?
10    A. Correct.
11    Q. What else is in there?
12    A. Photocopies of the written
13 examination score sheets, machine score
14 sheets.
15       Then down towards the bottom of the
16 package, in addition to the other two documents, is
17 the declaration sheet and answer sheet. These are
18 photocopies of the sheets from the physical agility
19 examination.
20    Q. Okay. Should this really be two
21 separate batches of documents, one is the
22 written test and one is for agility? Is
23 that what you're saying, there are some
24 documents pertaining to one portion of the
25 exam and some pertaining to another portion?

Page 109

A. I'm just telling you what is in this file, declaration sheet and machine scored written answer sheets.
For candidates who, apparently, went to the agility examination, copies of their agility score sheets are included on the bottom.
Q. And in your review of these documents, do they appear to be all from female candidates?
A. Yes.
Q. These came from your office?
A. Yes.
Q. And they're given in response to my clients' document request, correct?
A. That is correct.
MS. WALLACE: This is a good time to break for lunch.
(Whereupon, a lunch break was taken from 12:40 p.m. to 2:00 p.m.)
BY MS. WALLACE:
Q. I think we left off, Mr. Colligan, when you make the decision about who meets the requirements to become a candidate or to take an examination for entry level fire fighter in Bridgeport, does anyone help you

Page 110

make that determination, or you do that by yourself and your own review?
A. The requirements are set prior to my review of the candidate's application. It would be solely my responsibility.
Q. When you first get a list together, I take it you make some sort of list of people who are eligible to take that examination, correct?
A. They're all entered into the data base.
Q. Who has access to the data base?
A. In my office?
Q. Everybody, you know, who has access to that data base?
A. Myself and my staff.
Q. Is that considered a public record, the content of that data base?
A. The names perhaps, unless the candidate objects to having it known that they're applying for this job.
Q. Can they do that?
A. Yes.
Q. Is that on the application?
A. Yes.

Page 111

Q. When you enter the information in the data base, do you enter everything that is on the application form in all those data fields?
A. No.
Q. What information gets into the data base?
A. Name, address, race, gender. The entries are made according to the candidate's social security number in there. That's it.
Q. Age?
A. No.
Q. Any information about disability?
A. No.
Q. So name, address, race, gender and social security number?
A. Yes.
Q. Why are race and gender entered in at that point?
A. Well, we'd like to keep track of the candidate population that we have to do that in order to meet any EEOC challenges that might be challenging a disparate impact of these examinations.

Page 112

Q. Has anybody told you that you have to do that?
A. It's pretty much accepted practice as a result of uniform guidelines for employee selection.
Q. What are those guidelines?
A. That you must keep statistical data in your examinations to see that they comport to federal rules, particularly the 4/5ths rule, with regard to candidates passing the examination.
Q. Where does the 4/5ths rule come from?
A. Employee Guideline Selection.
Q. What is that publication?
A. Uniform Guideline Employee Selection.
Q. Who publishes that?
A. It's an agency of the federal government. I believe it's the EEOC.
Q. What is the most recent edition dated, what year?
A. I don't know.
Q. Do you have a copy of that in your office?

Page 113

A. I'm sure we do.
Q. When was the last time you reviewed it?
A. Oh, several years ago.
Q. And do you do any reporting -- again, I asked you earlier -- you talked a little bit about your report. Do you do any reporting of that specific data base made up of this applicant pool? Do you report that to EEOC?
A. No.
Q. Do you report that to the state?
A. No.
Q. Do you report it to any agency of the state or federal government?
A. No.
Q. Do you report it to the mayor's office?
A. No.
Q. To the city Affirmative Action Office?
A. If requested.
Q. Have you ever reported it there?
A. When it's requested, yes.
Q. When was the last time they

Page 114

requested information like that?
A. I don't recall.
Q. Is the city under an affirmative action plan?
A. Yes.
Q. What does that plan consist of?
A. Document putting forth the city's statement on affirmative action.
Q. Is that a new document that's been recently promulgated?
A. No.
Q. Has the policy been changed at all in the last two years?
A. No.
Q. Do you remember what year the policy was instituted?
A. I don't.
Q. Do you have anything to do with making that policy?
A. No.
Q. Where did the policy come from, which agency or department of the city?
A. From the Affirmative Action Office.
Q. Now, access to that data base with the information about employee applicants,

Page 115

1  I'm a little unclear.
2     You're saying there are certain people in
3  your office who have access. Does the fire chief
4  have access to it?
5     A. No.
6     Q. Would you give that information to
7  the people if they ask you?
8     A. I would not necessarily give the
9  names. If they wanted to know what the
10 candidate profile was, the overall candidate
11 profile, the pool, I would give that.
12    Q. At any point after you put these
13 names in -- you said you put these names in
14 over periods of time as applications come
15 in, correct?
16    A. Correct.
17    Q. The application is cleared and
18 screened initially by you and you put them
19 in the data base?
20    A. That's right.
21    Q. At any point along the way a member
22 of the public could ask for that information
23 and you would give it to them possibly with
24 the name redacted?
25    A. Correct.

Page 116

1     Q. The social security number
2  redacted?
3     A. Yes.
4     Q. But you would give them gender and
5  race information?
6     A. Yes, if asked.
7     Q. Has anybody asked for this
8  information from this current hiring list,
9  2002 announced exam?
10       MR. MITCHELL: Object to the
11 form, only because I don't know if you mean
12 anyone from the public.
13 BY MS. WALLACE:
14    Q. Anybody at all?
15    A. Outside our office at all, if I'm
16 not mistaken, I believe the Fire Birds have
17 requested it.
18    Q. Did you give it to them?
19    A. Yes.
20    Q. Any other organization operating
21 within the Bridgeport Fire Department ask
22 for it?
23    A. No.
24    Q. The union?
25    A. I don't believe they asked for it,

Page 117

1  no.
2     Q. Chief Haig Williams, did he ask for
3  it?
4     A. I don't recall.
5     Q. Richard D'Onofrio, did he ask for
6  it? If you don't know, say so.
7     A. I don't know who they are.
8     Q. Robert Winfred?
9     A. Robert Winfred is the president of
10 the union. I don't recall him asking for
11 it.
12    Q. Richard Albrecht?
13    A. I don't believe Attorney Albrecht
14 asked for it, to the best of my
15 recollection. I wouldn't know.
16    Q. Did the City of Bridgeport Hispanic
17 Fire Fighters Association ask for it?
18    A. I don't know. I don't recall.
19    Q. You're saying these people asked
20 for it. Did you give this information to
21 anybody from the date the 2002 examination
22 was announced?
23       Have you given that information that we've
24 been speaking of, the candidates, the initial
25 applicant pool or people who are able to take the

Page 118

1  exam, did you give that information as statistical
2  information to anyone else other than the Fire
3  Birds, whether they asked for it or not, outside
4  your staff, of course?
5     A. Well, no, I don't recall anyone
6  asking for it. If they did, it would have
7  been given to them with the names redacted
8  and social security number.
9     Who specifically requested it outside Mr.
10 Mackey and the Fire Birds, I do not recall anyone
11 else specifically asking for it.
12    Q. That wasn't my question. My
13 question was: Aside from people who have
14 asked for it, I'm asking you, who did you or
15 your staff give it to?
16    A. I don't know.
17    Q. Whether they asked for it or not --
18    A. No.
19    Q. -- besides the Fire Birds?
20    A. No, ma'am.
21    Q. Once you get that list made up, the
22 next step is what?
23    A. This was the next step in the
24 testing process.
25    Q. Where do they go from here?

