1997 WL 201568  
1997 WL 201568 (N.D.Ill.)  
(Cite as: 1997 WL 201568 (N.D.Ill.))

**H**  
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Cynthia G. FALK, Plaintiff,  
v.  
KIMBERLY SERVICES, INC., Defendant.

No. 92 C 1079.

April 16, 1997.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

*1 Plaintiff Cynthia Falk has sued Defendant Kimberly Services, Inc., claiming promissory estoppel. Before the Court are Defendant's Motions *in Limine* to Exclude the Testimony of Enola Falk, Beth Carpenter, and Ann Kirk.

ANALYSIS

A federal district court's authority to manage trials includes the power to exclude evidence pursuant to motions *in limine. Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The guidelines governing motions in limine are as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*

*Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400-01 (N.D.Ill.1993).

I. ENOLA FALK

Plaintiff stated in her answers to interrogatories that Enola Falk, Plaintiff's mother, could "testify that I told [her] the original arrangement and witnessed mental duress during 1991." Defendant now moves the Court to exclude the testimony of Enola Falk. Specifically, Defendant contends that (1) testimony by Enola Falk that Plaintiff told her about "the original arrangement" between Plaintiff and Kimberly constitutes inadmissible hearsay and (2) testimony as to Plaintiff's "mental duress" during 1991 is irrelevant and unfairly prejudicial.

A. The Original Arrangement

Plaintiff responds that Enola Falk's testimony as to what Plaintiff told her about "the original arrangement" is not excluded by the hearsay rule because it is a present sense impression or, alternatively, goes to Plaintiff's state of mind. Fed.R.Evid. 803(1) & (3). However, Plaintiff has not offered any reasoning to support either conclusion.

Any testimony by Enola Falk as to what Plaintiff said to her about the agreement is hearsay, because it constitutes a statement by the declarant-- Plaintiff--offered in evidence to prove the truth of the matter asserted, namely, the substance of the "original arrangement." Accordingly, unless Plaintiff's statements to her mother qualify as a hearsay exception under Rule 803, such testimony is inadmissible.

1. *Rule 803(3)*

The Court easily finds that such statements do not fall within Rule 803(3)' s exception for statements

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of the declarant's then existing state of mind, as the proffered statements fall squarely within the Rule's qualification: "but not including a statement of memory or belief to prove the fact remembered or believed."

2. Rule 803(1)

*2 Rule 803(1) provides the following exception to the hearsay rule: A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. In the instant case, the statement is any made by Plaintiff to her mother, the witness, describing the "original arrangement." Defendant's sole argument against applying Rule 803(1) is that there is no evidence that Plaintiff made any statements describing the original agreement to her mother within the time frame needed to trigger Rule 803(1). Because Enola Falk was presumably not present during the event (i.e., the making of the "original arrangement"), any statements to her do not constitute present sense impressions unless made "immediately thereafter." There is currently before the Court no evidence produced by Plaintiff which indicates that any statements were made "immediately thereafter" such that they could constitute present sense impressions. Accordingly, the Court GRANTS the Motion *in Limine*.

B. Mental Duress

The parties agree that Plaintiff is neither seeking nor entitled to emotional distress damages. Accordingly, testimony by Enola Falk as to Plaintiff's "emotional duress" is not relevant and, moreover, any probative value is substantially outweighed by the dangers of unfair prejudice and misleading the jury. Fed.R.Evid. 401, 402, & 403; *see Campbell v. Ingersoll Milling Machine Co.*, 893 F.2d 925, 929 (7th Cir.1990)(holding district court properly excluded evidence of assault on the plaintiff based upon "the danger that the evidence would lead the jury to decide the case on an improper basis such as sympathy," where no assault claim was before the jury and plaintiff was not entitled to damages caused by the assault). Thus, the Court GRANTS Defendant's Motion and excludes testimony by Enola Falk as to Plaintiff's "mental duress."

II. BETH CARPENTER & ANN KIRK

In the Pretrial Order, Plaintiff identified Beth Carpenter and Ann Kirk-- former employees of Defendant--as witnesses. Defendant moves to exclude their testimony on several grounds.

First, Defendant contends that it has been prevented from deposing both finesses because "neither Carpenter nor Cook [sic] were [sic] previously identified by Plaintiff, in her answers to interrogatories or in her deposition, as persons who had knowledge or information regarding her claims against Kimberly." Thus, argues Defendant, the testimony is "prejudicial to Kimberly." Of course, nothing prohibits the admission of "prejudicial" evidence; indeed, most evidence is offered in order to prejudice the opponent's case. *See, e.g., Davidson Oil Country Supply v. Klockner, Inc.*, 908 F.2d 1238, 1245 (5th Cir.1990); *O'Brien v. Papa Gino's of America, Inc.*, 780 F.2d 1067, 1075 (1st Cir.1986); *Koloda v. General Motors*, 716 F.2d 373, 378 (6th Cir.1983); *U.S. v. DeLilo*, 620 F.2d 939, 947 n. 2 (2d Cir.1980). Rather, Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." (emphasis added).

*3 Plaintiff counters that Defendant had an opportunity to depose Carpenter and Kirk because (1) "Defendant's own employment records should reflect that Carpenter worked for Defendant (and with Falk) as Regional Director and that Kirk worked for Defendant (and worked under Falk's supervision) as a recruiter during the relevant time period" and (2) Plaintiff identified Carpenter as a person with knowledge or information of her claims against Defendant at her deposition on August 23, 1994. Plaintiff also relies upon *West Coast Video Enterprises, Inc. v. Ponce de Leon*, 1991 WL 49566, *1 (N.D.Ill. Apr.4, 1991) as citing *Droughn v. FMC Corp.*, 74 F.R.D. 639, 642 (E.D.Pa.1977) for the proposition that a party who fails to bring a motion to compel discovery may not later seek to exclude evidence on the grounds that it was not produced. Unfortunately, after combing through *West Coast Video*'s disposition of nine motions *in limine*, this Court learned that the case neither cites *Droughn* nor supports the proposition for which Plaintiff cites it. Nevertheless, the Court's own

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

research uncovered two unpublished opinions by the *West Coast Video* court that rely upon *Droughn, Harbor Ins. Co. v. Continental Bank Corp.*, 1991 WI 222260, at n. 3 (N.D.Ill. Oct. 25, 1991) & *W.R. Grace & Co. v. Vikase Corp.*, 1991 WI 211647, at *4 (N.D.Ill. Oct. 15, 1991). However, the reasoning behind the proposition does not apply where the moving party has no way of knowing that its discovery request was resisted. Such is the case with Kirk, as it is undisputed that she was never referred to in discovery. Defendant's employment records reflecting her as having worked under Plaintiff's supervision do not compel otherwise. Carpenter is a closer case, as the deposition testimony arguably revealed her to be a person with knowledge two years prior to the filing of the present Motion. Nevertheless, this Court has a longstanding rule that permits a party to depose a witness after the close of discovery where no prior indication was given that the witness would testify at trial, in order to avoid prejudice. Accordingly, the Court grants Defendant leave to depose both witnesses.

Second, Defendant posits that Plaintiff's failure to provide information about the witnesses' testimony renders it "more likely than not ... irrelevant," citing two cases in support that are not on point. In the same vein, Defendant argues that "[b]oth Carpenter and Cook [sic] should be excluded as witnesses as there is no hint, let alone evidence, that either will present relevant or admissible testimony to this Court." (Mot. at 1). The Court rejects the argument for failure to meet the standard of a motion in limine, namely, that the evidence is clearly inadmissible on all potential grounds.

