1997 WL 201568
1997 WL 201568 (N.D.Ill.)
(Cite as: 1997 WL 201568 (N.D.Ill.))

Page 1

H
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Cynthia G. FALK, Plaintiff,
v.
KIMBERLY SERVICES, INC., Defendant.

No. 92 C 1079.

April 16, 1997.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

*1 Plaintiff Cynthia Falk has sued Defendant Kimberly Services, Inc., claiming promissory estoppel. Before the Court are Defendant's Motions *in Limine* to Exclude the Testimony of Enola Falk, Beth Carpenter, and Ann Kirk.

ANALYSIS

A federal district court's authority to manage trials includes the power to exclude evidence pursuant to motions *in limine*. *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The guidelines governing motions in limine are as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*.

*Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F.Supp. 1398, 1400-01 (N.D.Ill.1993).

I. ENOLA FALK

Plaintiff stated in her answers to interrogatories that Enola Falk, Plaintiff's mother, could "testify that I told [her] the original arrangement and witnessed mental duress during 1991." Defendant now moves the Court to exclude the testimony of Enola Falk. Specifically, Defendant contends that (1) testimony by Enola Falk that Plaintiff told her about "the original arrangement" between Plaintiff and Kimberly constitutes inadmissible hearsay and (2) testimony as to Plaintiff's "mental duress" during 1991 is irrelevant and unfairly prejudicial.

A. The Original Arrangement

Plaintiff responds that Enola Falk's testimony as to what Plaintiff told her about "the original arrangement" is not excluded by the hearsay rule because it is a present sense impression or, alternatively, goes to Plaintiff's state of mind. Fed.R.Evid. 803(1) & (3). However, Plaintiff has not offered any reasoning to support either conclusion.

Any testimony by Enola Falk as to what Plaintiff said to her about the agreement is hearsay, because it constitutes a statement by the declarant--Plaintiff--offered in evidence to prove the truth of the matter asserted, namely, the substance of the "original arrangement." Accordingly, unless Plaintiff's statements to her mother qualify as a hearsay exception under Rule 803, such testimony is inadmissible.

1. *Rule 803(3)*

The Court easily finds that such statements do not fall within Rule 803(3)'s exception for statements

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of the declarant's then existing state of mind, as the proffered statements fall squarely within the Rule's qualification: "but not including a statement of memory or belief to prove the fact remembered or believed."

2. *Rule 803(1)*

*2 Rule 803(1) provides the following exception to the hearsay rule: A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. In the instant case, the statement is any made by Plaintiff to her mother, the witness, describing the "original arrangement." Defendant's sole argument against applying Rule 803(1) is that there is no evidence that Plaintiff made any statements describing the original agreement to her mother within the time frame needed to trigger Rule 803(1). Because Enola Falk was presumably not present during the event (i.e., the making of the "original arrangement"), any statements to her do not constitute present sense impressions unless made "immediately thereafter." There is currently before the Court no evidence produced by Plaintiff which indicates that any statements were made "immediately thereafter" such that they could constitute present sense impressions. Accordingly, the Court GRANTS the Motion *in Limine.*

B. Mental Duress

The parties agree that Plaintiff is neither seeking nor entitled to emotional distress damages. Accordingly, testimony by Enola Falk as to Plaintiff's "emotional duress" is not relevant and, moreover, any probative value is substantially outweighed by the dangers of unfair prejudice and misleading the jury. Fed.R.Evid. 401, 402, & 403; *see Campbell v. Ingersoll Milling Machine Co.,* 893 F.2d 925, 929 (7th Cir.1990)(holding district court properly excluded evidence of assault on the plaintiff based upon "the danger that the evidence would lead the jury to decide the case on an improper basis such as sympathy," where no assault claim was before the jury and plaintiff was not entitled to damages caused by the assault). Thus, the Court GRANTS Defendant's Motion and excludes testimony by Enola Falk as to Plaintiff's "mental duress."

II. BETH CARPENTER & ANN KIRK

In the Pretrial Order, Plaintiff identified Beth Carpenter and Ann Kirk-- former employees of Defendant--as witnesses. Defendant moves to exclude their testimony on several grounds.

First, Defendant contends that it has been prevented from deposing both finesses because "neither Carpenter nor Cook [sic] were [sic] previously identified by Plaintiff, in her answers to interrogatories or in her deposition, as persons who had knowledge or information regarding her claims against Kimberly." Thus, argues Defendant, the testimony is "prejudicial to Kimberly." Of course, nothing prohibits the admission of "prejudicial" evidence; indeed, most evidence is offered in order to prejudice the opponent's case. *See, e.g., Davidson Oil Country Supply v. Klockner, Inc.,* 908 F.2d 1238, 1245 (5th Cir.1990); *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1075 (1st Cir.1986); *Koloda v. General Motors,* 716 F.2d 373, 378 (6th Cir.1983); *U.S. v. DeLilo,* 620 F.2d 939, 947 n. 2 (2d Cir.1980). Rather, Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." (emphasis added).

