**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ELIZABETH SCHILLER,** | : | **NO: 3:01cv00452(AVC)** |
|     **Plaintiff** | | **(ALL CASES)** |
| | : | |
| **JOHANNA S. GEORGIA,** | | |
|     **Plaintiff** | : | |
| | | |
| **v.** | : | |
| | | |
| **CITY OF BRIDGEPORT, ET AL.,** | | |
|     **Defendants** | : | **NOVEMBER 27, 2004** |

**PLAINTIFFS' MOTION IN LIMINE**
**TO EXCLUDE DEFENSE EXPERT TESTIMONY, OPINIONS AND REPORT**

Defendants have offered as an expert Arnold Levine, Ph.D., of Columbia, South Carolina, pertaining to Plaintiffs' former claims of disparate impact in hiring. Plaintiffs seek an order barring the defense from offering Dr. Levine's testimony, opinions, and report as evidence at trial, based on the following facts and authorities.

    **A.**     **DR. LEVINE'S TESTIMONY, OPINION AND REPORT ARE NOT RELEVANT TO ANY MATERIAL ISSUE.**

Statistical data may be used in adverse impact cases (Hazelwood School District v. U.S., 433 U.S. 299 (1977)), and expert testimony is admissible *only if it will aid the jury in finding material facts.* Dauber v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); F.R.E. 702. "Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry." Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002), citing Raskin v. Wyatt Co., 125 F.3d 55, 67 (2d Cir. 1997) ("Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful."), quoting Daubert, quoting 3 Weinstein & Berger ¶ 702[02], p. 702-18; In re Air Disaster, 37

F.3d 804, 824 (2d Cir. 1994) ("district court may exclude "unhelpful" expert testimony under Fed. R. Evid. 702"); United States v. Kahn, 787 F.2d 28, 34 (2d Cir. 1986) ("expert evidence is not immune from the relevance requirement of Fed. R. Evid. 401"). See also Beirne v. Fieldcrest Cannon, Inc., 74 Fair Empl. Prac. Cas. (BNA) 30, 34-35 (S.D.N.Y. 1997) (employer's expert statistical report in an age discrimination case purporting to show that its workforce actually increased not dispositive on discriminatory intent, because did not eliminate possibility that the plaintiffs were not subjected individually to unlawful age discrimination). "Relevant evidence" is defined under F.R.E. 401 as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Dr. Levine was retained to render his opinion on, in his words, "the issue of females [sic] hiring from applications, female applicants … look at the applicants and look at hiring from the qualified pool. The qualified pool being defined as the group that passed the examination or did not – or took the examination and passed it." Exh. A (p. 5:8-21). The only issues he considered -- failure to hire the Plaintiffs and adverse impact on women of the City's hiring practices in <u>1994 and 1996</u> (Exh. A (p. 26:2-22) -- were disposed of on summary judgment as time-barred (see Decision (Nov. 3, 2004 Covello, J.). He does not consider the Plaintiffs' disparate treatment claims that will be tried, for example, statistical import of the City's practice of hiring no more than two women into one training class at a time[1] (Exh. A (p. 27:14-20)), nor how the City recruits or selects candidates for hire (Exh. A (p. 17:6-20)), circumstantial evidence, nor other evidence of disparate treatment and hostile environment.

Thus, any testimony and opinion by Dr. Levine on the statistical significance of hiring patterns of

2

female versus male firefighters is irrelevant, immaterial, of no probative value, and would only tend to confuse the jury.

### B. DR. LEVINE IS NOT QUALIFIED TO RENDER AN EXPERT OPINION ON ANY OF THE DISPUTED ISSUES.

Dr. Levine testified that he knows of no statistical standards or norms that exist as to the number of women that should be expected to be hired by a municipality as firefighters. Exh. A (p. 28:8-12). He has performed only one other evaluation of a municipal gender hiring pattern, with police height and weight standards, for New Orleans in 1964. Exh. A (p. 5:22-25, pp. 6-8). He offers no expertise or knowledge of the peculiar rules of Connecticut municipal civil service employment or the modern Fire Service. Exh. A (all). He has never written about, or been trained or educated in the hiring of women in non-traditional employment, other than the tenuous connections of reviewing grants applications for health facilities for female veterans (Exh. A (p. 40:17-25)), and acting as an expert in one case involving height and weight standards for police officers in New Orleans in 1964. Exh. A (p. 41:21-25, 42:1-5).

### C. THE DEFENSE CANNOT MAKE THE NECESSARY SHOWING OF RELIABILITY FOR ADMISSIBILITY.

Even if any part of Dr. Levine's opinions are relevant, the defense cannot make the necessary showing of reliability for admissibility under F.R.E. 702 per Daubert, supra, and Kumho Tire Co., Ltd. v. Carmichael, 526 US 137 (1999) (applying Daubert standard to non-scientific expert opinion).

