| | | | |
|---|---|---|---|
| STATE OF CONNECTICUT | ) | | |
| | ) | ss. | Middletown |
| COUNTY OF MIDDLESEX | ) | | |

### AFFIDAVIT OF PLAINTIFF ELIZABETH SCHILLER

1. I am Elizabeth Schiller O'Connell, the Plaintiff in the action <u>Elizabeth Schiller v. City of Bridgeport, et al</u>, consolidated under no. 3:01cv00452(AVC). I am over the age of eighteen years, belief in the obligations of an oath, and have personal knowledge of the matters set forth herein.

2. I have reviewed the Motion for Summary Judgment the Defendants in my lawsuit have filed against me, and reviewed their "Local Rule 56(c)1 Statement Pertaining to Plaintiff Elizabeth Schiller" dated July 23, 2004. I make this affidavit to correct what I believe are errors, misstatements, or omissions of facts in the Defendants' "Local Rule 56(c)1 Statement."

3. My claim that the City and Fire Chief Michael Maglione discriminate against women in hiring firefighters is not limited to the time I was hired. I claim that this discrimination has been the history and is continuing. "BFD" is "Bridgeport Fire Department."

4. My participation in the <u>Fierlit v. Bridgeport</u> lawsuit in the Connecticut Superior Court which resulted in my getting hired as a firefighter with BFD does not mean that I did not believe that I was denied employment based only on race and not on sex. That lawsuit was already in place when I joined it. There were all White men in the case and they were claiming race discrimination but based on failure to follow established civil service hiring rules. I believed that I was also a victim of that practice, so I joined the suit. At the time I did not know positively that I was also being denied hire because I am female. I later came to have more information and to

Exh 1

believe that I was denied hire also because of sex discrimination.

5. When I was in training as a probationary Firefighter, I was shown documents that I was told are the Bridgeport Fire Department ("BFD") policy against sex harassment, but I <u>dispute</u> that it has been in force and effect in the BFD and with regard to my employment at all times of my employment, or at all. My basis for this belief is the way I have been treated as set forth in my lawsuit Amended Complaint and herein.

6. As to the locker room and bathrooms in our training, the City provided the men an enclosed private bathroom on site near their locker area. There was no toilet in that building for women. We were not allowed to use the men's toilet, and were directed to go to a public bathroom down the street. The City gave the men a changing area that was all blocked from public view by rows of lockers, while the women were next to it with a tarp to make a wall on one side opening to the street. Our training officers told us that to remedy the tarp blowing open, we could change in the public bathroom down the street. We had to change our clothes at least twice every day, sometimes more often depending on our activities and weather. We were allowed only 2-3 minutes to change. I used the public bathroom down the street to toilet and change for a time, but it was a long way and had only two stalls and many people using it, making it too hard to get changed on time, and we got group punishment if anyone was late. I ended up wearing my exercise clothes under my fire uniform. The men had access to showers every day. The women were not even allowed to use the showers except for one day toward the end of our two month training.

7. My training officers called out a sexist cadence as I allege in ¶ 31 of my Amended

2

Complaint ("Momma on the bottom ...") in my probationary firefighter training class. The whole class was directed to yell it, most of the trainees did yell it, and everyone in the class surely heard it. We yelled it on the public streets in New Haven as we ran, but I refused to say it because I found it sexually harassing, demeaning, abusive toward women, and inappropriate in the workplace and in front of the general public. I found that particularly embarrassing. One of the training officers who said this was Rodney Vining.

    8. If the Defendants did any investigation into this cadence, I was not aware of it. No one in BFD or the City asked me about it and I never saw or heard of anyone else being asked about it. I did not complain about it to my superiors out of fear of being a probationary employee subject to termination, and out of fear of retaliation for already having had to pursue legal action to get hired into that training class. I have read what the Defendants say in § 2(d)(1)(e) of their "Local Rule 56(c)1 Statement Pertaining to Plaintiff Elizabeth Schiller, and I have reviewed the Affidavits my sister Autumn Dennerlein and Dep. Chief Thomas Connor signed for the Defendants, she is not truthful in her Affidavit ¶ 4 saying that I "confirmed that Vining said nothing inappropriate in calling his training cadences." I never said such a thing, especially not to Autumn. Dep. Chief Connor is misleading in his Affidavit ¶ 5 saying that I he asked me or anyone around me whether the particular cadence words were used, no on asked about it. If he generally asked Vining or other people in our class if something "objectionable" was said, I don't know if that would be clear enough to get a clear answer of admission of something that supposedly would have been punished, and I did not hear Connor or anyone else ask anyone anything of the kind.

