1997 WL 201568  
1997 WL 201568 (N.D.Ill.)  
(Cite as: 1997 WL 201568 (N.D.Ill.))

Page 1

H  
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Cynthia G. FALK, Plaintiff,  
v.  
KIMBERLY SERVICES, INC., Defendant.

No. 92 C 1079.

April 16, 1997.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

*1 Plaintiff Cynthia Falk has sued Defendant Kimberly Services, Inc., claiming promissory estoppel. Before the Court are Defendant's Motions *in Limine* to Exclude the Testimony of Enola Falk, Beth Carpenter, and Ann Kirk.

ANALYSIS

A federal district court's authority to manage trials includes the power to exclude evidence pursuant to motions *in limine*. *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The guidelines governing motions in limine are as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*.

*Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F.Supp. 1398, 1400-01 (N.D.Ill.1993).

I. ENOLA FALK

Plaintiff stated in her answers to interrogatories that Enola Falk, Plaintiff's mother, could "testify that I told [her] the original arrangement and witnessed mental duress during 1991." Defendant now moves the Court to exclude the testimony of Enola Falk. Specifically, Defendant contends that (1) testimony by Enola Falk that Plaintiff told her about "the original arrangement" between Plaintiff and Kimberly constitutes inadmissible hearsay and (2) testimony as to Plaintiff's "mental duress" during 1991 is irrelevant and unfairly prejudicial.

A. The Original Arrangement

Plaintiff responds that Enola Falk's testimony as to what Plaintiff told her about "the original arrangement" is not excluded by the hearsay rule because it is a present sense impression or, alternatively, goes to Plaintiff's state of mind. Fed.R.Evid. 803(1) & (3). However, Plaintiff has not offered any reasoning to support either conclusion.

Any testimony by Enola Falk as to what Plaintiff said to her about the agreement is hearsay, because it constitutes a statement by the declarant--Plaintiff--offered in evidence to prove the truth of the matter asserted, namely, the substance of the "original arrangement." Accordingly, unless Plaintiff's statements to her mother qualify as a hearsay exception under Rule 803, such testimony is inadmissible.

1. *Rule 803(3)*

The Court easily finds that such statements do not fall within Rule 803(3)'s exception for statements

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of the declarant's then existing state of mind, as the proffered statements fall squarely within the Rule's qualification: "but not including a statement of memory or belief to prove the fact remembered or believed."

2. *Rule 803(1)*

*2 Rule 803(1) provides the following exception to the hearsay rule: A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. In the instant case, the statement is any made by Plaintiff to her mother, the witness, describing the "original arrangement." Defendant's sole argument against applying Rule 803(1) is that there is no evidence that Plaintiff made any statements describing the original agreement to her mother within the time frame needed to trigger Rule 803(1). Because Enola Falk was presumably not present during the event (i.e., the making of the "original arrangement"), any statements to her do not constitute present sense impressions unless made "immediately thereafter." There is currently before the Court no evidence produced by Plaintiff which indicates that any statements were made "immediately thereafter" such that they could constitute present sense impressions. Accordingly, the Court GRANTS the Motion *in Limine*.

B. Mental Duress

The parties agree that Plaintiff is neither seeking nor entitled to emotional distress damages. Accordingly, testimony by Enola Falk as to Plaintiff's "emotional duress" is not relevant and, moreover, any probative value is substantially outweighed by the dangers of unfair prejudice and misleading the jury. Fed.R.Evid. 401, 402, & 403; *see Campbell v. Ingersoll Milling Machine Co.*, 893 F.2d 925, 929 (7th Cir.1990)(holding district court properly excluded evidence of assault on the plaintiff based upon "the danger that the evidence would lead the jury to decide the case on an improper basis such as sympathy," where no assault claim was before the jury and plaintiff was not entitled to damages caused by the assault). Thus, the Court GRANTS Defendant's Motion and excludes testimony by Enola Falk as to Plaintiff's "mental duress."

II. BETH CARPENTER & ANN KIRK

In the Pretrial Order, Plaintiff identified Beth Carpenter and Ann Kirk-- former employees of Defendant--as witnesses. Defendant moves to exclude their testimony on several grounds.

First, Defendant contends that it has been prevented from deposing both finesses because "neither Carpenter nor Cook [sic] were [sic] previously identified by Plaintiff, in her answers to interrogatories or in her deposition, as persons who had knowledge or information regarding her claims against Kimberly." Thus, argues Defendant, the testimony is "prejudicial to Kimberly." Of course, nothing prohibits the admission of "prejudicial" evidence; indeed, most evidence is offered in order to prejudice the opponent's case. *See, e.g., Davidson Oil Country Supply v. Klockner, Inc.*, 908 F.2d 1238, 1245 (5th Cir.1990); *O'Brien v. Papa Gino's of America, Inc.*, 780 F.2d 1067, 1075 (1st Cir.1986); *Koloda v. General Motors*, 716 F.2d 373, 378 (6th Cir.1983); *U.S. v. DeLilo*, 620 F.2d 939, 947 n. 2 (2d Cir.1980). Rather, Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." (emphasis added).

*3 Plaintiff counters that Defendant had an opportunity to depose Carpenter and Kirk because (1) "Defendant's own employment records should reflect that Carpenter worked for Defendant (and with Falk) as Regional Director and that Kirk worked for Defendant (and worked under Falk's supervision) as a recruiter during the relevant time period" and (2) Plaintiff identified Carpenter as a person with knowledge or information of her claims against Defendant at her deposition on August 23, 1994. Plaintiff also relies upon *West Coast Video Enterprises, Inc. v. Ponce de Leon*, 1991 WL 49566, *1 (N.D.Ill. Apr.4, 1991) as citing *Droughn v. FMC Corp.*, 74 F.R.D. 639, 642 (E.D.Pa.1977) for the proposition that a party who fails to bring a motion to compel discovery may not later seek to exclude evidence on the grounds that it was not produced. Unfortunately, after combing through *West Coast Video* 's disposition of nine motions *in limine*, this Court learned that the case neither cites *Droughn* nor supports the proposition for which Plaintiff cites it. Nevertheless, the Court's own

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

research uncovered two unpublished opinions by the *West Coast Video* court that rely upon *Droughn, Harbor Ins. Co. v. Continental Bank Corp.*, 1991 WL 222260, at n. 3 (N.D.Ill. Oct. 25, 1991) & *W.R. Grace & Co. v. Vikase Corp.*, 1991 WL 211647, at *4 (N.D.Ill. Oct. 15, 1991). However, the reasoning behind the proposition does not apply where the moving party has no way of knowing that its discovery request was resisted. Such is the case with Kirk, as it is undisputed that she was never referred to in discovery. Defendant's employment records reflecting her as having worked under Plaintiff's supervision do not compel otherwise. Carpenter is a closer case, as the deposition testimony arguably revealed her to be a person with knowledge two years prior to the filing of the present Motion. Nevertheless, this Court has a longstanding rule that permits a party to depose a witness after the close of discovery where no prior indication was given that the witness would testify at trial, in order to avoid prejudice. Accordingly, the Court grants Defendant leave to depose both witnesses.

Second, Defendant posits that Plaintiff's failure to provide information about the witnesses' testimony renders it "more likely than not ... irrelevant," citing two cases in support that are not on point. In the same vein, Defendant argues that "[b]oth Carpenter and Cook [sic] should be excluded as witnesses as there is no hint, let alone evidence, that either will present relevant or admissible testimony to this Court." (Mot. at 1). The Court rejects the argument for failure to meet the standard of a motion in limine, namely, that the evidence is clearly inadmissible on all potential grounds.

