Westlaw.

1997 WL 201568
1997 WL 201568 (N.D.Ill.)
(Cite as: 1997 WL 201568 (N.D.Ill.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Cynthia G. FALK, Plaintiff,
v.
KIMBERLY SERVICES, INC., Defendant.

**No. 92 C 1079.**

April 16, 1997.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

*1 Plaintiff Cynthia Falk has sued Defendant Kimberly Services, Inc., claiming promissory estoppel. Before the Court are Defendant's Motions *in Limine* to Exclude the Testimony of Enola Falk, Beth Carpenter, and Ann Kirk.

ANALYSIS

A federal district court's authority to manage trials includes the power to exclude evidence pursuant to motions *in limine*. *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The guidelines governing motions in limine are as follows:

This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question

should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine.*
*Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400- 01 (N.D.Ill.1993).

I. ENOLA FALK

Plaintiff stated in her answers to interrogatories that Enola Falk, Plaintiff's mother, could "testify that I told [her] the original arrangement and witnessed mental duress during 1991." Defendant now moves the Court to exclude the testimony of Enola Falk. Specifically, Defendant contends that (1) testimony by Enola Falk that Plaintiff told her about "the original arrangement" between Plaintiff and Kimberly constitutes inadmissible hearsay and (2) testimony as to Plaintiff's "mental duress" during 1991 is irrelevant and unfairly prejudicial.

A. The Original Arrangement

Plaintiff responds that Enola Falk's testimony as to what Plaintiff told her about "the original arrangement" is not excluded by the hearsay rule because it is a present sense impression or, alternatively, goes to Plaintiff's state of mind. Fed.R.Evid. 803(1) & (3). However, Plaintiff has not offered any reasoning to support either conclusion.

Any testimony by Enola Falk as to what Plaintiff said to her about the agreement is hearsay, because it constitutes a statement by the declarant-- Plaintiff--offered in evidence to prove the truth of the matter asserted, namely, the substance of the "original arrangement." Accordingly, unless Plaintiff's statements to her mother qualify as a hearsay exception under Rule 803, such testimony is inadmissible.

*1. Rule 803(3)*

The Court easily finds that such statements do not fall within Rule 803(3)' s exception for statements

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of the declarant's then existing state of mind, as the proffered statements fall squarely within the Rule's qualification: "but not including a statement of memory or belief to prove the fact remembered or believed."

### 2. *Rule 803(1)*

**\*2** Rule 803(1) provides the following exception to the hearsay rule: A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter. In the instant case, the statement is any made by Plaintiff to her mother, the witness, describing the "original arrangement." Defendant's sole argument against applying Rule 803(1) is that there is no evidence that Plaintiff made any statements describing the original agreement to her mother within the time frame needed to trigger Rule 803(1). Because Enola Falk was presumably not present during the event (i.e., the making of the "original arrangement"), any statements to her do not constitute present sense impressions unless made "immediately thereafter."
There is currently before the Court no evidence produced by Plaintiff which indicates that any statements were made "immediately thereafter" such that they could constitute present sense impressions. Accordingly, the Court GRANTS the Motion *in Limine.*

### B. Mental Duress

The parties agree that Plaintiff is neither seeking nor entitled to emotional distress damages. Accordingly, testimony by Enola Falk as to Plaintiff's "emotional duress" is not relevant and, moreover, any probative value is substantially outweighed by the dangers of unfair prejudice and misleading the jury. Fed.R.Evid. 401, 402, & 403; *see Campbell v. Ingersoll Milling Machine Co.,* 893 F.2d 925, 929 (7th Cir.1990)(holding district court properly excluded evidence of assault on the plaintiff based upon "the danger that the evidence would lead the jury to decide the case on an improper basis such as sympathy," where no assault claim was before the jury and plaintiff was not entitled to damages caused by the assault). Thus, the Court GRANTS Defendant's Motion and excludes testimony by Enola Falk as to Plaintiff's "mental duress."

### II. BETH CARPENTER & ANN KIRK

In the Pretrial Order, Plaintiff identified Beth Carpenter and Ann Kirk-- former employees of Defendant--as witnesses. Defendant moves to exclude their testimony on several grounds.

First, Defendant contends that it has been prevented from deposing both finesses because "neither Carpenter nor Cook [sic] were [sic] previously identified by Plaintiff, in her answers to interrogatories or in her deposition, as persons who had knowledge or information regarding her claims against Kimberly." Thus, argues Defendant, the testimony is "prejudicial to Kimberly." Of course, nothing prohibits the admission of "prejudicial" evidence; indeed, most evidence is offered in order to prejudice the opponent's case. *See, e.g., Davidson Oil Country Supply v. Klockner, Inc.,* 908 F.2d 1238, 1245 (5th Cir.1990); *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1075 (1st Cir.1986); *Koloda v. General Motors,* 716 F.2d 373, 378 (6th Cir.1983); *U.S. v. DeLilo,* 620 F.2d 939, 947 n. 2 (2d Cir.1980). Rather, Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." (emphasis added).

**\*3** Plaintiff counters that Defendant had an opportunity to depose Carpenter and Kirk because (1) "Defendant's own employment records should reflect that Carpenter worked for Defendant (and with Falk) as Regional Director and that Kirk worked for Defendant (and worked under Falk's supervision) as a recruiter during the relevant time period" and (2) Plaintiff identified Carpenter as a person with knowledge or information of her claims against Defendant at her deposition on August 23, 1994. Plaintiff also relies upon *West Coast Video Enterprises, Inc. v. Ponce de* Leon, 1991 WL 49566, \*1 (N.D.Ill. Apr.4, 1991) as citing *Droughn v. FMC Corp.,* 74 F.R.D. 639, 642 (E.D.Pa.1977) for the proposition that a party who fails to bring a motion to compel discovery may not later seek to exclude evidence on the grounds that it was not produced. Unfortunately, after combing through *West Coast Video* 's disposition of nine motions *in limine,* this Court learned that the case neither cites *Droughn* nor supports the proposition for which Plaintiff cites it. Nevertheless, the Court's own

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 201568                                                                    Page 3
1997 WL 201568 (N.D.Ill.)
(Cite as: 1997 WL 201568 (N.D.Ill.))

research uncovered two unpublished opinions by the *West Coast Video* court that rely upon *Droughn, Harbor Ins. Co. v. Continental Bank Corp.,* 1991 WI 222260, at n. 3 (N.D.Ill. Oct. 25, 1991) & *W.R. Grace & Co. v. Vikase Corp.,* 1991 WI 211647, at *4 (N.D.Ill. Oct. 15, 1991). However, the reasoning behind the proposition does not apply where the moving party has no way of knowing that its discovery request was resisted. Such is the case with Kirk, as it is undisputed that she was never referred to in discovery. Defendant's employment records reflecting her as having worked under Plaintiff's supervision do not compel otherwise. Carpenter is a closer case, as the deposition testimony arguably revealed her to be a person with knowledge two years prior to the filing of the present Motion. Nevertheless, this Court has a longstanding rule that permits a party to depose a witness after the close of discovery where no prior indication was given that the witness would testify at trial, in order to avoid prejudice. Accordingly, the Court grants Defendant leave to depose both witnesses.

Second, Defendant posits that Plaintiff's failure to provide information about the witnesses' testimony renders it "more likely than not ... irrelevant," citing two cases in support that are not on point. In the same vein, Defendant argues that "[b]oth Carpenter and Cook [sic] should be excluded as witnesses as there is no hint, let alone evidence, that either will present relevant or admissible testimony to this Court." (Mot. at 1). The Court rejects the argument for failure to meet the standard of a motion in limine, namely, that the evidence is clearly inadmissible on all potential grounds.

Third, Defendant argues that "Plaintiff fails to state whether she anticipates Defendant to dispute the substance of the meeting [about which Carpenter would testify] as described by Plaintiff. If Defendant does not dispute Plaintiff's statement, Carpenter's testimony is at best duplicative and a waste of time and at worst confusing or misleading to the jury," substantially outweighing the probative value such that it is properly excluded under Rule 403. (Reply at 2-3). However, the case relied upon by Defendant--*West Coast Video,* 1991 WL 49566 (the same case mis-cited by Plaintiff)--does not stand for the proposition that testimony corroborating a plaintiff's statement is properly excluded where a defendant does not dispute the plaintiff's statement. Moreover, to exclude evidence based upon the proffering party's failure to state whether she anticipates the moving party to dispute other evidence flies in the face of the standard that applies to motions in limine. As explained above, evidence is excluded prior to trial only when it is clearly inadmissible on all potential grounds; by definition, an argument based upon anticipation, or the lack of, does not make such a showing. Further, for the movant to attack Plaintiff's failure to anticipate *the movant's plans* and then request a ruling without revealing those plans is disingenuous. Finally, Defendant's argument, which appears for the first time in its Reply, is outside the scope of the Response. For all of these reasons, the Court rejects the third argument. Accordingly, the Court DENIES the motion to exclude Carpenter and Kirk.