Page 119

1     A. After the written examination, the
2  lists are compiled.
3     Q. You make a list initially of people
4  who are eligible to take that exam, correct?
5     A. Right.
6     Q. You get the total list from there?
7     A. Correct.
8     Q. At some point in time you then
9  decide. What is the next step, written
10 exam?
11    A. Yes.
12    Q. Do you keep a list of people who
13 pass the written exam?
14    A. Yes.
15    Q. Do you keep a list of people who
16 fail the written exam?
17    A. Yes.
18    Q. Are those lists kept with
19 indications of race and/or gender?
20    A. The lists are not kept with race
21 and/or gender, but we have the ability to
22 punch into the computer to get a list
23 indicating race and gender.
24    Q. But the lists for review, what is
25 commonly referred to as the examination

Page 120

1  list, does not have race and gender on it?
2     A. No.
3     Q. You're saying you go back and punch
4  it in and get it from the initial applicant
5  list?
6     A. From the data base.
7     Q. When someone goes to take a written
8  exam, they're assigned a number?
9     A. Yes. When they go to their room,
10 their sheets are on the desk. They randomly
11 sit at whatever desk they want to.
12       There is a sheet called a declaration sheet
13 that has a number in the upper right-hand corner.
14    Q. That is on the documents marked
15 Exhibit 17 today?
16    A. That's exactly right.
17    Q. You're attempting to make a blind
18 test?
19    A. That's right.
20    Q. But you can go back on that blind
21 test and still find out what race or gender
22 the person is, correct?
23    A. Of course.
24    Q. As for the 2002 examination list of
25 people who passed the written exam, has

Page 121

1 anyone requested from you race and gender
2 information for the people who passed, from
3 you or your staff?
4     A. I don't recall.
5     Q. Do you keep a list in your office
6 of people that you give documents from your
7 office to?
8     A. Yes.
9     Q. Do you keep a list of people that
10 you give information to?
11     A. Yes.
12     Q. So you would be able to get copies
13 of those and indicate who you may have given
14 that information to?
15     A. That's correct.
16     Q. Is it a practice in your office
17 that people who give out information from
18 your office enter it into this log of who
19 you're giving information to?
20     A. That's correct.
21     Q. So you don't recall who may have
22 asked for the information regarding who
23 passed the test?
24     A. That's right.
25     Q. You don't recall how your staff may

Page 122

1 have given information as to race or gender
2 of who passed the test?
3     A. That's right.
4     Q. Now the next step after the written
5 test is what?
6     A. Which examination?
7     Q. Fire fighter entry level.
8     A. Which examination?
9     Q. 2002.
10     A. 2002, the next step would have been
11 the agility test.
12     Q. When people sign up to take the
13 agility test, they're not going to be
14 anonymous, obviously, because they're
15 appearing in person in front of the tester?
16     A. They're assigned a number.
17     Q. Again?
18     A. Right.
19     Q. The same number they had for the
20 written test?
21     A. No.
22     Q. Are the people who are rating the
23 agility test keeping track of race and
24 gender of the people taking the test?
25     A. No.

Page 123

1     Q. But they can, obviously, see the
2 person in front of them?
3     A. Yes.
4     Q. So they, obviously, know the race
5 and gender --
6     A. Yes.
7     Q. -- for the most part, correct?
8     A. Correct.
9     Q. What is the next step in the
10 process of the agility test?
11     A. After the agility test for 2002?
12     Q. Yes.
13     A. That would have been the oral
14 examination.
15     Q. Who conducts the oral exam?
16     A. The oral examination is
17 administered by my office, conducted by our
18 test consultant with fire fighting
19 professionals who serve as the oral board.
20     Q. These fire fighting professionals
21 come from other departments outside
22 Bridgeport?
23     A. Correct.
24     Q. Do any of them come from
25 Bridgeport, any of them part of the

Page 124

1 Bridgeport Fire Department?
2     A. No.
3     Q. They're always people who are
4 disinterested and outside Bridgeport?
5     A. Yes.
6     Q. Who screens them for lack of any
7 involvement with Bridgeport?
8     A. They may be involved with
9 Bridgeport in a very tangential way. They
10 are instructed, if they know any of the
11 candidates coming, they are to excuse
12 themselves and we'll put in another
13 examiner.
14     Q. Who are the people that recruit
15 them?
16     A. My office.
17     Q. What guidelines do you use to
18 select them?
19     A. We look for fire fighting
20 professionals depending on the rank of the
21 individual that this particular exam would
22 be, fire fighter rank or above. We go out
23 through various departments throughout the
24 tri-state area.
25     Q. You mean New York, New Jersey and

Page 125

1 Connecticut?
2     A. Yes.
3     Q. How many women have served on that
4 panel historically?
5     A. I don't know.
6     Q. Have any women served on that
7 panel?
8     A. Yes.
9     Q. When was that?
10     A. For which examination, 2002?
11     Q. Any examination.
12     A. Yes. In 2002 there was a woman on
13 the panel, more than one.
14     Q. Were these women in the fire
15 service?
16     A. Yes.
17     Q. Now people appear before them for
18 the oral exam, obviously, people can tell if
19 they're women or men or what their races are
20 for the most part, correct?
21     A. Correct.
22     Q. Do the oral examiners record that
23 information?
24     A. No.
25     Q. Are the oral examiners given any

Page 126

1 direction by your service?
2     A. With regard to what?
3     Q. As to how to conduct an oral exam.
4     A. Of course.
5     Q. What do you tell them, you or your
6 staff?
7     A. It's a structured oral examination.
8 There are questions that have been
9 determined to be good questions for
10 selection of persons to be fire fighters.
11     They are trained on the examination,
12 trained to what questions to ask and what the proper
13 responses would be.
14     Q. Who decides what the proper
15 responses would be?
16     A. The testing consultant.
17     Q. Who is that?
18     A. For this particular examination, I
19 think it was Mr. Davey.
20     Q. What is the name?
21     A. Mr. Davey or Dr. Aoutz. I have to
22 review my file.
23     Q. Have you provided any information
24 of any statistical experts that the city is
25 going to use in this present lawsuit?

Page 127

1  A. Have I provided?
2  Q. Yes, your office.
3  A. There was a gentleman that called
4  on behalf of Attorney Mitchell that we
5  provided information to.
6  Q. From his office you mean?
7  A. No. He's a statistician or
8  professor of mathematics, to my
9  understanding.
10 Q. What information did you provide
11 him?
12     MR. MITCHELL: Objection.
13     Do not answer. It's
14 privileged.
15 BY MS. WALLACE:
16 Q. Did you provide them the same
17 information that you provided my clients in
18 response to their request for production?
19     MR. MITCHELL: Objection.
20     I instruct you not to answer.
21 It's privileged information.
22     MR. MITCHELL: Objection.
23 Q. Were you interviewed by this
24 person?
25     MR. MITCHELL: Wait a moment.