Third, Defendant argues that "Plaintiff fails to state whether she anticipates Defendant to dispute the substance of the meeting [about which Carpenter would testify] as described by Plaintiff. If Defendant does not dispute Plaintiff's statement, Carpenter's testimony is at best duplicative and a waste of time and at worst confusing or misleading to the jury," substantially outweighing the probative value such that it is properly excluded under Rule 403. (Reply at 2-3). However, the case relied upon by Defendant--*West Coast Video*, 1991 WL 49566 (the same case mis-cited by Plaintiff)--does not stand for the proposition that testimony corroborating a plaintiff's statement is properly excluded where a defendant does not dispute the plaintiff's statement. Moreover, to exclude evidence based upon the proffering party's failure to state whether she anticipates the moving party to dispute other evidence flies in the face of the standard that applies to motions in limine. As explained above, evidence is excluded prior to trial only when it is clearly inadmissible on all potential grounds; by definition, an argument based upon anticipation, or the lack of, does not make such a showing. Further, for the movant to attack Plaintiff's failure to anticipate *the movant's plans* and then request a ruling without revealing those plans is disingenuous. Finally, Defendant's argument, which appears for the first time in its Reply, is outside the scope of the Response. For all of these reasons, the Court rejects the third argument. Accordingly, the Court DENIES the motion to exclude Carpenter and Kirk.

CONCLUSION

*4 For the reasons given, the Court (1) GRANTS the Motion *in Limine* to Exclude Enola Falk and (2) DENIES the Motion in Limine to Exclude Beth Carpenter and Ann Kirk, but GRANTS Defendant leave to depose Carpenter and Kirk.

1997 WL 201568 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

COMMERCE FUNDING CORPORATION,
Plaintiff,
v.
COMPREHENSIVE HABILITATION
SERVICES, INC., et al., Defendants.

No. 01 Civ. 3796(PKL).

Sept. 3, 2004.

Harris Beach LLP, New York, New York, John W. Clarke, Arent Fox Kintner Plotkin & Kahn, PLLC, New York, New York, Jeffrey R. Ruggiero, for Defendant/Cross-Claimant Comprehensive Habilitation Services, Inc.

Garfunkel, Wild & Travis, PC, Great Neck, New York, Roy W. Breitenbach, Dennis H. McCoobery, for Defendant/Cross-Claim Defendant St. Francis Hospital.

*OPINION AND ORDER*

LEISURE, J.

*1 This action, originally brought by plaintiff Commerce Funding Corporation upon an alleged breach of a factoring agreement, has been trimmed down by settlements and arbitration, such that only cross-claims asserted by defendant Comprehensive Habilitation Services ("CHS") against defendants St. Francis Hospital ("St.Francis") and Staten Island University Hospital ("Staten Island") remain unresolved. CHS brings a breach of contract claim against St. Francis that will be tried without a jury, and a breach of contract claim against Staten Island that will be tried before a jury.

With respect to St. Francis, CHS alleges that St. Francis owes it $215,270.10 plus interest for services it provided to St. Francis pursuant to a Memorandum of Understanding between the two parties dated February 19, 1999. St. Francis denies the allegations. The Court has scheduled a bench trial on CHS's claims against St. Francis to begin September 13, 2004. CHS now makes two motions *in limine* to exclude from evidence several documents that St. Francis intends to offer at trial. In its first motion *in limine* dated July 30, 2004, CHS seeks to exclude documents that predate the Memorandum of Understanding, and documents related to a settlement between St. Francis and the Attorney General's Office. In its second motion *in limine* dated August 3, 2004, CHS seeks to exclude a plea agreement reached in the case of *People v. Comprehensive Clinical Center, Inc.* St. Francis opposes CHS's motions. For the reasons set forth below, the Court grants in part and denies in part CHS's first motion *in limine,* and reserves judgment until trial on CHS's second motion *in limine,* so that the motion is placed in the appropriate factual context.

Background

The following background information is derived from the submissions of the parties in association with the current motions and does not constitute findings of fact.

I. *Factual Background*

During all relevant times, defendant St. Francis was a hospital in Poughkeepsie, New York, that provided a full range of health care services to the mentally retarded and the developmentally disabled. Cross-claimant CHS provided consultation and administrative services to health providers. On May 25, 1995, CHS and St. Francis reached an agreement (the "Contract"), by which CHS would provide services such as occupational therapy, physical therapy, and social work for St. Francis and be compensated at a rate of $50 per hour. (Contract (attached to CHS's July 30, 2004, Notice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of Motion as Exhibit 1) ¶ 5 and Addendum.) The Contract includes several terms upon which the parties agreed, such as that CHS's services "shall only be provided upon obtaining all Federal, State, and local approvals including, without limitation, approvals of the New York State Department of Health and the New York State Department of Mental Hygiene." (Contract ¶ 5.) After the commencement of the Contract CHS provided services for St. Francis and issued invoices to St. Francis for payment.

*2 At some time after 1995, the Office of the Attorney General, Medicaid Fraud Control Unit ("Attorney General's Office") "conducted an audit of [clinics operated by St. Francis] and thereafter asserted, among other things, that: (a) the Clinics were neither authorized under, nor operated in accordance with, applicable New York State laws, rules and regulations; (b) [St. Francis] submitted improper claims for payment to Medicaid during the Service Period relating to the Clinics; and (c) [CHS's] relationship with [St. Francis] violated applicable New York State laws, rules and regulations." (February 6, 2002, Agreement and Settlement between St. Francis and Attorney General's Office ("February 2002 Settlement"), at 1.) In February 2002 St. Francis entered a settlement with the Attorney General's Office by which St. Francis expressly denied the allegations of the Attorney General's Office, but "in order to avoid the uncertainties, burdens and expenses of litigation," agreed to pay a $1 million settlement in the form of weekly withholdings by the State Department of Health of future Medicaid checks payable to St. Francis. (February 2002 Settlement, at 2-3.)

On February 19, 1999, apparently after the Attorney General's Office had commenced its investigation into the parties' performance under the Contract, and before St. Francis reached a settlement with the Attorney General's Office, CHS and St. Francis agreed to a Memorandum of Understanding. (Memorandum of Understanding (attached as Exhibit 2 to CHS's August 3, 2004, Notice of Motion).) In the Memorandum of Understanding the parties agreed to, among other things, the following terms:
  (1) The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein.
  (2) *Payment and Holdback.* ... [St. Francis] shall pay certain invoices received by it from CHS for services rendered in connection with the Contract on the following schedule: $510,115 on or before February 26, 1999. Invoices 149 and 150 will be withheld as a holdback, and all other outstanding invoices will be paid in accordance with [St. Francis'] 90-day cycle.
....
  (4) *Continuity of Services.* CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates.
....
  (10) *Holdback of Monies--Attorney General--Department of Health Investigation.* CHS, and [St. Francis] acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract, and related issues.... In the event there is an immediate repayment required [by the Attorney General's Office], any outstanding invoices would be used as part of such a repayment plan.
*3 (Memorandum of Understanding ¶¶ 1, 2, 10 and attached Exhibit.)