*3 Plaintiff counters that Defendant had an opportunity to depose Carpenter and Kirk because (1) "Defendant's own employment records should reflect that Carpenter worked for Defendant (and with Falk) as Regional Director and that Kirk worked for Defendant (and worked under Falk's supervision) as a recruiter during the relevant time period" and (2) Plaintiff identified Carpenter as a person with knowledge or information of her claims against Defendant at her deposition on August 23, 1994. Plaintiff also relies upon *West Coast Video Enterprises, Inc. v. Ponce de Leon,* 1991 WL 49566, *1 (N.D.Ill. Apr.4, 1991) as citing *Droughn v. FMC Corp.,* 74 F.R.D. 639, 642 (E.D.Pa.1977) for the proposition that a party who fails to bring a motion to compel discovery may not later seek to exclude evidence on the grounds that it was not produced. Unfortunately, after combing through *West Coast Video* 's disposition of nine motions *in limine,* this Court learned that the case neither cites *Droughn* nor supports the proposition for which Plaintiff cites it. Nevertheless, the Court's own

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.


1997 WL 201568
1997 WL 201568 (N.D.Ill.)
(Cite as: 1997 WL 201568 (N.D.Ill.))

research uncovered two unpublished opinions by the *West Coast Video* court that rely upon *Droughn, Harbor Ins. Co. v. Continental Bank Corp.*, 1991 WL 222260, at n. 3 (N.D.Ill. Oct. 25, 1991) & *W.R. Grace & Co. v. Vikase Corp.*, 1991 WL 211647, at *4 (N.D.Ill. Oct. 15, 1991). However, the reasoning behind the proposition does not apply where the moving party has no way of knowing that its discovery request was resisted. Such is the case with Kirk, as it is undisputed that she was never referred to in discovery. Defendant's employment records reflecting her as having worked under Plaintiff's supervision do not compel otherwise. Carpenter is a closer case, as the deposition testimony arguably revealed her to be a person with knowledge two years prior to the filing of the present Motion. Nevertheless, this Court has a longstanding rule that permits a party to depose a witness after the close of discovery where no prior indication was given that the witness would testify at trial, in order to avoid prejudice. Accordingly, the Court grants Defendant leave to depose both witnesses.

Second, Defendant posits that Plaintiff's failure to provide information about the witnesses' testimony renders it "more likely than not ... irrelevant," citing two cases in support that are not on point. In the same vein, Defendant argues that "[b]oth Carpenter and Cook [sic] should be excluded as witnesses as there is no hint, let alone evidence, that either will present relevant or admissible testimony to this Court." (Mot. at 1). The Court rejects the argument for failure to meet the standard of a motion in limine, namely, that the evidence is clearly inadmissible on all potential grounds.

Third, Defendant argues that "Plaintiff fails to state whether she anticipates Defendant to dispute the substance of the meeting [about which Carpenter would testify] as described by Plaintiff. If Defendant does not dispute Plaintiff's statement, Carpenter's testimony is at best duplicative and a waste of time and at worst confusing or misleading to the jury," substantially outweighing the probative value such that it is properly excluded under Rule 403. (Reply at 2-3). However, the case relied upon by Defendant--*West Coast Video*, 1991 WL 49566 (the same case mis-cited by Plaintiff)--does not stand for the proposition that testimony corroborating a plaintiff's statement is properly excluded where a defendant does not dispute the plaintiff's statement. Moreover, to exclude evidence based upon the proffering party's failure to state whether she anticipates the moving party to dispute other evidence flies in the face of the standard that applies to motions in limine. As explained above, evidence is excluded prior to trial only when it is clearly inadmissible on all potential grounds; by definition, an argument based upon anticipation, or the lack of, does not make such a showing. Further, for the movant to attack Plaintiff's failure to anticipate *the movant's plans* and then request a ruling without revealing those plans is disingenuous. Finally, Defendant's argument, which appears for the first time in its Reply, is outside the scope of the Response. For all of these reasons, the Court rejects the third argument. Accordingly, the Court DENIES the motion to exclude Carpenter and Kirk.

CONCLUSION

*4 For the reasons given, the Court (1) GRANTS the Motion *in Limine* to Exclude Enola Falk and (2) DENIES the Motion in Limine to Exclude Beth Carpenter and Ann Kirk, but GRANTS Defendant leave to depose Carpenter and Kirk.

1997 WL 201568 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

COMMERCE FUNDING CORPORATION,
Plaintiff,
v.
COMPREHENSIVE HABILITATION
SERVICES, INC., et al., Defendants.

No. 01 Civ. 3796(PKL).

Sept. 3, 2004.

Harris Beach LLP, New York, New York, John W. Clarke, Arent Fox Kintner Plotkin & Kahn, PLLC, New York, New York, Jeffrey R. Ruggiero, for Defendant/Cross-Claimant Comprehensive Habilitation Services, Inc.

Garfunkel, Wild & Travis, PC, Great Neck, New York, Roy W. Breitenbach, Dennis H. McCoobery, for Defendant/Cross-Claim Defendant St. Francis Hospital.

*OPINION AND ORDER*

LEISURE, J.

*1 This action, originally brought by plaintiff Commerce Funding Corporation upon an alleged breach of a factoring agreement, has been trimmed down by settlements and arbitration, such that only cross-claims asserted by defendant Comprehensive Habilitation Services ("CHS") against defendants St. Francis Hospital ("St.Francis") and Staten Island University Hospital ("Staten Island") remain unresolved. CHS brings a breach of contract claim against St. Francis that will be tried without a jury, and a breach of contract claim against Staten Island that will be tried before a jury.