To be admissible under F.R.E. 702, "[t]he subject of an expert's testimony must be 'scientific . . . knowledge,'" because it is "the requirement that an expert's testimony pertain to 'scientific knowledge'" that "establishes a standard of evidentiary reliability." Daubert, 509 U.S. at 590. "[I]n order to qualify as

---

[1] See Amended Complaint by Elizabeth Schiller at ¶ 23, Amended Complaint by Johanna Georgia at ¶ 25.

'scientific knowledge,' an inference or assertion must be derived by the scientific method . . . ." Id. "Ordinary, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." Id. at 593-94. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Id. at 593. As the gatekeeper on admissibility, the Court must evaluate expert testimony and opinions for at least four criteria: (1) whether the methods upon which the testimony are based on a testable hypothesis; (2) what the known or potential rate of error associated with the method is; (3) whether the method has been subject to peer review; and (4) whether the method is generally accepted in the relevant scientific community (i.e., incorporating the former standard under Frye v. U.S., 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923)). Daubert at 593-94; Kumho Tire.

Dr. Levine provided no showing of the first and third criteria. See his deposition, Exh. A.

As to the second criterion, i.e., the known or potential rate of error associated with the method employed to arrive at the conclusions that the disparities between male and female employment as firefighters by Bridgeport are statistically insignificant, there is no showing that the standard deviation Dr. Levine utilized is significant or informative as to whether or not discrimination has in fact occurred.

Dr. Levine testified that he utilized the standard deviation of two to three points set forth in Castaneda v. Partida, 430 U.S. 482 (1977)[2]; Exh. A (p. 19:5-16). The methodology utilized in Castaneda

---

[2] The Court explained: "If the jurors were drawn randomly from the general population, then the number of Mexican-Americans in the sample could be modeled by a binomial distribution. See Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv. L. Rev. 338, 353-356 (1966). See generally P. Hoel, Introduction to Mathematical Statistics 58-61, 79-86 14th ed. (1971); F. Mosteller, R. Rourke, & G. Thomas, Probability with Statistical Applications 130-146, 270-291 (2d ed.1970). Given that 79.1% of the

is to first determine an "expected" number of protected class members for a particular group, and if the actual, or "observed" number of class members differs, then determine whether the deviation exceeds whatever number of points is arbitrarily set as the "standard deviation." Id. at n. 17 (see footnote 2 herein); Exh. A (p. 19:17-19). Dr. Levine testified that the statistical deviations between the numbers of women expected to be hire and the numbers actually hired in Bridgeport's hiring patterns in 1994 and 1996 were .85 and 3.66, and that these deviations are insignificant, because in Castaneda, "[t]he Supreme Court has set the number of standard deviations which tells you that you have significance at two or three standard deviations." Exh. A (p. 20:16-19). However, this is not accurate; the Court described only a "general rule" that "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [selection] … was random would be suspect to a social scientist" (Castaneda, n. 17, see footnote 1 herein), and the Court pointed out that this method is only useful with much larger numbers than in the instant cases, where a disparity arising out of a seemingly neutral practice is so large on its face that there can be no credible non-discriminatory reason for it.

---

population is Mexican-American, the expected number of Mexican-Americans among the 870 persons summoned to serve as grand jurors over the 11-year period is approximately 688. The observed number is 339. Of course, in any given drawing, some fluctuation from the expected number is predicted. The important point, however, is that the statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value. See F. Mosteller, R. Rourke, & G. Thomas, supra at 270-290. The measure of the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (here 870) times the probability of selecting a Mexican-American (0.791) times the probability of selecting a non-Mexican-American (0.209). Id. at 213. Thus, in this case, the standard deviation is approximately 12. As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist . . . ." Castaneda v. Partida at n. 17.

Contrary to Castaneda, and the other authorities cited above, Dr. Levine testified that "the standard [deviation] doesn't depend on the number of people." Exh. A (p. 33:18-24). At the same time, he concedes the limited utility of trying to apply an "expected" value and standard deviation to the miniscule number[3] of women Bridgeport has hired. Exh. A (p. 26:16-17). He goes on to testify that "of course, there are some particular situations where you might want to use a different standard. There's no such thing as one size fits all in this kind of enterprise," and that he knows of some cases that have used a standard deviation of as little as 1.95, and as high as 3. Exh. A (p. 30:10-13, 20-23). He then dismisses as "chance" the differences between the two Bridgeport Fire hirings he examined. Exh. A (pp. 36-38). If, as he testified, the standard deviation is 2 to 3, but can be less than 2, it would appear that the .85 and the 3.66 deviations are substantial.