3

9. I believe that my sister Autumn Dennerlein (a/k/a Autumn Caldaroni and Autumn Schiller) has not been and will not be truthful and accurate when speaking and even when testifying under oath about me, about my co-plaintiff Johanna Georgia, and about the issues of sex discrimination, harassment and retaliation in BFD. I distanced myself from Autumn several years ago, due to her lack of truthfulness and her behavior with regard to men, including her work as an "exotic dancer" – as a "stripper," advertising herself in local newspapers as available for hire for private sex shows; the fact that since she started working in BFD in 1999, entered a personal relationship as a probationary firefighter with her superior officer (Lt. Michael Caldaroni, whom she married and has now divorced); and there were posts on the Signal 29 website (see Plaintiff's Exh 5) about how she was going around her firehouse in revealing clothing visibly without undergarments, which is consistent with her behavior as I know it. Based on all of this, and more of what I know of my sister's personal conduct, I do not believe that she is a reasonable judge of what is appropriate workplace conduct between men and women, or what is or is not sexual harassment.

10. As for what the Defendants claim was their "investigation" into sexual harassment by Captain Donald Day, before my interview, I asked to bring union or legal representation. Deputy Chief Pettway refused, saying the interview process was "confidential," and that if I refused to talk right then and there, it "would constitute disobeying an order," for which I could be disciplined and terminated.

11. As far as I know, the Defendants made no investigation of any of the other discrimination and harassment that I tried to complain about, or that Johanna Georgia tried to

4

complain about, as she lists in her Amended Complaint in this action, aside from the "c—t" comment. I believe the Defendants intended to discourage me and the other women from pursuing CHRO/EEOC Charges, and did not intend to actually remedy our complaints about other harassment in the workplace. I do not believe that the Defendants intended the interviews of the women just "to find out the facts respecting the Donald Day 'cunt' remark and the other complaints about his conduct raised in the internal BFD sex harassment charge that [I] filed on February 28, 2000." By this time, the Defendants already had enough information from my written complaint and my CHRO/EEOC Charge to do something about Day's remark, but they still had not acted. I felt threatened by their insistence of getting me alone without my union or lawyer with a threat of discipline up to termination just after I filed a Charge of Discrimination against the City.

12. City Attorney John Mitola participated in the information-gathering and in directing me that I could not have union and legal representation, and that I had to attend and give information. He attended and Marilyn Flores, a <u>City Attorney</u> assigned to the Labor Relations Department, also attended my interview, and the Investigation Report says she wrote it.

13. As I waited to be called into my interview on May 11, 2000, with my sister Autumn, we both cried, and Johanna Georgia was there too and looked very upset and scared. I feared retaliation because the City exposed to the view of many male co-workers and superiors who saw us women at Headquarters with high level officials.

14. I have reviewed David Dunn's affidavit and its "attachment F" which he states (¶ 12) is a "true and accurate transcription" of my interview. This is a false statement, it is <u>not</u> a

complete transcription of the whole interview. Without telling me, David Dunn had the tape off for a good part of that interview. By the time I realized it, a significant amount of material had been covered, including many incidents that I had found insulting/distasteful/ harassing in addition to Captain Day's "cunt" comment. I told the panel about the men using the women's bathroom and leaving it fouled, about Signal 29 and the threats I had received, about the poster up in Engine 15 women's quarters, and all the other events. When I realized he had turned it off, I specifically said that I wanted to recap what I had said so it would be part of the tape of the interview. The group interviewing me refused to let me do that. I was also having trouble expressing myself. I was crying before and throughout the interview because I was intimidated and scared by being called with all the other women up to Headquarters to be interviewed by high level City officials, in view of our male co-workers who were told we had made sex harassment complaints (some of whom had been disparaging us for our complaints on the Signal 29 site), and by being cornered in a room alone, denied any support or representation, and interrogated by high level City officials and City attorneys, when I was just a new firefighter in my first "career" job. Mr. Dunn especially, by his harsh, interrogating tone, and not allowing me to put all my complaints on the tape, he made me feel like the aim was to discredit my complaints about anything besides Captain Day and to pressure me to withdraw my complaints about everything except Captain Day. The pressure tactics worked – I was so upset, I just wanted to get out of that room, so I backed off some of my complaints. The transcript does show that I kept saying I feared retaliation, I was hoping that some of the officials in the room would see that I was afraid. I did not say that my fears of retaliation for complaining about sexual harassment

6

have "failed to materialize." I did say that I had good experiences with co-workers, because that was true with my immediate co-workers in my firehouse at that time, although I did not know the identities of all the firefighters who were disparaging me and the other women on the Signal 29 website. Most of my complaints were about things that the officers and Chief were doing.