Third, Defendant argues that "Plaintiff fails to state whether she anticipates Defendant to dispute the substance of the meeting [about which Carpenter would testify] as described by Plaintiff. If Defendant does not dispute Plaintiff's statement, Carpenter's testimony is at best duplicative and a waste of time and at worst confusing or misleading to the jury," substantially outweighing the probative value such that it is properly excluded under Rule 403. (Reply at 2-3). However, the case relied upon by Defendant--*West Coast Video*, 1991 WL 49566 (the same case mis-cited by Plaintiff)--does not stand for the proposition that testimony corroborating a plaintiff's statement is properly excluded where a defendant does not dispute the plaintiff's statement. Moreover, to exclude evidence based upon the proffering party's failure to state whether she anticipates the moving party to dispute other evidence flies in the face of the standard that applies to motions in limine. As explained above, evidence is excluded prior to trial only when it is clearly inadmissible on all potential grounds; by definition, an argument based upon anticipation, or the lack of, does not make such a showing. Further, for the movant to attack Plaintiff's failure to anticipate *the movant's plans* and then request a ruling without revealing those plans is disingenuous. Finally, Defendant's argument, which appears for the first time in its Reply, is outside the scope of the Response. For all of these reasons, the Court rejects the third argument. Accordingly, the Court DENIES the motion to exclude Carpenter and Kirk.

## CONCLUSION

*4 For the reasons given, the Court (1) GRANTS the Motion *in Limine* to Exclude Enola Falk and (2) DENIES the Motion in Limine to Exclude Beth Carpenter and Ann Kirk, but GRANTS Defendant leave to depose Carpenter and Kirk.

1997 WL 201568 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

COMMERCE FUNDING CORPORATION,
Plaintiff,
v.
COMPREHENSIVE HABILITATION
SERVICES, INC., et al., Defendants.

No. 01 Civ. 3796(PKL).

Sept. 3, 2004.

Harris Beach LLP, New York, New York, John W. Clarke, Arent Fox Kintner Plotkin & Kahn, PLLC, New York, New York, Jeffrey R. Ruggiero, for Defendant/Cross-Claimant Comprehensive Habilitation Services, Inc.

Garfunkel, Wild & Travis, PC, Great Neck, New York, Roy W. Breitenbach, Dennis H. McCoobery, for Defendant/Cross-Claim Defendant St. Francis Hospital.

*OPINION AND ORDER*

LEISURE, J.

*1 This action, originally brought by plaintiff Commerce Funding Corporation upon an alleged breach of a factoring agreement, has been trimmed down by settlements and arbitration, such that only cross-claims asserted by defendant Comprehensive Habilitation Services ("CHS") against defendants St. Francis Hospital ("St.Francis") and Staten Island University Hospital ("Staten Island") remain unresolved. CHS brings a breach of contract claim against St. Francis that will be tried without a jury, and a breach of contract claim against Staten Island that will be tried before a jury.

With respect to St. Francis, CHS alleges that St. Francis owes it $215,270.10 plus interest for services it provided to St. Francis pursuant to a Memorandum of Understanding between the two parties dated February 19, 1999. St. Francis denies the allegations. The Court has scheduled a bench trial on CHS's claims against St. Francis to begin September 13, 2004. CHS now makes two motions *in limine* to exclude from evidence several documents that St. Francis intends to offer at trial. In its first motion *in limine* dated July 30, 2004, CHS seeks to exclude documents that predate the Memorandum of Understanding, and documents related to a settlement between St. Francis and the Attorney General's Office. In its second motion *in limine* dated August 3, 2004, CHS seeks to exclude a plea agreement reached in the case of *People v. Comprehensive Clinical Center, Inc.* St. Francis opposes CHS's motions. For the reasons set forth below, the Court grants in part and denies in part CHS's first motion *in limine*, and reserves judgment until trial on CHS's second motion *in limine*, so that the motion is placed in the appropriate factual context.

Background

The following background information is derived from the submissions of the parties in association with the current motions and does not constitute findings of fact.

I. *Factual Background*

During all relevant times, defendant St. Francis was a hospital in Poughkeepsie, New York, that provided a full range of health care services to the mentally retarded and the developmentally disabled. Cross-claimant CHS provided consultation and administrative services to health providers. On May 25, 1995, CHS and St. Francis reached an agreement (the "Contract"), by which CHS would provide services such as occupational therapy, physical therapy, and social work for St. Francis and be compensated at a rate of $50 per hour. (Contract (attached to CHS's July 30, 2004, Notice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of Motion as Exhibit 1) ¶ 5 and Addendum.) The Contract includes several terms upon which the parties agreed, such as that CHS's services "shall only be provided upon obtaining all Federal, State, and local approvals including, without limitation, approvals of the New York State Department of Health and the New York State Department of Mental Hygiene." (Contract ¶ 5.) After the commencement of the Contract CHS provided services for St. Francis and issued invoices to St. Francis for payment.

*2 At some time after 1995, the Office of the Attorney General, Medicaid Fraud Control Unit ("Attorney General's Office") "conducted an audit of [clinics operated by St. Francis] and thereafter asserted, among other things, that: (a) the Clinics were neither authorized under, nor operated in accordance with, applicable New York State laws, rules and regulations; (b) [St. Francis] submitted improper claims for payment to Medicaid during the Service Period relating to the Clinics; and (c) [CHS's] relationship with [St. Francis] violated applicable New York State laws, rules and regulations." (February 6, 2002, Agreement and Settlement between St. Francis and Attorney General's Office ("February 2002 Settlement"), at 1.) In February 2002 St. Francis entered a settlement with the Attorney General's Office by which St. Francis expressly denied the allegations of the Attorney General's Office, but "in order to avoid the uncertainties, burdens and expenses of litigation," agreed to pay a $1 million settlement in the form of weekly withholdings by the State Department of Health of future Medicaid checks payable to St. Francis. (February 2002 Settlement, at 2-3.)

On February 19, 1999, apparently after the Attorney General's Office had commenced its investigation into the parties' performance under the Contract, and before St. Francis reached a settlement with the Attorney General's Office, CHS and St. Francis agreed to a Memorandum of Understanding. (Memorandum of Understanding (attached as Exhibit 2 to CHS's August 3, 2004, Notice of Motion).) In the Memorandum of Understanding the parties agreed to, among other things, the following terms:
   (1) The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein.
   (2) *Payment and Holdback.* ... [St. Francis] shall pay certain invoices received by it from CHS for services rendered in connection with the Contract on the following schedule: $510,115 on or before February 26, 1999. Invoices 149 and 150 will be withheld as a holdback, and all other outstanding invoices will be paid in accordance with [St. Francis'] 90-day cycle.
   ....
   (4) *Continuity of Services.* CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates.
   ....
   (10) *Holdback of Monies--Attorney General--Department of Health Investigation.* CHS, and [St. Francis] acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract, and related issues.... In the event there is an immediate repayment required [by the Attorney General's Office], any outstanding invoices would be used as part of such a repayment plan.
*3 (Memorandum of Understanding ¶¶ 1, 2, 10 and attached Exhibit.)

After the parties agreed upon this Memorandum of Understanding, CHS continued to provide services and submit invoices to St. Francis. St. Francis received the services provided by CHS, but stopped making payments on the invoices.