CONCLUSION

*4 For the reasons given, the Court (1) GRANTS the Motion *in Limine* to Exclude Enola Falk and (2) DENIES the Motion in Limine to Exclude Beth Carpenter and Ann Kirk, but GRANTS Defendant leave to depose Carpenter and Kirk.

1997 WL 201568 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

COMMERCE FUNDING CORPORATION,
Plaintiff,
v.
COMPREHENSIVE HABILITATION
SERVICES, INC., et al., Defendants.

No. 01 Civ. 3796(PKL).

Sept. 3, 2004.

Harris Beach LLP, New York, New York, John W.
Clarke, Arent Fox Kintner Plotkin & Kahn, PLLC,
New York, New York, Jeffrey R. Ruggiero, for
Defendant/Cross-Claimant        Comprehensive
Habilitation Services, Inc.

Garfunkel, Wild & Travis, PC, Great Neck, New
York, Roy W. Breitenbach, Dennis H. McCoobery,
for Defendant/Cross-Claim Defendant St. Francis
Hospital.

*OPINION AND ORDER*

LEISURE, J.

**\*1** This action, originally brought by plaintiff
Commerce Funding Corporation upon an alleged
breach of a factoring agreement, has been trimmed
down by settlements and arbitration, such that only
cross-claims asserted by defendant Comprehensive
Habilitation Services ("CHS") against defendants
St. Francis Hospital ("St.Francis") and Staten Island
University Hospital ("Staten Island") remain
unresolved. CHS brings a breach of contract claim
against St. Francis that will be tried without a jury,
and a breach of contract claim against Staten Island
that will be tried before a jury.

With respect to St. Francis, CHS alleges that St.
Francis owes it $215,270.10 plus interest for
services it provided to St. Francis pursuant to a
Memorandum of Understanding between the two
parties dated February 19, 1999. St. Francis denies
the allegations. The Court has scheduled a bench
trial on CHS's claims against St. Francis to begin
September 13, 2004. CHS now makes two motions
*in limine* to exclude from evidence several
documents that St. Francis intends to offer at trial.
In its first motion *in limine* dated July 30, 2004,
CHS seeks to exclude documents that predate the
Memorandum of Understanding, and documents
related to a settlement between St. Francis and the
Attorney General's Office. In its second motion *in
limine* dated August 3, 2004, CHS seeks to exclude
a plea agreement reached in the case of *People v.
Comprehensive Clinical Center, Inc.* St. Francis
opposes CHS's motions. For the reasons set forth
below, the Court grants in part and denies in part
CHS's first motion *in limine,* and reserves judgment
until trial on CHS's second motion *in limine,* so that
the motion is placed in the appropriate factual
context.

Background

The following background information is derived
from the submissions of the parties in association
with the current motions and does not constitute
findings of fact.

I. *Factual Background*

During all relevant times, defendant St. Francis was
a hospital in Poughkeepsie, New York, that
provided a full range of health care services to the
mentally retarded and the developmentally disabled.
Cross-claimant CHS provided consultation and
administrative services to health providers. On May
25, 1995, CHS and St. Francis reached an
agreement (the "Contract"), by which CHS would
provide services such as occupational therapy,
physical therapy, and social work for St. Francis
and be compensated at a rate of $50 per hour.
(Contract (attached to CHS's July 30, 2004, Notice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

of Motion as Exhibit 1) ¶ 5 and Addendum.) The Contract includes several terms upon which the parties agreed, such as that CHS's services "shall only be provided upon obtaining all Federal, State, and local approvals including, without limitation, approvals of the New York State Department of Health and the New York State Department of Mental Hygiene." (Contract ¶ 5.) After the commencement of the Contract CHS provided services for St. Francis and issued invoices to St. Francis for payment.

*2 At some time after 1995, the Office of the Attorney General, Medicaid Fraud Control Unit ("Attorney General's Office") "conducted an audit of [clinics operated by St. Francis] and thereafter asserted, among other things, that: (a) the Clinics were neither authorized under, nor operated in accordance with, applicable New York State laws, rules and regulations; (b) [St. Francis] submitted improper claims for payment to Medicaid during the Service Period relating to the Clinics; and (c) [CHS's] relationship with [St. Francis] violated applicable New York State laws, rules and regulations." (February 6, 2002, Agreement and Settlement between St. Francis and Attorney General's Office ("February 2002 Settlement"), at 1.) In February 2002 St. Francis entered a settlement with the Attorney General's Office by which St. Francis expressly denied the allegations of the Attorney General's Office, but "in order to avoid the uncertainties, burdens and expenses of litigation," agreed to pay a $1 million settlement in the form of weekly withholdings by the State Department of Health of future Medicaid checks payable to St. Francis. (February 2002 Settlement, at 2-3.)

On February 19, 1999, apparently after the Attorney General's Office had commenced its investigation into the parties' performance under the Contract, and before St. Francis reached a settlement with the Attorney General's Office, CHS and St. Francis agreed to a Memorandum of Understanding. (Memorandum of Understanding (attached as Exhibit 2 to CHS's August 3, 2004, Notice of Motion).) In the Memorandum of Understanding the parties agreed to, among other things, the following terms:
  (1) The Contract is terminated, and the parties shall have no further obligations under the

Contract, except as expressly outlined herein.
  (2) *Payment and Holdback.* ... [St. Francis] shall pay certain invoices received by it from CHS for services rendered in connection with the Contract on the following schedule: $510,115 on or before February 26, 1999. Invoices 149 and 150 will be withheld as a holdback, and all other outstanding invoices will be paid in accordance with [St. Francis'] 90-day cycle.
  ....
  (4) *Continuity of Services.* CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates.
  ....
  (10) *Holdback of Monies--Attorney General--Department of Health Investigation.* CHS, and [St. Francis] acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract, and related issues.... In the event there is an immediate repayment required [by the Attorney General's Office], any outstanding invoices would be used as part of such a repayment plan.
*3 (Memorandum of Understanding ¶¶ 1, 2, 10 and attached Exhibit.)

After the parties agreed upon this Memorandum of Understanding, CHS continued to provide services and submit invoices to St. Francis. St. Francis received the services provided by CHS, but stopped making payments on the invoices.

II. *Procedural Background*

A. *CHS's Cross-Claim*

CHS brings the current cross-claim against St. Francis for breach of contract. CHS claims that St. Francis owes payment on seven invoices CHS issued for payment for services it rendered: Invoice Nos. 149, 150, 151, 152, 153, 154 and 155. Invoices 149 and 150 were issued for services rendered in January and February 1999, and are referenced in the Memorandum of Understanding. Invoices 151-155 were issued for services rendered

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

in February, March, April, and May 1999, and are not explicitly referenced in the Memorandum of Understanding. The parties agree that the claim to be resolved at the bench trial is a simple breach of contract claim for failure to pay these invoices. (*See* Affidavit of John W. Clarke in support of CHS's Motion *In Limine* To Exclude Various St. Francis Trial Exhibits ("Clarke Aff.") ¶ 2 ("In short, this is a garden variety collection case in which a debtor profited from the services of contractor and then defaulted on its contractual obligation of payment."); Memorandum of Law of St. Francis Opposing CHS's 8/3/04 Motion *In Limine,* at 1 ("This lawsuit is fundamentally a non-payment action.").)

CHS's position is that the Memorandum of Understanding governs all of the invoices, Nos. 149-155, and that payment is due on these invoices under the terms of the Memorandum of Understanding. With respect to Invoices 149 and 150 which are subject to "holdback" in the Memorandum of Understanding, CHS argues that monies owed by St. Francis to CHS for these invoices should not be applied to the settlement with the Attorney General because the "settlement was entered into without consultation with or agreement by CHS. Nothing in the [Settlement] alleges that CHS engaged in any impropriety or had responsibility for the alleged violations. In short, there is no link to any acts of CHS in connection with its performance of the Agreement with [St. Francis], and [St. Francis'] settlement with [the Attorney General's Office]." (Joint Pre-Trial Order, at 5.) CHS thus argues that payment for Invoices 149 and 150 is due. With respect to Invoices 151-155, CHS argues that paragraph four of the Memorandum of Understanding, titled *"Continuity of Services,"* governs these invoices. CHS thus argues that payment for Invoices 151-155, issued for services rendered after the parties signed the Memorandum of Understanding, is due.