Page 128

1      Go ahead and answer the
2  question.
3  A. Repeat the question.
4      (Question read.)
5  A. Yes.
6  BY MS. WALLACE:
7  Q. What date, to the best of your
8  recollection?
9  A. I don't recall.
10 Q. Was it within the last month?
11 A. Yes.
12 Q. How many times were you interviewed
13 by him?
14 A. Once.
15 Q. No face-to-face meeting; on the
16 telephone you mean?
17 A. Telephone.
18 Q. Did the hiring process for the 2002
19 exam, as far as the stages of going through
20 the examination, vary or differ from the
21 1997 fire fighter examination?
22 A. I'm not quite sure I understand
23 your question.
24 Q. Did they vary? Was it a different
25 process you used in any respect in terms of

Page 129

1  -- you testified that there are certain
2  steps or stages in the application process,
3  correct?
4  A. Correct.
5  Q. To take the test and what not.
6  A. Right.
7  Q. The process used thus far in the
8  2002 exam, is that different from the
9  process used in the 1997 fire fighter exam?
10 A. All of the components are the same,
11 but I'm not quite sure of the sequence.
12 Q. Why do you say that?
13 A. Because I'm not quite sure of the
14 sequence.
15 Q. Sequence of what, the different
16 components?
17 A. In this particular exam, the 2002
18 exam, we had a written examination. We had
19 the agility exam phase and we had the oral
20 examination.
21     So I'm not quite sure that we had the same
22 sequence in the previous examination in 1997.
23     We could very well have had the written
24 examination, the oral examination and the agility
25 test.

Page 130

1  Q. Is there something somewhere, some
2  kind of regulation or rules that you follow
3  when you give these examinations?
4  A. No.
5  Q. Is there any provision in the city
6  charter that guides how people can progress
7  through the process?
8  A. No.
9  Q. Doesn't say you have to meet this
10 first and then you can move on to that?
11 A. No.
12 Q. Anything like that in the union
13 contract in the fire department?
14 A. No.
15 Q. Anything like that in the Civil
16 Service rules?
17 A. No.
18 Q. So you could give an exam in any
19 order you want to; is that your testimony?
20 A. In any order after consulting with
21 our testing consultant. The order that
22 makes the most sense.
23 Q. These testing consultants, who
24 selects them?
25 A. I do.

Page 131

1  Q. Do they go by competitive bid?
2  A. No.
3  Q. Are you given a budget to hire
4  them?
5  A. Yes.
6  Q. Is that part of your overall budget
7  for conducting the test?
8  A. Yes.
9  Q. It's not a broken down line budget
10 item?
11 A. That is a line budget item, testing
12 and services.
13 Q. Does testing include anything
14 besides the expert or testing consultant?
15 A. I use part of it for the medical
16 examinations.
17     For positions where we have psychological
18 examinations, I use it for that.
19     I use it for polygraphs for entry level
20 police officers.
21     I use it for rental space. If we conduct
22 examinations off-site out in city property, we use
23 it for that as well.
24 Q. Is any of that money federally
25 funded or federally derived?

Page 132

1  A. I don't know.
2  Q. Who would know?
3  A. I would assume the financial
4  authorities of the City of Bridgeport.
5  Q. If someone does not fill in their
6  race and gender on the initial application
7  form, is their application still processed?
8  A. Yes.
9  Q. How do you account for the people
10 who don't fill in anything when you have
11 your statistical number as to what the
12 applicant pool looks like?
13 A. There is a column off to the right
14 that says unknown.
15 Q. So what would happen if no one
16 filled it in? How would you then determine
17 that your list met whatever goals you have
18 for hiring women?
19 A. Nothing could be determined in that
20 respect.
21 Q. Do you have any scientific way of
22 accounting for the fact that various
23 individuals may not give the information out
24 of the pool?
25     MR. MITCHELL: Objection to the

Page 133

1 form.
2 BY MS. WALLACE:
3     Q. Like you just said, except listing
4 a number like you just said?
5     MR. MITCHELL: Object to the
6 form.
7     Go ahead and answer.
8     A. I have no idea what the question
9 means.
10 BY MS. WALLACE:
11     Q. Are you trained at all in
12 statistics?
13     A. I have a superficial knowledge of
14 statistics. I'm certainly not a
15 statistician nor a psychometrician.
16     Q. What was your undergraduate degree
17 in?
18     A. Secondary education.
19     Q. What subject level?
20     A. Social studies.
21     Q. Why is it important to note the
22 race or gender of the applicant who failed
23 any part of the examination?
24     A. The race and gender is filled out
25 on the application. The applications are

Page 134

1 submitted prior to the written examination,
2 so that's the information that we already
3 have.
4     Q. Not quite my question: Why is it
5 important to note the race and gender on a
6 list of people who failed to appear for the
7 examination? You answered that you have
8 that information?
9     A. Right.
10     Q. Why is it important to then again
11 note it on a list of people who failed to
12 appear?
13     A. I believe that's what you
14 requested.
15     Q. Who requested it?
16     A. You.
17     Q. Are you saying you never noted that
18 except in response to something my client
19 asked for?
20     A. Customarily it is not noted on the
21 failed list. We keep the failed list
22 separate from the passed list. Customarily,
23 that information is not included.
24     I believe it was included in as a result of
25 your request.

Page 135

1     Q. Do you employ the practice of
2 banding?
3     A. Sometimes.
4     Q. Are you employing it this year at
5 this current test, the 2002 announced test
6 for fire fighter?
7     A. No.
8     Q. Did you employ it in the 1997 fire
9 fighter test?
10     A. I have to review it.
11     Q. You don't recall?
12     A. I don't recall banding.
13     Q. Do you recall a lawsuit brought by
14 Andrew Fierlit and a number of other persons
15 who complained that banding kept them from
16 being hired for fire fighter in 1997-98?
17     A. I recall the Andrew Fierlit
18 lawsuit. To the best of my knowledge it was
19 not about banding. It was about the
20 introduction of the oral examination in the
21 selection process.
22     Q. When was the last time you employed
23 banding in hiring?
24     A. I have to check my records.
25     Q. You don't recall?

Page 136

1     A. I don't.
2     Q. But you're not employing it right
3 now for the current fire fighter exam?
4     A. No.
5     Q. Do you have any authority over who
6 serves as a provisional officer within the
7 Bridgeport Fire Department?
8     A. All provisional officers have to be
9 approved by the Civil Service Commission.
10     Q. What does that approval require?
11     A. They must meet the basic
12 requirements for the position.
13     Q. So how does the process go? If
14 someone is going to go back on provisional,
15 who initiates the process of getting them to
16 be provisional?
17     A. The department head would initiate
18 it, could designate it, or the potential
19 provisional, they could submit that request
20 to me.
21     I, in turn, would direct it to the Civil
22 Service Commission and the commission would vote on
23 whether or not to make that person provisional.
24     Q. How long are people allowed to
25 serve on a provisional basis in a particular