After the parties agreed upon this Memorandum of Understanding, CHS continued to provide services and submit invoices to St. Francis. St. Francis received the services provided by CHS, but stopped making payments on the invoices.

II. *Procedural Background*

A. *CHS's Cross-Claim*

CHS brings the current cross-claim against St. Francis for breach of contract. CHS claims that St. Francis owes payment on seven invoices CHS issued for payment for services it rendered: Invoice Nos. 149, 150, 151, 152, 153, 154 and 155. Invoices 149 and 150 were issued for services rendered in January and February 1999, and are referenced in the Memorandum of Understanding. Invoices 151-155 were issued for services rendered

in February, March, April, and May 1999, and are not explicitly referenced in the Memorandum of Understanding. The parties agree that the claim to be resolved at the bench trial is a simple breach of contract claim for failure to pay these invoices. (*See* Affidavit of John W. Clarke in support of CHS's Motion *In Limine* To Exclude Various St. Francis Trial Exhibits ("Clarke Aff.") ¶ 2 ("In short, this is a garden variety collection case in which a debtor profited from the services of contractor and then defaulted on its contractual obligation of payment."); Memorandum of Law of St. Francis Opposing CHS's 8/3/04 Motion *In Limine,* at 1 ("This lawsuit is fundamentally a non-payment action.").)

CHS's position is that the Memorandum of Understanding governs all of the invoices, Nos. 149-155, and that payment is due on these invoices under the terms of the Memorandum of Understanding. With respect to Invoices 149 and 150 which are subject to "holdback" in the Memorandum of Understanding, CHS argues that monies owed by St. Francis to CHS for these invoices should not be applied to the settlement with the Attorney General because the "settlement was entered into without consultation with or agreement by CHS. Nothing in the [Settlement] alleges that CHS engaged in any impropriety or had responsibility for the alleged violations. In short, there is no link to any acts of CHS in connection with its performance of the Agreement with [St. Francis], and [St. Francis'] settlement with [the Attorney General's Office]." (Joint Pre-Trial Order, at 5.) CHS thus argues that payment for Invoices 149 and 150 is due. With respect to Invoices 151-155, CHS argues that paragraph four of the Memorandum of Understanding, titled *"Continuity of Services,"* governs these invoices. CHS thus argues that payment for Invoices 151-155, issued for services rendered after the parties signed the Memorandum of Understanding, is due.

St. Francis denies CHS's allegations of breach of contract. St. Francis' position is that the Memorandum of Understanding governs Invoices 149 and 150, and the Contract governs Invoices 151-155. With respect to Invoices 149 and 150, St. Francis argues that the Memorandum of Understanding provides that St. Francis may hold back payment on these invoices and apply it to its Settlement with the Attorney General's Office. As the Settlement amount exceeds the amount of Invoices 149 and 150, St. Francis contends that under the terms of the Memorandum of Understanding it owes nothing to CHS for Invoices 149 and 150. With respect to Invoices 151-155, St. Francis argues that "those invoices are expressly not subject to the Memorandum of Understanding and, accordingly, are governed by the terms of the parties' original [Contract]." (Joint Pre-Trial Order, at 3.) St. Francis argues that CHS failed to perform its obligations under the Contract "to ensure compliance with all rules and regulations pertaining to the operation of the [St. Francis] Clinics; to market, implement and provide administrative services at Hospital operated Clinics; to obtain all Federal, State and local approvals of the New York State Department of Health and the New York State Department of Mental Hygiene relating to the operation of the clinics; and to comply with the contract's covenant of good faith and fair dealing." (Joint Pre-Trial Order, at 3 (internal quotations omitted).) St. Francis concludes that "the doctrine of prior material breach precludes CHS from collecting under Invoice Nos. 151, 152, 153, 154 and 155." (Joint Pre-Trial Order, at 3.)

B. *CHS's Current Motions*

*4 CHS brings two motions *in limine* to exclude certain evidence that St. Francis intends to offer at trial. The Court takes up each motion in turn below.

Discussion
I. *Motion In Limine Standard*

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials); *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 283 (S.D.N.Y.1996). Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94

Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co.*, 937 F.Supp. at 287.

A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence. Fed.R.Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court...."). The court's ruling regarding a motion *in limine* is "subject to change when the case unfolds." *Luce*, 469 U.S. at 41. This opinion and order thus determines preliminarily whether the evidence challenged by CHS may be presented to the trier of fact. Once this Court makes a determination that certain forecasted evidence is admissible, it will, as the trier of fact, consider the weight and sufficiency of the evidence presented at trial. *See, e.g., In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1132 (2d Cir.1995) (noting that once shaky, unreliable evidence is admitted, such evidence is best challenged with " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." ' (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).

II. *CHS's Motion To Exclude Documents that Predate the Memorandum of Understanding and Documents Related to St. Francis' Settlement with the Attorney General's Office*

CHS seeks to exclude several documents in its first motion *in limine*, dated July 30, 2004. The first set of documents are those that predate the Memorandum of Understanding. The second set are those related to St. Francis' Settlement with the Attorney General's Office. The Court takes up each of these sets of documents in turn.

A. *Documents that Predate the Memorandum of Understanding*

*5 CHS seeks to exclude St. Francis' proposed exhibits A, B, D, E, G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX on relevance grounds. [FN1] These exhibits are a variety of documents with a common trait: they all predate the Memorandum of Understanding, which the parties signed in February 1999. St. Francis seeks to admit these documents because its position is that the Contract, which predates most of these documents, governs the invoices at issue. The proposed exhibits, St. Francis argues, tend to show that CHS did not perform its obligations under the Contract. St. Francis thus opposes CHS's motion, but indicates either expressly or impliedly in its opposition papers that it does not seek to admit exhibits A, B, D, or E. [FN2]

> FN1. CHS also observes that Exhibits E, G, H, I, J, L, M, P, Q, R, and XX need to be authenticated before they can be admitted. The Court need not take up authenticity as a ground for excluding the proposed exhibits at this time. First, on the current record the proposed exhibits are irrelevant, thus their authenticity is moot. Second, CHS does not argue for the pretrial exclusion of documents on authenticity grounds, but simply notes that the challenged exhibits should be excluded if St. Francis fails to authenticate them. And third, questions about whether a document is authentic do not typically justify excluding the document in advance of trial, because authenticity can be easily established at trial. "Evidence sufficient to support a finding that the matter in question is what its proponent claims" satisfies Rule 901's requirement of authentication. Fed.R.Evid. 901(a). "Rule 901 does not erect a particularly high hurdle." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001) (internal quotations omitted). "Testimony that a matter is what it is claimed to be," for example, sufficiently authenticates a document. Fed.R.Evid. 901(b)(1).

> FN2. Proposed exhibits A and B predate the Contract and thus appear irrelevant under any circumstances, and St. Francis does not indicate that it will seek

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

admission of these documents. St. Francis expressly withdraws proposed exhibits D and E from consideration, indicating that it will not seek to introduce these documents into evidence.

The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir.1985). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401. While the Rules of Evidence apply with equal force in jury and non-jury trials, courts often apply the relevance standard with little rigor during a bench trial. The Second Circuit has noted that "ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records." *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552 (2d Cir.1977) (Oakes, J.). While standards for admissible evidence are not "out the window entirely" in a bench trial, "all doubts at a bench trial should be resolved in favor of admissibility." *Dreyful Ashby, Inc. v. S/S "Rouen",* 1989 WL 151685, at *2 (S.D.N.Y.1989) (Mukasey, J.). " 'In non-jury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence." ' *In re Unisys Savings Plan Litigation,* 173 F.3d 145, 172 (3d Cir.1999) (quoting Wright and Miller, Federal Practice and Procedure, § 2885, at 454).