With respect to St. Francis, CHS alleges that St. Francis owes it $215,270.10 plus interest for services it provided to St. Francis pursuant to a Memorandum of Understanding between the two parties dated February 19, 1999. St. Francis denies the allegations. The Court has scheduled a bench trial on CHS's claims against St. Francis to begin September 13, 2004. CHS now makes two motions *in limine* to exclude from evidence several documents that St. Francis intends to offer at trial. In its first motion *in limine* dated July 30, 2004, CHS seeks to exclude documents that predate the Memorandum of Understanding, and documents related to a settlement between St. Francis and the Attorney General's Office. In its second motion *in limine* dated August 3, 2004, CHS seeks to exclude a plea agreement reached in the case of *People v. Comprehensive Clinical Center, Inc.* St. Francis opposes CHS's motions. For the reasons set forth below, the Court grants in part and denies in part CHS's first motion *in limine*, and reserves judgment until trial on CHS's second motion *in limine*, so that the motion is placed in the appropriate factual context.

Background

The following background information is derived from the submissions of the parties in association with the current motions and does not constitute findings of fact.

I. *Factual Background*

During all relevant times, defendant St. Francis was a hospital in Poughkeepsie, New York, that provided a full range of health care services to the mentally retarded and the developmentally disabled. Cross-claimant CHS provided consultation and administrative services to health providers. On May 25, 1995, CHS and St. Francis reached an agreement (the "Contract"), by which CHS would provide services such as occupational therapy, physical therapy, and social work for St. Francis and be compensated at a rate of $50 per hour. (Contract (attached to CHS's July 30, 2004, Notice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of Motion as Exhibit 1) ¶ 5 and Addendum.) The Contract includes several terms upon which the parties agreed, such as that CHS's services "shall only be provided upon obtaining all Federal, State, and local approvals including, without limitation, approvals of the New York State Department of Health and the New York State Department of Mental Hygiene." (Contract ¶ 5.) After the commencement of the Contract CHS provided services for St. Francis and issued invoices to St. Francis for payment.

*2 At some time after 1995, the Office of the Attorney General, Medicaid Fraud Control Unit ("Attorney General's Office") "conducted an audit of [clinics operated by St. Francis] and thereafter asserted, among other things, that: (a) the Clinics were neither authorized under, nor operated in accordance with, applicable New York State laws, rules and regulations; (b) [St. Francis] submitted improper claims for payment to Medicaid during the Service Period relating to the Clinics; and (c) [CHS's] relationship with [St. Francis] violated applicable New York State laws, rules and regulations." (February 6, 2002, Agreement and Settlement between St. Francis and Attorney General's Office ("February 2002 Settlement"), at 1.) In February 2002 St. Francis entered a settlement with the Attorney General's Office by which St. Francis expressly denied the allegations of the Attorney General's Office, but "in order to avoid the uncertainties, burdens and expenses of litigation," agreed to pay a $1 million settlement in the form of weekly withholdings by the State Department of Health of future Medicaid checks payable to St. Francis. (February 2002 Settlement, at 2-3.)

On February 19, 1999, apparently after the Attorney General's Office had commenced its investigation into the parties' performance under the Contract, and before St. Francis reached a settlement with the Attorney General's Office, CHS and St. Francis agreed to a Memorandum of Understanding. (Memorandum of Understanding (attached as Exhibit 2 to CHS's August 3, 2004, Notice of Motion).) In the Memorandum of Understanding the parties agreed to, among other things, the following terms:
  (1) The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein.
  (2) *Payment and Holdback.* ... [St. Francis] shall pay certain invoices received by it from CHS for services rendered in connection with the Contract on the following schedule: $510,115 on or before February 26, 1999. Invoices 149 and 150 will be withheld as a holdback, and all other outstanding invoices will be paid in accordance with [St. Francis'] 90-day cycle.
  ....
  (4) *Continuity of Services.* CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates.
  ....
  (10) *Holdback of Monies--Attorney General--Department of Health Investigation.* CHS, and [St. Francis] acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract, and related issues.... In the event there is an immediate repayment required [by the Attorney General's Office], any outstanding invoices would be used as part of such a repayment plan.
*3 (Memorandum of Understanding ¶¶ 1, 2, 10 and attached Exhibit.)

After the parties agreed upon this Memorandum of Understanding, CHS continued to provide services and submit invoices to St. Francis. St. Francis received the services provided by CHS, but stopped making payments on the invoices.

II. *Procedural Background*

A. *CHS's Cross-Claim*

CHS brings the current cross-claim against St. Francis for breach of contract. CHS claims that St. Francis owes payment on seven invoices CHS issued for payment for services it rendered: Invoice Nos. 149, 150, 151, 152, 153, 154 and 155. Invoices 149 and 150 were issued for services rendered in January and February 1999, and are referenced in the Memorandum of Understanding. Invoices 151-155 were issued for services rendered

in February, March, April, and May 1999, and are not explicitly referenced in the Memorandum of Understanding. The parties agree that the claim to be resolved at the bench trial is a simple breach of contract claim for failure to pay these invoices. (*See* Affidavit of John W. Clarke in support of CHS's Motion *In Limine* To Exclude Various St. Francis Trial Exhibits ("Clarke Aff.") ¶ 2 ("In short, this is a garden variety collection case in which a debtor profited from the services of contractor and then defaulted on its contractual obligation of payment."); Memorandum of Law of St. Francis Opposing CHS's 8/3/04 Motion *In Limine,* at 1 ("This lawsuit is fundamentally a non-payment action.").)