As a matter of law, "no minimum threshold of statistical significance mandates a finding of a Title VII violation." Waisome v. Port Auth., 948 F.2d 1370, 1375 (2d Cir. 1991), citing Bilingual Bicultural Coalition on Mass Media, Inc. v. Federal Communications Comm'n, 595 F.2d 621, 642 n. 57 (D.C. Cir. 1978) (Robinson, J., dissenting in part) (statistical significance tells nothing of the importance, magnitude, or practical significance of a disparity; citing H. Blalock, Social Statistics 163 (2d Ed. 1972)). Accordingly, in Waisome, supra, the trial court properly posited that "if two additional black candidates passed the written examination the disparity would no longer be of statistical

---

[3] This is not even going into the quality of the data Dr. Levine was given to work with. This expert and the data given to him was not disclosed to the Plaintiffs until after conclusion of other discovery. Dr. Levine testified that the only "verification" he did of that data was to compare the different documents the City gave him. Exh. A (p. 32:16-22)

6

importance."[4] *Ergo*, the converse must also be true, i.e., that there is no minimum statistical relationship under which there can be no discrimination, and Dr. Levine cannot be legally correct in his opinion that there is no statistical indicia of discrimination in the .85 and the 3.66 deviations in the City's last hirings of women into its Fire Department.

Clearly, whatever this witness is willing to say is a substantial deviation suggestive of discrimination is a moving target. This is hardly the verifiable scientific basis that Daubert requires. In any event, finding discriminatory intent also "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-67 (1977).

As to the fourth criterion, whether the method Dr. Levine used to arrive at his opinion is generally accepted in the relevant scientific community, he testified that his experience in municipal hiring patterns is limited to one case. Exh. A (p. 5:22-25, pp. 6-8 (all). His knowledge of the two-to-three point standard deviation he used in the instant action comes not from the scientific world, but from as the Court, to wit, he testified that "when the Castaneda case came out, I was relieved first because the Supreme Court had said something, but then I was concerned because I didn't have a good idea of why they had arrived at that particular standard." Exh. A (p. 29:12-16). His testimony that, since then, the two-to-three point standard deviation "seems to be in almost all the cases the safest standard according to the criteria that should be used" (Exh. A (p. 5:22-25)) is based on what, in his limited *litigation*

---

[4] Pursuant to 44 Fed. Reg. 11996, 11999 (March 2, 1979), Waisome, supra ("approving of use of hypothetical alterations in results of challenged employment practice to determine whether disparity was too small to find an illegal disparate impact.").

experience, has generally been accepted by *litigants and courts* – not the *scientific community,* as required by Daubert. Exh. A (p. 30:7-9).

The jury is capable of weighing the facts and circumstances that will be presented at the trials of the instant cases without an expert. The jury will be presented with the simple data that currently, only 7 of Bridgeport's approximately 350 firefighters are women, that only 5 women are actually working "on the line"; that in the last two occasions that the City hired firefighters, it hired 40 men and 2 women, then 80 men and 5 women; and that there have been only roughly a dozen women ever hired as firefighters compared to many thousands of men hired in the history of the Bridgeport Fire Department. The jury can weigh the significance of this simple data vis-à-vis the Plaintiffs' claims of disparate treatment and hostile environment, without expert "spin," "*ipse dixit*."

**D.    CONCLUSION.**

The minimum criteria of Daubert and Rules 401 and 702 being unmet, the Court cannot properly allow the Defendants to offer the testimony, opinions, and report of Dr. Levine at trial.

**FOR THE PLAINTIFFS,**

Dated_____         _____
                                                    Susan V. Wallace
                                                    ~ *Attorney at Law* ~
                                                    11 Blue Orchard Drive
                                                    Middletown, CT 06457
                                                    Tel: (860) 704-0472  Fax: -0490
                                                    law4us@rcn.com
                                                    Fed Bar No. CT08134

**CERTIFICATION OF SERVICE**

The undersigned counsel certifies that a copy of the foregoing "Plaintiffs' Motion in Limine to Exclude Defense Expert Testimony, Opinions, and Report" has been served upon: Robert B. Mitchell, Esq., Margaret M. Sheahan, Esq., Pullman & Comley, LLC, 850 Main Street, P.O. Box 7006, Bridgeport, CT, 06601-7006, on this 27th day of November, 2004, via

    _X_   Regular U.S. Mail, first class, postage prepaid

    ____   U.S. Priority Mail

    ____   U.S. Express Mail or other overnight mail service

    ____   Facsimile

    ____   Hand-delivery

_____
Susan V. Wallace, Esq.