15. My fears and the retaliation did <u>not</u> end because Captain Day went on a leave of absence from work, and I never said that – it only got worse after he left. After the interview with City officials, I suffered much more harassment and discrimination. The way this "investigation" was done lead me to believe that it really wasn't an investigation aimed at protecting the women from discrimination and harassment. That is why I was afraid to participate.

16. I also believe I have been the victim of retaliation in the form of denials of benefits I was due for post-partum leave when I had a child on October 19, 2002, bereavement leave when my mother died in May 2003, refusing to accommodate my breastfeeding of my child and denying me compensatory time I earned while I was breastfeeding, so that I had to file union grievances over it. The City and Chief Maglione refuse to this day to make any policy about accommodating breastfeeding for any woman, even though there is a state law requiring all employers to do so.

17. As to the Signal 29 website, I accessed and read it. "Plaintiff's Exhibit 5" has copies of some of the postings from it. It was accessible to the public on the internet. Users were required to register to post on it. It was identified on its homepage and in postings by its webmaster to be for BFD members. I read discussion on it that appeared to me to be by BFD

employees, about known workplace incidents, policies, practices, and people. It discussed me and female BFD Firefighters Johanna Georgia, Nancy Petrucelli, Debbie Ramos, and my sister, Autumn Dennerlein (then, Caldaroni). The name "Signal 29" is the name of the fire call alarm signal that BFD has used for decades. There are BFD personnel capable of and in fact running websites related to the BFD for the use of BFD personnel, like Joe Lachioma who runs the BFD "3engine.com" website. Signal 29 was accessible by BFD employees on duty using City computers with internet access in each firehouse, because the firehouse computers had free access at all times to the internet. I know that at least some of the posters to the website are BFD personnel because they used their real names, and I can identify others by things they say. I can figure out if some people posted at work by the time of day they posted knowing what shift they were working then. There were numerous blatantly sexually discriminatory, harassing and retaliatory postings on the site about "affirmative action," about me, about Johanna Georgia, and other female firefighters, and about our attempts to enforce anti-discrimination and sexual harassment policies and laws. There were threats of harm to me, Johanna Georgia, and other female firefighters. There were discriminatory, harassing and retaliatory statements about other minority employees of BFD.

18. As to the poster of a nude male "stripper" on the wall at Firehouse 15's (alleged in ¶ 73 of my Amended Complaint), I don't know if there was another man who complained "anonymously" or they could have done that, but a male firefighter named Kevin Shevlin complained to Dep. Chief Pettway before I did. We both told Pettway the poster was offensive to us. Pettway refused to remove it until I complained in writing up the chain of command. I was

involuntarily exposed to this pornographic material and it was offensive to me in my workplace.

19. As to the liquor store "pin-up" calendar of scantily-dressed women, I saw it hanging on the wall in the officers' room when I was assigned to clean the room. It was not thrown out immediately. A few days later, the calendar was still in the firehouse, placed on the top of a garbage can in the officer's hallway where I would see it when I came in to clean the men's quarters as ordered. I was involuntarily exposed to this pornographic material and it was offensive to me in my workplace.

20. As to the "pin-up" calendar of a scantily-dressed woman posed with a fire truck, as alleged in ¶ 161 of my Amended Complaint. I recognize the garage in the photo as BFD Firehouse 15's apparatus floor, the fire truck in the photo as Engine 15 that is housed in that apparatus bay, and the axe the woman is using as a prop is the type of axe that is kept on that truck. I recognize the architecture, the tiling and floor, the hazardous material locker and printer table in the same location as Firehouse 15's. As best as I can tell from the photo, I recognize the motorcycle in the photo as belonging to Lt. Paul Neugebauer who was assigned to 15's and regularly parked his motorcycle on the apparatus floor. I was involuntarily exposed to this pornographic material and it was offensive to me in my workplace.