II. *Procedural Background*

A. *CHS's Cross-Claim*

CHS brings the current cross-claim against St. Francis for breach of contract. CHS claims that St. Francis owes payment on seven invoices CHS issued for payment for services it rendered: Invoice Nos. 149, 150, 151, 152, 153, 154 and 155. Invoices 149 and 150 were issued for services rendered in January and February 1999, and are referenced in the Memorandum of Understanding. Invoices 151-155 were issued for services rendered

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

in February, March, April, and May 1999, and are not explicitly referenced in the Memorandum of Understanding. The parties agree that the claim to be resolved at the bench trial is a simple breach of contract claim for failure to pay these invoices. (*See* Affidavit of John W. Clarke in support of CHS's Motion *In Limine* To Exclude Various St. Francis Trial Exhibits ("Clarke Aff.") ¶ 2 ("In short, this is a garden variety collection case in which a debtor profited from the services of contractor and then defaulted on its contractual obligation of payment."); Memorandum of Law of St. Francis Opposing CHS's 8/3/04 Motion *In Limine*, at 1 ("This lawsuit is fundamentally a non-payment action.").)

CHS's position is that the Memorandum of Understanding governs all of the invoices, Nos. 149-155, and that payment is due on these invoices under the terms of the Memorandum of Understanding. With respect to Invoices 149 and 150 which are subject to "holdback" in the Memorandum of Understanding, CHS argues that monies owed by St. Francis to CHS for these invoices should not be applied to the settlement with the Attorney General because the "settlement was entered into without consultation with or agreement by CHS. Nothing in the [Settlement] alleges that CHS engaged in any impropriety or had responsibility for the alleged violations. In short, there is no link to any acts of CHS in connection with its performance of the Agreement with [St. Francis], and [St. Francis'] settlement with [the Attorney General's Office]." (Joint Pre-Trial Order, at 5.) CHS thus argues that payment for Invoices 149 and 150 is due. With respect to Invoices 151-155, CHS argues that paragraph four of the Memorandum of Understanding, titled *"Continuity of Services,"* governs these invoices. CHS thus argues that payment for Invoices 151-155, issued for services rendered after the parties signed the Memorandum of Understanding, is due.

St. Francis denies CHS's allegations of breach of contract. St. Francis' position is that the Memorandum of Understanding governs Invoices 149 and 150, and the Contract governs Invoices 151-155. With respect to Invoices 149 and 150, St. Francis argues that the Memorandum of Understanding provides that St. Francis may hold back payment on these invoices and apply it to its Settlement with the Attorney General's Office. As the Settlement amount exceeds the amount of Invoices 149 and 150, St. Francis contends that under the terms of the Memorandum of Understanding it owes nothing to CHS for Invoices 149 and 150. With respect to Invoices 151-155, St. Francis argues that "those invoices are expressly not subject to the Memorandum of Understanding and, accordingly, are governed by the terms of the parties' original [Contract]." (Joint Pre-Trial Order, at 3.) St. Francis argues that CHS failed to perform its obligations under the Contract "to ensure compliance with all rules and regulations pertaining to the operation of the [St. Francis] Clinics; to market, implement and provide administrative services at Hospital operated Clinics; to obtain all Federal, State and local approvals of the New York State Department of Health and the New York State Department of Mental Hygiene relating to the operation of the clinics; and to comply with the contract's covenant of good faith and fair dealing." (Joint Pre-Trial Order, at 3 (internal quotations omitted).) St. Francis concludes that "the doctrine of prior material breach precludes CHS from collecting under Invoice Nos. 151, 152, 153, 154 and 155." (Joint Pre-Trial Order, at 3.)

B. *CHS's Current Motions*

*4 CHS brings two motions *in limine* to exclude certain evidence that St. Francis intends to offer at trial. The Court takes up each motion in turn below.

Discussion

I. *Motion In Limine Standard*

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials); *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 283 (S.D.N.Y.1996). Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. See *Nat'l Union Fire Ins. Co.*, 937 F.Supp. at 287.

A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence. Fed.R.Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court...."). The court's ruling regarding a motion *in limine* is "subject to change when the case unfolds." *Luce*, 469 U.S. at 41. This opinion and order thus determines preliminarily whether the evidence challenged by CHS may be presented to the trier of fact. Once this Court makes a determination that certain forecasted evidence is admissible, it will, as the trier of fact, consider the weight and sufficiency of the evidence presented at trial. See, e.g., *In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1132 (2d Cir.1995) (noting that once shaky, unreliable evidence is admitted, such evidence is best challenged with " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).

II. *CHS's Motion To Exclude Documents that Predate the Memorandum of Understanding and Documents Related to St. Francis' Settlement with the Attorney General's Office*

CHS seeks to exclude several documents in its first motion *in limine*, dated July 30, 2004. The first set of documents are those that predate the Memorandum of Understanding. The second set are those related to St. Francis' Settlement with the Attorney General's Office. The Court takes up each of these sets of documents in turn.

A. *Documents that Predate the Memorandum of Understanding*

*5 CHS seeks to exclude St. Francis' proposed exhibits A, B, D, E, G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX on relevance grounds. [FN1] These exhibits are a variety of documents with a common trait: they all predate the Memorandum of Understanding, which the parties signed in February 1999. St. Francis seeks to admit these documents because its position is that the Contract, which predates most of these documents, governs the invoices at issue. The proposed exhibits, St. Francis argues, tend to show that CHS did not perform its obligations under the Contract. St. Francis thus opposes CHS's motion, but indicates either expressly or implicitly in its opposition papers that it does not seek to admit exhibits A, B, D, or E. [FN2]

> FN1. CHS also observes that Exhibits E, G, H, I, J, L, M, P, Q, R, and XX need to be authenticated before they can be admitted. The Court need not take up authenticity as a ground for excluding the proposed exhibits at this time. First, on the current record the proposed exhibits are irrelevant, thus their authenticity is moot. Second, CHS does not argue for the pretrial exclusion of documents on authenticity grounds, but simply notes that the challenged exhibits should be excluded if St. Francis fails to authenticate them. And third, questions about whether a document is authentic do not typically justify excluding the document in advance of trial, because authenticity can be easily established at trial. "Evidence sufficient to support a finding that the matter in question is what its proponent claims" satisfies Rule 901's requirement of authentication. Fed.R.Evid. 901(a). "Rule 901 does not erect a particularly high hurdle." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001) (internal quotations omitted). "Testimony that a matter is what it is claimed to be," for example, sufficiently authenticates a document. Fed.R.Evid. 901(b)(1).

> FN2. Proposed exhibits A and B predate the Contract and thus appear irrelevant under any circumstances, and St. Francis does not indicate that it will seek

admission of these documents. St. Francis expressly withdraws proposed exhibits D and E from consideration, indicating that it will not seek to introduce these documents into evidence.

The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.1985). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401. While the Rules of Evidence apply with equal force in jury and non-jury trials, courts often apply the relevance standard with little rigor during a bench trial. The Second Circuit has noted that "ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records." *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir.1977) (Oakes, J.). While standards for admissible evidence are not "out the window entirely" in a bench trial, "all doubts at a bench trial should be resolved in favor of admissibility." *Dreyfus Ashby, Inc. v. S/S "Rouen"*, 1989 WL 151685, at *2 (S.D.N.Y.1989) (Mukasey, J.). " 'In non-jury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence.' " *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 172 (3d Cir.1999) (quoting Wright and Miller, Federal Practice and Procedure, § 2885, at 454).