St. Francis denies CHS's allegations of breach of contract. St. Francis' position is that the Memorandum of Understanding governs Invoices 149 and 150, and the Contract governs Invoices 151-155. With respect to Invoices 149 and 150, St. Francis argues that the Memorandum of Understanding provides that St. Francis may hold back payment on these invoices and apply it to its

Settlement with the Attorney General's Office. As the Settlement amount exceeds the amount of Invoices 149 and 150, St. Francis contends that under the terms of the Memorandum of Understanding it owes nothing to CHS for Invoices 149 and 150. With respect to Invoices 151-155, St. Francis argues that "those invoices are expressly not subject to the Memorandum of Understanding and, accordingly, are governed by the terms of the parties' original [Contract]." (Joint Pre-Trial Order, at 3.) St. Francis argues that CHS failed to perform its obligations under the Contract "to ensure compliance with all rules and regulations pertaining to the operation of the [St. Francis] Clinics; to market, implement and provide administrative services at Hospital operated Clinics; to obtain all Federal, State and local approvals of the New York State Department of Health and the New York State Department of Mental Hygiene relating to the operation of the clinics; and to comply with the contract's covenant of good faith and fair dealing." (Joint Pre-Trial Order, at 3 (internal quotations omitted).) St. Francis concludes that "the doctrine of prior material breach precludes CHS from collecting under Invoice Nos. 151, 152, 153, 154 and 155." (Joint Pre-Trial Order, at 3.)

### B. *CHS's Current Motions*

*4 CHS brings two motions *in limine* to exclude certain evidence that St. Francis intends to offer at trial. The Court takes up each motion in turn below.

### Discussion
### I. *Motion In Limine Standard*

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials); *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996); *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 283 (S.D.N.Y.1996). Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co.,* 937 F.Supp. at 287.

A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence. Fed.R.Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court...."). The court's ruling regarding a motion *in limine* is "subject to change when the case unfolds." *Luce,* 469 U.S. at 41. This opinion and order thus determines preliminarily whether the evidence challenged by CHS may be presented to the trier of fact. Once this Court makes a determination that certain forecasted evidence is admissible, it will, as the trier of fact, consider the weight and sufficiency of the evidence presented at trial. *See, e.g., In re Joint Eastern & Southern District Asbestos Litigation,* 52 F.3d 1124, 1132 (2d Cir.1995) (noting that once shaky, unreliable evidence is admitted, such evidence is best challenged with " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." ' (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993)).

II. *CHS's Motion To Exclude Documents that Predate the Memorandum of Understanding and Documents Related to St. Francis' Settlement with the Attorney General's Office*

CHS seeks to exclude several documents in its first motion *in limine,* dated July 30, 2004. The first set of documents are those that predate the Memorandum of Understanding. The second set are those related to St. Francis' Settlement with the Attorney General's Office. The Court takes up each of these sets of documents in turn.

A. *Documents that Predate the Memorandum of Understanding*

*5 CHS seeks to exclude St. Francis' proposed exhibits A, B, D, E, G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX on relevance grounds. [FN1] These exhibits are a variety of documents with a common trait: they all predate the Memorandum of Understanding, which the parties signed in February 1999. St. Francis seeks to admit these documents because its position is that the Contract, which predates most of these documents, governs the invoices at issue. The proposed exhibits, St. Francis argues, tend to show that CHS did not perform its obligations under the Contract. St. Francis thus opposes CHS's motion, but indicates either expressly or impliedly in its opposition papers that it does not seek to admit exhibits A, B, D, or E. [FN2]

> FN1. CHS also observes that Exhibits E, G, H, I, J, L, M, P, Q, R, and XX need to be authenticated before they can be admitted. The Court need not take up authenticity as a ground for excluding the proposed exhibits at this time. First, on the current record the proposed exhibits are irrelevant, thus their authenticity is moot. Second, CHS does not argue for the pretrial exclusion of documents on authenticity grounds, but simply notes that the challenged exhibits should be excluded if St. Francis fails to authenticate them. And third, questions about whether a document is authentic do not typically justify excluding the document in advance of trial, because authenticity can be easily established at trial. "Evidence sufficient to support a finding that the matter in question is what its proponent claims" satisfies Rule 901's requirement of authentication. Fed.R.Evid. 901(a). "Rule 901 does not erect a particularly high hurdle." *United States v. Dhinsa,* 243 F.3d 635, 658 (2d Cir.2001) (internal quotations omitted). "Testimony that a matter is what it is claimed to be," for example, sufficiently authenticates a document. Fed.R.Evid. 901(b)(1).

> FN2. Proposed exhibits A and B predate the Contract and thus appear irrelevant under any circumstances, and St. Francis does not indicate that it will seek

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

admission of these documents. St. Francis expressly withdraws proposed exhibits D and E from consideration, indicating that it will not seek to introduce these documents into evidence.

The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.1985). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401. While the Rules of Evidence apply with equal force in jury and non-jury trials, courts often apply the relevance standard with little rigor during a bench trial. The Second Circuit has noted that "ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records." *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir.1977) (Oakes, J.). While standards for admissible evidence are not "out the window entirely" in a bench trial, "all doubts at a bench trial should be resolved in favor of admissibility." *Dreyful Ashby, Inc. v. S/S "Rouen"*, 1989 WL 151685, at *2 (S.D.N.Y.1989) (Mukasey, J.). " 'In non-jury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence." ' *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 172 (3d Cir.1999) (quoting Wright and Miller, Federal Practice and Procedure, § 2885, at 454).

Here, St. Francis' proposed exhibits that predate the Memorandum of Understanding are irrelevant, such that admitting them even at a bench trial would contravene Rule 401 and serve no purpose. The Memorandum of Understanding states, "The Contract is terminated, and the parties shall have no further obligations under the Contract, except as expressly outlined herein." (Memorandum of Understanding ¶ 1.) It then explicitly references "outstanding invoices," including Invoices 149 and 150. (Memorandum of Understanding ¶ 2.) It then states that "CHS agrees ... that CHS will continue to provide and coordinate continuity of therapy services until (i) sufficient CHS therapists agree to become employed by [St. Francis] or (ii) [St. Francis] shall engage replacement services by other

therapists no later than March 30, 1999. During this transition period CHS shall bill [St. Francis] in the ordinary course of business at the current rates." (Memorandum of Understanding ¶ 4.) Invoices 151-155 were issued for services rendered by CHS during and beyond this "transition period," from February through April 1999. The Memorandum of Understanding unambiguously applies to all the invoices at issue in this case. Thus, documents that predate the Memorandum of Understanding do not tend to make the existence of any fact at issue more or less probable.

*6 St. Francis offers no support for its position that the Contract governs Invoices 151-155. It simply states first that "those invoices are expressly not subject to the Memorandum of Understanding," (Joint Pre-Trial Order, at 3.), and second that "[those invoices] are not set forth on Exhibit B and are ... neither covered nor controlled by the Memorandum of Understanding." (Memorandum of Law of St. Francis Opposing CHS's 7/30/04 Motion *In Limine*, at 2.) St. Francis then argues that "CHS, during the term of the parties' relationship, failed to comply with its contractual obligations," and seeks to admit the proposed exhibits as documentary evidence in support of this contention. (Joint Pre-Trial Order, at 3.) St. Francis' first statement is incorrect. The Memorandum of Understanding does not express that Invoices 151-155 are not governed by it. No clause of the Memorandum of Understanding "expressly" excludes invoices from its terms. St. Francis' second statement is partially correct. Invoices 151-155 are not set forth in Exhibit B attached to the Memorandum of Understanding. These invoices, however, were issued for services rendered *after* the parties signed the Memorandum of Understanding, during the transition period contemplated by paragraph four of the Memorandum of Understanding. The Memorandum of Understanding does not state that invoices not listed in Exhibit B, for future services performed, are not governed by this agreement. It in fact states the opposite, expressly terminating the Contract and providing for the payment of services during the transition period in paragraph four.

As St. Francis argues only that the proposed exhibits are relevant because the Contract governs Invoices 151-155, and its assertion that the Contract governs the Invoices finds no factual support, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. Although this Court will resolve relevance questions about evidence in favor of admissibility, the Court will not admit irrelevant documents simply because they are offered. Based on the current record these proposed exhibits will not be admitted at trial. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

B. *Documents Related to St. Francis' Settlement with the Attorney General*

CHS seeks to exclude St. Francis' proposed exhibit JJ, UU, and WW. These documents are an email related to St. Francis' Settlement with the Attorney General's Office, a letter related to the Settlement, and the Settlement itself. CHS contends that these documents are irrelevant. CHS's position is that the circumstances of the Settlement and the Settlement itself show that St. Francis' liability to the State cannot be attributed to CHS. Thus, CHS argues, under the terms of the Memorandum of Understanding, St. Francis had no contractual right to withhold payment owed to CHS and apply the payments to the Settlement. St. Francis responds that the terms of the Memorandum of Understanding permit it to apply monies owed to CHS to the Settlement with the Attorney General's Office.

*7 The Court finds on the current record that the Settlement and related documents are relevant. Paragraph 10 of the Memorandum of Understanding provides that the parties "acknowledge that there is an ongoing inquiry concerning the parties' performance under the Contract.... To the extent that a long term payment plan is offered [by the Attorney General's Office as a settlement], the parties hereto shall cooperate in good faith to quantify the liability and reach a suitable repayment agreement. In the event there is an immediate repayment required, any outstanding invoices would be used as part of such a repayment plan." (Memorandum of Understanding ¶ 10.) The Memorandum of Understanding thus expressly references a potential settlement with the Attorney General's Office, and contemplates that the parties' contractual obligations may be affected by the terms of the Settlement. The Settlement Agreement (Exh.