Page 137

1 position in the Bridgeport Fire Department?
2     A. Well, there is no clear-cut answer
3 to that. The charter sets forth a period of
4 time the person should be, but from practice
5 people have served much longer as
6 provisional than set forth in the charter.
7     Q. Why is that?
8     A. The needs of the department.
9     Q. Which are you bound to follow, the
10 city charter or the express needs of the
11 department head?
12     A. The Civil Service Commission in a
13 meeting of approximately ten years ago heard
14 the then fire chief, Chief John Scmidlin, on
15 this matter.
16     The chief represented to the Civil Service
17 Commission that the constant rotation between the
18 fire service was a threat to the efficiency and
19 safety of people in the City of Bridgeport as well
20 as the members of the fire department.
21     As a consequence, the chief asked that we
22 not continuously rotate provisionals. The
23 commission understanding his dilemma, said that
24 would be the case.
25     Q. So you decided to disobey the city

Page 138

1 charter?
2     A. I didn't decide anything.
3     Q. The Civil Service Commission
4 decided to, in effect, disobey the city
5 charter?
6     A. That's your described
7 characterization. My opinion is they state
8 the needs of the department as well as the
9 citizens of the City of Bridgeport.
10     Q. Does the city charter say they're
11 allowed to consider the needs of the
12 department to make the determination as to
13 how long someone could serve a provisional
14 position in the fire department?
15     A. I don't know.
16     Q. Is it your job to advise the Civil
17 Service Commission of what their civil
18 duties are under the Civil Service System in
19 the City of Bridgeport?
20     A. No.
21     Q. Is it your job to make
22 recommendations how to act?
23     A. No.
24     Q. At the time this was done two years
25 ago, what job title did you hold?

Page 139

1  A. Assistant director.
2  Q. What is your role right now, as the
3  director of personnel, what is your role
4  with regard to the Civil Service Commission?
5  A. I serve as the secretary to the
6  commission.
7  Q. Do you have the power to make
8  recommendations to them?
9  A. I do.
10 Q. Do you have the power to advise
11 them in any way?
12 A. I can.
13 Q. So the answer is yes?
14 A. Yes.
15 Q. You have the power to do that?
16 A. Yes.
17 Q. If the Civil Service Commission
18 wants to do something that you believe is
19 clearly a violation of the law, what is your
20 duty?
21 A. If it's a clear violation of the
22 law, I would tell them not to do it.
23 Q. If they do it, what is your duty
24 then?
25 A. Not sure what my duty is after

Page 140

1  that.
2  Q. Do you have a duty, if they still
3  commit what you perceive to be a clear
4  violation of the law, do you believe you
5  have a duty to act in any way?
6  A. I believe I consult the city
7  attorney's office.
8  Q. Anything else?
9  A. That's it.
10 Q. What would be the final step for
11 you in terms of any duty to act with regard
12 to that scenario if the Civil Service
13 Commission acted in what you believe was an
14 illegal manner?
15 A. I can tell the city attorney. Then
16 that would be the end of my responsibility.
17 I report it to the city attorney, legal
18 authorities.
19     That, in my opinion, as a lay person, if I
20 think it's a possible violation of the law, the city
21 attorney's office would then take it from there.
22 Q. Have you ever made such a report to
23 the city attorney's office regarding
24 anything you perceived to be a violation of
25 the law by the Bridgeport Civil Service

Page 141

1  Commission?
2  A. No.
3  Q. Have you ever observed the
4  Bridgeport Civil Service Commission to
5  commit what you believed to be a violation
6  of the law?
7  A. No.
8  Q. But you just testified that they
9  are acting contrary to the city charter with
10 regard to allowing people to stay in
11 provisional positions passed the time set by
12 the city charter?
13 A. That's correct.
14 Q. How do you reconcile that, aside
15 from what the policy reads and what the law
16 says?
17 A. If there was a member of the city
18 attorney's staff present at that meeting,
19 there was a decision made by the commission,
20 as a consequence, that was my responsibility
21 as assistant director.
22 Q. In your opinion, is it a violation
23 of the city charter to have provisionals
24 serving longer than the time the city
25 charter states they may serve?

Page 142

1  A. Yes.
2  Q. Do you keep statistics on how many
3  people in the Bridgeport Fire Department
4  serve in a provisional capacity at any one
5  time?
6  A. No.
7  Q. At this point, as far as your
8  office is concerned, when someone is
9  appointed as provisional officer in the
10 Bridgeport Fire Department, you never again
11 keep track of how long they're in a
12 particular job?
13 A. That's correct.
14 Q. They could be in there for a
15 career, 30 years?
16 A. No one has ever been there for 30
17 years.
18 Q. It could happen though, right,
19 because you're not keeping track of it?
20 A. No, it's very unlikely it would
21 happen.
22 Q. Well, ten years?
23 A. Actually, there would be no
24 provisionals in the department if we're
25 allowed to hold examinations that are not

Page 143

1  being held up by lawsuit.
2  Q. So you're blaming that there are,
3  in fact, provisionals and the lawsuit is
4  holding up the advancement exam?
5  A. Absolutely.
6  Q. Has the city followed any
7  particular timetable in giving promotional
8  exams?
9  A. Not sure what you mean.
10 Q. Does the city have a statutory or
11 charter timetable upon which they must
12 follow to give promotional exams?
13 A. Yes.
14 Q. Has the city adhered to that
15 timetable in every instance for each
16 position in the fire department?
17     MR. MITCHELL: Object to the
18 form.
19     Go ahead and answer.
20 A. We certainly have tried to, but
21 there have been reasons throughout the
22 years, primarily budgetary reasons, and now
23 currently with the lawsuits, that are
24 holding up the examinations.
25 BY MS. WALLACE:

Page 144

1  Q. Is it true that if an examination
2  for an officer position is held up, that it
3  may have an effect upon which people, which
4  employees within the fire department may be
5  eligible to take another examination for
6  another officer position in the department?
7  A. Not sure I understand your
8  question.
9  Q. Is it true that if a particular
10 examination for a particular officer rank,
11 captain or lieutenant or assistant chief,
12 there is a certain time that it's given,
13 that that may effect the eligibility of who
14 can take the test?
15 A. Once again, I have no idea what
16 your question is.
17 Q. What is the required timetable for
18 giving the captain's exam? How frequently
19 are they supposed to be done in Bridgeport?
20 A. There is no timetable per se. All
21 depends upon when the vacancy occurs.
22 Q. How long after the vacancy occurs?
23 A. Within one hundred twenty days.
24 Q. Isn't it true that if the city
25 doesn't test within one hundred twenty days

Page 145

1  of a vacancy coming open for captain, and
2  say you wait two years, that pool of
3  applicants is going to be different than if
4  that was given within one hundred twenty
5  days?
6      A. No.
7      Q. Why not?
8      A. Because the only pool of applicants
9  would be those individuals who were eligible
10 within the one hundred twenty days after
11 creation of the first vacancy.
12         So dragging out the examination for two
13 years, in your scenario, there would be no other
14 individuals, no other extra individuals who would be
15 allowed to participate.
16     Q. Well, there would be some effect in
17 terms of attrition, some employees who would
18 no longer be employed in the department --
19     A. That's true.
20     Q. -- who may have been able to take
21 it during the one hundred twenty days,
22 correct?
23     A. That part is true, yes.
24     Q. Who may have been able to take it?
25     A. Yes.