Here, St. Francis' proposed exhibits that predate the Memorandum of Understanding are irrelevant, such that admitting them even at a bench trial would contravene Rule 401 and serve no purpose. The Memorandum of Understanding states, "The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein." (Memorandum of Understanding ¶ 1.) It then explicitly references "outstanding invoices," including Invoices 149 and 150. (Memorandum of Understanding ¶ 2.) It then states that "CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates." (Memorandum of Understanding ¶ 4.) Invoices 151-155 were issued for services rendered by CHS during and beyond this "transition period," from February through April 1999. The Memorandum of Understanding unambiguously applies to all the invoices at issue in this case. Thus, documents that predate the Memorandum of Understanding do not tend to make the existence of any fact at issue more or less probable.

*6 St. Francis offers no support for its position that the Contract governs Invoices 151-155. It simply states first that "those invoices are expressly not subject to the Memorandum of Understanding," (Joint Pre-Trial Order, at 3.), and second that "[those invoices] are not set forth on Exhibit B and are ... neither covered nor controlled by the Memorandum of Understanding." (Memorandum of Law of St. Francis Opposing CHS's 7/30/04 Motion *In Limine,* at 2.) St. Francis then argues that "CHS, during the term of the parties' relationship, failed to comply with its contractual obligations," and seeks to admit the proposed exhibits as documentary evidence in support of this contention. (Joint Pre-Trial Order, at 3.) St. Francis' first statement is incorrect. The Memorandum of Understanding does not express that Invoices 151-155 are not governed by it. No clause of the Memorandum of Understanding "expressly" excludes invoices from its terms. St. Francis' second statement is partially correct. Invoices 151-155 are not set forth in Exhibit B attached to the Memorandum of Understanding. These invoices, however, were issued for services rendered *after* the parties signed the Memorandum of Understanding, during the transition period contemplated by paragraph four of the Memorandum of Understanding. The Memorandum of Understanding does not state that invoices not listed in Exhibit B, for future services performed, are not governed by this agreement. It in fact states the opposite, expressly terminating the Contract and providing for the payment of services during the transition period in paragraph four.

As St. Francis argues only that the proposed exhibits are relevant because the Contract governs Invoices 151-155, and its assertion that the Contract governs the Invoices finds no factual support, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. Although this Court will resolve relevance questions about evidence in favor of admissibility, the Court will not admit irrelevant documents simply because they are offered. Based on the current record these proposed exhibits will not be admitted at trial. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

B. *Documents Related to St. Francis' Settlement with the Attorney General*

CHS seeks to exclude St. Francis' proposed exhibit JJ, UU, and WW. These documents are an email related to St. Francis' Settlement with the Attorney General's Office, a letter related to the Settlement, and the Settlement itself. CHS contends that these documents are irrelevant. CHS's position is that the circumstances of the Settlement and the Settlement itself show that St. Francis' liability to the State cannot be attributed to CHS. Thus, CHS argues, under the terms of the Memorandum of Understanding, St. Francis had no contractual right to withhold payment owed to CHS and apply the payments to the Settlement. St. Francis responds that the terms of the Memorandum of Understanding permit it to apply monies owed to CHS to the Settlement with the Attorney General's Office.

*7 The Court finds on the current record that the Settlement and related documents are relevant. Paragraph 10 of the Memorandum of Understanding provides that the parties "acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract.... To the extent that a long term payment plan is offered [by the Attorney General's Office as a settlement], the parties hereto shall cooperate in good faith to quantify the liability and reach a suitable repayment agreement. In the event there is an immediate repayment required, any outstanding invoices would be used as part of such a repayment plan." (Memorandum of Understanding ¶ 10.) The Memorandum of Understanding thus expressly references a potential settlement with the Attorney General's Office, and contemplates that the parties' contractual obligations may be affected by the terms of the Settlement. The Settlement Agreement (Exh. WW) and related emails and letters (Exhs.JJ, UU) are relevant to show whether and how the parties' obligations under the Memorandum of Understanding were impacted by St. Francis' Settlement with the Attorney General's Office.

Based on the current record the Court denies CHS's motion to exclude proposed exhibits JJ, UU, and WW, as these documents are relevant. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

III. *CHS's Motion To Exclude the Superior Court Information in the Case of People v. Comprehensive Clinical Center, Inc.*

CHS moves to exclude St. Francis' proposed exhibit VV, a Superior Court Information containing a plea agreement between Comprehensive Clinical Center, Inc. ("CCC") and the Attorney General of the State of New York ("Attorney General"), dated April 9, 2001, relating to the action *People v. Comprehensive Clinical Center, Inc.* [FN3] CHS argues that the plea agreement is irrelevant, that its prejudice substantially outweighs its probity, and that it is not properly admitted as character evidence.

> FN3. CHS also moves to exclude St. Francis' proposed exhibits ZZ and AAA, documents from websites of Health and Human Services and the New York State Department of Health, respectively. Upon CHS's motion St. Francis has withdrawn these proposed exhibits and agrees not to seek to introduce them into evidence in its case-in-chief.

According to CHS, CCC is a corporation that operated clinics providing psychological and other services. Its president and sole shareholder was Dr. Peter Magaro. Magaro also is the president and chief executive officer of CHS, and he signed the Memorandum of Understanding with St. Francis on behalf of CHS. The Attorney General criminally prosecuted Magaro's company, CCC, as part of an investigation similar to that of St. Francis which resulted in the Settlement discussed above. The prosecution of CCC resulted in a plea agreement by which CCC as a company pleaded to grand larceny for Medicaid fraud. The plea agreement includes

the following: "The plea of guilty to the Superior Court Information will cover Peter A. Magaro, his immediate family and the corporations which he controls, either *de facto* or *de jure,* including [CHS]." (CHS's Notice of Motion, Exh. C ¶ 3.) St. Francis intends to offer the plea agreement as proposed exhibit VV at trial. St. Francis' takes the position that the guilty plea of CCC, a company owned by Magaro, tends to show that CHS, another company run by Magaro, was responsible for the Medicaid violations for which St. Francis settled with the Attorney General's Office. St. Francis argues that the plea agreement shows that CHS did not meet the contractual obligations it owed to St. Francis, namely, its obligations "to ensure compliance with all rules and regulations pertaining to the operation of [St. Francis] Clinics," and to obtain "all Federal, State and local approvals of the New York State Department of Health an the New York State Department of Mental Hygiene" relating to the operation of the clinics. (Contract ¶¶ 5, 6.)

*8 The Court finds on the current record that granting or denying CHS's motion to exclude proposed exhibit VV would be premature, and reserves judgment until trial so that the motion is placed in the appropriate factual context. The plea agreement's relevance depends upon an inference that appears tenuous on the current record, namely, that the prosecution of CCC tends to show that CHS did not perform its contractual obligations with St. Francis. The Court has little information at this time to rule on the propriety of this inference and evidence offered upon it. The scope of the plea agreement, which purports to "cover" CHS, is unclear. Magaro's role in CCC, and more importantly in CHS and in fulfilling CHS's contractual obligations to St. Francis, is unclear. The sparse record currently includes too little information for the Court to rule on the admissibility of the plea agreement. The relevance and/or prejudice of the plea agreement will be better determined at trial, once the parties have developed the factual background of the case and once St. Francis has endeavored to lay a foundation for the plea agreement. The Court therefore reserves judgment on proposed exhibit VV.