CHS's position is that the Memorandum of Understanding governs all of the invoices, Nos. 149-155, and that payment is due on these invoices under the terms of the Memorandum of Understanding. With respect to Invoices 149 and 150 which are subject to "holdback" in the Memorandum of Understanding, CHS argues that monies owed by St. Francis to CHS for these invoices should not be applied to the settlement with the Attorney General because the "settlement was entered into without consultation with or agreement by CHS. Nothing in the [Settlement] alleges that CHS engaged in any impropriety or had responsibility for the alleged violations. In short, there is no link to any acts of CHS in connection with its performance of the Agreement with [St. Francis], and [St. Francis'] settlement with [the Attorney General's Office]." (Joint Pre-Trial Order, at 5.) CHS thus argues that payment for Invoices 149 and 150 is due. With respect to Invoices 151-155, CHS argues that paragraph four of the Memorandum of Understanding, titled *"Continuity of Services,"* governs these invoices. CHS thus argues that payment for Invoices 151-155, issued for services rendered after the parties signed the Memorandum of Understanding, is due.

St. Francis denies CHS's allegations of breach of contract. St. Francis' position is that the Memorandum of Understanding governs Invoices 149 and 150, and the Contract governs Invoices 151-155. With respect to Invoices 149 and 150, St. Francis argues that the Memorandum of Understanding provides that St. Francis may hold back payment on these invoices and apply it to its Settlement with the Attorney General's Office. As the Settlement amount exceeds the amount of Invoices 149 and 150, St. Francis contends that under the terms of the Memorandum of Understanding it owes nothing to CHS for Invoices 149 and 150. With respect to Invoices 151-155, St. Francis argues that "those invoices are expressly not subject to the Memorandum of Understanding and, accordingly, are governed by the terms of the parties' original [Contract]." (Joint Pre-Trial Order, at 3.) St. Francis argues that CHS failed to perform its obligations under the Contract "to ensure compliance with all rules and regulations pertaining to the operation of the [St. Francis] Clinics; to market, implement and provide administrative services at Hospital operated Clinics; to obtain all Federal, State and local approvals of the New York State Department of Health and the New York State Department of Mental Hygiene relating to the operation of the clinics; and to comply with the contract's covenant of good faith and fair dealing." (Joint Pre-Trial Order, at 3 (internal quotations omitted).) St. Francis concludes that "the doctrine of prior material breach precludes CHS from collecting under Invoice Nos. 151, 152, 153, 154 and 155." (Joint Pre-Trial Order, at 3.)

B. *CHS's Current Motions*

*4 CHS brings two motions *in limine* to exclude certain evidence that St. Francis intends to offer at trial. The Court takes up each motion in turn below.

Discussion
I. *Motion In Limine Standard*

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials); *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 283 (S.D.N.Y.1996). Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94

Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co.*, 937 F.Supp. at 287.

A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence. Fed.R.Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court...."). The court's ruling regarding a motion *in limine* is "subject to change when the case unfolds." *Luce*, 469 U.S. at 41. This opinion and order thus determines preliminarily whether the evidence challenged by CHS may be presented to the trier of fact. Once this Court makes a determination that certain forecasted evidence is admissible, it will, as the trier of fact, consider the weight and sufficiency of the evidence presented at trial. *See, e.g., In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1132 (2d Cir.1995) (noting that once shaky, unreliable evidence is admitted, such evidence is best challenged with " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).

II. *CHS's Motion To Exclude Documents that Predate the Memorandum of Understanding and Documents Related to St. Francis' Settlement with the Attorney General's Office*

CHS seeks to exclude several documents in its first motion *in limine*, dated July 30, 2004. The first set of documents are those that predate the Memorandum of Understanding. The second set are those related to St. Francis' Settlement with the Attorney General's Office. The Court takes up each of these sets of documents in turn.

A. *Documents that Predate the Memorandum of Understanding*

*5 CHS seeks to exclude St. Francis' proposed exhibits A, B, D, E, G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX on relevance grounds. [FN1] These exhibits are a variety of documents with a common trait: they all predate the Memorandum of Understanding, which the parties signed in February 1999. St. Francis seeks to admit these documents because its position is that the Contract, which predates most of these documents, governs the invoices at issue. The proposed exhibits, St. Francis argues, tend to show that CHS did not perform its obligations under the Contract. St. Francis thus opposes CHS's motion, but indicates either expressly or impliedly in its opposition papers that it does not seek to admit exhibits A, B, D, or E. [FN2]

> FN1. CHS also observes that Exhibits E, G, H, I, J, L, M, P, Q, R, and XX need to be authenticated before they can be admitted. The Court need not take up authenticity as a ground for excluding the proposed exhibits at this time. First, on the current record the proposed exhibits are irrelevant, thus their authenticity is moot. Second, CHS does not argue for the pretrial exclusion of documents on authenticity grounds, but simply notes that the challenged exhibits should be excluded if St. Francis fails to authenticate them. And third, questions about whether a document is authentic do not typically justify excluding the document in advance of trial, because authenticity can be easily established at trial. "Evidence sufficient to support a finding that the matter in question is what its proponent claims" satisfies Rule 901's requirement of authentication. Fed.R.Evid. 901(a). "Rule 901 does not erect a particularly high hurdle." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001) (internal quotations omitted). "Testimony that a matter is what it is claimed to be," for example, sufficiently authenticates a document. Fed.R.Evid. 901(b)(1).