21. As to the pornography playing on firehouse's TV's, I was involuntarily exposed to this pornographic material and it was offensive to me in my workplace. I saw and complained about sexually offensive explicit hard-core pornography playing on firehouse TV's in communal rooms, and male co-workers watching it on duty. I did not complain about "television program reception" and mere "availability" of porn on the TV's. I videotaped firehouse TV's showing

them playing porn as proof that it was being openly allowed, because my experience to that point in the BFD was that my complaints were minimized or denied even when I complained about things my superiors saw right in front of them, like the vandalism of the women's quarters and the other porn in the firehouses. As it turned out, Chief Maglione and his senior officers warned the firehouses before they went out to "inspect" for the porn on the TV's, giving the men a chance to remove the cable hookups to the porn channels so the officers could make documentation that they saw no evidence of what I reported. The Chief has made no effort that I know of to hold anyone accountable for the porn channel hookups and use in the firehouses.

22. As to vandalism of women's quarters, when I showed Lt. George Lopez the toilet in women's quarters, as I allege in ¶¶ 80-81, 124-125, and 139 of my Amended Complaint, it was not just "likely unflushed" with just "a couple of spots of urine on the rim." It was a heavily fouled toilet with urine sprayed all over and around it. That is why I complained even in writing about it. I also complained because it had happened before to me, and because Firefighter Nancy Petrucelli told me that she had been experiencing and complaining about the men fouling the women's toilets for years. It is simply not truthful to say that it is a common occurrence for toilets in the women's quarters to be left unflushed by the women themselves when they are rushed, as in the case of a fire call. In my experience, the chance of this is about nothing. Only a couple of women are ever working line duty at a time in BFD, because there are only 5 of us assigned line duty the past three years, and we have rotating shifts so we are not all on duty at the same time, and then a woman would have to actually relieving herself at the exact moment that a fire call comes, and then not flushing. This is not a "common" event. I have never seen it.

Moreover, what I was complaining about was human waste left in the bathroom for much longer than just a fire call and back, and more human waste than looks typical for a woman, and urine sprayed where women just can't spray it.

23. Nancy Petrucelli also told me that she kept a large amount of documentation of numerous incidents of sexual harassment and discrimination she experienced at BFD and her reports or complaints of it over the years. I have reviewed Nancy Petrucelli's sworn deposition testimony from April 11, 2003, and I believe that she did <u>not</u> testify truthfully in her sworn deposition in this case when she denied recall of and possession of any of the documentation that my lawyer subpoenaed from her.

24. As for women being on BFD recruitment teams, since the time I applied for employment as a BFD Firefighter in 1997, I have known of only one recruitment team with a female member -- Johanna Georgia. However, she has been out of work a long time and did not, to my knowledge, ever do any recruiting.

25. As to my uniforms, the City <u>does</u> "provide" them to me and <u>does</u> control what I can wear. When I was hired, I was not told I could wear female-cut uniforms, that they existed, where I could get them, or that the City has any specifications for female-cut uniforms. During my initial training, recruits were ordered to use only the local merchant that BFD listed for us. After the incident stated in ¶ 133 of my Amended Complaint, in which Assistant Chief Currivan cited me at a uniform inspection in front of my co-workers for a poor fitting dress uniform, to get me to look uniform with the men which is required, the senior officers had to get permission from Deputy Chief Wallace Thomas to buy me a female-cut dress uniforms from a New York

11

City store. The problem was not my weight, it was the male design and cut of the uniforms. The female-cut dress uniform fits me correctly. Male firefighters do not have to suffer the embarrassment I did, or have to complain to their chiefs, or have to repeatedly have attention called to their bodies just to get uniforms that fit. I have to suffer these things only because I am a woman.

26. As to "turnout gear" (firefighting overcoats, pants, boots, etc.), It is not made for the women based on their all their measurements. It is not custom-made from scratch for every firefighters' body measurements. It is first designed and cut for male body proportional measurements, not female body proportional measurements, and the City then orders sizes roughly corresponding to each firefighter's measurements, i.e., size 12, short, etc. It cannot be easily altered, like the sleeves shortened, because it would destroy the fire resistant properties. The male turnout gear the City provides me has never fit me properly.