Here, St. Francis' proposed exhibits that predate the Memorandum of Understanding are irrelevant, such that admitting them even at a bench trial would contravene Rule 401 and serve no purpose. The Memorandum of Understanding states, "The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein." (Memorandum of Understanding ¶ 1.) It then explicitly references "outstanding invoices," including Invoices 149 and 150. (Memorandum of Understanding ¶ 2.) It then states that "CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates." (Memorandum of Understanding ¶ 4.) Invoices 151-155 were issued for services rendered by CHS during and beyond this "transition period," from February through April 1999. The Memorandum of Understanding unambiguously applies to all the invoices at issue in this case. Thus, documents that predate the Memorandum of Understanding do not tend to make the existence of any fact at issue more or less probable.

*6 St. Francis offers no support for its position that the Contract governs Invoices 151-155. It simply states first that "those invoices are expressly not subject to the Memorandum of Understanding," (Joint Pre-Trial Order, at 3.), and second that "[those invoices] are not set forth on Exhibit B and are ... neither covered nor controlled by the Memorandum of Understanding." (Memorandum of Law of St. Francis Opposing CHS's 7/30/04 Motion *In Limine*, at 2.) St. Francis then argues that "CHS, during the term of the parties' relationship, failed to comply with its contractual obligations," and seeks to admit the proposed exhibits as documentary evidence in support of this contention. (Joint Pre-Trial Order, at 3.) St. Francis' first statement is incorrect. The Memorandum of Understanding does not express that Invoices 151-155 are not governed by it. No clause of the Memorandum of Understanding "expressly" excludes invoices from its terms. St. Francis' second statement is partially correct. Invoices 151-155 are not set forth in Exhibit B attached to the Memorandum of Understanding. These invoices, however, were issued for services rendered *after* the parties signed the Memorandum of Understanding, during the transition period contemplated by paragraph four of the Memorandum of Understanding. The Memorandum of Understanding does not state that invoices not listed in Exhibit B, for future services performed, are not governed by this agreement. It in fact states the opposite, expressly terminating the Contract and providing for the payment of services during the transition period in paragraph four.

As St. Francis argues only that the proposed exhibits are relevant because the Contract governs Invoices 151-155, and its assertion that the Contract governs the Invoices finds no factual support, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. Although this Court will resolve relevance questions about evidence in favor of admissibility, the Court will not admit irrelevant documents simply because they are offered. Based on the current record these proposed exhibits will not be admitted at trial. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

B. *Documents Related to St. Francis' Settlement with the Attorney General*

CHS seeks to exclude St. Francis' proposed exhibit JJ, UU, and WW. These documents are an email related to St. Francis' Settlement with the Attorney General's Office, a letter related to the Settlement, and the Settlement itself. CHS contends that these documents are irrelevant. CHS's position is that the circumstances of the Settlement and the Settlement itself show that St. Francis' liability to the State cannot be attributed to CHS. Thus, CHS argues, under the terms of the Memorandum of Understanding, St. Francis had no contractual right to withhold payment owed to CHS and apply the payments to the Settlement. St. Francis responds that the terms of the Memorandum of Understanding permit it to apply monies owed to CHS to the Settlement with the Attorney General's Office.

*7 The Court finds on the current record that the Settlement and related documents are relevant. Paragraph 10 of the Memorandum of Understanding provides that the parties "acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract.... To the extent that a long term payment plan is offered [by the Attorney General's Office as a settlement], the parties hereto shall cooperate in good faith to quantify the liability and reach a suitable repayment agreement. In the event there is an immediate repayment required, any outstanding invoices would be used as part of such a repayment plan." (Memorandum of Understanding ¶ 10.) The Memorandum of Understanding thus expressly references a potential settlement with the Attorney General's Office, and contemplates that the parties' contractual obligations may be affected by the terms of the Settlement. The Settlement Agreement (Exh. WW) and related emails and letters (Exhs. JJ, UU) are relevant to show whether and how the parties' obligations under the Memorandum of Understanding were impacted by St. Francis' Settlement with the Attorney General's Office.

Based on the current record the Court denies CHS's motion to exclude proposed exhibits JJ, UU, and WW, as these documents are relevant. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

III. *CHS's Motion To Exclude the Superior Court Information in the Case of People v. Comprehensive Clinical Center, Inc.*

CHS moves to exclude St. Francis' proposed exhibit VV, a Superior Court Information containing a plea agreement between Comprehensive Clinical Center, Inc. ("CCC") and the Attorney General of the State of New York ("Attorney General"), dated April 9, 2001, relating to the action *People v. Comprehensive Clinical Center, Inc.* [FN3] CHS argues that the plea agreement is irrelevant, that its prejudice substantially outweighs its probity, and that it is not properly admitted as character evidence.

> FN3. CHS also moves to exclude St. Francis' proposed exhibits ZZ and AAA, documents from websites of Health and Human Services and the New York State Department of Health, respectively. Upon CHS's motion St. Francis has withdrawn these proposed exhibits and agrees not to seek to introduce them into evidence in its case-in-chief.

According to CHS, CCC is a corporation that operated clinics providing psychological and other services. Its president and sole shareholder was Dr. Peter Magaro. Magaro also is the president and chief executive officer of CHS, and he signed the Memorandum of Understanding with St. Francis on behalf of CHS. The Attorney General criminally prosecuted Magaro's company, CCC, as part of an investigation similar to that of St. Francis which resulted in the Settlement discussed above. The prosecution of CCC resulted in a plea agreement by which CCC as a company pleaded to grand larceny for Medicaid fraud. The plea agreement includes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the following: "The plea of guilty to the Superior Court Information will cover Peter A. Magaro, his immediate family and the corporations which he controls, either *de facto* or *de jure*, including [CHS]." (CHS's Notice of Motion, Exh. C ¶ 3.) St. Francis intends to offer the plea agreement as proposed exhibit VV at trial. St. Francis' takes the position that the guilty plea of CCC, a company owned by Magaro, tends to show that CHS, another company run by Magaro, was responsible for the Medicaid violations for which St. Francis settled with the Attorney General's Office. St. Francis argues that the plea agreement shows that CHS did not meet the contractual obligations it owed to St. Francis, namely, its obligations "to ensure compliance with all rules and regulations pertaining to the operation of [St. Francis] Clinics," and to obtain "all Federal, State and local approvals of the New York State Department of Health an the New York State Department of Mental Hygiene" relating to the operation of the clinics. (Contract ¶¶ 5, 6.)

*8 The Court finds on the current record that granting or denying CHS's motion to exclude proposed exhibit VV would be premature, and reserves judgment until trial so that the motion is placed in the appropriate factual context. The plea agreement's relevance depends upon an inference that appears tenuous on the current record, namely, that the prosecution of CCC tends to show that CHS did not perform its contractual obligations with St. Francis. The Court has little information at this time to rule on the propriety of this inference and evidence offered upon it. The scope of the plea agreement, which purports to "cover" CHS, is unclear. Magaro's role in CCC, and more importantly in CHS and in fulfilling CHS's contractual obligations to St. Francis, is unclear. The sparse record currently includes too little information for the Court to rule on the admissibility of the plea agreement. The relevance and/or prejudice of the plea agreement will be better determined at trial, once the parties have developed the factual background of the case and once St. Francis has endeavored to lay a foundation for the plea agreement. The Court therefore reserves judgment on proposed exhibit VV.