WW) and related emails and letters (Exhs.JJ, UU) are relevant to show whether and how the parties' obligations under the Memorandum of Understanding were impacted by St. Francis' Settlement with the Attorney General's Office.

Based on the current record the Court denies CHS's motion to exclude proposed exhibits JJ, UU, and WW, as these documents are relevant. The Court's ruling under Rule 104 is a preliminary one that is subject to change as the case unfolds.

III. *CHS's Motion To Exclude the Superior Court Information in the Case of People v. Comprehensive Clinical Center, Inc.*

CHS moves to exclude St. Francis' proposed exhibit VV, a Superior Court Information containing a plea agreement between Comprehensive Clinical Center, Inc. ("CCC") and the Attorney General of the State of New York ("Attorney General"), dated April 9, 2001, relating to the action *People v. Comprehensive Clinical Center, Inc.* [FN3] CHS argues that the plea agreement is irrelevant, that its prejudice substantially outweighs its probity, and that it is not properly admitted as character evidence.

> FN3. CHS also moves to exclude St. Francis' proposed exhibits ZZ and AAA, documents from websites of Health and Human Services and the New York State Department of Health, respectively. Upon CHS's motion St. Francis has withdrawn these proposed exhibits and agrees not to seek to introduce them into evidence in its case-in-chief.

According to CHS, CCC is a corporation that operated clinics providing psychological and other services. Its president and sole shareholder was Dr. Peter Magaro. Magaro also is the president and chief executive officer of CHS, and he signed the Memorandum of Understanding with St. Francis on behalf of CHS. The Attorney General criminally prosecuted Magaro's company, CCC, as part of an investigation similar to that of St. Francis which resulted in the Settlement discussed above. The prosecution of CCC resulted in a plea agreement by which CCC as a company pleaded to grand larceny for Medicaid fraud. The plea agreement includes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1970144 (S.D.N.Y.)
(Cite as: 2004 WL 1970144 (S.D.N.Y.))

Page 7

the following: "The plea of guilty to the Superior Court Information will cover Peter A. Magaro, his immediate family and the corporations which he controls, either *de facto* or *de jure*, including [CHS]." (CHS's Notice of Motion, Exh. C ¶ 3.) St. Francis intends to offer the plea agreement as proposed exhibit VV at trial. St. Francis' takes the position that the guilty plea of CCC, a company owned by Magaro, tends to show that CHS, another company run by Magaro, was responsible for the Medicaid violations for which St. Francis settled with the Attorney General's Office. St. Francis argues that the plea agreement shows that CHS did not meet the contractual obligations it owed to St. Francis, namely, its obligations "to ensure compliance with all rules and regulations pertaining to the operation of [St. Francis] Clinics," and to obtain "all Federal, State and local approvals of the New York State Department of Health an the New York State Department of Mental Hygiene" relating to the operation of the clinics. (Contract ¶¶ 5, 6.)

*8 The Court finds on the current record that granting or denying CHS's motion to exclude proposed exhibit VV would be premature, and reserves judgment until trial so that the motion is placed in the appropriate factual context. The plea agreement's relevance depends upon an inference that appears tenuous on the current record, namely, that the prosecution of CCC tends to show that CHS did not perform its contractual obligations with St. Francis. The Court has little information at this time to rule on the propriety of this inference and evidence offered upon it. The scope of the plea agreement, which purports to "cover" CHS, is unclear. Magaro's role in CCC, and more importantly in CHS and in fulfilling CHS's contractual obligations to St. Francis, is unclear. The sparse record currently includes too little information for the Court to rule on the admissibility of the plea agreement. The relevance and/or prejudice of the plea agreement will be better determined at trial, once the parties have developed the factual background of the case and once St. Francis has endeavored to lay a foundation for the plea agreement. The Court therefore reserves judgment on proposed exhibit VV.

Conclusion

For the reasons set forth above, the Court grants in

part and denies in part CHS's first motion *in limine,* and reserves judgment until trial on CHS's second motion *in limine,* so that the motion is placed in the appropriate factual context. The Court finds on the current record that St. Francis' proposed exhibits G, H, I, J, L, M, N, O, P, Q, R, S, T, V, W, Y, and XX are irrelevant. The Court finds that St. Francis' proposed exhibits JJ, UU, and WW are relevant. The Court reserves judgment on St. Francis' proposed exhibit VV until trial. Each of these preliminary rulings, made under Rule 104 of the Federal Rules of Evidence, is subject to change as the case unfolds.

SO ORDERED.

2004 WL 1970144 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:01CV03796 (Docket)

(May. 03, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1997 WL 598586
1997 WL 598586 (S.D.N.Y.)
(Cite as: 1997 WL 598586 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Karla Beth KUDATZKY, Plaintiff,
v.
The GALBREATH COMPANY,
Galbreath/Riverbank, L.P., Peter E. Ricker, Sr.,
Martin
Winkelman, William Nikolis, Realty Credit
Corporation, FGP 90 West Street, Inc.
and FGH Realty Credit Corp., and Aegon, USA,
Ageon, N.V., Defendants.

No. 96 Civ. 2693(HB).

Sept. 23, 1997.

Brian D. Graifman, Neil D. Grossman, Lawrence B. Goodman, Caro & Graifman, P.C., New York, NY, for Karla B. Kudatzky.

Joseph W. Muccia, Marc J. Gottrodge, Donna M. Gitter, Corbin, Silverman & Sanseverino, LLP, New York, NY, for Galbreath Co, Galbreath-Riverbank L.P., Peter E. Ricker, Sr., and Martin Winkelman.

Joseph E. Gulmi, James J. Cutro, Richards & O'Neil, LLP, New York, NY, for FGP 90 West Street, Inc, FGH Realty Credit Corp.

Eric J. Wallach, Heidi Lichthardt, Mark E. Greenfield, Rosenman & Colin, LLP, for Aegon USA.

OPINION AND ORDER

BAER, J.

**\*1** Plaintiff's complaint alleges violations of Title VII due to sexual harassment, sex discrimination, and retaliatory discharge, as well as a panoply of state law claims. Defendants move for summary judgment on all claims. [FN1] Plaintiff moves to strike the motions and answer of The Galbreath Company, Galbreath Riverbank, L.P., Peter E. Ricker, Sr., and Martin Winkelman (the "Galbreath Defendants") in the alternative, plaintiff seeks an adverse inference charge based on their alleged intentional document spoilation. For the reasons stated below, defendants' motion is granted in part and denied in part, while plaintiff's motion is denied in its entirety.

> FN1. Defendants first moved to dismiss plaintiff's claims and then moved for summary judgment. The court considers the arguments in both motions and treats them combined as one for summary judgment.

*I. Background*

Plaintiff, Karla Beth Kudatzky, is a licensed real estate salesperson. In June or July of 1991 she approached members of the management of The Galbreath Company ("Galbreath"), a real estate brokerage firm, and proposed that Galbreath seek to obtain the assignment to manage an office building at 90 West Street in Manhattan (the "Building" or "90 West Street"), and that plaintiff be employed as the on-sight manager and leasing agent. The Building had just been purchased by defendant FGP 90 West Street Inc ., a subsidiary of defendant FGH Realty Credit Corp. ("FGH"), which is a subsidiary of defendants Aegon U.S.A. and Aegon N.V. [FN2] . On July 19, 1991, plaintiff sent a memorandum letter to defendant Peter E. Ricker ("Ricker"), who was Galbreath's new president, which recited some terms of their agreement but stated that the remainder of the agreement "would have to be outlined in specificity" and "mutually agreed upon" at a later date. As requested, Ricker countersigned the bottom of this letter. On August 28, 1991, plaintiff sent another letter to Ricker which proposed that if Galbreath obtained the management business from FGH, then plaintiff would be employed for the "life of th[at] agency." Ricker did not countersign that letter.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN2. Plaintiff claims that she obtained the FGH account for Galbreath, while Galbreath contends that it was through its own contacts that the FGH account was acquired.

October 28, 1991, Galbreath and plaintiff entered into an employment agreement whereby plaintiff would receive an annual salary of $50,000 plus commission and benefits for her duties as the on-site building manager. Plaintiff alleges that she performed her job satisfactorily and claims that during her tenure, the building raised occupancy rose from 40% to 78%. In August 1994 she received a positive review and a raise.

Plaintiff claims that while working at the Building, she was subjected to unwanted and degrading sexual remarks by defendant William Nikolis, who was during the relevant period Vice President of FGH. Plaintiff alleges that some of these remarks were made in the presence of defendant Martin Winkelman, who was during the relevant period a senior managing director of Galbreath. Additionally, plaintiff alleges she was excluded by the individual defendants from meetings, management discussions and decision making. Plaintiff was fired in October 1994 and she claims it was as a consequence of her refusal to acquiesce to Nikolis' sexual blandishments and of her refusal to become engaged in an alleged illegal "kickback" scheme whereby the FGH Defendants and the Galbreath Defendants pressured her to, among other things, approve change orders for unnecessary work.