Page 146

1      Q. Is there a time-in-grade rule to
2  progress from one rank to the next in
3  Bridgeport?
4      A. Correct.
5      Q. There is a dispute right now in
6  various legal actions about whether that is
7  a three-year or one-year time-in-grade rule?
8      A. Correct.
9      Q. If there is a time-in-grade rule,
10 does the order in which the tests are given,
11 for example, captain or lieutenant, when
12 there are vacancies, in fact, who would wind
13 up in the potential candidate pool?
14         MR. MITCHELL: Objection to the
15 form.
16         Go ahead and answer.
17     A. No.
18 BY MS. WALLACE:
19     Q. Why is that?
20     A. Whoever is going to be eligible is
21 going to be eligible no matter what sequence
22 you give the examinations.
23     Q. But if you have to have
24 time-in-grade as a lieutenant to be able to
25 make a captain's test, if there has been,

Page 147

1  say, no lieutenant exam given for five
2  years, is it true there will be a number of
3  fire fighters who have not had the chance to
4  become a lieutenant for five years?
5      A. Well, everything is predicated upon
6  the date of the first vacancy.
7      Q. Are you saying the order of the
8  testing, which rank is tested first within a
9  certain period, has no effect on the
10 candidate pool?
11     A. I would think not.
12     Q. Are you guessing?
13     A. No. It does not make any sense to
14 me the way you're posing the question.
15 There could be a very, very unusual
16 situation that arose, then possibly; but
17 under general conditions, no, I don't think
18 that would affect it at all.
19     Q. Well, suppose in 1995 there was a
20 particular fire fighter who would have had
21 enough time-in-grade, and at the time the
22 position of lieutenant came open, one or
23 more positions of lieutenant came open, the
24 person certainly would have been eligible to
25 sit for the test for lieutenant.

Page 148

1  Suppose the lieutenant's test is just not
2  given until today, here in 2000.
3         But in the meantime, before the
4  lieutenant's test ever gets given, he's still
5  sitting as a fire fighter rank. The department then
6  tests for captain at a time when he would have had
7  enough time-in-grade as a lieutenant. Had he been
8  advanced timely, he could have taken the captain's
9  exam, isn't it true that scenario can occur?
10     A. It's potentially possible. Not
11 sure that ever has occurred, but it's
12 possible.
13     Q. Okay. Now is there anything in the
14 system that you have right now with testing
15 that would cure that kind of defect?
16     A. I'm not sure I understand the
17 question.
18     Q. Is there anything in your system
19 that would redress that anomaly?
20     A. What do you mean by my system?
21     Q. Is there any way of giving the test
22 in the way we've been talking about?
23         The time and sequence of various
24 promotional exams, is there anything in the
25 Bridgeport Civil Service System that would address

Page 149

1  the anomaly of someone being in a situation like
2  that, having been normally eligible to take the next
3  rank test, and then, because there was no test given
4  for that, even though there were vacancies,
5  ultimately the next rank after that test is given,
6  that they would have, in fact, been eligible to sit
7  for also, that the person could actually have been
8  denied the secondary level appointment?
9          MR. MITCHELL: Object to the
10 form.
11         Go ahead and answer.
12     A. The single biggest deterrent to our
13 holding the exam is this right now. The
14 lawsuit is holding them up. We're ready to
15 go. We have the money. We have the
16 examination. We've announced them. The
17 lawsuits are creating the various scenarios
18 you're hypothesizing.
19 BY MS. WALLACE:
20     Q. My question is: What does the
21 Civil Service Commission in Bridgeport got
22 in place that addresses that anomaly?
23     A. The anomaly is we're ready to hold
24 the test. It's in the court system.
25     Q. My question isn't whether you're

Page 150

1  ready to do it today. My question is: What
2  provision exists in the Bridgeport Civil
3  Service System or the Civil Service Rules in
4  Bridgeport that would redress it?
5      A. We are redressing it. We're ready
6  to give the examinations. We're ready to
7  hold the captain's exam. We're ready to
8  hold the assistant chief's exam. The only
9  reason we are not holding them is because of
10 the lawsuit.
11     Q. When was the last time there was a
12 lieutenant's vacancy?
13     A. I have no idea.
14     Q. When was the last time there was a
15 captain's vacancy?
16     A. I have no idea.
17     Q. When was the last time there was a
18 chief's vacancy?
19     A. I don't know.
20     Q. When was the last time the
21 lieutenant's exam was given?
22     A. I have to look in my records.
23     Q. When was the last time the
24 captain's test was given?
25     A. I have to look in my records.

Page 151

1  Q. When was the last time the
2  assistant chief's exam was given?
3  A. I have to look in my records
4  Q. What tests are currently announced
5  right now?
6  A. The examinations that were held up
7  as a result of the litigation are fire
8  captain and fire assistant, chief engineer.
9  We're also ready to certify from the pumper
10 engineer list.
11 Q. My question was: What exams are
12 currently announced right now?
13 A. None.
14 Q. Do you have any legal training?
15 A. No.
16 Q. Do you have any special knowledge
17 of the law?
18 A. No.
19    MS. WALLACE: I have some more
20 documents for you to look at.
21    (Plaintiff's exhibit for
22 identification marked City: 18: List 2070
23 for Fire Fighter.)
24 BY MS. WALLACE:
25 Q. And for what year?

Page 152

1  A. This list was established in 1994
2     MS. WALLACE: For the record,
3  Exhibit 18 encompasses Bates stamped 002035
4  to 002100.
5  BY MS. WALLACE:
6  Q. First one is marked City Exhibit
7  18. Can you tell me if you know what that
8  is?
9  A. I can.
10 Q. What is it?
11 A. That is list 2070 for fire fighter.
12 Q. And for what year?
13 A. This list was established in 1994.
14 Q. 1994?
15 A. Correct.
16 Q. So what year would that test have
17 been announced, in 1993?
18 A. I believe the test was held in
19 August of 1993.
20 Q. You're referring to some documents
21 you brought today?
22 A. Yes.
23 Q. What have you brought?
24 A. Exactly what you have, the legal
25 announcement for the 2070 examination, legal

Page 153

1  notice for the 2070 examination, which has
2  been introduced.
3  Q. You're talking about the notice of
4  deposition?
5  A. No. Talking about the legal
6  notice.
7  Q. Exhibit 12-A?
8  A. Correct, yes.
9  Q. What else have you brought?
10 A. I have the list as well for the
11 other two examinations, 2185 and 2114.
12 Q. You have a list for them?
13 A. I have an announcement for them.
14 Q. Which are duplicates of what has
15 been marked as exhibits today?
16 A. That's correct.
17 Q. Anything else?
18 A. I have a renotice of deposition.
19 Q. Okay.
20 A. I have list 2114, which is a copy
21 of what was given to you probably going to
22 one of the things you're showing me shortly.
23 Q. Okay. Anything else?
24 A. That's it.
25 Q. The document you have in front of

Page 154

1  you, Exhibit --
2  A. Exhibit 18.
3  Q. So you know what that is?
4  A. I do.
5  Q. At what point in the hiring process
6  was that document made? Is that the final
7  list of people who were candidates?
8  A. No.
9  Q. Initial applicant eligibilities?
10 A. This is the list of standing after
11 the written examination for list 2070.
12    (Plaintiff's exhibit for
13 identification marked City 19: List of
14 Candidates for Written Exam 2070.)
15 BY MS. WALLACE:
16 Q. Okay. Another one, Exhibit 19,
17 tell me what that is, Bates stamp for
18 Exhibit 19 is 002101 to 002145?
19 A. Exhibit 19 is a list of those
20 candidates who failed the written test for
21 exam 2070.
22 Q. This was given what date?
23 A. That was in 1993.
24 Q. Does that document indicate race or
25 gender?