Conclusion

For the reasons set forth above, the Court grants in part and denies in part CHS's first motion *in limine,* and reserves judgment until trial on CHS's second motion *in limine,* so that the motion is placed in the appropriate factual context. The Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. The Court finds that St. Francis' proposed exhibits JJ, UU, and WW are relevant. The Court reserves judgment on St. Francis' proposed exhibit VV until trial. Each of these preliminary rulings, made under Rule 104 of the Federal Rules of Evidence, is subject to change as the case unfolds.

SO ORDERED.

2004 WL 1970144 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

- 1:01CV03796 (Docket)
  (May. 03, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2000 WL 33407343 (W.D.N.Y.)  
**(Cite as: 2000 WL 33407343 (W.D.N.Y.))**

Page 1

▷ Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Paul L. SIDARI, et al., Plaintiffs  
v.  
ORLEANS COUNTY, et al., Defendants

No. 95-CV-7250.

Oct. 3, 2000.

DECISION and ORDER

SIRAGUSA, J.

*1 Now before the Court is defendants' letter motion [# 312] for reconsideration of the Court's Decision and Order [# 298], defendants' motion [# 303] renewing a motion to compel discovery, and plaintiffs' cross-motion [# 308] renewing their objections to a Decision and Order [# 283] by the Honorable Hugh B. Scott, United States Magistrate Judge. For the reasons that follow, defendants' motion for reconsideration is granted in part and denied in part, defendants' motion to compel discovery is granted, and plaintiffs' cross-motion is denied.

BACKGROUND

The facts of this case have been set forth in several prior decisions of this Court, familiarity with which is presumed. It is sufficient here to note that this is an action in which plaintiff Paul Sidari [FN1] who is caucasian, Italian-American, and Catholic, is suing pursuant to Title VII, 42 U.S.C. § 2000(e) *et seq.*, 42 U.S.C. § 1983, and New York State law, claiming that he was discriminated against in his employment because of national origin, and religion, and that he suffered retaliation when he complained. (Amended Complaint [# 62], p. 2).

FN1. Chris Deen Sidari, Paul Sidari's wife, is also a plaintiff in this action. However, her claim for loss of consortium is not at issue in this Decision and Order, and accordingly, references herein to "plaintiff" refer only to Paul Sidari.

I. Defendants' Motion for Reconsideration.

By Decision and Order [# 298] dated June 14, 2000, the Court found that pursuant to *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir.2000), the plaintiff could as part of his claim for a hostile work environment, introduce at trial evidence that defendants had discriminated against African-American and Hispanic jail inmates. This Court ruled that:

Based upon the Second Circuit's decision in *Cruz,* the Court finds that plaintiff in the case at bar must be permitted to introduce evidence of racial and sexual discrimination against inmates and other employees at the Orleans Correctional Facility by defendants, in support of his claim for hostile work environment, since these other incidents of discrimination could reasonably have exacerbated the harassment which plaintiff personally experienced.

(Decision and Order [# 298], p. 12). In *Cruz,* the plaintiff, a Hispanic woman, alleged a hostile working environment because of racial and sexual harassment. As evidence of her claim, plaintiff produced evidence showing that in addition to harassing her, her supervisor had also made derogatory comments against African-Americans and other women. The Second Circuit Court of Appeals held that:

Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances. Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim. Nor must offensive remarks or behavior be directed at individuals who are

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee.

*2 *Cruz,* 202 F.3d at 570 (citations omitted). The Second Circuit further noted that "even if [plaintiff] herself were not present or were not the target of some of [her supervisor's] racial remarks, a jury plausibly could find that his persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [she] experienced individually." 202 F.3d at 571. Finally, the *Cruz* court noted that evidence of racial harassment could be used by a plaintiff to bolster a claim of sex-based hostile working environment, and vice versa: "Given the evidence of both race-based and sex-based hostility, a jury could find that [the employer's] racial harassment exacerbated the effect of his sexually threatening behavior and vice versa." 202 F.3d at 572.

By letter dated June 20, 2000, defendants requested reconsideration of the Decision and Order [# 298], on the ground that the Court's ruling was "founded upon an unduly broad reading of the Second Circuit's holding in *Cruz.*" Specifically, defendants stated:

Neither Cruz, nor any case cited therein, nor the 19 cases which have thus far cited Cruz, support the proposition that plaintiff, a white male, may buttress or otherwise advance his claims of discrimination based on religion or national origin with unrelated allegations of race and gender discrimination. Rather, a careful reading of Cruz and related case law indicates simply that a plaintiff may present evidence of discrimination in the same general category in order to support his or her own alleged discrimination claims.

After receiving defendants' letter, the Court held a conference with counsel, at which time the Court gave plaintiffs' counsel the opportunity to submit any case where a court allowed evidence of race discrimination to be introduced in support of a discrimination claim based upon national origin. Plaintiff has not produced any such case. [FN2]

FN2. The cases which plaintiffs primarily rely upon are not directly on point. In *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10 th Cir.1987), the plaintiff was an African-American female who alleged a hostile work environment on the basis of both race and sex. Although finding that she did not allege sufficient evidence of a racial hostile work environment, the Court allowed her to use racial evidence in support of her sexual hostile work environment claim. In *Hafford v. Seidner,* 183 F.3d 506, 515 (6 th Cir.1999), the plaintiff was an African-American Muslim, who alleged hostile work environment on the basis of race and religion. Although finding insufficient evidence on the religion claim, the court allowed him to use evidence of religious discrimination in support of his racial hostile work environment claim. Neither case involves a plaintiff alleging only national origin hostile work environment, who seeks to use evidence of race discrimination against others in support of his claim.

However, plaintiff did submit, *inter alia,* the case of *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997). In *Schwapp,* the plaintiff was an African-American police officer who in support of his claim for hostile work environment based upon racial discrimination, sought to introduce evidence of discriminatory conduct against "other minority groups" that had occurred outside of his presence. *Id.* at p. 109. For example, plaintiff sought to introduce evidence that other officers had called persons of "Middle-Eastern origin" "camel jockeys," and that "an officer who is of Italian ancestry and has dark skin was referred to as the 'big nigger." ' *Id.* The district court in *Schwapp* had excluded this evidence, however the Second Circuit reversed, finding that the aforementioned "hostile comments directed at other minority groups" were relevant to the hostile work environment claim. *Id.* at 109-110. Referring to the incidents which included the comment about the Italian-American officer, the Second Circuit stated, *inter alia,* that "the incidents relating to other minorities ... may be of limited probative value, but cannot be ignored." *Id.* at 112.