> FN2. Proposed exhibits A and B predate the Contract and thus appear irrelevant under any circumstances, and St. Francis does not indicate that it will seek

admission of these documents. St. Francis expressly withdraws proposed exhibits D and E from consideration, indicating that it will not seek to introduce these documents into evidence.

The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.1985). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401. While the Rules of Evidence apply with equal force in jury and non-jury trials, courts often apply the relevance standard with little rigor during a bench trial. The Second Circuit has noted that "ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records." *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir.1977) (Oakes, J.). While standards for admissible evidence are not "out the window entirely" in a bench trial, "all doubts at a bench trial should be resolved in favor of admissibility." *Dreyful Ashby, Inc. v. S/S "Rouen"*, 1989 WL 151685, at *2 (S.D.N.Y.1989) (Mukasey, J.). " 'In non-jury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence." ' *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 172 (3d Cir.1999) (quoting Wright and Miller, Federal Practice and Procedure, § 2885, at 454).

Here, St. Francis' proposed exhibits that predate the Memorandum of Understanding are irrelevant, such that admitting them even at a bench trial would contravene Rule 401 and serve no purpose. The Memorandum of Understanding states, "The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein." (Memorandum of Understanding ¶ 1.) It then explicitly references "outstanding invoices," including Invoices 149 and 150. (Memorandum of Understanding ¶ 2.) It then states that "CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates." (Memorandum of Understanding ¶ 4.) Invoices 151-155 were issued for services rendered by CHS during and beyond this "transition period," from February through April 1999. The Memorandum of Understanding unambiguously applies to all the invoices at issue in this case. Thus, documents that predate the Memorandum of Understanding do not tend to make the existence of any fact at issue more or less probable.

*6 St. Francis offers no support for its position that the Contract governs Invoices 151-155. It simply states first that "those invoices are expressly not subject to the Memorandum of Understanding," (Joint Pre-Trial Order, at 3.), and second that "[those invoices] are not set forth on Exhibit B and are ... neither covered nor controlled by the Memorandum of Understanding." (Memorandum of Law of St. Francis Opposing CHS's 7/30/04 Motion *In Limine*, at 2.) St. Francis then argues that "CHS, during the term of the parties' relationship, failed to comply with its contractual obligations," and seeks to admit the proposed exhibits as documentary evidence in support of this contention. (Joint Pre-Trial Order, at 3.) St. Francis' first statement is incorrect. The Memorandum of Understanding does not express that Invoices 151-155 are not governed by it. No clause of the Memorandum of Understanding "expressly" excludes invoices from its terms. St. Francis' second statement is partially correct. Invoices 151-155 are not set forth in Exhibit B attached to the Memorandum of Understanding. These invoices, however, were issued for services rendered *after* the parties signed the Memorandum of Understanding, during the transition period contemplated by paragraph four of the Memorandum of Understanding. The Memorandum of Understanding does not state that invoices not listed in Exhibit B, for future services performed, are not governed by this agreement. It in fact states the opposite, expressly terminating the Contract and providing for the payment of services during the transition period in paragraph four.

As St. Francis argues only that the proposed exhibits are relevant because the Contract governs Invoices 151-155, and its assertion that the Contract governs the Invoices finds no factual support, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. Although this Court will resolve relevance questions about evidence in favor of admissibility, the Court will not admit irrelevant documents simply because they are offered. Based on the current record these proposed exhibits will not be admitted at trial. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

B. *Documents Related to St. Francis' Settlement with the Attorney General*

CHS seeks to exclude St. Francis' proposed exhibit JJ, UU, and WW. These documents are an email related to St. Francis' Settlement with the Attorney General's Office, a letter related to the Settlement, and the Settlement itself. CHS contends that these documents are irrelevant. CHS's position is that the circumstances of the Settlement and the Settlement itself show that St. Francis' liability to the State cannot be attributed to CHS. Thus, CHS argues, under the terms of the Memorandum of Understanding, St. Francis had no contractual right to withhold payment owed to CHS and apply the payments to the Settlement. St. Francis responds that the terms of the Memorandum of Understanding permit it to apply monies owed to CHS to the Settlement with the Attorney General's Office.

*7 The Court finds on the current record that the Settlement and related documents are relevant. Paragraph 10 of the Memorandum of Understanding provides that the parties "acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract.... To the extent that a long term payment plan is offered [by the Attorney General's Office as a settlement], the parties hereto shall cooperate in good faith to quantify the liability and reach a suitable repayment agreement. In the event there is an immediate repayment required, any outstanding invoices would be used as part of such a repayment plan." (Memorandum of Understanding ¶ 10.) The Memorandum of Understanding thus expressly references a potential settlement with the Attorney General's Office, and contemplates that the parties' contractual obligations may be affected by the terms of the Settlement. The Settlement Agreement (Exh. WW) and related emails and letters (Exhs.JJ, UU) are relevant to show whether and how the parties' obligations under the Memorandum of Understanding were impacted by St. Francis' Settlement with the Attorney General's Office.