27. As to the segregation and less favorable treatment of women than men in the BFD, I believe woman are "rationed" and limited in their assignments and that it will only get worse if we get more women on because the City is not providing enough quarters or beds for us in the firehouses. The City provides living quarters, including beds, toilets, showers and changing areas, for male firefighters sufficient to allow a full company of men to work anywhere at any shift without regard to their sex. The City segregates and separates female firefighters into separate quarters from the males, and then provides a very limited number of beds and quarters for the females, and does not provide an equal amount for the women in all firehouses, and does not provide any quarters at all for women in one firehouse. Firehouse number 10 (called "10's")

has <u>no</u> quarters for women, so women are not assigned there. Firehouse 12's has quarters for <u>only one woman</u> to work there at one time; Headquarters and Firehouses 3/4's, 6's, 7/11's, 16's each have quarters for <u>only two women</u> to work at a time; and Firehouse 15's can accommodate <u>only three women</u> at a time. The total number of women who can work at the same time in the entire BFD <u>with quartering available for all of them</u> is <u>12.</u>

28. In my observation, this results in female firefighters being "rationed" between work units and firehouses, i.e., the number of women than can be and that are assigned to the same firehouse and "line" firefighting duty in any company on the same shift is limited to one, or two, or three depending on which firehouse -- even in houses with multiple work units. This lesser access to firehouses, work units, shifts, rotations, and assignments impacts the women's experience levels, career development, bonding with co-workers, and overtime pay. It has negatively impacted mine.

29. As to condition of the women's quarters, I would not describe them as having "semi-private bathroom and shower facilities." With the possible exception of Firehouse 12's that has quartering for only one female at a time, whatever female firefighters are on duty at a time in a firehouse share the female facilities the same as the male firefighters do. In my observation, there are differences between the men's and women's quarters besides their size and bathrooms. In my observation, the women's quarters in most of the firehouses are substandard to the men's. There are quarters for women in 7 firehouses. In 5 of the 7, the women's quarters are small or in odd, inconvenient spaces and have no room for more beds. In 3 firehouses, there are no alarms in the women's bathrooms and showers like the men's have, so that the women have to leave the

bathroom and shower doors open to hear. The men's quarters all have the alarms ring in their bed, locker, and bath areas. The female quarters in at least 4 firehouses are also used by the men as a storage or junk room. Men who are ill use the women's quarters if there is no woman in the house. One women's quarters has no heat, another no air conditioning. I have as an exhibit photographs showing the poor condition of women's quarters and the way that the men use the women's quarters as storage and junk rooms. Plaintiff's Exh. 36. I think the women's quarters, especially in Firehouse 7/11's whether Johanna Georgia is assigned, are with the exception of firehouse, much smaller and inferior to and more hazardous than any men's quarters I have seen. There have been women on the BFD for about 15 years, yet there still are not proper quarters set up for all of us in all locations, even where we are permanently assigned.

30. "Traveling" is being assigned for a shift to a different firehouse than your usual assignment. It is generally not desirable. It is inconvenient not just for the first firefighter being traveled, but then another one or two have to be moved or called in to cover each place. Making this the way to resolve women's complaints disrupts the woman but can also make co-workers resentful. It might not always be available for the women anyway given the extremely limited amount of female quartering.

31. As to my diary being stolen, have reviewed the affidavit of my ex-brother-in-law Michael Caldaroni. It is not entirely truthful and accurate. I never alleged that Lt. Caldaroni rold me anything about it. My sister Autumn Dennerlein told me about what Dwayne Dupree had said about my diary being taken and read, she told me that Lt. Caldaroni had told her about it. In the Spring of 2000, I was keeping a diary at the direction of my then-attorney Mark Carey to record

the sexual harassment I was experiencing at work for legal action. I was very careful to keep it private, I only used it in the women's quarters, hid it well inside other things inside a drawer, and never to leave it "in plain view" even inside the women's quarters. It disappeared from the drawer where I kept it hidden because the things I hid it under had clearly been rifled through, and I never got it back. Even if it was "in plain view" (which I am sure it was not), I was the only woman working and using that women's quarters at the time, so a male would have had to enter the women's quarters to find it. I do not know if Michael Caldaroni was telling me the truth about what Dwayne Dupree said to him, but as I allege in ¶ 82(b), (c) of my Amended Complaint, in April 2000, a BFD employee posted on the Signal 29 that all the women firefighters, specifically referencing me, were keeping diaries of sex harassment and therefore could not be trusted. See Plaintiffs' Exh 5. My lawyer wrote to the City complaining about the diary theft and reading of it, yet to my knowledge, the Defendants have done nothing to respond, investigate, or discipline anyone for it.