Conclusion

For the reasons set forth above, the Court grants in part and denies in part CHS's first motion *in limine*, and reserves judgment until trial on CHS's second motion *in limine*, so that the motion is placed in the appropriate factual context. The Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. The Court finds that St. Francis' proposed exhibits JJ, UU, and WW are relevant. The Court reserves judgment on St. Francis' proposed exhibit VV until trial. Each of these preliminary rulings, made under Rule 104 of the Federal Rules of Evidence, is subject to change as the case unfolds.

SO ORDERED.

2004 WL 1970144 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:01CV03796 (Docket)
(May. 03, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 2367740 (N.D.Ill.)  
**(Cite as: 2004 WL 2367740 (N.D.Ill.))**

Page 1

H  
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,  
N.D. Illinois, Eastern Division.

TELEWIZJA POLSKA USA, INC. a Delaware  
Corporation, Plaintiff,  
v.  
ECHOSTAR SATELLITE CORPORATION, a  
Colorado corporation, Defendant.

No. 02 C 3293.

Oct. 15, 2004.

Phillip Jay Zisook, Paul M. Levy, Brian D. Saucier, Deutsch, Levy & Engel, Chicago, IL, for Plaintiff.

Mitchell Alan Orpett, Douglas C. Crone, Tribler, Orpett & Crone, Chicago, IL, Ross W. Wooten, David M. Noll, T. Wade Welch & Associates, Houston, TX, for Defendant.

MEMORANDUM OPINION AND ORDER

KEYS, Magistrate J.

*1 Currently before the Court are Plaintiff's 17 Motions *in Limine* and Defendant's 38 Motions *in Limine*. The Court will address each party's Motions in turn.

DISCUSSION

A Motion *in Limine* should be granted only if the evidence clearly is not admissible for any purpose. *See Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400 (N.D.Ill.1993). Generally, motions *in limine* are disfavored. Instead of barring evidence before trial, the preferred practice is to resolve questions of admissibility as they arise. *See Scarboro v. Travelers Ins. Co.,* 91 F.R.D. 21, 22 (E.D.Tenn.1980). By deferring evidentiary rulings until trial, courts can properly resolve questions of foundation, relevancy, and prejudice. *See Hawthorne Partners,* 831 F.Supp. at 1401.

I. Plaintiff's Motions in Limine

Plaintiff has filed seventeen separate motions *in limine*. A number of those motions attack the propriety of allowing Defendant to proceed with several affirmative defenses, based upon the evidence produced--or not produced--during discovery. Because a motion *in limine* is not the appropriate vehicle for addressing the strength of the evidence or the substance of a complaint, *See Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1362 (7th Cir.1996), the Court denies these motions in a fairly cursory manner.

In its First Motion *in limine,* Plaintiff argues that Defendant should be prohibited from arguing that it was entitled to sell subscriptions after the parties' contract was terminated. Plaintiff notes that in *Polska USA, Inc. v. Echostar,* No. 02-4332, 2003 WL 21579968, (7th Cir. July 7, 2003), the Seventh Circuit reversed the district court's conclusion that the only permissible interpretation of the parties' contract permitted Defendant to sell subscriptions during the post-termination period. In reversing the dismissal of Plaintiff's breach of contract claim, the Seventh Circuit stated that the more natural reading of the parties' contract prohibited Defendant from selling subscriptions to the Polska programming after it received Plaintiff's notice of termination. Plaintiff asserts that the law of the case doctrine bars Defendant from arguing that its conduct (ie, selling subscriptions after the termination of the contract) was permissible, because the Seventh Circuit has held otherwise.

Law of the case is a judicially created doctrine that seeks to limit repeated appeals of issues that have already been decided. *Gertz v. Welch,* 680 F.2d 527 (7th Cir.1982). While a district court is not free to disregard an appellate ruling, the court may rule on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

issues not directly decided on appeal. *Id.* at 532 (noting that the law of the case doctrine is not an "immutable rule," depriving the court of jurisdiction over an issue, but is rather a prudential limitation.)

In this case, the Seventh Circuit found that Plaintiff's Complaint stated a cognizable breach of contract claim. On September 1, 2004, Judge Guzman issued a Memorandum Opinion and Order, finding that Defendant was, nevertheless, "free to argue that it had the right to [sell subscriptions during the post-termination period] because the contract did not explicitly forbid its conduct." *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.,* No. 02 C 3293 (N.D.Ill. Sept. 1, 2004). Because Judge Guzman has decided that the Seventh Circuit's ruling does not prevent Defendant from arguing that its conduct is authorized under the parties' contract, the Motion is denied

*2 Next, Plaintiff seeks to exclude evidence and testimony supporting Defendants's counterclaim for tortious interference with prospective economic advantage, in its Second Motion *in limine.* Plaintiff argues that Defendant should be precluded from presenting such evidence, because Defendant failed to produce any evidence in support of its tortious interference claim. The Court agrees that Defendant should not be permitted to introduce evidence at trial that it refused to produce during discovery. However, the Court finds that Plaintiff's argument here--that the evidence that Defendant has produced is insufficient to support a claim for tortious interference--is better reserved for a summary judgment motion. *KRW Sales Inc. v. Kristel Corp.,* No. 93 C 4377, 1994 WL 75522, at *1 (N.D.Ill. Mar.8, 1994) (motions in limine should be utilized for resolving evidentiary, not substantive, disputes). Plaintiff's Second Motion *in limine* is denied.

Plaintiff seeks to exclude evidence and testimony supporting Defendant's defamation counterclaim, because Defendant has allegedly failed to produce sufficient evidence in support of this claim. Plaintiff is again seeking a substantive ruling on the sufficiency of Defendant's evidence. The Court denies Plaintiff's Third Motion *in limine.*

In Motion *in limine* 4, Plaintiff claims that, because one of Defendant's officers acknowledged that Defendant was withholding revenue payments, Plaintiff's alleged statement that Echostar was "scamming" Polska was not defamatory. Plaintiff is asking the Court to weigh the evidence and determine whether Defendant has enough evidence in support of its defamation counterclaim to warrant a trial. Because Plaintiff is improperly seeking a ruling on the substance of Defendant's defamation claim, Motion *in limine* 4 is denied.

Plaintiff seeks to prevent Defendant from introducing at trial amendments to the deposition testimony of Mr. Michael Schwimmer. Federal Rule 30(e) allows a witness to review his deposition transcript and make " 'any changes in form or substance" ' to the answers. *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1406 (N.D.Ill.1993) (quoting *Lugig v. Thomas,* 89 F.R.D. 639, 641 (N.D.Ill.1981)). The witness must provide a specific reason for each change made; a blanket, conclusory explanation is insufficient. However, "[a] witness can make changes that contradict the original answers, and the reasons given need not be convincing." *Hawthorne,* 831 F.Supp. at 1406. Courts usually allow such amendments, and stress the fact that these changes can be inquired into on cross examination. *Hawthorne,* 831 F.Supp. at 1407; *Sanford v. CBS, Inc.,* 594 F.Supp. 713, 715 (N.D.Ill.1984) (noting that courts typically are reluctant to strike these changes.)