*2 Plaintiff claims that her discharge was part of a "surprise confrontation" where defendant Ricker gave her the option of dismissal or resignation. She alleges that Ricker sequestered her in his office and refused to allow her to leave by, among other things, physical intimidation. Plaintiff also alleges that she was locked out of her office. Lastly plaintiff alleges that Galbreath filled plaintiff's position with a male employee who was not qualified for the position. Defendants, for their part, deny that any sexual harassment occurred and contend that plaintiff was fired not in retaliation for her failure to acquiesce to Nikolis' sexual advances or defendants' illegal kickback schemes, but instead because plaintiff misappropriated reimbursement checks that she received from Galbreath for

allegedly business-related cellular phone calls.

After plaintiff filed a claim with the EEOC on December 14, 1994 and a right to sue letter was issued, this lawsuit ensued.

II. *Discussion*
A. *Motion for Summary Judgment by the RCC Defendants and Aegon U.S.A.*

Defendants FGP 90 West Street, Inc., FGH, and Realty Credit Corp. ("RCC"), the successor corporation to FGH (together, the "RCC Defendants"), and Aegon U.S.A. move for summary judgment and argue that because they were not named as respondents in plaintiff's EEOC complaint plaintiff cannot properly bring a cause of action against them. Plaintiff objects and argues that because these defendants were named in the body of the complaint, she is not barred from bringing suit against them. Plaintiff only named Galbreath as a respondent in her EEOC complaint.

The general rule in this district is that the court only has subject matter jurisdiction over actions against those individuals named as respondents in an EEOC charge. *Bridges v. Eastman Kodak Co.,* 822 F.Supp. 1020, 1023 (S.D.N.Y.1993). However, the "identity of interest" exception to this rule provides that a court may assert jurisdiction over an unnamed party if it has an identity of interest with the named party. This reasonable exception arose because EEOC charges "generally are filed by parties not versed in the vagaries of Title VII." *Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir.1991). To determine whether there is an identity of interest between the named and unnamed party, the court must consider four factors: (1) whether the role of the unnamed party was known to plaintiff at the time of filing the EEOC charge; (2) whether the interests of the named party are so similar to the unnamed party's "that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings"; (3) whether the unnamed party's absence from the EEOC proceedings resulted in actual prejudice to it; and (4) "whether the unnamed party has in some way represented to the [plaintiff] that its relationship with the [plaintiff] is to be through the named party." *Id.* This exception applies only where a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

plaintiff was not represented by counsel when she filed her EEOC charge. *Tarr v. CreditSuisse Asset Management*, 958 F.Supp. 785, 794 (E.D.N.Y.1997) (citing *Sharkey v. Lasmo*, 906 F.Supp. 949,954 (S.D.N.Y.1995)).

*3 Here, plaintiff admits that she was represented by counsel when she filed her EEOC charge. Kudatzky Dep. at 7-8. Indeed, she stated that she hired a law firm for the specific purpose of filing her EEOC charge. *Id.* Consequently, leaving aside the fact, as noted below, that the four part test would be determinative against plaintiff, since plaintiff was represented by counsel, the identity of interest exception is inapplicable to her and this court has no jurisdiction over the RCC Defendants and Aegon U.S.A., *See Tarr*, 958 F.Supp. at 794.

First, plaintiff clearly knew the RCC Defendants's and Aegon's names and identities. Indeed, she alleges that she introduced Galbreath to these parties. Second, the interests of Galbreath on the one hand and the RCC Defendants and Aegon U.S.A. on the other cannot be said to be similar for the purposes of obtaining voluntary conciliation and compliance. They are separate entities. *See Johnson v. District Council*, 1995 WL 567426 at *3 (S.D.N.Y. Sept.25, 1995). Furthermore, Galbreath did not have the authority to settle disputes for these defendants. As to the third part of the test, plaintiff argues that defendants cannot show actual prejudice because the EEOC proceedings were perfunctory. However, as these defendants point out, if RCC or Aegon had been named, the investigation may not have been perfunctory and "might have ... result[ed] in a termination of the charges" against them. *Johnson v. Palma*, 931 F.3d at 210; *see also, Smith v. Local Union 28*, 877 F.Supp. 165, 173 (S.D.N.Y.1995). Lastly, plaintiff does not claim that the RCC Defendants or Aegon U.S.A. indicated that their interests were represented by Galbreath. Indeed, she claims instead that the RCC Defendants and Aegon U.S.A. dealt with plaintiff separately. Each factor weighs against finding that RCC and Aegon had an identity of interest with Galbreath.

Consequently, because plaintiff failed to name the RCC Defendants and Aegon U.S.A. as respondents in her EEOC complaint, while represented by experienced counsel, and because there is no identity of interest between the named and unnamed

parties, plaintiff's Title VII claims against the RCC Defendants and Aegon U.S.A. must be dismissed.

*B. Galbreath's Motion for Summary Judgment On Claim of Sexual Harassment* [FN3]

> FN3. Plaintiff concedes that none of her Title VII claims are viable as against individuals that are named as defendants. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995). Plaintiff also concedes that to the extent her complaint may be read to include a cause of action pursuant to 42 U.S.C. § 1981, such claim is not viable because § 1981 only applies to cases of race discrimination. *See Bloomfield v. Banco Bilbao Vizcaya, S.A.*, 1995 WL 49269 (S.D.N.Y. Feb.8, 1995).

Galbreath argues that plaintiff's sexual harassment claim must be dismissed because: (1) she has failed to allege facts that establish the existence of a hostile work environment; (2) Galbreath cannot be liable as a matter of law for the acts of defendant Nikolis, a non-employee and (3) plaintiff's claims are time-barred. For the reasons stated below, I find that these arguments lack merit.

**1. Hostile Work Environment**

In order for a plaintiff to prevail on a hostile work environment claim, she must show "(1) that her workplace was permeated with discriminatory intimidation ... sufficiently severe or pervasive to alter the conditions of her employment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996). In determining whether or not a hostile work environment exists, the court should consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or whether a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Isolated incidents will not merit relief. *Kotcher v. Rosa and Sullivan Appliance Center*, 957 F.2d 59, 62 (2d Cir.1992).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*4 Here, plaintiff alleges that defendant Nikolis made sexual remarks to her "more than 10 and less than 20" times during business meetings. Kudatzky Dep. at 445. She alleges that when she asked for a raise, he "asked [her] out." *Id.* at 459. Plaintiff also claims that Nikolis made references to sado-masochistic behavior and repeatedly asked plaintiff about her boyfriends and "what she liked to do with them." *Id.* at 85, 458. Finally, plaintiff alleges that Nikolis kissed her twice at a business-related Christmas party. *Id.* at 420-21. Allegations similar to these have passed muster to defeat summary judgment. *Kotcher,* 957 F.2d at 61-3. On balance, I find that a reasonable jury could conclude that Nikolis' comments permeated plaintiff's workplace with discriminatory intimidation sufficiently severe to alter the conditions of her work environment.

### 2. Galbreath's Liability for Acts of Non-Employees

According to the EEOC Guidelines, "[a]n employer may also be responsible for the acts of non-employees, with respect to sexual harassment in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate or appropriate corrective action." 29 C.F.R. § 1604.11(e). In determining whether to impose liability the court should consider "the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." *Id.* While these Guidelines are not controlling, they represent a body of experience to which the courts may resort for guidance. *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141-42, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). And although the general view is that employers cannot be held liable for harassment that occurs outside of the workplace, *see Whitaker v. Carney,* 778 F.2d 216, 221 (5th Cir.1985), it is increasingly recognized that employers may be liable for harassment committed by nonemployees in the workplace where the employer knows of the harassment but fails to act. *See Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024, 1027 (D. Nevada 1992). Indeed, the Ninth Circuit recently held that "an employer may be liable for sexual harassment on the part of a private individual ... where the employer either ratifies or acquiesces in

the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enterprises, Inc.,* 107 F.3d 754, 756 (9th Cir.1997); *see also Woods-Pirozzi v. Nabisco Foods,* 29 N.J.Super. 252, 268-69 (App.Div.1996) (holding that an employer can be liable for sexual harassment by an independent contractor). In reaching this conclusion, I am mindful "that while the harasser may not be an employee, the victim is ... [[and] an employer that knows or should know its employee is being harassed *in the workplace,* regardless of by whom, should take appropriate action." *Woods-Pirozzi,* 290 N.J.Super. at 269, 675 A.2d 684 (emphasis added).