Page 155

1  A. It does not.
2     (Plaintiff's exhibit for
3  identification marked City 20: Fire Fighter
4  Failed List for 2114 Exam.)
5  BY MS. WALLACE:
6  Q. Showing you what's been marked
7  Exhibit 20. What you've got marked Exhibit
8  20, if you could read the first and last
9  Bates stamp into the record?
10 A. 002146 to 002177.
11 Q. Do you recognize that?
12 A. I do.
13 Q. What is it?
14 A. This is the failed list, failed
15 written examination list for exam 2114.
16 Q. Which was given in what year?
17 A. That would have been the 1997, I
18 think.
19 Q. Does that list indicate race or
20 gender on it?
21 A. It does not.
22    (Plaintiff's exhibit for
23 identification marked City 21: Fire Fighter
24 List for 2114 Exam.)
25 Q. Showing you what's been marked

Page 156

1  Exhibit 21. This is Bates stamped 002178 to
2  002213. What is that?
3  A. This is the fire fighter list for
4  exam 2114.
5  Q. Which was given at what year?
6  A. Most recent exam given in 2002.
7  Q. What information does that list
8  give?
9  A. Excuse me, 2114 was not given in
10 2002. That was the '97 examination.
11 Q. What information does that document
12 record?
13 A. It records the final standing of
14 the candidates, what their final score was
15 in the written examination, their name,
16 their address.
17    There is a column for certification, those
18 individuals who were certified from the list.
19    And there is a column for probationary
20 appointment, giving the date the individuals were
21 made probationary fire fighters.
22 Q. This was the list that was done
23 after they passed all stages of the exam?
24 A. No. This list, as you see it now,
25 is the generated list for the written exam.

Page 157

1   Q. Only for the written exam?
2   A. But this was, if you recall, the
3 examination that I raised the question about
4 the Fierlit lawsuit.
5   Q. Yes.
6   A. After that list was generated, we
7 had an oral examination. Those candidates
8 who successfully passed the oral examination
9 were then certified and appointed according
10 to their ranks in the exam.
11   Q. Why was an oral exam given that
12 year?
13   A. It's a long story. It started out
14 with the examination going to be exclusively
15 a written examination.
16       We had used banding in the past, starting
17 in the mid 1980s, 1986. Banding was a concept that
18 was introduced to the City of Bridgeport as a result
19 of federal litigation, ADE versus the City of
20 Bridgeport lawsuit and the fire department as well
21 as lawsuits in the police department, Brown versus
22 the City of Bridgeport.
23       In both of those cases the court found that
24 the use exclusively of a written examination would
25 have had a disparate impact on protected classes of

Page 158

1 minority persons. As a consequence, the judge
2 ordered the city to come up with an alternative
3 method of scoring and ranking.
4       After sitting down with a consultant, the
5 city came up with the banding solution. Banding is
6 simply a device that is used to say that an
7 individual's score, when separated by fractions of a
8 point or two to three points, maybe even more, that
9 there really is no statistical difference between
10 how you may perform at 98.7 and I may perform at
11 96.7.
12       What you do is put together a band and make
13 your selections from within the band. And the court
14 order is to do that, make the selections based on
15 race and ethnicity by those candidates in the band
16 compared to the race and ethnicity of the candidates
17 in the entire candidate pool.
18       As I said, we had been using banding in
19 these examinations since 1986. What happened was
20 that we had announced this particular examination as
21 being exclusively a written examination.
22       Unbeknown to us, there was a case that was
23 settled before the Connecticut Supreme Court in
24 which the city agreed not to use this type of
25 banding system, but we were not informed of that

Page 159

1 We, being a civil office, were not informed
2 of it until after this examination had been
3 announced and held.
4   Q. Not informed by whom?
5   A. By the city attorney's office.
6   Q. By the city attorney's office?
7   A. Correct.
8   Q. Did you consult the city attorney's
9 office before you instituted the banding in
10 1997?
11   A. The banding had been in use ever
12 since 1986 with the full knowledge of the
13 city attorney's office.
14       What happened was this particular
15 examination was being challenged in the police
16 department. This was the Superior Court, Byrk
17 versus the City of Bridgeport. It was upheld in the
18 Superior Court level.
19       The Byrk case progressed up to the
20 Connecticut Supreme Court. The city attorney's
21 office and the plaintiff's attorneys for Byrk agreed
22 in a stipulated agreement that Byrk and the other
23 plaintiff would be appointed to the police
24 department. And they said it would not use banding
25 in this particular form again.

Page 160

1       But what happened is the sequence of these
2 events was that, while Byrk was being settled, we
3 had already announced the fire fighter examination
4 as being strictly a written examination.
5       Unfortunately, we were not informed until
6 after the examination had been held and lists
7 promulgated that we were not to use this particular
8 form of banding.
9   Q. Let me ask you ask one question:
10 Was the oral test held in 1997 then done to
11 facilitate the banding?
12   A. The oral examination held in 1997
13 was done to remove the very serious
14 disparate impact on minorities in the fire
15 fighter examination.
16       MS. WALLACE: Would you read my
17 question back.
18       (Question read.)
19       THE WITNESS: The answer to
20 that would be no.
21 BY MS. WALLACE:
22   Q. Was the banding done in order to
23 alleviate an actual disparate impact upon
24 minority persons in the 1997 fire fighter
25 test?

Page 161

1       MR. MITCHELL: Objection to the
2 form.
3       Go ahead.
4   A. My testimony was the banding was
5 not used in the 1997 examination.
6 BY MS. WALLACE:
7   Q. Didn't you say you started out to
8 use the banding --
9   A. That was our intent, yes.
10   Q. The Feirlit lawsuit stopped that?
11   A. No.
12   Q. The knowledge of the other Superior
13 Court decision?
14   A. The Byrk case, which had progressed
15 up to the Supreme Court level, which was
16 settled by the stipulated agreement, in that
17 agreement the city agreed not to use banding
18 in that particular form again.
19       So, that meant that we were now faced with
20 an examination where it had been announced as one
21 hundred percent written, that we could no longer
22 utilize the banding system. We were precluded from
23 using the banding.
24       So as a consequence, if one were to read
25 literally that examination announcement, we would

Page 162

1 have had to chose in rank order from that
2 examination list. If we had done that, there would
3 have been virtually no minorities hired in the
4 Bridgeport Fire Department from that list, because
5 the list was overwhelmingly white male.
6   Q. How about women, would there have
7 been fewer or no women hired had you gone by
8 the strict written test rank order?
9   A. There would have been fewer women
10 hired than by using the oral examination
11 that we did.
12   Q. Isn't it true that statistically on
13 a standardized examination females tend to
14 get a higher score, score better than males?
15       MR. MITCHELL: Object to the
16 form.
17       Go ahead and answer.
18   A. I don't know.
19 BY MS. WALLACE:
20   Q. In keeping your statistics about
21 these exams over the years in Bridgeport,
22 has it been your experience that women as a
23 whole percentage-wise do better than males
24 on a written exam?
25   A. For what position?