*3 During oral argument on these motions, counsel for the Orleans County defendants asserted that pursuant to *Cruz* and subsequent cases which have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

cited *Cruz,* a caucasian plaintiff suing for hostile work environment discrimination based upon national origin may not introduce evidence of discrimination against non-whites. Moreover, defendants' counsel vehemently asserted that Italians are not a "minority," and that *Schwapp* was inapplicable, since the derogatory comment made against the Italian officer was actually a slur against African-Americans, not Italians. In the alternative, defendants' counsel stated that the slur against the Italian officer was only allowed to be introduced because the Italian was described as having "dark skin." *See, Schwapp,* 118 F.3d at 109. However, the Court disagrees, and notes that defendants' assertions are contrary to the actual language of the *Schwapp* decision. In *Schwapp,* the Second Circuit panel explicitly divided the alleged slurs into three groups. The first group involved incidents which occurred in plaintiff's presence, all of which involved slurs against African-Americans. *Id.* at 108. The second group involved "racial comments that [the plaintiff] did not experience first-hand, but that were relayed to him by fellow officers during his employment," including slurs against African-Americans and Hispanics. *Id.* Finally the Second Circuit identified

> [a] third group of incidents [which] occurred during [the plaintiff's] employment but involved hostile comments directed at *other minority groups.* In the first such incident, a fellow officer told [the plaintiff] that [another officer] said during roll call: "We have a nest of camel jockeys over at 156 West Main," referring to persons of Middle-Eastern origin. Second, fellow officers told [the plaintiff] that in the Summer of 1993, [another officer] stated during a training session on the use of capsicum, a pepper spray, "you have capsicum if you stop a car ... and it is a car load of Puerto Ricans." The last incident relayed to [the plaintiff] apparently occurred prior to [his] employment.... According to fellow officers, an officer who is of Italian ancestry and has dark skin was referred to as the "big nigger" by ... officers.

*Id.* at 109 (emphasis added; citations omitted). Thus, it appears to the Court that defendants' contention that the comment about the Italian officer was allowed in only because it was a slur against African-Americans, is incorrect, since the Second Circuit clearly described this as one of the incidents involving "other minority groups," which can only be understood to include Italians.

In any event, upon reconsideration, and *Cruz* and *Schwapp* notwithstanding, the Court concludes that defendants' counsel is correct in asserting that a plaintiff who is alleging one "type" of hostile work environment discrimination may not generally use evidence of other "types" of discrimination to support his claim. *See, e.g., Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 949 F.Supp. 13, 19 (D.D.C.1996) ("[A]llegations of race discrimination are not relevant to a claim of national origin discrimination"); *Rivera v. Baccarat, Inc.,* No. 95 CIV. 9478 MBM JCF, 1997 WL 777887 at *2 (S.D.N.Y. Dec. 15, 1997)("[E]vidence that [other] ... employees may have been victims of gender bias or sexual harassment has no bearing on the plaintiff's claims of national origin and age discrimination in this case."); *Simonetti v. Runyon,* No. Civ.A.98-2128, 2000 WL 1133066 at *6 (D.N.J. Aug. 7, 2000)("[P]laintiff may not use evidence of one type of discrimination [race, religion] to prove discrimination of another type [disability].");

*4 However, some courts have recognized that notwithstanding the general rule noted above, evidence of one type of discrimination may be relevant to a claim for another type of discrimination if there is a sufficient nexus between the two types. For example, in *Rivera v. Baccarat, Inc.,* 1997 WL 77887 at * 2 (S.D.N.Y. Dec. 15, 1997), the district court discussed the Ninth Circuit's decision in *EEOC v. Farmer Brothers Co.,* 31 F.3d 891, 898 (9 th Cir.1994): "There, evidence of sexual harassment was admitted in a case of gender discrimination '[b]ecause hostility against women underlies decisions to discharge or to refuse to hire women[.]' No such *nexus* necessarily exists between hostility against women and acts of age or national origin discrimination." (Emphasis added). Similarly, in *Kelly v. Boeing Petroleum Services, Inc.,* 61 F.3d 350, 358 (5 th Cir.1995), the Fifth Circuit Court of Appeals excluded evidence of other discrimination, not because it was a different type of discrimination than alleged by the plaintiff, but because there was an insufficient nexus: "[W]e find a tenuous relationship here between discrimination that could be reflected in [the defendant's] derogatory remarks about race, sex, and national origin and discrimination based on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

handicap, which is the focus of [plaintiff's] complaint. We therefore agree ... that [defendant's] acts of unrelated discrimination are irrelevant."

In the instant case, the Court finds that there is a definite nexus between the incidents of race discrimination against inmates and plaintiff's claim of discrimination on the basis of national origin. Plaintiff alleges that defendant Dingman referred to African-American inmates as "niggers" and subjected them to physical and psychological abuse, which included keeping an African-American inmate naked in a cell without a sink, toilet, or bed, referring to him as a "pet nigger," and forcing him to perform oral sex on himself in exchange for cigarettes. (*See, e.g.,* Amended Complaint [# 62], p. 6- 7). Defendant Dingman also allegedly referred to African-American inmates as "DANS," which stands for "dum-ass nigger." (*Id.,* p. 6). Plaintiff also alleges that defendants Dingman and Walsh referred to Hispanic inmates as "spics." (Id., p. 7). Moreover, plaintiff claims that defendant Dingman equated Italians with African-Americans:

> Dingman regularly referred to plaintiff as "Dago" or as "a nigger turned inside out" or has referred to Italians and blacks as "low life" or has stated there is no difference between blacks and Italians, Italians are niggers, they are the same thing, that Italy and Africa are closely related, that Italians and blacks are racially related.... Plaintiff has also observed other employees of Italian origin called the same or similar slurs.

(Amended Complaint [# 62], p. 8). Plaintiff alleges that defendant Dingman also once referred to an African-American man who was visiting the jail as plaintiff's brother," and that he once told plaintiff he was "slow as a nigger." (Id.). While generally a claim of discrimination based upon one's Italian heritage would be treated as discrimination based upon national origin, not race, defendants here allegedly equated Italians with African-Americans. Accordingly, the Court finds that the evidence of racial discrimination against jail inmates is in fact related and relevant to the discrimination that plaintiff Paul Sidari alleges he experienced, and that such racial discrimination could reasonably have affected plaintiff's working environment. Based upon all of the foregoing, defendants' motion for reconsideration is denied in regard to the use of evidence of racial discrimination to support plaintiff's national origin claim.

*5 However, defendants' motion for reconsideration is granted with respect to the Court's earlier ruling that plaintiff could use evidence of sex discrimination. The Court finds no such nexus between the allegations of gender discrimination against plaintiff's co-workers and plaintiff's claim of national origin discrimination, accordingly plaintiff may not use evidence of gender discrimination at trial. [FN3]

> FN3. Following oral argument on this motion on September 21, 2000, counsel submitted letters to the Court discussing, *inter alia,* the September 20, 2000, Memorandum and Order of Senior United States District Judge John T. Elfvin in the case of *Gavenda v. Orleans County, et al.,* 95- CV-7025, which discusses the *Cruz* decision. (September 25, 2000 letter of Robert A. Doren, Esq.; September 26, 200o letter of Emmelyn Logan-Baldwin, Esq.; September 27, 2000 letter of Robert A. Doren, Esq.; September 28, 2000 letter of Josephine A. Greco, Esq.; September 28, 2000 letter of Emmelyn Logan-Baldwin, Esq.) The Court has reviewed and considered these submissions.