Based on the current record the Court denies CHS's motion to exclude proposed exhibits JJ, UU, and WW, as these documents are relevant. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

III. *CHS's Motion To Exclude the Superior Court Information in the Case of People v. Comprehensive Clinical Center, Inc.*

CHS moves to exclude St. Francis' proposed exhibit VV, a Superior Court Information containing a plea agreement between Comprehensive Clinical Center, Inc. ("CCC") and the Attorney General of the State of New York ("Attorney General"), dated April 9, 2001, relating to the action *People v. Comprehensive Clinical Center, Inc.* [FN3] CHS argues that the plea agreement is irrelevant, that its prejudice substantially outweighs its probity, and that it is not properly admitted as character evidence.

> FN3. CHS also moves to exclude St. Francis' proposed exhibits ZZ and AAA, documents from websites of Health and Human Services and the New York State Department of Health, respectively. Upon CHS's motion St. Francis has withdrawn these proposed exhibits and agrees not to seek to introduce them into evidence in its case-in-chief.

According to CHS, CCC is a corporation that operated clinics providing psychological and other services. Its president and sole shareholder was Dr. Peter Magaro. Magaro also is the president and chief executive officer of CHS, and he signed the Memorandum of Understanding with St. Francis on behalf of CHS. The Attorney General criminally prosecuted Magaro's company, CCC, as part of an investigation similar to that of St. Francis which resulted in the Settlement discussed above. The prosecution of CCC resulted in a plea agreement by which CCC as a company pleaded to grand larceny for Medicaid fraud. The plea agreement includes

the following: "The plea of guilty to the Superior Court Information will cover Peter A. Magaro, his immediate family and the corporations which he controls, either *de facto* or *de jure*, including [CHS]." (CHS's Notice of Motion, Exh. C ¶ 3.) St. Francis intends to offer the plea agreement as proposed exhibit VV at trial. St. Francis' takes the position that the guilty plea of CCC, a company owned by Magaro, tends to show that CHS, another company run by Magaro, was responsible for the Medicaid violations for which St. Francis settled with the Attorney General's Office. St. Francis argues that the plea agreement shows that CHS did not meet the contractual obligations it owed to St. Francis, namely, its obligations "to ensure compliance with all rules and regulations pertaining to the operation of [St. Francis] Clinics," and to obtain "all Federal, State and local approvals of the New York State Department of Health an the New York State Department of Mental Hygiene" relating to the operation of the clinics. (Contract ¶¶ 5, 6.)

*8 The Court finds on the current record that granting or denying CHS's motion to exclude proposed exhibit VV would be premature, and reserves judgment until trial so that the motion is placed in the appropriate factual context. The plea agreement's relevance depends upon an inference that appears tenuous on the current record, namely, that the prosecution of CCC tends to show that CHS did not perform its contractual obligations with St. Francis. The Court has little information at this time to rule on the propriety of this inference and evidence offered upon it. The scope of the plea agreement, which purports to "cover" CHS, is unclear. Magaro's role in CCC, and more importantly in CHS and in fulfilling CHS's contractual obligations to St. Francis, is unclear. The sparse record currently includes too little information for the Court to rule on the admissibility of the plea agreement. The relevance and/or prejudice of the plea agreement will be better determined at trial, once the parties have developed the factual background of the case and once St. Francis has endeavored to lay a foundation for the plea agreement. The Court therefore reserves judgment on proposed exhibit VV.

Conclusion

For the reasons set forth above, the Court grants in part and denies in part CHS's first motion *in limine*, and reserves judgment until trial on CHS's second motion *in limine*, so that the motion is placed in the appropriate factual context. The Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. The Court finds that St. Francis' proposed exhibits JJ, UU, and WW are relevant. The Court reserves judgment on St. Francis' proposed exhibit VV until trial. Each of these preliminary rulings, made under Rule 104 of the Federal Rules of Evidence, is subject to change as the case unfolds.

SO ORDERED.

2004 WL 1970144 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

- 1:01CV03796  (Docket)

(May. 03, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 777887
1997 WL 777887 (S.D.N.Y.)
(Cite as: 1997 WL 777887 (S.D.N.Y.))

Page 1

H
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Irma RIVERA, Plaintiff,
v.
BACCARAT, INC., Defendant.

No. 95 CIV. 9478 MBM JCF.

Dec. 15, 1997.

Joseph C. Maya, Esq., Maya & Associates, PC, Westport, CT.

Jeffrey H. Daichman, Esq., Kane & Kessler, P.C., New York, New York.

MEMORANDUM AND ORDER

FRANCIS, Magistrate J.

*1 The plaintiff, Irma Rivera, alleges that her former employer, Baccarat, Inc. ("Baccarat"), discriminated against her on the basis of her national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and on the basis of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"). The parties have consented to referral of this case to me for final disposition pursuant to 28 U.S.C. § 636(c).

Baccarat now moves *in limine* for an order declaring certain evidence inadmissible at trial. Specifically, Baccarat seeks to preclude: (1) evidence purportedly showing ethnic bias by a former Baccarat manager, J.D. Watts, (2) testimony about sexist comments or sexual harassment by Baccarat supervisors, (3) evidence of alleged discriminatory treatment of two other Baccarat employees, Andree Leopold and Loretta Brown, (4) evidence concerning the provision of severance benefits to the plaintiff, (5) evidence of the plaintiff's sales performance (6) evidence of lost wages for any period after the plaintiff was terminated by a subsequent employer, (7) admission of the charges filed by the plaintiff with the Equal Employment Opportunity Commission ("EEOC") and the Right to Sue Letter issued by that agency, (8) admission of depositions or affidavits by witnesses who could testify at trial, as well as subpoenas issued to these persons, and (9) evidence concerning any policy by Baccarat forbidding its employees from speaking languages other than English while on the job. For the reasons that follow, Baccarat's motion is granted in part and denied in part.