32. As to the incident where Firefighter Lawlor was throwing away mugs I bought for my firehouse, I have reviewed his affidavit and the affidavits that Nancy Petrucelli (her ¶ 4), my ex-brother-in-law Michael Caldaroni (his ¶ 3), and Michael Donovan (his ¶ 3) signed for the Defendants' Motion for Summary Judgment. They have some facts wrong. In the particular incident that I alleged in my lawsuit, I did not leave the mugs dirty by the sink, and there was no "sloppy housekeeping" by me or Terry O'Connell. We left the mugs on a table where we were interrupted in the middle of a game of Scrabble. And even if I had left them by the sink it would justify throwing them in the garbage. Nancy Petrucelli would not know what Lawlor does as a

matter of routine because she is not assigned to the same firehouse he is. Contrary to what she, Caldaroni and Donovan say, the mugs I brought in are the only instance in which I have ever seen or heard Lawlor or anyone else in the BFD deliberately throwing other people's or communal belongings in the garbage like that. We have dishwashers, it is not a big deal to put two mugs into a dishwasher, we all do that, no matter who left it. Also, what they don't tell in their affidavits is that I gave 20 mugs to the firehouse. I handed one to Firefighter Cindy Mattera, and gave the other 19 to the firehouse kitchen for everyone to use. After the incident with Lawlor, they all disappeared within the next one to two months. All 19 of them were not left around as "sloppy housekeeping." Kitchen items don't just disappear like that, that much of one item that quickly. I believe they were thrown away as an act of hostility and ostracizing.

33. As to firehouse housework assignments, in some firehouses, males are not permitted to enter female quarters and so cannot clean them, while females are assigned to enter and clean male and female quarters. Job sheets don't show whether or not the men are actually going in to clean women's quarters. Since I complained about it, it seems to be up to the officer in charge, so sometimes women's quarters get cleaned if no women are working that day, sometimes not, while as a daily practice, someone, male or female, is assigned to clean the men's quarters.

34. As to the lawsuit I joined when the City did not initially hire me (Fierlit v. Bridgeport), it does not say or mean that I believe I was denied employment based only on race and not on my sex. We were all White people, and the claim was that the City deviated from civil service rules in order to manipulate the racial mix of the hires, and we did make claims about race discrimination (the defendants' Exhbit 6 is a copy of the court's Judgment ). At that

*administrative agency charge process*. Df Exh. 6 (Fierlit v. Bridgeport Complaint). I believed I was also the victim of the deviation from civil service rules, so I joined the suit. At the time I did not know positively that I was also being denied hire because of my sex being female. I later came to have information about the hiring patterns by gender and to believe that I was denied hire based on my sex being female.

35. It is my observation and belief that Johanna Georgia is being treated much worse than I am in terms of retaliation against her, like being denied return to work, because unlike me she is not personally involved with or married to a male firefighter. Johanna Georgia is the only woman employed in BFD who does not have a male family member on or formerly on the BFD. My husband is a BFD firefighter and is a member of the BFME group ("Bridgeport Firefighters for Merit Employment, Inc.") We are assigned to the same fire company, and since I married him, much of the harassment and retaliation against me has stopped. I believe that dating or marrying a male BFD employee is some protection for a woman firefighter, more than even having a relative on the BFD. Before I married a male BFD member, most employees knew my father was a former Chief of the BFD, but my sister Autumn Dennealein and I were still subjected to the harassment I state in my Amended Complaint, including the attacks and threats against us on the Signal 29 website, which mentioned that our father was a chief. Firefighter Cindy Mattera, who has an uncle but not a boyfriend or husband on the BFD, has had to file an EEOC Charge, and Ina Anderson who only has a brother who used to be on the BFD, also has had to file an EEOC Charge. Nancy Petrucelli who is married to an Assistant Chief, has gotten favors the rest of us women have not been given, like woman's sized gear items, and that the

17

harassment she complained about against her seems to have slowed down since she married a senior officer. Since Autumn Dennerlein divorced her officer husband recently, the men are again talking about her in derogatory terms, commenting on her personal life. I believe that Johanna Georgia does not have the protection of a boyfriend or husband, or even any male relative on BFD, and I believe that is a factor in how badly she is being mistreated. I believe she will be subjected to continuing retaliation and perhaps loss of her job as a result of it.

Dated 10/11/04

By: Elizabeth Schiller-O'Connell

Personally appeared before me Elizabeth Schiller who made oath that the foregoing statements are based upon her personal knowledge and belief and true and accurate to the best of her knowledge and belief.

Subscribed and sworn to before me on this 11 day of October, 2004.

_____
Commissioner of the Superior Court