In the instant case, Mr. Schwimmer is not seeking to directly contradict his deposition testimony, but rather to "explain" or put into context answers given during his deposition. *See, e.g., Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir.2000) (noting that, while it seems dubious to permit a deponent to change his testimony from what he said to what he meant to say via subsequent affidavit, Rule 30(e) clearly permits the practice.) While Mr. Schwimmer has offered the identical explanation for each requested change, it is not for the Court "to examine the sufficiency, reasonableness or legitimacy of the reasons for the change"--that is reserved for the trier of fact. *Lugtig,* 89 F.R.D. at 641. Plaintiff is free to explore the distinctions between Mr. Schwimmer's deposition testimony and amended testimony at trial. Motion *in limine* 5 is denied.

*3 In Motion *in limine* 6, Plaintiff seeks to prevent Defendant from introducing evidence and testimony

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

relating to Defendant's lost profits and lost business. Plaintiff asserts that the evidence is inadmissible, because Defendant failed to produce relevant tax returns, evidence of lost subscription sales, and other responsive evidence. Defendant counters that it has produced all relevant, non-privileged evidence, and notes that Plaintiff's reliance upon Illinois state caselaw is misplaced.

Defendant's failure to produce its tax returns and other requested evidence prevents Defendant from introducing such evidence at trial. However, there is no rule stating that a tax return is the exclusive method for proving damages or lost business. The issue of whether Defendant will be unable to establish damages absent this evidence should be addressed in a summary judgment motion.

The cases relied upon by Plaintiff are readily distinguishable, as they involved an Illinois procedural rule not applicable in the instant case, *see Hawkins v. Wiggins,* 92 Ill.App.3d 278, 47 Ill.Dec. 866, 415 N.E.2d 1179 (Ill.App.1980); *Smith v. P.A.C.E.,* 323 Ill.App.3d 1067, 257 Ill.Dec. 158, 753 N.E.2d 353 (Ill.App.2001) (both applying Illinois Supreme Court Rule 237(b)), or a court-imposed sanction for failing to comply with a court's discovery order, pursuant to Federal Rule 37, *see Govas v. Chalmers,* 965 F.2d 298 (7th Cir.1992), which cannot be invoked in the instant case, because there has been no court order compelling discovery. *See FineLine Distributors, Inc. v. Rymer Meats, Inc.,* No. 93 C 5685, 1994 WL 376283, at *4 (N.D.Ill. July 15, 1994) ("the cases interpreting Rule 37(b) clearly establish that the Court should only issue sanctions pursuant to Rule 37(b) for a violation of a court order regarding discovery.")

The Court will grant Plaintiff's Motion, to the extent that Plaintiff seeks to preclude Defendant from introducing evidence that it refused to produce during discovery. But absent evidence that Defendant's failure to produce the documents was in violation of a court order, or was otherwise wilful, the Court denies Plaintiff's Motion.

In its Seventh Motion *in limine,* Plaintiff seeks to preclude Defendant from introducing any evidence in support of its affirmative defenses of waiver, estoppel, ratification, assumption of the risk, failure to mitigate, and unclean hands. Once again, Plaintiff bases its Motion, largely, upon its claim that Defendant's evidence fails to raise a genuine issue of material fact with regard to these claims. Because substantive rulings should be reserved for substantive motions, Plaintiff's Seventh Motion *in limine* is denied.

Similarly, Plaintiff's Eighth Motion *in limine,* seeking to bar Defendant's affirmative defenses of estoppel, unclean hands, and laches, is an attack on the substance of Defendant's affirmative defenses, and is, therefore, denied.

Plaintiff's Ninth, Twelfth, and Thirteenth Motions *in limine* seek to preclude any evidence in support of Defendant's Thirteenth and Fifteenth Affirmative Defenses, and its Illinois Uniform Deceptive Trade Practices Act Counterclaim, respectively. These Motions are denied as moot, however, as Judge Guzman has already granted Plaintiff's Motion to Strike these same affirmative defenses and counterclaim. *See Telewizja Polska USA, Inc. v. Echostar Satellite Corp.,* No. 02 C 3293 (Sept. 1, 2004).

*4 In its Tenth Motion *in limine,* Plaintiff moves for an Order finding that Defendant is a public figure for purposes of its counterclaims. The United States Supreme Court recognizes two classes of public figures: 1) those who are public figures for all purposes; and 2) those who are public figures for a particular public controversy. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

To determine whether an entity is a limited purpose public figure, courts look to "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352. The Court disagrees that Defendant's mere status as a satellite provider renders it a public figure. Nevertheless, Plaintiff has demonstrated that Defendant has sufficiently interjected its position on the controversy into the public realm so as to warrant labeling it a public figure for purposes of this defamation action.

After Plaintiff's programming was pulled from the air, Defendant repeatedly ran a message promoting its version of the events giving rise to the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

cancellation on the station formerly broadcasting Plaintiff's shows. Defendant had the opportunity to counter Plaintiff's alleged attacks on its reputation, as well as to shape public opinion on the issue by directly addressing the non-party individuals most interested in the controversy. Under these circumstances, this Court is of the opinion that Defendant is a limited purpose public figure. Therefore, Plaintiff's Tenth Motion *in limine* is granted, in part.

Plaintiff's Eleventh Motion *in limine* seeks to prevent Defendant from introducing any evidence in support of its fourteenth affirmative defense of mistake. Once again, Plaintiff's attack on the substance of Defendant's affirmative defense and the sufficiency of Defendant's evidence is better left to a summary judgment motion. Notably, Judge Guzman denied Plaintiff's Motion to Strike Defendant's Fourteenth Affirmative Defense in his September 1, 2004 Memorandum Opinion and Order. *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, at *10 (N.D.Ill. Sept. 1, 2004).

In its Fourteenth Motion *in limine*, Plaintiff moves to preclude Defendant from introducing any exhibits that it has produced as translations performed by a company identified as Transtelecom. The exhibits purport to transcribe emails from unidentified individuals to Plaintiff's officers, in both the original Polish text and English translations, provided by Transtelecom. Plaintiff attacks the admissibility of the exhibits on numerous fronts. The most persuasive attack goes to the accuracy of the translations; the translations are obviously inaccurate on their face.

The exhibits consist of email communications between two alleged consumers and Plaintiff's President, Mr. B.M. Spanski. Both consumers express their frustration, in Polish, with the termination of the Polonia program. Mr. Spanski responded in kind, offering both individuals the *identical* response. Despite the fact that Mr. Spanski gave the same response--verbatim--to both individuals, Transtelecomm has translated the responses quite differently.

*5 Specifically, Transtelecomm interprets the first two sentences of Mr. Spanski's response to a Ms. Barbara Malewicz as follows: "Dish Network ordered us to give them full rights to distribute TV Polonia in the United States. We could not agree to those terms, nor will we agree to those terms, I am very sorry it has come to this." Conversely, Transtelecomm interprets the first two sentences of Mr. Spanski's identical response to "CAC2201" as "Dish Network worked hard to reach an agreement with TV Polonia U.S. sales agent to allow to continue delivering television channels into your homes. There are a lot of unhappy people with this situation."

Defendant offers no explanation for the obvious differences between the translations, and the differences are significant. In this case, Defendant has alleged that Plaintiff defamed it, in part, by claiming that Defendant was demanding exclusive rights to distribute TV Polonia. The translation of Mr. Spanski's response to Ms. Malewicz strongly supports Plaintiff's claim, while the translation of Mr. Spanski's response to CAC2201 is far more benign.