*5 Here, plaintiff has alleged that she complained to Winkelman and Ricker on numerous occasions about Nikolis' behavior to no avail. Galbreath argues that because the alleged conduct occurred outside of Galbreath's offices it should not be held liable. *See Rothman v.. The Halstead Property,* Index No. 129483/95 (N.Y.S.Ct. June 25, 1996). However, Title VII is designed to protect against sexual harassment in the workplace--not only in the defendant's workplace, but in the workplace of its employees. Where, as here, defendant requires that an employee work at a cite other than the defendant's corporate offices it would defeat the purpose of Title VII to absolve defendant of liability under the statute simply because its employee's work cite is different than the defendant's. Furthermore, in terms of Galbreath's control over Nikolis, Nikolis was the President of FGH and was Galbreath's client; Galbreath, much like a casino owner or the employer of an independent contractor, could have deterred Nikolis and his alleged sexual harassment of plaintiff. *See Powell,* 841 F.Supp. at 1030; *Woods-Pirozzi;* 290 N.J.Super. at 273, 675 A.2d 684. Therefore, because I find that an employer can be liable for the sexual harassment by a non-employee and because I find that an issue of fact exists as to whether or not Galbreath is liable here, Galbreath's motion for summary judgment on this ground must be denied.

### 3. Statute of Limitations

In New York, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *See 42*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

U.S.C. § 2000e-5(e)(1); *Van Zandt,* 80, F.3d at 712. Where "plaintiff experiences a continuous practice and policy of discrimination, however, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson,* 23 F.3d 694, 703-04 (2d Cir.1994) (internal quotation marks and citation omitted). In this Circuit, a continuing violation exists where "there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests ... [or where the defendant] allow[s] related incidents of discrimination ... to continue unremedied for so long as to amount to a discriminatory practice or policy." *Van Zandt,* 80 F.3d at 713 (citation omitted). Moreover, "[b]y its nature, a claim of 'hostile environment' discrimination turns on the existence of a continuing violation, rather than on any individual offensive act." *Engelmann v. National Broadcasting Co.,* 1996 WL 76107 at *15 (S.D.N.Y. Feb.22, 1996).

Here, plaintiff filed her EEOC complaint on December 14, 1994, and therefore the alleged sexual harassment must have occurred after February 17, 1994. Plaintiff alleges that much of the alleged sexual harassment occurred at meetings in 1993. The Galbreath defendants contend that Nikolis stopped attending these meetings in 1993. However, at plaintiff's deposition she testified that at least some of Nikolis' harassment occurred when a certain Jean Johnstone worked at Galbreath. Kudatzky Dep. at 1252. Ms. Johnstone began to work at Galbreath in August 1994, so at least some of the alleged harassment occurred in August 1994, within the statutory time period. Furthermore, while "discrete incidents of discrimination" will ordinarily not amount to a continuing violation, *Van Zandt,* 80 F .3d at 708, plaintiff here has alleged that she reported Nikolis' behavior to her superiors at Galbreath, and that some of the alleged harassment occurred in front of defendant Winkelman, a senior managing director of Galbreath, and was not addressed to say nothing of corrected. Therefore, viewing the evidence in the light most favorable to plaintiff, I find that plaintiff has established a continuing violation by virtue of the fact that the alleged harassment continued for long enough to amount to a discriminatory policy on the part of Galbreath and that at least some of the acts that constituted such violation occurred within the

limitations period. Accordingly, plaintiff's sexual harassment claim is not time barred.

*C. Galbreath's Motion for Summary Judgment as to Plaintiff's Sex Discrimination Claim*

**\*6** Galbreath advances several grounds for summary judgment on the sex discrimination claim with respect to jurisdiction. The law is clear that district courts have jurisdiction in Title VII cases only over such claims that are either included in the plaintiff's EEOC charge or are based on conduct that is reasonably related to them. *Cruz v. Ecolab Pest Elimination Division,* 817 F.Supp. 388, 391 (S.D.N.Y.1993). Three types of "reasonably related" claims are recognized in this Circuit, including those where "the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' " *Butts v. Dept. of Housing,* 990 F.2d 1397, 1402 (2d Cir.1993) (citation omitted). Although this rule, like the identity of interest exception discussed above, is based on a loose pleading standard in recognition that those who fill out EEOC charges frequently do so without counsel, there appears to be no prerequisite that plaintiff not have counsel to benefit from this rule.

Nonetheless, plaintiff's sex discrimination claim must fail because plaintiff is unable to establish a genuine issue of fact that sex was a motivating factor in defendants' decision to terminate her employment.

By now, the burden shifting analysis for Title VII cases that was first articulated by *McDonnell Douglas Corp. v. Green* is familiar. 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is well known. The plaintiff must first establish a *prima facie* case of sex discrimination by proving that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she was terminated; and (4) that such termination occurred under circumstances that give rise to an inference of discrimination. *See Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Casanova v. General Mills Restaurants, Inc.,* 1997 WL 473840 at *2 (S.D.N.Y. Aug.15, 1997)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1997 WL 598586
1997 WL 598586 (S.D.N.Y.)
(Cite as: 1997 WL 598586 (S.D.N.Y.))

Page 6

(internal quotation marks and citation omitted).

Once plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Chertkova v. Connecticut Life Ins.*, 92 F.3d 81, 87 (2d Cir.1996). Once the defendant has shouldered this burden, the Second Circuit has recently stated that the burden shifts back to plaintiff to prove that an impermissible factor, such as sex, motivated the employment decision. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir.1997).

Plaintiff has satisfied the first three elements of her prima facie case. Although defendant argues that she was not qualified for the job because of her alleged nonpayment of cellular phone bills and fraudulently procured reimbursement checks, "reliance on the behavior incidents cited to justify her termination fails to undercut a finding of qualification to perform the substantive aspects of her job." *Casanova*, 1997 WL 473840 at \*4. As to the last element, plaintiff has established (albeit marginally) the requisite inference of discrimination. She alleges that shortly after complaining to defendants about Nikolis' sexual harassment and about requests she had received to participate in "illegal and unethical activities" that she implies were being perpetrated by members of the "good-old boy network" insist at Galbreath, Comp. ¶¶ 34, 39, she was fired without warning and replaced by a man with less experience. Comp. ¶ 44.

\*7 Defendants, for their part, have articulated a legitimate non-discriminatory reason for plaintiff's termination. They allege that plaintiff submitted reimbursement requests for her Cellular One portable phone account for certain business calls, but in fact these reimbursement requests included personal calls. In addition, they claim that plaintiff did not use these checks to pay her Celluar One account, but instead pocketed the money. Consequently, the Cellular One account was in arrears. In late September, 1994, when Galbreath contacted Cellular One to open another account for a customer, they were told that they would be unable to do so until Kudatzky's account was paid in full. Affidavit of Elliot Kosoffsky ¶ 3.

Defendants allege they uncovered plaintiff's fraud upon further investigation, confronted plaintiff, and gave her the option of resigning or being terminated.

Plaintiff, who is marginally able to meet the standard for a *prima facie* case, fails to raise a triable issue of fact as to whether her gender was a motivating factor or contributed to defendants' decision to terminate her. Her proof consists of her vague allegations that to be part of the "good-old boy" network she was expected to participate in an illegal kickback scheme. Furthermore, plaintiff's claims in her complaint that she was excluded from golf games and telephone discussion is belied by her deposition testimony in which she concedes that she could not specify any telephone discussion from which she was excluded and admits that she does not play golf. Kudatzky Dep. at 482-83; 480-82. Also, plaintiff's claim that she was replaced by a man does not sustain her burden. *See Sassower v. City of White Plains*, 742 F.Supp. 151, 157 (S.D.N.Y.1990). Furthermore, while plaintiff contends that the man she was replaced with had less experience than her, defendants contend that they offered the job to a woman first and that the man who replaced her was paid a salary much less than hers. Where, as here, plaintiff has marginally established a *prima facie* case, and where she has come forward with nothing more than conclusory allegations, she has not raised a genuine issue of material fact that sex played a motivating factor in defendants' decision to terminate her. *See Mieri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Consequently, plaintiff's claim for discriminatory discharge based on her sex must be dismissed.

*D. Galbreath's Motion for Summary Judgment as to Plaintiff's Retaliatory Discharge Claim*

The burden shifting analysis discussed above also applies to plaintiff's claim for retaliatory discharge. To establish a *prima facie* case of retaliatory discharge plaintiff must establish that: (1) she participated in a protected activity; (2) the defendant was aware of this activity; (3) that the plaintiff suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Here, plaintiff has established a *prima facie* case (again marginally) because she alleges that she complained to defendants about Nikolis' behavior

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

and she made the Galbreath defendants aware of the fact that she was asked to participate in an illegal kickback scheme. Comp. ¶ 42. Defendants' argument that this does not amount to a protected activity is simply incorrect. *See Iannone v. Frederic R. Harris. Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996) (protected activity includes registering a complaint, which "need not be a formal claim filed with a court; ... it may simply be an objection voiced to the employer").

**\*8** However, for the same reasons as stated above in Section C, plaintiff's claim for retaliatory discharge fails because she has failed to establish that a genuine issue of material fact exists as to whether or not a retaliatory motive played a role in defendants' decision to terminate plaintiff. She offers nothing more than conclusory allegations that she was fired because she "refused to get involved with Nikolis sexually," Kudatzky Aff. ¶ 34, and because she was not a part of the "good old boy" network. Accordingly, plaintiff's claim for retaliatory discharge must be dismissed.