Page 163

1  Q. Fire fighter.
2  A. I don't know. I don't have those
3  statistics.
4  Q. Once you introduced the oral
5  examination in 1997, did you not then
6  introduce an element of subjectivity to the
7  examination?
8  A. I think not.
9  Q. You don't think so?
10 A. No.
11 Q. Was the purpose of the oral exam to
12 be able to determine whether you should hire
13 someone on the basis of race?
14 A. No.
15 Q. Why did you institute it?
16 A. Because we felt that under the
17 uniform guidelines for employee selection,
18 every attempt must be used and utilized to
19 reduce disparate impact.
20     We had conferred with our consultant and he
21 felt that by possibly introducing -- no guarantee --
22 by possibly introducing an oral examination, we
23 could lessen the disparate impact on the minority
24 candidate.
25 Q. What about women, did he give an

Page 164

1  opinion, the expert you consulted, give an
2  opinion on the impact of having an oral
3  examination that would have ameliorated and
4  alleviated any adverse impact upon female
5  candidates?
6      MR. MITCHELL: Object to form.
7  A. No.
8  BY MS. WALLACE:
9  Q. Did you even ask what the impact
10 would have been upon women?
11 A. No. The impact -- just a footnote
12 -- the impact was positive. As I said, if
13 we had used the strict rank order, possibly
14 one women would have been appointed. As a
15 result of using the orals, we did have more
16 women applicants being hired.
17 Q. To what do you attribute the fact
18 the written examination in 1997 came out
19 overwhelmingly white male on the top of the
20 list?
21 A. I don't know.
22 Q. Have you ever looked into it?
23 A. Yes. I don't know.
24 Q. Have you or the Civil Service
25 Commission ever called upon anyone to study

Page 165

1  why that occurred?
2  A. It was what it is. The examination
3  was professionally developed. It was an
4  examination that both construct and content
5  validated -- would you repeat the question?
6  Q. Have you or the Civil Service
7  Commission ever called for a study as to why
8  that happened, why the 1997 written
9  examination, the highest scorers turned out
10 to be, as you say, overwhelmingly white
11 male?
12     MR. MITCHELL: Object to the
13 form.
14     Go ahead and answer.
15 A. No specific study, I believe, was
16 done on that examination. But I can tell
17 you from my experience over the years, what
18 happens in written examinations is that you
19 do have white candidates that historically
20 are going to score higher than minority
21 candidates.
22 BY MS. WALLACE:
23 Q. Why is that?
24 A. I have no idea. There are many
25 theories on it, education, social status,

Page 166

1  opportunities. I don't know. But that is a
2  fact and that's specifically the reason why
3  the city was compelled to use banding, in
4  order to ameliorate those societal impacts
5  on these written examinations.
6  Q. My question to you actually was
7  whether you or the Civil Service Commission
8  ever called for a study into why the 1997
9  written exam's highest scores were
10 overwhelmingly white males?
11     MR. MITCHELL: Object to the
12 form.
13 A. I did not.
14 BY MS. WALLACE:
15 Q. You did not. To your knowledge,
16 the Civil Service Commission did not either?
17 A. That's correct.
18 Q. Have you had to make changes to the
19 2002 fire fighter examination based on what
20 you observed of the 1997 fire fighter
21 examination process?
22 A. Yes. An oral examination was used
23 to select the candidates and the written
24 examination was used in qualifying the
25 examination. The entire selection process

Page 167

1  was based on the performance in the oral
2  exam.
3  Q. In 2002?
4  A. Correct.
5  Q. The entire selection process was on
6  the oral exam?
7  A. Correct.
8  Q. Even if you scored lower on the
9  written, whatever you scored on the oral
10 exam would carry you?
11 A. The written exam was a qualifying
12 exam, yes.
13 Q. So why bother giving a written exam
14 then?
15 A. To see who would be qualified to
16 take the oral exam.
17 Q. The written exam is used as a
18 screen to get the oral exam?
19 A. That's correct.
20 Q. At what point did you set the
21 bottom line of scores on the written to be
22 able to qualify to get the oral?
23 A. The passing point was set at 75
24 percent of whatever the highest score on the
25 written exam was.

Page 168

1  Q. You had to attain 75 percent of
2  whatever the highest score was?
3  A. Correct.
4  Q. No statistical changes in how you
5  decided how the pool came out in the written
6  exam scores?
7  A. No.
8  Q. And in the oral exam?
9  A. The oral exam graded for pass/fail
10 for 2002.
11 Q. So then who are you selecting off
12 the final list that you get? Is it going to
13 be a combination of the written score with
14 the oral score to achieve some average?
15 A. No.
16 Q. Or are you just going by who gets
17 the highest score in the oral?
18 A. That's correct.
19     MR. MITCHELL: Objection to
20 form.
21     You go ahead and answer if you
22 understand the question.
23     THE WITNESS: I do.
24 BY MS. WALLACE:
25 Q. So basically, you might be low

Page 169

1  scorer, on the low end of the scores that
2  were allowed to take the oral, and the
3  written and might have been a low written
4  scorer, but you might do well enough on the
5  oral portion that you would jump ahead of
6  the people that had a higher written score
7  than you?
8     A. That is correct.
9     Q. No banding whatsoever?
10    A. No.
11    Q. What is your knowledge of potential
12 for a discriminatory decision based on oral
13 interviews in the Civil Service examination?
14    A. This is a structured oral
15 examination. I don't think that would be a
16 factor.
17    Q. Why do you not think it would be a
18 factor?
19    A. Because there are preset questions
20 and responses that are expected of the
21 candidates and the candidates answers are
22 rated on their responses.
23    Q. How are they rated on their
24 responses, by the sheer words they use?
25    A. Simply the words they use. Whether

Page 170

1  they responded correctly to a situation or
2  to a question.
3     Q. Are the questions they're asked of
4  an oral yes or no nature?
5     A. Some.
6     Q. Are some of them calling for an
7  extended narrative type of answer?
8     A. Some.
9     Q. Are there occasional scenarios
10 where someone is asked a hypothetical what
11 they would do in a situation?
12    A. Yes.
13    Q. Is there a clear correct and
14 incorrect answer to each question?
15    A. Yes.
16    Q. There are never two choices that
17 could be chosen between in answering a
18 scenario question?
19    A. That's right.
20    Q. Is the person rated in any way on
21 the manner and mannerism which they present
22 themselves as a person in the questioning?
23    A. Possibly, I think there is, yes.
24    Q. In other words, if a person is well
25 spoken or less well spoken, that might

Page 171

1  influence, or at least as the testers
2  perceive, that might influence their score?
3     A. Correct.
4     Q. Is that legitimate under the
5  Bridgeport Civil Service rules regarding
6  that test?
7     A. Yes.
8     Q. Is there any guidance given to
9  these testers as to how they will rate
10 someone's mannerisms when they're being put
11 to the oral?
12    A. They rate them on their
13 communication skills and ability.
14    Q. Do they have a chart or some sort
15 of written rating device they use?
16    A. Yes.
17    Q. Are those public record?
18    A. No.
19    Q. Why not?
20    A. They're protected and copyrighted.
21 They're not public record.
22    Q. Copyrighted by whom?
23    A. By the owners of the examination.
24    Q. Who are the owners of the
25 examination?