II. Defendants' Renewed Motion to Compel Discovery

On May 28, 1996, defendants served their Fifth Notice to Produce, which requested, in relevant part, "[a]ny documents directly and/or indirectly referring to Plaintiff Paul Sidari's or Plaintiff Paul Sidari's attorney's communications with ... Zina Baker ... John Mignano ... including but not limited to ... tape recordings of communications with Mr. Mignano ... referenced in Plaintiff Paul Sidari's deposition transcript at p. 1381." (*Id.,* p. 2). Plaintiffs objected to producing the information requested, stating that "the material requested is protected by the attorney-client privilege and/or is the attorney work product." (Notice of Motion to Compel [# 232], Exhibit B, p. 2). Defendants then filed a motion to compel [# 232], and by Decision and Order [# 283], the Honorable Hugh B. Scott, United States Magistrate Judge, wrote that

> plaintiff asserts that the material requested is

subject to the attorney work-product privilege. On its face, it would appear that at least some of the requested information may be subject to the attorney work-product privilege. However, inter alia this would depend on when the conversations took place and who was present at that time. Moreover, even in such cases the party asserting such a privilege is obligated to "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." (Rule 26(b)(5) of the Federal Rules of Civil Procedure .)

The plaintiff is directed to produce a privilege log which describes each such document or recording. With respect to recordings, the log shall state where and when the recordings were made, who was present at the time, the nature and substance of the recordings, who has been provided with access to or a copy of the recordings, and the date on which any such access or copy was provided. With respect to documents, the log shall identify the date of the documents, who drafted the documents, the nature of the substance of the documents and each person who has been given access to or a copy of the documents, and the date on which any such access or copy was provided. The plaintiff is directed to produce this privilege log to the defendants on or before April 14, 2000.

It also appears that the plaintiff voluntarily submitted some (if not all) of these materials to the [F.B.I.]. Any such voluntary disclosure may constitute a waiver of the work-product privilege. *Information Resources Inc. v. The Dun & Bradstreet Corp.,* 999 F.Supp. 591 (S.D.N.Y.1998); *Partnership v. Salomon Bros., Inc.,* 1993 WL 277182 (S.D.N.Y.1993). Whether or not the disclosure constituted a waiver depends, in part, upon whether the information was given over to the FBI to instigate the investigation, and whether the FBI was committed to any such investigation at the time the information was given over to the FBI. The above privilege log shall include the date on which any such documents or recordings were presented to the FBI. To the extent defendants seek disclosure of this information based upon an alleged waiver of the attorney work product privilege, the motion is denied without prejudice. The defendants may renew such a motion, upon the development of the record to allow the Court to determine when and under what circumstances the information was disclosed to the FBI.

*6 Decision and Order [# 283], pp. 5-6).

Thereafter, plaintiff served defendants with a privilege log, which revealed, *inter alia,* the existence of the two recordings: 1) an April 25, 1998 recording of an interview with Zina Baker and her mother, Sylvia Baker Shoemaker, made at the office of plaintiff's counsel, at which plaintiffs' counsel, Baker and Shoemaker were present, in which is discussed Ms. Baker's "claims including for example employment discrimination/retaliation in Baker v. Orleans County, et al." (Defendant's Renewed Motion to Compel [# 303], Exhibit A, p. 3); and 2) an April 26, 1995 recording and transcript of an interview with John Mignano, a co-worker of Paul Sidari, made at the home of plaintiff Paul Sidari, at which plaintiffs' counsel, Mignano, and Paul Sidari were present, in which Mignano discusses Sidari's claims of discrimination and retaliation. (Renewed Motion to Compel [# 303], Exhibit A). The privilege log states that on September 26, 1997, a transcript of the Mignano recording was provided to Paul Campana, Esq., Assistant U.S. Attorney, "expressly reserving attorney work product privilege in writing," and that the Baker/Shoemaker recording was given to "FBI agent on 4/27/98 expressly reserving in writing the attorney client and work product privileges," and that, (Renewed Motion to Compel [# 303], Exhibit A). Plaintiffs' counsel provided the Mignano recording to the United States Attorney's office for use in the criminal trial of John Walsh, who is also a defendant in this action. Specifically, the United States Attorney's office believed that Mignano would testify as a defense witness in Walsh's criminal trial, and they intended to utilize the Mignano recording and transcript to impeach Mignano on cross-examination. However, Mignano never testified, and the Assistant United States Attorney returned the tape and transcript to plaintiffs' counsel without having listened to the tape or having viewed the transcript. (Plaintiffs' Cross Motion [# 308], Exhibit A, Affidavit of Paul J. Campana, Esq.). Approximately seven months after the completion of the Walsh criminal trial, plaintiffs' counsel made the Baker/Shoemaker tape

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33407343 (W.D.N.Y.)
(Cite as: 2000 WL 33407343 (W.D.N.Y.))

Page 6

and provided it to the F.B.I. (Defendants' Notice of Motion [# 303], Exhibit A, p. 3). Plaintiffs' counsel does not explain why she provided this tape to the F.B.I., other than to state that "[m]y contact with the F.B.I. was on behalf of each of them [Baker and Shoemaker] on the matter for which I was consulted." (Plaintiffs' Cross-motion [# 308], p. 9).

On July 6, 2000, the Orleans County defendants filed a "Motion Renewing Motion to Compel Discovery" [# 303]. This motion seeks an order compelling production of the following:

(A) tape recording of conversation with Zina Baker and non-party Sylvia Baker Shoemaker made April 25, 1998, and turned over to FBI (hereinafter referred to as "Baker tape recording") and

(B) tape recording of conversation with non-party John Mignano, made April 26, 1995, and transcript of same, both of which were turned over to Paul Campagna, Esq., Asst. U.S. Attorney (hereinafter referred to as "Mignano tape recording and transcript").

*7 (Defendants' Renewed Motion to Compel [# 303], pp. 1-2). Defendants contend that there is no Attorney-Client privilege as to the Mignano recording, because Mignano was not a party to this action, and that while the recording would have been privileged as attorney work product, that privilege was waived when plaintiffs' counsel provided a transcript of the recording to the United States Attorney's office. Defendants contend that there is no Attorney-Client privilege as to the Baker/Shoemaker recording, since at that time Ms. Shoemaker was neither a client nor a party to this action or to Ms. Baker's action against Orleans County. Moreover, defendants contend that while the Baker recording would have been privileged as attorney work product, that the privilege was waived when plaintiffs' counsel provided the tape to the F.B.I.

In response to defendants' motion, plaintiffs filed a cross-motion [# 308], renewing plaintiffs' objections [# 289] to Magistrate Judge Scott's Decision and Order [# 283], which Decision and Order was affirmed by this Court on June 15, 2000 [# 297]. Plaintiffs allege that they raised objections regarding these recordings in their objections [# 289], but that this Court failed to address those objections in its Decision and Order [# 297].

Plaintiffs further request that "in the alternative, should the court entertain any breach of plaintiffs' attorney/client or work product privileges, that the court order defense counsel to produce for plaintiffs all investigatory information they have shared with each other and/or any other person or entity in this case and in *Gavenda v. Orleans Co., et al., Baker v. Orleans Co, et al.,* and *Stilwell v. Orleans Co., et al.*" ( [# 308], p. 2).