A. *J.D. Watts' Remarks*

Ms. Rivera alleges that one of her former supervisors at Baccarat, J.D. Watts, made a series of comments reflecting discriminatory animus. Baccarat contends that because Mr. Watts was not involved in the plaintiff's termination--indeed, he was himself terminated more than four months before Ms. Rivera--evidence of his remarks should not be admitted.

The defendant's argument has merit with respect to stray remarks reflecting only Mr. Watts' purported personal bias. For example, he allegedly referred to Ms. Rivera's "hot Latin temper" and suggested that her Hispanic customers made their purchases with proceeds from drug sales. Such references by a person not involved in the decision to terminate the plaintiff are inadmissible. *See Boyle v. McCann-Erickson, Inc.*, 949 F.Supp. 1095, 1102 (S.D.N.Y.1997); *Ellis v. Provident Life & Accident Insurance Co.*, 926 F.Supp. 417, 428 (S.D.N.Y.1996), *aff'd*, 107 F.3d 2 (2d Cir.1997).

By contrast, statements by Mr. Watts that reflect a pattern of discrimination by the decisionmakers who ultimately terminated the plaintiff would be probative. Thus, for example, testimony by Mr. Watts that Jean-Luc Negre, Baccarat's Chief Executive Officer, said he wanted a "young and sexy" sales staff would be admissible. Similarly,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

because Mr. Negre made the decision to terminate Ms. Rivera, testimony that he told Mr. Watts he did not like the plaintiff's accent would be allowed. Comments by Mr. Watts, then, will be admissible to the extent that it can be inferred that they relate to Baccarat policies or to the bias of persons, including Mr. Negre, who made the decision to fire Ms. Rivera.

B. *Sex Discrimination*

*2 The plaintiff apparently intends to introduce evidence of gender discrimination at Baccarat, including the use of sexist comments and acts of sexual harassment directed at other employees. Baccarat seeks to preclude such evidence on the ground that this case does not involve claims by Ms. Rivera of sex discrimination.

The plaintiff argues that she should be permitted to demonstrate that a general attitude of discrimination pervaded Baccarat. This contention is without merit. Title VII does not create a blanket prohibition against discrimination; it identifies discrete categories of discrimination that are forbidden. Thus, "allegations of race discrimination are not relevant to a claim of national origin discrimination." *Kim v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F.Supp. 13, 19 (D.D.C.1996); *see also Kelly v. Boeing Petroleum Services, Inc.*, 61 F.3d 350, 357-58 (5th Cir.1995) (evidence of race and sex discrimination inadmissible in disability discrimination case). Similarly, evidence that other Baccarat employees may have been victims of gender bias or sexual harassment has no bearing on the plaintiff's claims of national origin and age discrimination in this case.

The decision relied on by the plaintiff, *EEOC v. Farmer Brothers Co.*, 31 F.3d 891, 898 (9th Cir.1994), is consistent with this conclusion. There, evidence of sexual harassment was admitted in a case of gender discrimination "[b]ecause hostility against women underlies decisions to discharge or to refuse to hire women[ .]" *Id.* No such nexus necessarily exists between hostility against women and acts of age or national origin discrimination. Accordingly, evidence of sex discrimination or harassment shall not be admitted.

C. *Treatment of Other Employees*

Next, the defendant seeks to exclude evidence of discrimination claims brought by two other Baccarat employees: a charge filed by Loretta Brown with the New York City Commission on Human Rights and a lawsuit filed by Andree Leopold. Baccarat argues that evidence of the treatment of these employees is irrelevant because they were not similarly situated to Ms. Rivera.

However, proof of bias by a decisionmaker against other employees is probative of discriminatory animus even if those employees are not similarly situated to the plaintiff. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 62, 65 (2d Cir.1995). The critical question is whether the same decisionmaker was involved in both the prior discriminatory acts and in the adverse employment action taken against the plaintiff. In the case of Ms. Leopold, it was not; she was apparently terminated by Francois de Montmorin before Mr. Negre had even joined Baccarat. Evidence concerning her termination is therefore inadmissible. No information has been provided concerning the nature of Ms. Brown's discrimination claim or the identity of her supervisors, and thus no determination can yet be made concerning the relevance of her charges of discrimination to this case.

D. *Plaintiff's Severance Benefits*

*3 The plaintiff contends that Mr. Negre initially declined to provide her with certain severance benefits unless she signed a release of all age and national origin discrimination claims and only relented after she filed her complaint with the EEOC. Baccarat contends that there is nothing improper about seeking a release of claims and that Ms. Rivera was treated no differently than any other employee.

However, there appears to be a dispute both about the circumstances regarding Mr. Negre's hesitation to provide the benefits and the inferences to be drawn from his conduct. Therefore, no determination concerning admissibility can be made until the facts have been more fully developed.