However, a party challenging the authenticity or accuracy of a translation bears the burden of presenting a competing translation, permitting the trier of fact to chose which version to credit. *United States v. Briscoe*, 896 F.2d 1476, 1492 (7th Cir.1990). In this case, Plaintiff has not offered a competing translation of the emails. Defendant has, however, substantially eased Plaintiff's burden in attacking the accuracy of Defendant's translations.

Next, Plaintiff states that the inaccurate translations are evidence of sanctionable conduct on Defendant's part. The Court disagrees that the translations, standing alone, are sufficient evidence of sanctionable conduct. The translations could be the result of honest human error. There is simply not enough evidence before the Court to sanction Defendant at this time.

Finally, "[a] judge is entitled to exclude unreliable evidence." *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 669 (7th Cir.2002). If the litigants were trying this case before this Court, the Court would likely strike both translations as being inherently unreliable. However, this close decision is better left to the trial judge. Motion denied.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Plaintiff's Fifteenth Motion *in limine* seeks to bar Defendant from introducing an exhibit to prove what Polska's website looked like on various dates in 2001. The exhibit is potentially damaging, as it purports to show Polska advertising DISH Network as a provider of T.V. Polonia on Polska's website *after* the expiration of the contract period. Plaintiff contends that the exhibit constitutes double hearsay, and, therefore, Defendant should not be permitted to present the exhibit at trial. The Court disagrees. "To the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all--and thus fall outside the ambit of the hearsay rule." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1155 (C.D.Cal.2002) (noting that the printouts of the website are admissible pursuant to the best evidence rule.) Moreover, the contents of Polska's website may be considered an admission of a party-opponent, and are not barred by the hearsay rule. *See Van Westrienen v. Americontinental Collection Corp.*, 94 F.Supp.2d 1087, 1109 (D.Or.2000).

*6 Plaintiff then contends that the exhibit has not been properly authenticated. [FN1] Attached to the exhibits is an affidavit from Ms. Molly Davis, verifying that the Internet Archive Company retrieved copies of the website as it appeared on the dates in question from its electronic archives. Plaintiff labels the Internet Archive an unreliable source and claims that Defendant has not, therefore, met the threshold requirement for authentication.

> FN1. Coincidentally, Plaintiff claims that it is unable to access any images of its website during the time in question.

Federal Rule of Evidence 901 "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *U.S. v. Harvey*, 117 F.3d 1044, 1049 (7th Cir.1997). Admittedly, the Internet Archive does not fit neatly into any of the non-exhaustive examples listed in Rule 901; the Internet Archive is a relatively new source for archiving websites. Nevertheless, Plaintiff has presented no evidence that the Internet Archive is unreliable or biased. And Plaintiff has neither denied that the exhibit represents the contents of its website on the dates in question, nor come forward with its own evidence challenging the veracity of the exhibit. Under these circumstances, the Court is of the opinion that Ms. Davis' affidavit is sufficient to satisfy Rule 901's threshold requirement for admissibility. Plaintiff is free to raise its concerns regarding reliability with the jury.

Finally, Plaintiff asserts that Ms. Davis is an undisclosed expert witness and that her affidavit authenticating the exhibits should be barred. The Court rejects Plaintiff's assertion that Ms. Davis is offering an opinion, expert or otherwise, and rejects Plaintiff's argument. Plaintiff's Fifteenth Motion *in limine* is denied.

In its Sixteenth Motion *in limine*, Plaintiff asks that Defendant be prohibited from introducing any evidence that statements--other than those alleged in its Second Amended Counterclaim--are defamatory.

Plaintiff contends that courts in the Northern District employ the precise language requirement in defamation actions. *Vantassell-Matin v. Nelson*, 741 F.Supp. 698, 707-08 (N.D.Ill.1990). The precise language requirement ensures that the opposing party has notice of the words alleged to be defamatory in forming its responsive pleadings. *Id.*

However, at least one court in this district has questioned the propriety of employing the judicially-created precise language rule, given Rule 8's liberal notice pleading requirement. In *Socorro v. IMI Data Search Inc.*, Judge Kennelly issued a thorough and well reasoned opinion tracing the roots of the precise language rule to nonbinding precedent from the Eighth Circuit. No. 02 C 8120, 2003 WL 1964269, at *3 (N.D.Ill. April 28, 2003). Judge Kennelly further notes that "an allegation is considered 'specific enough' if it permits the defendant to understand the specific nature of the claim and form a responsive pleading." *Id.* citing *Cozzi v. Pepsi-Cola Gen. Bottlers Inc.*, No. 96 C 7228, 1997 WL 312048, at *5 (N.D.Ill. June 6, 1997) (stating that "courts in this district ... have held that the defamatory language need not be quoted verbatim").

*7 For example, in *Harding v. Rosewell*, 22 F.Supp.2d 806, 818 (N.D.Ill.1998), the court found that once a case proceeds beyond the pleading stage, the appropriate inquiry is whether the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2367740 (N.D.Ill.)
(Cite as: 2004 WL 2367740 (N.D.Ill.))

Page 6

opposing party had notice of the defamatory remarks. The court noted that "[t]he defendants, through discovery, have been given all the notice required of the alleged defamatory statements." *Id.*

Similarly, in the case at bar, the pleading stage has long since past; discovery is now closed. While Plaintiff asserts (but does not explain) prejudice, the Court is of the opinion that Plaintiff was given sufficient notice of the alleged defamatory remarks through the discovery process. And the "new" remarks that Defendant seeks to rely upon in support of its defamation counterclaim, like the two statements identified in Defendant's Second Amended Counterclaim, all arise from the parties' falling out over their attempts to renew their contract. Under these circumstances, the Court finds that it would be inappropriate to bar evidence of the allegedly defamatory statements not specifically identified in Defendant's Second Amended Counterclaim. Plaintiff's Sixteenth Motion *in limine* is denied.

Plaintiff seeks to bar Defendant from introducing a redacted email to an unknown recipient from Telewizja's President, B.M. Spanski in its Seventeenth Motion *in limine*. Plaintiff claims that the document should not be admitted because it has not been authenticated, among other reasons. Defendant counters that Mr. Spanski authenticated the email by identifying it in his deposition. A review of the relevant deposition testimony belies Defendant's assertion. Mr. Spanski acknowledged that the email contained his email address, and little more. He neither recognized the email, nor remembered sending it. Because the document has not been authenticated, Plaintiff's Seventeenth Motion *in limine* is granted.

II. Defendant's Motions In Limine

Defendant has filed an astounding 38 Motions *in limine;* very few warrant serious discussion. In half of its motions, Defendant is seeking little more than acknowledgment that it has correctly recited the Federal Rules of Evidence. Plaintiff apparently agrees that Defendant has succeeded in this limited regard, stating that it has no objection to Defendant's Motions *in limine* Nos. 1, 2, 6, 8, 10, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 29, 33, and 36.

Motion *in limine* No. 34 (which "claims surprise" as to matters, causes of action, theories of recovery, etc. that Plaintiff hasn't specifically identified) seeks to preclude precisely *nothing,* while Motion No. 38 (a catch-all provision referencing all of the "matters listed above") seeks to preclude almost *everything.* Both Motions are denied.

Defendant's Third Motion *in limine* seeks to preclude Plaintiff's counsel and witnesses from referencing any statement of the law, other than that regarding the burden of proof and the basic legal definitions. Plaintiff does not object to the Motion, but asks that it exclude the Seventh Circuit's holding in *Telewizja Polska USA, Inc. v. EchoStar Satellite Corp.,* No. 02- 4332, 2003 WL 21579968, at *2-3 (7th Cir. Sept.10, 2003).