*E. Plaintiff's State Law Claims*

Plaintiff also alleges thirteen state law causes of action: (1) sexual discrimination under New York Executive Law; (2) wrongful discharge; (3) breach of contract; (4) breach of implied covenant of good faith and fair dealing; (5) promissory estoppel; (6) wage law violations; (7) quantum meruit; (8) unjust enrichment; (9) breach of fiduciary duty; (10) tortious interference with contract; (11) unlawful imprisonment; (12) intentional infliction of emotional distress; and (13) negligence. [FN4]

> FN4. Plaintiff had also alleged a claim for prima facie tort, but has withdrawn that claim.

A district court may exercise supplemental jurisdiction over state law claims when they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a)(1). In order for the federal and state claims to be considered part of the same case or controversy, they must derive from a common nucleus of operative fact. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16

L.Ed.2d 218 (1966).

Having dismissed plaintiff's discriminatory discharge and retaliatory discharge claims, the only claim over which this court has original jurisdiction is plaintiff's sexual harassment claim. Because plaintiff's state law claims arise out of the same facts as plaintiff's sexual harassment claim and because their dismissal would result in duplicative litigation, *see Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 680 (S.D.N.Y.1995), I will exercise supplemental jurisdiction over them. I address each of plaintiff's claims below.

**1. Discrimination Under New York Executive Law (Fourth Cause of Action)**

Plaintiff brings a cause of action under New York State Executive Law § 296, which prohibits an employer from discriminating against an employee on the basis of her sex. N.Y.Exec.Law § 296(1)(a). Since the same analysis that is used to determine the sufficiency of Title VII claims is also applied to these claims, plaintiff's claims for sex discrimination and retaliatory discharge, but not her claim for sexual harassment, are dismissed. *See Boyce v. New York City Mission Society,* 963 F.Supp. 290, 295 (S.D.N.Y.1997). Furthermore, plaintiff's claim for sexual harassment pursuant to § 296 is viable against individuals named as defendants. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995).

**2. Wrongful Discharge (Fifth Cause of Action) and Breach of Contract (Sixth Cause of Action)**

**\*9** In order to determine whether a parties' preliminary agreement is binding, the court must determine whether or not those parties intended to be bound by analyzing: "(1) the language of the agreement; (2) the context of negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transaction." *Arcadian Phosphates Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) (citing *Teachers Ins. & Annuity Assn. v. Tribune,* 670 F.Supp. 491, 499-503 (S.D.N.Y.1987)).

Plaintiff bases many of her state law claims on a "June Agreement" entered into by the parties, which

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

actually refers to the July 19, 1991 letter signed by both plaintiff and defendant Ricker. The letter's language, however, indicates that the parties did not intend to be bound by their agreement, but instead indicates that the letter is an unenforceable agreement to agree. See *Lieberman v. Good Stuff Corp.,* 1995 WL 600864 *3 (S.D.N.Y. Oct.11, 1995). Perhaps most important is that the parties expressly stated that the "[t]erms and conditions [of their agreement] would be mutually agreed upon," thereby leaving open the material terms of their agreement. Muccia Aff.Ex. 3. Because price is "an essential ingredient of every contract for the rendering of services, the absence of such term renders the understanding as an unenforceable agreement to agree." *Cooper Square Realty Inc. v. A.R.S. Management, Ltd.,* 181 A.D.2d 551, 581 N.Y.S.2d 50, 51 (App.Div.1992); *cf. Phil Kriegel Assocs. Inc. v. M. Lahm Knitting Mills, Inc.,* 179 A.D.2d 539, 579 N.Y.S.2d 44, 45 (App.Div.1992). Furthermore, the parties did not use language that implied a "firm commitment" or "binding agreement." *Arcadian Phosphates,* 884 F.2d at 73.

It should also be noted that plaintiff herself stated that the October and November 1991 employment agreements "outlined my agreement with The Galbreath Company concerning [90 West Street] ." Kudatzky Aff.Ex. A. Conspicuously, she does not even refer to the allegedly binding agreement entered into by the parties by virtue of the July, 1991 letter. *See also* Kudatzky Dep. at 811. Finally, plaintiff testified at her deposition that she understood the July leper was an "agreement to enter into another agreement." Kudatzky Dep. at 326. Consequently, the July 19, 1991 letter is an unenforceable agreement to agree and the October 28, 1991 and the November 1991 amendment to that agreement (the "employment agreement") constitute the enforceable agreement between the parties.

With this in mind, I now turn to plaintiff's claim for wrongful discharge. In New York, an employee is an at-will employee absent an employment contract that specifically restricts an employer's right to discharge an employee. *See Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 304-05, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Furthermore, an employee is also considered at-will unless there is a definite period of employment

clearly specified in a contract. *Id.* at 300-1, 461 N.Y.S.2d 232, 448 N.E.2d 86. As plaintiff concedes, an at-will employee may be fired "at any time for any reason or even for no reason." *Id.*

*10 Plaintiff's wrongful discharge claim centers around her allegation that she was fired for failing to participate in the defendants' alleged illegal "kickback" scheme. The employment agreement does not limit Galbreath's ability to fire plaintiff; nor does it specify that plaintiff was to be employed for a definite amount of time. Consequently, plaintiff is an at-will employee, subject to discharge for any reason. *Id.* Therefore plaintiff's claim for wrongful discharge must be dismissed.

Plaintiff also alleges that defendants breached their contract because they have failed to pay plaintiff commissions due under the employment agreement for her procurement of the management agreement for 90 West Street. Defendants contend that they do not owe plaintiff any money because the employment agreement only provides for commissions to be paid to plaintiff for any "new" management agreements that she procures, the 90 West Street management agreement was not "new" when the parties signed the employment agreement and that plaintiff, in any event, did not "procure" the 90 West Street agreement. However, I find that plaintiff has raised an issue of fact with respect to whether or not 90 West Street was a "new" management agreement and whether or not plaintiff procured such agreement. Therefore, defendants' motion for summary judgment as to plaintiff's breach of contract claim is denied.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing (Seventh Cause of Action)

"It is well-settled ... that an implied covenant of good faith does not attach to employment contracts governed by New York law." *Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358, 1367 (S.D.N.Y.1995). Because the only enforceable contract at issue here is the employment agreement, this claim must be dismissed as a matter of law.

### 4. Promissory Estoppel (Eighth Cause of Action)

Plaintiff alleges in her complaint:
   Galbreath represented to plaintiff that she was to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

participate as a principal in Galbreath's management and leasing of the Property, would be the on-site management/leasing agent for the life the [sic] FGH/Galbreath contract and any extensions thereof, an [sic] would be paid a stated remuneration....

Plaintiff claims that she relied on those representations to her detriment and has been damaged. Comp. ¶ 82. In New York a cause of action for promissory estoppel may lie "where there is 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.' " *Totalplan Corp. of America v. Colborne,* 14 F.3d 824, 833 (2d Cir .1994) (citation omitted). Plaintiff's promissory estoppel claim fails for proof that the Galbreath Defendants made a clear and unambiguous promise. Although the promises that plaintiff alleges in ¶ 82 of her complaint were part of the July 19, 1991 unenforceable agreement to agree and plaintiff's subsequent proposals, the parties never agreed to these terms. Consequently, plaintiff's claim must be dismissed. *See id.* (holding that there is no cause of action for promissory estoppel where rights plaintiff sought to enforce were proposed only in draft agreements).

### 5. Wage Law Violations (Ninth Cause of Action)

*11 A plaintiff is entitled to relief under New York Labor Law § 190 *et seq.* only if plaintiff has a contractual right to such wages. *Cf. Pashaian v. Eccelston Props. Ltd.,* 1993 WL 322835 at *2 (S.D.N.Y. Aug.16, 1993). Because plaintiff has raised a genuine issue of material fact as to whether or not she is entitled to commissions under the employment agreement, *see* Part E.1, *supra,* I find that plaintiff has similarly raised an issue of fact as to whether or not defendants violated New York's wage laws. Defendants' motion for summary judgment as to this claim is therefore denied.

### 6. Quantum Meruit (Tenth Cause of Action)

In New York, a plaintiff cannot state a cause of action for quantum meruit where there is a written employment agreement already in place. *See Zolotar v. New York Life Ins. Co.,* 172 A.D.2d 27, 576 N.Y.S.2d 850 (App.Div.1991). As discussed

above, the parties entered into a viable employment contract on October 28, 1991. Consequently, plaintiff's tenth cause of action must be dismissed.

### 7. Unjust Enrichment (Eleventh Cause of Action) and Breach of Fiduciary Duty (Twelfth Cause of Action)

Where, as here, a written agreement exists which covers the "subject matter of the claims based on ... unjust enrichment, such claim[ ] [is] precluded as a matter of law." *AEB & Assoc. Design Group v. Tonka Corp.,* 853 F.Supp. 724, 731 (S.D.N.Y.1994) . Also, an employer owes no fiduciary duty to an at-will employee. *Weintraub v. Phillips, Nizer, Benjamin. Krim & Ballon,* 172 A.D.2d 254, 568 N.Y.S.2d 84, 85 (App.Div.1991).