Page 172

1     A. Let's see. For which examination
2  are you talking about?
3     Q. 2002.
4     A. I'd have to review, but I believe
5  that examination was Dr. Aoutz.
6     Q. He claims copyright over them?
7     A. Yes.
8     Q. What does that have to do with them
9  being available for inspection? You have to
10 pay Dr. Aoutz to get copies?
11    A. It's his intellectual property.
12 He's not going to allow it to be open to
13 public review.
14    Q. Really? Has he said that to you in
15 writing?
16    A. I'm not sure if he said it in
17 writing.
18    Q. How do you know that then?
19    A. He's told me.
20    Q. He told you that?
21    A. Yes.
22    Q. Dr. Aoutz?
23    A. Yes.
24    Q. What makes a public record a public
25 record?

Page 173

1        MR. MITCHELL: Objection as to
2  form.
3  BY MS. WALLACE:
4     Q. In your capacity as personnel
5  director for the City of Bridgeport and for
6  the Civil Service Commission, do you receive
7  Freedom of Information Act requests for
8  public records from the City of Bridgeport
9  Civil Service Commission?
10    A. I do.
11    Q. Are you charged with making
12 decisions whether those documents leave the
13 Civil Service office?
14    A. Yes.
15    Q. What do you use for guidance in
16 deciding whether or not you should respond
17 by providing records asked for in such
18 requests?
19    A. The statute that has the rules and
20 regulation regarding Freedom of Information
21 for the State of Connecticut.
22    Q. Connecticut General Statutes of
23 Freedom of Information?
24    A. That's correct.
25    Q. What makes a public record a public

Page 174

1  record under that law?
2        MR. MITCHELL: Object to the
3  form.
4        Go ahead and answer.
5     A. If you are taking the examination,
6  part of the examination, you are precluded
7  under that law. They're not considered
8  public record.
9  BY MS. WALLACE:
10    Q. The completed examinations are a
11 form examination?
12    A. The examination.
13    Q. There has to be a distinction in
14 your opinion between the form that is used
15 to examine and between the completed
16 examination, something completed by the
17 applicant?
18    A. No.
19    Q. Is there a difference between an
20 examination that has been held in the past
21 and an examination that has yet to be held
22 under you public records act?
23        MR. MITCHELL: Objection as to
24 form.
25        Go ahead and answer.

Page 175

1  A. That would be a legal question that
2  I'm not qualified to answer.
3  BY MS. WALLACE:
4  Q. How do you decide on the people to
5  give that interview for fire fighter, do you
6  interview them personally?
7  A. No.
8  Q. Who interviews them?
9  A. We contact various fire departments
10 in the tri-state area. We ask them to give
11 us names of the people who would be
12 interested in helping us on these exams.
13       They then come to Bridgeport and they are
14 prepared by the test consultant on how to
15 administrate the examination.
16  Q. It would be up to Dr. Aoutz if he
17 happens to be a consultant for a particular
18 year to prepare the people how to do the
19 exam?
20  A. Yes.
21  Q. Does anybody oversee what Dr. Aoutz
22 does?
23  A. No.
24  Q. Do you ask for a report about what
25 he's doing?

Page 176

1  A. I'm there on site. You might say I
2  could be an overseer. I don't interfere
3  with the content of the examination. I
4  would not interfere with anything that I
5  felt was in conflict with our Civil Service
6  rules.
7  Q. Are you there the entire time Dr.
8  Aoutz is preparing each one of these people?
9  A. They are prepared in a group.
10  Q. Are you there the entire time the
11 consultant is there that is preparing each
12 of these people?
13  A. Yes.
14  Q. So you hear everything the
15 consultant tells them?
16  A. Yes.
17  Q. Do you see all the materials the
18 consultant gives them to use?
19  A. Yes.
20  Q. Were any of the panelists chosen
21 for the 2002 oral examination female?
22  A. Yes.
23  Q. How many?
24  A. I don't recall.
25  Q. How many panelists were there

Page 177

1  total?
2  A. I don't recall.
3  Q. Were they given any special
4  instruction with the City of Bridgeport or
5  any of its contractors, agents or
6  representatives as to equal employment
7  opportunity issues giving the oral
8  examination?
9       MR. MITCHELL: Object to the
10 form.
11      Go ahead and answer if you can.
12  A. No.
13 BY MS. WALLACE:
14  Q. Were they given any instructions
15 about sexual harassment or racial harassment
16 in giving the examination?
17      MR. MITCHELL: Object as to
18 form.
19      Go ahead and answer if you can.
20  A. No, because the examination has
21 been prepared by the consultant and it's a
22 validated examination. So it's not the type
23 of thing that would be instructing examiners
24 prior to giving of the examination.
25  Q. Is it possible that examiners could

Page 178

1  sexually harass someone in the course of
2  giving an examination to them?
3       MR. MITCHELL: Objection as to
4  form.
5       Go ahead and answer.
6  A. Anything is possible, I guess.
7  BY MS. WALLACE:
8  Q. What is your definition of sexual
9  harassment?
10  A. Simply takes two forms. Quid quo
11 pro form and uncomfortable workplace.
12  Q. Uncomfortable workplace?
13  A. Yes, hostile environment.
14  Q. Does the action have to be sexual
15 in nature to be sexual harassment?
16  A. No.
17  Q. Has anyone screened Dr. Aoutz or do
18 you know if he had special training in equal
19 employment opportunity issues?
20  A. I don't know.
21  Q. Do you have a copy of his
22 curriculum vitae or resume?
23  A. I might have it in the office.
24  Q. How many years has he worked for
25 the City of Bridgeport?

Page 179

1  A. Probably since that 1986 ADE
2  lawsuit.
3  Q. Where is Dr. Aoutz's office
4  located?
5  A. Washington, D.C.
6  Q. Does he work with any firm or
7  company?
8  A. He is the owner or president of the
9  firm as an associate.
10  Q. How many people work with him?
11  A. Dr. Aoutz is an associate.
12  Q. Does he work with any agency of the
13 federal government?
14  A. I don't know.
15  Q. Bruce Davey, who is he?
16  A. Consultant who has his own firm,
17 Bruce Davey & Associates.
18  Q. Where is Bruce Davey located?
19  A. In Glastonbury, Connecticut.
20  Q. Has he been involved in the 2002
21 fire fighter exam?
22  A. No.
23  Q. How about the 1997 fire fighter
24 exam?
25  A. Yes.

Page 180

1  Q. Did Dr. Aoutz provide the oral
2  examination questions for the 1997 exam?
3  A. I believe that was Mr. Davey.
4  Q. So what do you have to assure you
5  that Dr. Aoutz, in fact, is creating oral
6  examination questions that are not going to
7  run afoul of any equal employment
8  opportunity laws?
9  A. Dr. Aoutz is an expert in
10 developing examinations. He has a Ph.D. in
11 industrial psychology. He is widely
12 respected his field. He has developed
13 examinations throughout the country.
14      He has been used by federal courts, most
15 notably in San Francisco, to assist them in
16 developing fair and valid selection processes for
17 their fire department.
18      I have the utmost confidence in him and he
19 is widely respected. And I do not think he would do
20 anything to violate EEO principles.
21  Q. Do you have statistics in your
22 department about what the difference is on
23 the 2002 exam between the people who scored
24 highest in rank order in the written exam
25 and the people who scored highest rank order