With regard to the motion to compel, at oral argument, plaintiffs' counsel acknowledged that she turned the tapes and transcript over to the United States Attorney and F.B.I. voluntarily, and not pursuant to a subpoena. However, plaintiffs contend that they have not waived any privileges for two reasons. First, plaintiffs contend that there was no disclosure of the contents of either tape, since neither the United States Attorney nor the F.B.I. actually listened to the tapes or viewed the transcript. Plaintiffs assert that "[d]efendants have no waiver argument when, as here, the person or entity to whom 'disclosure' was made did not view, use, and/or retain the tapes and/or transcript." (Plaintiffs' Cross-motion [# 308], p. 6). Second, plaintiffs contend that even assuming that the tapes were "disclosed," that there was still no waiver of a privilege, since both the United States Attorney and F.B.I. were "litigation allies." (Id., p. 10). In that regard, plaintiffs' counsel asserted at oral argument that she had an oral "understanding" with Assistant U.S. Attorney Paul J. Campana that the Mignano tape would remain confidential. The Court notes, however, that the affidavit of Mr. Campana submitted in opposition to defendants' motion makes no mention of such an agreement. Plaintiffs have not alleged that they had any confidentiality agreement, either oral or written, with the F.B.I. The Court further notes that while on the privilege log, plaintiffs' counsel stated that she had expressly reserved the asserted privileges "in writing" to both the United States Attorney and the F.B.I., plaintiffs have not produced any such writings.

*8 Based upon all of the foregoing, the Court finds that defendants' motion to compel should be granted. First, the Court finds that, based upon the representations of plaintiff's counsel as an officer of this Court that she represented both Ms. Baker and Ms. Shoemaker at the time the Baker/Shoemaker tape was made, the Baker/Shoemaker tape would

have been protected by the attorney-client privilege. Moreover, as defendants' counsel acknowledges, both the Baker/Shoemaker and Mignano tapes would have in any event been protected by the attorney work product privilege. However, the Court finds that all these privileges were waived when plaintiffs' counsel voluntarily disclosed the tapes and transcript to third parties. As to the Baker/Shoemaker tape, the Court finds that any attorney-client privilege was waived when plaintiffs' counsel turned the tape over to the F.B.I., even if no one at the F.B.I. actually reviewed the tape. *See, In re Grand Jury Subpoena (Horowitz),* 482 F.2d 72 (2d Cir.1973), *cert den.* 414 U.S. 867, *reh. den.,* 414 U.S. 1052. However, this finding is not dispositive of the attorney work-product privilege issue. Disclosure of attorney work-product to a third party, "unlike disclosure of a document protected by the attorney-client privilege ... does not necessarily waive the work product immunity. Disclosure of work product to a third party does not waive its protection unless it substantially increases the opportunity for potential adversaries to obtain the information." *In re Grand Jury Subpoenas Dated December 18, 1981,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982); *see also, Visa Check/MasterMoney Antitrust Litigation,* 190 F.R.D. 309, 314 (E.D.N.Y.2000) ("The purpose behind the work product doctrine is narrower [than the attorney-client privilege]: it is to keep counsel's work from his opponent in the litigation so that it will not be used against him.").

With regard to the issue of whether or not the attorney work product privilege was waived in this case, both sides in this action claim that they should prevail on this issue pursuant to the case of *Information Resources, Inc. v. Dun & Bradstreet Corp.,* 999 F.Supp. 591 (S.D.N.Y.1998). However, the Court finds that plaintiffs did waive the attorney work-product privilege, because in both instances where the tapes were disclosed, the disclosure substantially increased the likelihood that the tapes/transcript would be disclosed to the public and in particular, to defendants herein. First, with regard to the Mignano tape, it is undisputed that plaintiffs' counsel turned the tape over to the United States Attorney with knowledge that the Assistant U.S. Attorney prosecuting John Walsh intended to use the tape to cross-examine Paul Mignano. Plaintiffs' counsel was therefore aware, or should have been aware, that if Mignano had at trial testified in a manner inconsistent with his tape recorded statements, the tape could have been used to impeach him in open court. Although plaintiffs' counsel claimed during oral argument that she had an oral understanding that the tape would remain confidential, she has produced no proof of such an agreement, and such a claim is frankly inconsistent with the obvious purpose for which it was being provided to the United States Attorney, who clearly intended to use the tape at trial. With regard to the Baker/Shoemaker tape, the Court similarly finds that the attorney work-product privilege was waived. As noted above, plaintiffs' privilege log alleged that the tape given to the F.B.I. pertained solely to Ms. Baker's claims of employment discrimination and retaliation against Orleans County. Plaintiffs' counsel alleged during oral argument that she provided the Baker/Shoemaker tape to the F.B.I. in connection with an ongoing F.B.I. investigation of Orleans County. However, the nature and target of any such investigation is unclear. Thus, plaintiffs have not demonstrated that they were litigation allies with the F.B.I., nor have plaintiffs presented any proof of a confidentiality agreement with the F.B.I. Accordingly, the Court finds that the facts alleged herein are most closely analogous to the situation described in the *Information Resources* case, where the court found that plaintiff had waived the attorney work-product protection:

> *9 The present case falls clearly into a third category, in which waiver results from the voluntary submission of material to a government agency to incite it to attack the informant's adversary.
>
> * * *
>
> In the present case, the plaintiff and the government authorities were neither adversaries nor allies when the documents were submitted. As in many such cases, plaintiff sought to persuade uncommitted agencies to initiate actions which would disadvantage its competitor and perhaps provide plaintiff with the advantages of collateral estoppel from a governmentally-litigated favorable judgment, or at least useful evidence from a governmental authority's investigation.
>
> *Information Resources v. Dun & Bradstreet Corp.,* 999 F.Supp. 591, 593 (S.D.N.Y.1998).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Accordingly, defendants' motion to compel is granted.

With regard to plaintiffs' motion [# 308] to renew their objections to Magistrate Judge Scott's Decision and Order [# 283], that motion is denied in its entirety. Plaintiffs are incorrect in asserting that this Court failed to consider those objections. The Court fully considered all of plaintiff's objections, and granted some of the relief plaintiffs requested. However, as the Court noted in the final sentence of its Decision and Order [# 297], "[t]he Decision and Order [# 283] is affirmed in all other respects." Accordingly, plaintiffs' cross-motion to renew objections, which incidentally is untimely [FN4] and was apparently only made as a strategic ploy in response to defendants' motions, is denied. Moreover, plaintiffs' demand in the alternative to have this Court order defendants to produce "investigatory information" is also denied. Plaintiffs had ample opportunity to make discovery demands in this action, and again, this motion appears to be merely a baseless strategic ploy in response to defendants' motions. Plaintiffs' cross-motion [# 308] is denied.

> FN4. The Decision and Order affirming Magistrate Judge Scott's Decision and Order was filed on June 15, 2000. Plaintiffs' motion herein was not filed until August 22, 2000. Moreover, if plaintiffs honestly believed the Court had not properly considered their objections, the correct procedure would have been to immediately seek reconsideration of this Court's ruling, not to wait over two months and then renew their objections to the Magistrate Judge's Decision and Order.

## CONCLUSION

Accordingly, defendants' motion for reconsideration [# 312] is denied in part and granted in part as noted above. Defendants' renewed motion to compel discovery [# 303] is granted. As the Court directed at the close or oral argument on September 21, 2000, plaintiffs' counsel is directed to provide defendants' counsel with the tapes and transcript sought on or before September 28, 2000. Plaintiffs' cross-motion [# 308] is denied. All dispositive motions shall be filed and served by November 1, 2000. In the event that dispositive motions do not resolve this matter in its entirety, the trial of this matter will commence on February 12, 2001. A separate Pre-Trial Order will follow this Decision and Order.

SO ORDERED.

2000 WL 33407343 (W.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.