E. *Plaintiff's Sales Performance*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Baccarat further objects to admission at trial of evidence of Ms. Rivera's satisfactory sales performance. Such evidence is relevant, however, in at least two respects. First, the plaintiff must demonstrate that she was qualified for the position from which she was terminated. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985). Second, once the employer proffers a legitimate reason for the adverse employment action, the plaintiff must demonstrate that this was not the only reason and that discriminatory animus was at least one of the motivating factors. *See Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 203 (2d Cir.1995). In this context, the plaintiff's past performance is surely relevant to demonstrating that the proffered basis for termination is pretextual. Such evidence shall therefore be admissible.

F. *Termination from Subsequent Employment*

Baccarat next asks that any back pay damages awarded to the plaintiff be cut off as of the date that she was terminated by her subsequent employer, Bernardaud. This request, too, is premature.

An obligation to mitigate damages is incorporated in Title VII, which provides in pertinent part that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1); *see also Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Accordingly, a claimant fails to mitigate damages when she voluntarily quits comparable interim employment. *See Brooks v. Fonda-Fultonville Central School District*, 938 F.Supp. 1094, 1109 (N.D.N.Y.1996). Similarly, a plaintiff who is terminated for cause from a subsequent equivalent job has not met the mitigation requirement. *See Strauss v. Microsoft Corp.*, No. 91 Civ. 5928, 1995 WL 326492, at *5-6 (S.D.N.Y. June 1, 1995).

However, the burden is on the defendant to prove the failure to mitigate. *See Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992). To do so, it must show that the plaintiff refused comparable employment. If it is the defendant's position that Ms. Rivera quit comparable employment when she left Bernardaud, then the defendant has the burden of demonstrating that Ms. Rivera's position at Bernardaud was substantially equivalent to that from which the defendant previously discharged her. *See Shore v. Federal Express Corp.*, 42 F.3d 373, 378 (6th Cir.1994). The defendant here has not yet made such a showing. Furthermore, the defendant must demonstrate that the plaintiff's conduct that induced her discharge from Bernardaud was not motivated by unreasonable working conditions. *See Strauss*, 1995 WL 326492, at *5. Again, no proof has been presented on this issue. Therefore, no order cutting off the plaintiff's potential back pay award is appropriate at this time.

G. *EEOC Charges*

*4 In the pretrial order, the plaintiff indicated that she intended to introduce the administrative charge that she filed with the EEOC, her Request for Notice of Right to Sue, and her Notice of Right to Sue issued by the EEOC. A substantive determination by the EEOC, while not preclusive, may be admissible. *See Philbrook v. Ansonia Board of Education*, 757 F.2d 476, 481 (2d Cir.1985); *cf. Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 113-14, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (findings of state human rights agency admissible but not preclusive). Of course, neither the charges themselves nor the Right to Sue letter constitute substantive findings. In the absence of some showing of relevance, then, these documents would not be admissible.

H. *Subpoenas, Affidavits, and Depositions*

The plaintiff has also listed as proposed exhibits certain affidavits, depositions, and subpoenas of witnesses. The parties now appear to agree that Rule 32(a)(3) of the Federal Rules of Civil Procedure governs the admissibility of such evidence. Depositions will be admitted where the witness is unavailable as provided for in that rule, and subpoenas may be probative of efforts to secure the attendance of witnesses. Affidavits will not be admissible as direct evidence, but only for purposes of impeachment.

I. *Evidence of an English-Only Policy*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Finally, Baccarat seeks to ban evidence that it had a policy of requiring employees to speak only English in the workplace unless they were conversing with a customer in the customer's language. The defendant argues that the rule is irrelevant. It further notes that although EEOC Guidelines provide that an employee can make out a prima facie claim in a disparate impact case merely by proving the existence of an English-only policy, 29 C.F.R. § 1606.7(a) & (b), these regulations have been rejected by some courts. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489-90 (9th Cir.1993).

However, even the *Spun Steak* decision recognized the potential relevance of English-only rules in proving a case of national origin discrimination:

> [I]n some circumstances English-only rules can exacerbate existing tensions, or, when combined with other discriminatory behavior, contribute to an overall environment of discrimination. Likewise, we can envision a case in which such rules are enforced in such a draconian manner that the enforcement itself amounts to harassment.
>
> In evaluating such a claim, however, a court must look to the totality of the circumstances in the particular factual context in which the claim arises.

*Id.* at 1489. This approach is consistent with the EEOC's findings that English only rules may "create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment." 29 C.F.R. § 1606.7(a). Therefore, even if an English-only rule may not by itself suffice to prove discrimination, such a policy may well be relevant to the issue of discriminatory animus. Thus, evidence of Baccarat's English language policy shall be admitted.

*Conclusion*

*5 For the reasons set forth above, Baccarat's motion *in limine* is granted to the extent that the plaintiff may not introduce at trial: (1) stray remarks by J.D. Watts unconnected either to Baccarat policies or to the bias of persons who terminated Ms. Rivera; (2) proof of sexist comments or sexual harassment; (3) claims of discrimination asserted by employees such as Andree Leopold who were not subjected to adverse employment actions by the persons responsible for firing Ms. Rivera; (4) her EEOC charges and Right to Sue letter, absent a showing of relevance; or (5) any deposition, affidavit, or subpoena, except as appropriate under Rule 32(a)(3) of the Federal Rules of Civil Procedure. In all other respects, the defendant's motion is denied.

SO ORDERED.

1997 WL 777887 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.