*8 Plaintiff does not suggest how, precisely, it would like to introduce the Seventh Circuit's opinion into evidence. Of course, it would be inappropriate for a witness to testify as to the contents of the Seventh Circuit's decision. The interpretation of the contract is the province of the court, not the jury; accordingly, the jury does not require assistance from the Seventh Circuit in interpreting and evaluating the scope of the parties' agreement. The Motion is granted.

Defendant's Motions *in limine* Nos. 4, 5, and 18 contend that any reference to prior verdicts, lawsuits, or claims against it is impermissible, pursuant to Federal Rule of Evidence 401 (defining relevant evidence), Rule 402 (stating that relevant evidence is generally admissible), and 403 (noting that relevant evidence should not be admitted if it is unduly prejudicial). Similarly, In Motions 28, 30, 31, and 32, Defendant seeks to exclude evidence of collateral bad acts or character evidence, citing Rule 404.

Plaintiff correctly notes however, that where a movant places its character at issue, evidence of reputation or specific instances of conduct may be admitted to prove character. Fed.R.Evid. 405(a) and (b). A movant may put its character at issue by filing a claim for defamation, "where injury to reputation must be proven." *Johnson v. Pistelli,* No. 95 C 6424, 1996 WL 587554, at *3, n. 5 (N.D.Ill. Oct.8, 1996).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2367740 (N.D.Ill.)
(Cite as: 2004 WL 2367740 (N.D.Ill.))

Page 7

In this case, Defendant has filed a defamation counterclaim. To the extent that Plaintiff demonstrates at trial that evidence of other claims or lawsuits involving Defendant, or of Defendant's collateral bad acts bears upon its character and reputation, that evidence may be admissible. *See Schafer v. Time, Inc.*, 142 F.3d 1361, 1370 (11th Cir.1998). Because such evidence may be admissible at trial, upon a proper showing by Plaintiff, motions *in limine* Nos. 4, 5, 18, 28, 30, 31, and 32 are denied.

In Motions *in limine* Nos. 7, 11, 12, and 13, Defendant asserts that evidence of its size, power, net worth, assets, or wealth is irrelevant and, even if relevant, would be unduly prejudicial. *See* Fed.R.Evid. 402 and 403. In its counterclaims, however, Defendant has alleged that Plaintiff defamed it and otherwise caused it damage by claiming that Defendant is a "monopoly" and has otherwise asserted its powerful market position to bully Plaintiff. Evidence of Defendant's market strength and wealth would likely be relevant in defending against such a claim. To the extent that Defendant places its wealth and/or power at issue, it may open the door to evidence on the issue. Therefore, the motions are denied.

Defendant's Ninth Motion *in limine* seeks to prohibit inquiry into its communications with its attorneys. While privileged communications that have not been waived will remain off limits, Defendant's request captures non-privileged communications with counsel, as well as instances where the privilege has been waived. *See, e.g., C & F Packing Co., Inc. v. IBP, Inc.*, No. 93 C 1601, 1997 WL 619848 (N.D.Ill. Sept.30, 1997). As such, Defendant's Ninth Motion *in limine* is denied.

*9 Defendant also seeks to prevent Plaintiff from commenting on Defendant's failure to produce a witness, if, in fact, Defendant fails to produce a witness at trial. Permitting or prohibiting attorneys from commenting on its opponents failure to call a witness rest soundly within the discretion of the trial judge. *U.S. v. Simpson*, 974 F.2d 845, 848 (7th Cir.1992). Because a ruling on the issue is best reserved for trial, Defendant's Nineteenth Motion *in limine* is Denied.

Defendant then asks the Court to prevent Plaintiff from introducing new theories of damages, as well as previously undisclosed damage calculations. Plaintiff counters that granting the motion would eliminate the flexibility required to potentially modify its damages calculations to meet the evidence introduced at trial. The Court grants Defendant's Twenty-second Motion *in limine* in part, barring Plaintiff from introducing at trial any evidence concerning a source of damages that it has failed to disclose. However, to the extent that Plaintiff must modify its damages calculations in light of the evidence presented or rulings made at trial, the Motion is denied.

Defendant's Thirty-fifth Motion *in limine* seeks to bar any reference to the substance of statements of potential witnesses until trial. The Court notes, however, that traditionally, attorneys have referenced potential witnesses and testimony during opening argument and that granting Defendant's Motion would prevent the parties from doing so. Defendant's Thirty-fifth Motion *in limine*, therefore, is denied.

Finally, Defendant's Thirty-seventh Motion *in limine* requests that Plaintiff be prevented from mentioning that it seeks disgorgement damages from Defendant's profits. Defendant argues that disgorgement is not a valid remedy in a breach of contract action, because the terms of the contract governs the parties' relationship. *See Conseco Group Risk Mgmt. Co. v. Ahrens Fin. Sys. Inc.*, No. 00 C 5467, 2001 WL 219627, at *6 (N.D.Ill. Mar.6, 2001).

Plaintiff does not dispute Defendant's assertion, but notes that it brought the unjust enrichment claim--which would give rise to a disgorgement remedy -in the alternative to the breach of contract claim. As Judge Guzman has not dismissed Plaintiff's unjust enrichment claim, it would be inappropriate at this stage of the proceedings to preclude Plaintiff from mentioning disgorgement damages. Therefore, Defendant's Motion *in limine* 37 is denied.

## CONCLUSION

As set forth above, the Court grants Plaintiff's Seventeenth Motion *in limine*, and grants in part Plaintiff's Sixth and Tenth Motions *in limine*. The

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-00452-AVC   Document 234-3   Filed 11/29/2004   Page 18 of 18
Slip Copy
2004 WL 2367740 (N.D.Ill.)
(Cite as: 2004 WL 2367740 (N.D.Ill.))

Page 8

Court denies Plaintiff's remaining Motions *in limine.*

With respect to Defendant's Motions, the Court grants Motions *in Limine* Nos. 1, 2, 3, 6, 8, 10, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 29, 33, and 36, as Plaintiff has not objected to these Motions. The Court denies Defendant's Motions *in Limine* Nos. 4, 5, 7, 9, 11, 12, 13, 18, 19, 28, 30, 31, 32, 35, 37 and 38.

2004 WL 2367740 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

• 2004 WL 2257333 (Trial Pleading) Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories (Feb. 12, 2004)

• 2003 WL 23819230 (Trial Pleading) Defendant Echostar Satellite Corporation's Second Amended Answer, Affirmative Defenses & Counterclaims (Dec. 08, 2003)

• 2003 WL 23819229 (Trial Pleading) Defendant Echostar Satellite Corporation's Amended Answer, Affirmative Defenses & Counterclaims (Nov. 06, 2003)

• 2003 WL 23819228 (Trial Pleading) Defendant Echostar Satellite Corporation's Answer and Affirmative Defenses (Oct. 17, 2003)

• 2003 WL 23819226 (Trial Pleading) Second Amended Complaint (Oct. 02, 2003)

• 2002 WL 32680159 (Trial Pleading) Amended Complaint (Aug. 06, 2002)

• 2002 WL 32680147 (Trial Pleading) Complaint (May. 07, 2002)

• 1:02CV03293 (Docket) (May. 07, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.