Plaintiff claims that the Galbreath Defendants were unjustly enriched by her efforts to procure the FGH management agreement. However, the employment agreement signed by the parties covers this. Consequently plaintiff cannot state a cause of action for unjust enrichment. Similarly, the employment agreement establishes that plaintiff is an at-will employee, to whom defendants owed no fiduciary duty. Consequently, both of these claims must be dismissed.

### 8. Tortious interference With Contract (Thirteenth Cause of Action)

Defendant moves to dismiss this claim as to Galbreath, and plaintiff concedes that she asserts this cause of action only against the individual defendants. Accordingly, plaintiff's claim for tortious interference with a contract against Galbreath is dismissed.

### 9. False Imprisonment (Fourteenth Cause of Action)

In order to establish a false imprisonment claim in New York, a plaintiff must demonstrate that: "(1) defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *DeMarco v. Sadiker,* 952 F.Supp. 134, 141 (S.D.N.Y.1996). A cause of action will not lie for false imprisonment where an employee is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

questioned during regular business hours in familiar surroundings, if she is not threatened and is free to leave at any time. *Malanga v. Sears, Roebuck and Co.,* 109 A.D.2d 1054, 487 N.Y.S.2d 194, 196 (App.Div.1985).

*12 Here, plaintiff alleges that defendant Ricker falsely imprisoned her when he fired her because he told her he would not let her leave until she resigned and at one point stood in front of the door to his office. However, plaintiff cannot recall how long she was in Mr. Ricker's office, nor does plaintiff allege that she was threatened in any way. Furthermore, plaintiff's deposition testimony regarding Mr. Ricker's statements conflicts with her other allegations that she was given the choice of being fired or resigning. Because a reasonable jury could not find that plaintiff was falsely imprisoned, defendants motion for summary judgment on this claim must be granted.

## 10. Intentional Infliction of Emotional Distress (Fifteenth Cause of Action)

A plaintiff that alleges a cause of action for intentional infliction of emotional distress must establish "the existence of '(1) an extreme and outrageous act by the defendant, (2) an intent to cause severe emotional distress, (3) resulting severe emotional distress, (4) caused by the defendant's conduct.' " *Johnson v. Harron,* 1995 WL 319943 *29 (N.D.N.Y. May 23, 1995). These standards are strictly applied by New York courts. *Realmuto v. Yellow Freight System,* 712 F.Supp. 287-89 (E.D.N.Y.1989). The alleged conduct must be [s]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Johnson,* 1995 WL 319943 at *29 (citation omitted). In New York, courts have upheld a claim for intentional infliction of emotional distress based on charges of sexual harassment. *See O'Reilly v. Executone of Albany, Inc.,* 121 A.D.2d 772, 503 N.Y.S.2d 185, 186 (App.Div.1986).

As analyzed above, plaintiff has established that a genuine issue of material fact exists as to whether or not she was sexually harassed. Based on her allegations and deposition testimony that describe the "explicit remarks ... and innuendo," *Shapiro v.*

*AOE/RICOH, Inc.,* 1997 WL 452026 *5 (S.D.N.Y. Aug.7, 1997), I cannot hold as matter of law that defendants' conduct was not sufficiently extreme or outrageous, and therefore defendants' motion must be denied. *See Wishner v. Continental Airlines,* 1997 WL 420286 *5 (S.D.N.Y. July 25, 1997).

## 11. Negligence (Sixteenth Cause of Action)

In New York, an employer cannot be held liable in tort for failure to prevent, hire or train its employees from acting in a discriminatory manner. *Gilliard v. New York Public Library System,* 597 F.Supp. 1069, 1081 (S.D.N.Y.1984). Therefore, to the extent that plaintiff's claims against defendants relate to their failure to remedy the alleged sexual harassment, plaintiff's claim must be dismissed.

*F Plaintiff's .Motion Based on The Galbreath Defendants' Alleged Intentional Document Spoilation*

This case has been rife with discovery disputes, and hopefully this will be the last ink spilt and tree felled in that regard. Plaintiff claims that she was barred from her office after she was fired on October 19, 1994 and she claims that the Galbreath Defendants destroyed certain documents that were in her office that were relevant to the relief she seeks here, despite the fact that almost immediately she requested that all documents in her office be preserved. When plaintiff served its document request that the Galbreath Defendants produce "[a]ll documents and items left in plaintiff's office at 90 West Street at the time of her termination," the Galbreath Defendants objected to the request on the grounds of overbreadth and irrelevance. This document request was the subject of a hearing before Magistrate Judge Katz, who held that such request was overbroad and irrelevant. Plaintiff appealed Magistrate Judge Katz's rulings to this court, and finding Magistrate Judge Katz's ruling were not clearly erroneous, I denied plaintiff's application. Plaintiff now moves to strike the Galbreath Defendants' motions and their Answer or, in the alternative, for an adverse inference against the Galbreath Defendants and to bar them from introducing certain evidence because they destroyed the documents in plaintiff's office.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*13 The law is clear that the court has the authority to impose sanctions on a party for failure to produce evidence, either pursuant to Fed.R.Civ.P. 37(b) or the court's "inherent powers to sanction parties 'acting in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Church of Scientology Internat'l v. Time Warner, Inc.,* 1994 WL 38677 at *2 (S.D.N.Y. Feb.4, 1994) (citation omitted). When the court relies on its inherent power, it should exercise "restraint and discretion." *Id.* (internal quotations and citation omitted).

Because no court order was issued here with respect to the documents in plaintiff's office, the court appears to have no authority to impose sanctions under Fed.R.Civ.P. 37(b). *Id.* The threshold question with respect to imposing sanctions for document spoilation based on the court's inherent powers is whether the party "knew or should known that the destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation." *Shaffer v. RWP Group, Inc.,* 169 F.R.D. 19, 24 (E.D.N.Y.1996). Based on plaintiff's allegations, it appears that the Galbreath Defendants knew that such documents were relevant. However, plaintiff's application fails for a couple of reasons. First, she has produced no evidence to support her allegation that the documents have actually been destroyed. Plaintiff has offered the affidavit of Jerry Jones which states that when he went into plaintiff's office to retrieve some of his artwork that plaintiff had had in her office, he saw people were going through her files and putting some of them in a laundry cart. Jones Aff. at ¶¶ 2-3. Defendants have submitted affidavits that they did not destroy any documents. *See, e.g.,* Winkelman Aff. ¶¶ 5-6. In each case that the parties cite, it appears that a prerequisite to relief for document spoilation is that the documents have been lost or destroyed. *See, e.g., Skeete v. McKinsey & Co., Inc.,* 1993 WL 256659 at * 2 (S.D.N.Y. July 7, 1993).

However, even if the defendants did destroy the documents, plaintiff would not be entitled to an adverse inference charge. Such a charge is appropriate "[w]hen the contents of a document are relevant to an issue in a case [so that the] trier of fact ... may receive the fact of the document's ... destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." *Id.* at 25. Here, however, Magistrate Judge Peck decided (and I have affirmed) that plaintiff failed to establish that these documents are relevant. Therefore, plaintiff cannot be entitled to an adverse inference charge. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 76-77 (S.D.N.Y.1991).

Similarly, "[i]n weighing and determining the appropriateness and severity of sanctions, judges should examine the materiality and value of the suppressed evidence upon the ability of a [party] to fully and fairly prepare for trial." *Id.* at 26-27 (alteration in the original) (citation omitted). Again, because the documents plaintiff requested have been ruled irrelevant, no prejudice has accrued to plaintiff, and consequently this court chooses not to exercise its inherent power to strike the defendants' motion and its answer. Therefore, plaintiff's motion is denied. Similarly, defendants' motion for costs with respect to this application is also denied.

III. *Conclusion*

*14 For the reasons stated above, the motion for summary judgment made by the RCC Defendants and Aegon U.S.A. is GRANTED. The Galbreath Defendants' motion for summary judgment of plaintiff's Title VII claims is DENIED with respect to her claim for sexual harassment, but GRANTED with respect to her claim for discriminatory discharge based on her sex and retaliatory discharge. Lastly, the Galbreath Defendants' motion for summary judgment on plaintiff's state law claims is GRANTED with respect to her Fifth, Seventh, Tenth, Eleventh, Twelfth, Thirteenth (as to The Galbreath Company only), Fourteenth and Sixteenth causes of action, but DENIED with respect to her Sixth, Ninth, Thirteenth (as to the individual defendants) and Fifteenth causes of action. Plaintiff's motion with respect to the alleged intentional document spoilation is DENIED, as is the Galbreath Defendants' motion for fees on that application. The remainder of the claims will be tried in November, 1997.

**SO ORDERED.**

1997 WL 598586 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.