(406X

**GEORGIA/SCHILLER V BRIDGEPORT**                           **NANCY PETRUCELLI; 4-11-03**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         DISTRICT OF CONNECTICUT
 3    * * * * * * * * * *
 4    ELIZABETH SCHILLER,          *
 5         Plaintiff,              *
 6    JOHANNA S. GEORGIA,          *
 7         Plaintiff,              *
 8         vs.              * CIVIL ACTION
                              No. 3:01 CV-00452
 9    CITY OF BRIDGEPORT, et al,  * (AVC)
10         Defendants.             *
11    * * * * * * * * * *
12                    New Britain, CT
13                    April 11, 2003
14                    9:35 a.m.
15         DEPOSITION OF NANCY PETRUCELLI
16    APPEARANCES:
17    FOR THE PLAINTIFFS:
18      BY: SUSAN V. WALLACE, ESQ.
19         11 Blue Orchard Drive
           Middletown, CT 06457
20
21    FOR THE DEFENDANTS CITY OF BRIDGEPORT,
22    EARL PETTWAY AND MICHAEL MAGLIONE:
      PULLMAN & COMLEY, LLC
23    BY: MARGARET M. SHEAHAN, ESQ.
         850 Main Street
24       Bridgeport, CT 06601-7006
25
```

EXHIBIT 1

Page 2

```
 1    FOR IAFF LOCAL 834, AFL, CIO
      BY: ROGER J. KERGARAVAT
 2       10 Congress Street
         Bridgeport, CT 06604
 3
 4
 5    Deposition of Nancy Petrucelli, taken on
 6    behalf of the Defendant herein, for the purpose of
      discovery and for use as evidence in this cause,
 7    pending in the United States District Court for the
      District of Connecticut, pursuant to Notice, before
 8    Lorraine Cajegari, Licensed Shorthand Reporter, No.
      SHR 172, and a Notary Public within and for the
 9    State of Connecticut, at the offices of The Bar
      Association, 30 Bank Street, New Britain, CT on the
10    11th day of April 2003 at 9:35 a.m. at which time
      counsel appeared as herein before set forth . . .
11
12
13            STIPULATIONS
14
15       IT IS HEREBY STIPULATED AND AGREED TO by and
      among counsel for the respective parties hereto that
16    all technicalities as to the proof of the official
      character of the authority before whom the
17    deposition is to be taken are waived.
18
         IT IS FURTHER STIPULATED AND AGREED TO
19    by and among counsel for the respective parties
      hereto that all objections, except as to form, are
20    reserved to the time of trial.
21
22
23
24
25
```

Page 3

```
 1    Thereupon:
 2        NANCY PETRUCELLI, residing at 28 Wakeley
 3    Street, Trumbull, Connecticut, being first duly
 4    sworn, as hereinafter certified, was examined and
 5    testified as follows:
 6    DIRECT EXAMINATION BY MS. WALLACE:
 7        Q. Good morning, Miss Petrucelli. I'm
 8    Susan Wallace. I represent the Plaintiffs,
 9    Johanna Georgia and Elizabeth Schiller
10    O'Connell in a lawsuit they brought against
11    the city of Bridgeport for certain incidents
12    that occurred while they were firefighters.
13        Have you ever been deposed before?
14        A. No.
15        Q. Have you ever testified in court
16    before?
17        A. No.
18        Q. Have you ever been sued?
19        A. No.
20        Q. Are you a firefighter with the city
21    of Bridgeport?
22        A. Yes.
23        Q. How long have you held that job?
24        A. Fifteen years.
25        Q. Were you the first female
```

Page 4

```
 1    firefighter?
 2        A. Second class of female
 3    firefighters.
 4        Q. What training did you have to be a
 5    firefighter?
 6        A. Just the training they gave us
 7    before we came on.
 8        Q. "They" being who?
 9        A. The city of Bridgeport training.
10        Q. So you were trained within the
11    city?
12        A. Yes.
13        Q. What did that training consist of?
14        A. Our training was just putting up
15    ladders, going into smokey buildings, just
16    class.
17        Q. Class being what?
18        A. Class, book class, learning, like
19    that.
20        Q. On fire-fighting?
21        A. Was nothing like the other woman
22    that came on or the other classes that came
23    on.
24        Q. Why do you say it was different?
25        A. It was changed. The whole hiring
```

Page 5

```
 1    was changed.
 2        Q. When did that occur?
 3        A. I don't know, in the '90s.
 4        Q. What changed?
 5        A. What they gave, oral. The whole
 6    process of hiring was different.
 7        Q. Did you have an oral interview?
 8        A. No, I did not.
 9        Q. Did you have to take a test to be
10    hired?
11        A. Yes, Civil Service test.
12        Q. Did you get hired into the job as
13    part of any quota or affirmative action
14    program?
15        A. I don't know. I wouldn't know
16    that.
17        Q. What made you want to be a
18    firefighter?
19        A. My father was one.
20        Q. Was he a firefighter in Bridgeport?
21        A. Yes.
22        Q. Are you currently married to a
23    Bridgeport firefighter?
24        A. Yes, I am.
25        Q. And that's who?
```

Page 6

```
 1        A. Robert Petrucelli.
 2        Q. Who holds what rank?
 3        A. Assistant chief.
 4        Q. What firehouse do you work at?
 5        A. Madison Avenue.
 6        Q. You're here today pursuant to a
 7    subpoena; is that correct?
 8        A. Correct.
 9            (Whereupon the subpoena and
10    notice of deposition were marked Plaintiff's
11    Exhibit A for identification.)
12            (Whereupon a document was
13    marked Plaintiff's Exhibit B for
14    identification.)
15    BY MS. WALLACE:
16        Q. I'm going to show you a copy of
17    what's been marked as Plaintiff Exhibit A,
18    Petrucelli A, a copy of a subpoena and
19    notice of deposition. Attached to the
20    notice of deposition is a schedule A.
21        Tell me if you've seen this?
22        A. It's got the wrong date. Says
23    April 8th, so I wasn't handed this on April
24    8th.
25        Q. April 8th is the day on the last
```

Page 7

1 page?
2   A. Right.
3   Q. That's a copy of a notice that I
4 gave to the court about when I mailed
5 something out to attorneys in this case.
6   A. Well, I got this yesterday at
7 quarter to eight at night.
8   Q. Okay. And you were served by the
9 Marshall; is that correct?
10   A. Yes.
11   Q. Now have you ever seen it before
12 yesterday?
13   A. No -- yeah, I did. I had gotten a
14 deposition in the mail after April 3rd.
15   Q. Okay.
16   A. I received a letter in the mail
17 that just said -- didn't have the top page
18 on it. Had the rest of the stuff, I guess.
19        Said that you will appear
20 April 3rd. I think it was a Thursday, which
21 I wasn't working that day. I had a vacation
22 day on that date. I didn't know anything
23 about it until I got it in the mail. That
24 was after April 3rd I received it.
25   Q. Who did you get it in the mail

Page 8

1 from?
2   A. I guess Pullman & Comley. That's
3 you, isn't it?
4   Q. No. Pullman & Comley is the law
5 firm that represents the city in this case.
6   A. Well, that's who the letter said,
7 Pullman & Comley, and I didn't get it until
8 after April 3rd.
9   Q. Well, have you conducted a search
10 for the items listed on schedule A?
11   A. I don't have anything. I don't
12 have any items. I don't have anything in
13 writing. I have nothing.
14   Q. You have no diaries?
15   A. No, I don't have a diary.
16   Q. You have no copies of any
17 complaints you may have filed?
18   A. No, I don't save those. I throw
19 them away. I don't save any of that.
20   Q. You haven't got one single piece of
21 paper --
22   A. No.
23   Q. -- regarding any items asked for in
24 schedule A?
25   A. No.

Page 9

1   Q. Did you look at any documents to
2 prepare for your testimony today?
3   A. No.
4   Q. Did anybody prepare you for your
5 testimony today?
6   A. No.
7   Q. Okay. Have you ever read the
8 complaints in the lawsuit that firefighters
9 Johanna Georgia and Elizabeth Schiller
10 O'Connell brought?
11   A. Yes.
12   Q. You read their complaints?
13   A. I know what they were complaining
14 of.
15   Q. What I'm asking: Did you actually
16 read their court complaints?
17   A. No.
18   Q. You say you know what they're
19 complaining of; what's that?
20   A. A lot of things that they're saying
21 that are really not true and they're made up
22 because they told me they were going to make
23 them up.
24   Q. Okay.
25   A. So you can continue and I'll answer

Page 10

1 your questions best of my ability.
2   Q. You're saying that Johanna Georgia
3 and Elizabeth Schiller O'Connell both told
4 you they were going to fabricate --
5   A. Yes.
6   Q. You have to wait until I finish the
7 question first. They were going to
8 fabricate complaints?
9   A. One of them had said that to me,
10 yes.
11   Q. Who said that?
12   A. Johanna Georgia.
13   Q. Johanna Georgia said she was going
14 to fabricate the complaint?
15   A. Yes.
16   Q. When did she tell you that?
17   A. It's been over a year now. I don't
18 remember. It's over of year when she had a
19 different attorney. She had a different
20 attorney before she got rid of her attorney
21 and was in with Elizabeth Schiller.
22        She was angry. She was a very
23 angry individual. She told me that she was
24 going to sue the city because someone else
25 had sued the city and she could get a lot of

Page 11

1 money.
2        And she also wanted Autumn
3 Caldarone and myself to be in a class action
4 suit, which we could get six figures. And I
5 said no, I wasn't going to lie.
6   Q. Lie about what?
7   A. I made one complaint with the city,
8 which was about Donald Day. That was my
9 complaint. It snowballed into saying let's
10 complain about this, let's do that. I said
11 no, I'm not going to do it.
12   Q. What did she snowball you into
13 saying, let's do what?
14   A. Let's sue the city. Let's sue the
15 city so we could get a six figure amount, if
16 not more, that some people get in a suit.
17 It could be a class action suit.
18        She knows all about it because her
19 brother just sued the state because he had
20 gotten fired, and she knows how to do it.
21 That's what she told me.
22        When she told me that I said I'm
23 not doing it, and I didn't speak to her
24 again after that.
25   Q. Is that the only conversation you

Page 12

1 had with Johanna Georgia about a lawsuit?
2   A. No.
3   Q. Tell me any other conversations you
4 had with her about a lawsuit?
5   A. She wanted to sue the
6 international. I said I wasn't going to
7 take part of that either.
8   Q. International what?
9   A. What is that she called it?
10   Q. She wanted to sue the union?
11   A. She wanted to sue the union also.
12   Q. For what?
13   A. For not representing her.
14   Q. In what?
15   A. In her lawsuit or in her
16 complaints.
17   Q. Her complaints about what?
18   A. Whatever she complained about. She
19 was always complaining about something. She
20 was always complaining about something. I
21 can't remember everything.
22   Q. Did you ever have Johanna Georgia
23 at your home?
24   A. Yes, I did.
25   Q. On what occasion?

Page 37

1 is he said?
2   A. He said: Move the mattress now.
3 You're being insubordinate and you just do
4 what I tell you to do.
5      I'm not going to do what you just
6 tell me to do because I can't do it by
7 myself. So that's all we did was argue back
8 and forth.
9   Q. Did he use any curse words?
10  A. Yeah, he swore.
11  Q. Did he call you any names?
12  A. No. He just said: You do what the
13 fuck I tell you to do. That's how he
14 talked.
15  Q. Did he threaten you in any way?
16  A. No.
17  Q. Did he tell you he would do
18 anything to you if you didn't listen to him?
19  A. No.
20  Q. Did he tell you that you would be
21 disciplined?
22  A. Yes. I could be brought up on
23 disciplinary charges. And my officer was
24 also there and said: Nancy, you're being
25 insubordinate.

Page 38

1      I said: I didn't care if I was
2 being insubordinate. I was pissed off. I
3 was pissed off.
4   Q. Do you sometimes have trouble
5 controlling your behavior when you're angry?
6   A. Yes, I do.
7   Q. Are you angry at Johanna Georgia?
8   A. Not angry at her. I just think
9 she's a liar.
10  Q. What is it that Johanna Georgia
11 lied about?
12  A. She lies about a lot. I don't know
13 what you have in your complaint, but she got
14 rid of one lawyer because she didn't have a
15 case against the city and went in with the
16 other one's case.
17  Q. How do you know that?
18  A. She told me that and Beth Schiller
19 also told me that.
20  Q. Would you be surprised to learn she
21 never fired any lawyer?
22  A. Well, I don't know. She only has
23 one lawyer --
24  Q. So you're assuming --
25  A. -- it's not the same lawyer she

Page 39

1 brought with her to the Donald Day incident.
2   Q. So you're assuming --
3   A. That's what she told me.
4   Q. -- she told you --
5   A. That she was going to get rid of
6 her lawyer because he wasn't doing anything
7 for her and that was it.
8   Q. When did she tell you that?
9   A. That is over a year ago. That
10 Donald Day thing, I think, is two years old.
11  Q. I'm asking when she told you she
12 was going to get rid of her lawyer?
13  A. About a year ago, maybe more.
14  Q. Where was it she told you this?
15  A. On the phone.
16  Q. She was talking to you on the
17 phone?
18  A. Yes.
19  Q. Do you two telephone call
20 frequently?
21  A. She used to call me about two years
22 ago, but now I don't remember when the
23 Donald Day thing was. It was maybe a few
24 months after the Donald Day incident. That
25 was pretty much the last time I really

Page 40

1 talked to her.
2      I don't remember when the Donald
3 Day thing happened. Might have been -- I
4 don't know -- 2000 or '99. I don't
5 remember.
6   Q. So what is it that Johanna Georgia
7 has lied about, that you know of, that you
8 can swear under oath?
9   A. I swear under oath she told me she
10 wanted me and Autumn Caldarone to get in a
11 class action suit because we could get six
12 figures.
13  Q. How is that a lie?
14  A. What am I going to lie about? What
15 am I going to say in a class action suit?
16  Q. I don't think you're understanding
17 my question. Listen carefully. Tell me
18 what it is, what fact it is that Johanna
19 Georgia lied about?
20  A. What fact she was lying about?
21  Q. Specifically what fact --
22  A. I can't tell you because I don't
23 know what she's suing about.
24  Q. Ma'am, you're going to have to let
25 me ask the question. She can't take both of

Page 41

1 us at the same time.
2      I want to know what fact you are
3 claiming Johanna Georgia has lied about?
4   A. She's lying about the fact that she
5 wants me to lie on a piece of paper saying
6 that I was sexually harassed in the fire
7 department.
8   Q. Okay.
9   A. And I said no, I wasn't going to do
10 that.
11  Q. If she asked you if you want to be
12 involved with a lawsuit regarding sex
13 harassment in the fire department, how is
14 that a lie?
15  A. Because it's a lie that I would be
16 putting on a piece of paper.
17  Q. Did she tell you to --
18  A. Yeah, she would help me write it.
19  Q. Nancy, please let me ask the
20 question.
21      Did she tell you flat out: Nancy,
22 I want you to lie for me?
23  A. Not in those words, no.
24  Q. Well, in what words did she ask you
25 to lie for her?

Page 42

1   A. She told me that if I got in on her
2 class action suit and she could use all of
3 my complaints that I had with the city and
4 what she knows about filing because her
5 brother -- this is how the whole thing
6 started. Her brother is a dwarf --
7   Q. I don't want to go into all that.
8   A. That is how she told me. That is
9 how she told me how she could get money from
10 the city.
11  Q. My question is: Did she ask you to
12 lie on a specific matter? Did she tell you
13 to lie --
14  A. She asked --
15  Q. Hold on. Perhaps you're not
16 understanding the question.
17  A. Maybe I'm not.
18  Q. If she asked you would you like to
19 participate in a lawsuit, do you think that
20 that statement itself is a lie?
21  A. No.
22  Q. So what is it that she said to you
23 that was a lie being an untruth as to the
24 facts?
25  A. She wanted me to put untruths on a

Page 109

1 you: How can you make those two claims at
2 the same time that you don't know whether or
3 not they're actually telling the truth or
4 not, and at the same you believe they're
5 both not telling the truth?)
6   A. I'm going to give you two. The day
7 that I had Johanna Georgia at my house Beth
8 Schiller was also there, and the day that we
9 were complaining about Donald Day, Beth
10 Schiller made the remark saying: I'm going
11 to sue the hell out of the city because I
12 need a house.
13      Okay. She's going to sue the hell
14 out of the city because she needs a house.
15 All right. And she wasn't married yet or
16 anything like that. Now she's married. She
17 was going to sue the city because of Donald
18 Day and she sued the hell out of him.
19      Johanna Georgia told me -- this is
20 months after she came back and she was
21 assigned to Engine 16 -- that she was so
22 angry that her brother -- and I'm going
23 bring it up because it has to do with her
24 suing the city -- she was so angry that her
25 brother, the dwarf, got fired from his job

Page 110

1 and he sued the city or the state, or
2 whatever it was, that he sued and won a big
3 lawsuit.
4      So she was going to sue the city
5 also and get six figures and that's what she
6 planned to do.
7   Q. Okay. What does that have to do
8 with the truth of the allegations?
9   A. Has nothing to do with the truth of
10 the allegations. Has to do with her telling
11 me from the beginning of the whole incident
12 of Donald Day that she had it planned in her
13 head to sue the city.
14      I didn't want to have to sue the
15 city if I could resolve my problems through
16 the department.
17   Q. Well, after all, you're married to
18 a deputy chief, assistant chief, correct?
19   A. What does that have to do with
20 anything? He doesn't get my complaints. It
21 goes to my assistant chief.
22   Q. But you're married to a senior
23 officer in the department.
24   A. What does that have to do with
25 anything?

Page 111

1   Q. Hasn't that helped you get
2 scheduling the way you want it?
3   A. No, never.
4   Q. Hasn't that helped you get assigned
5 at the house you want to be?
6   A. No. Seniority.
7   Q. Hasn't that helped you resolve
8 complaints in the past?
9   A. Never. I have to go through the
10 chain of command just like anybody else.
11 Doesn't have nothing to do with my husband
12 at work.
13      He's not on the same shift as me.
14 He's not in the same town as I am and not
15 the same assistant chief.
16   Q. Don't you two, in fact, swap shifts
17 sometimes?
18   A. Sometimes.
19   Q. In fact, pretty regularly?
20   A. Sometimes I swap.
21   Q. With your husband?
22   A. No, I don't swap with my husband.
23   Q. You swap shifts with your husband?
24   A. I don't swap shifts with my
25 husband. I can't work for my husband.

Page 112

1   Q. In the current position he's in,
2 did you ever swap shifts with him on a prior
3 shift he held at the fire department?
4   A. No. I can never work in his
5 position. He's assistant chief. I'm a
6 firefighter.
7   Q. Before the assistant chief --
8   A. He was assistant.
9   Q. You got to stop and listen to my
10 question.
11   A. You're not letting me finish.
12      MS. SHEAHAN: You need to hold
13 your question until the answer is finished.
14      THE WITNESS: You're not
15 letting me finish.
16 BY MS. WALLACE:
17   Q. Have you ever, you or your husband,
18 ever covered a shift for the other of you?
19   A. No, I can never do that. He's an
20 officer.
21   Q. I don't mean assistant chief.
22   A. I know what you mean. No is the
23 answer. How can I work for an officer? I'm
24 a firefighter. When I met my husband he was
25 a captain.

Page 113

1   Q. He was never a firefighter when you
2 met him?
3   A. Never.
4   Q. When you had Johanna Georgia and
5 Elizabeth Schiller at your house --
6   A. Right.
7   Q. -- to discuss filing a sex
8 discrimination or sex harassment
9 complaint --
10   A. Right.
11   Q. -- and you were talking together,
12 the women were talking together about going
13 to CHRO --
14   A. Right.
15   Q. -- correct?
16   A. Right.
17   Q. Your husband was present at the
18 house at that time?
19   A. He was in the house, yes.
20   Q. Was your husband, in fact, serving
21 refreshments to the women, getting them
22 drinks, ordering pizza?
23   A. He helped get food and bring it
24 down.
25   Q. Why did you have these women over

Page 114

1 to your house if you had no intentions or
2 inclination ever to file any kind of lawsuit
3 against the city?
4   A. It wasn't a lawsuit. I was making
5 a complaint against Donald Day and following
6 the chain of command doing it the way the
7 department was telling us to do it.
8   Q. You were preparing a complaint to
9 go to the CHRO?
10   A. I went to the CHRO.
11   Q. But you met with the women at your
12 home?
13   A. Right.
14   Q. You're in the middle of preparing
15 to go to the CHRO to file a charge of
16 discrimination?
17   A. Not discrimination. I was filing a
18 complaint about Donald Day badmouthing the
19 women in the fire department.
20   Q. Would that complaint be sexual
21 harassment or sexual discrimination --
22   A. I don't know if you consider that
23 -- I don't know.
24   Q. Let me ask the question.
25   A. I'm answering the question.

43



# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHANNA S. GEORGIA,<br><br>    Plaintiff,<br><br>VS.<br><br>CITY OF BRIDGEPORT; DONALD DAY, IN His Official Capacity As Fire Captain And In His Personal Capacity; EARL PETTWAY, In His Official Capacity As Deputy Fire Chief And In His Personal Capacity; MICHAEL MAGLIONE, In His Official Capacity As Fire Chief And In His Personal Capacity.<br><br>    Defendants. | CIVIL ACTION<br>NO. 3:01 CV-00717 (AVC) |
| ELIZABETH SCHILLER,<br><br>    Plaintiff,<br><br>VS.<br><br>CITY OF BRIDGEPORT; DONALD DAY, IN His Official Capacity As Fire Captain And In His Personal Capacity; EARL PETTWAY, | CIVIL ACTION<br>NO. 3:01 CV-00452 (AVC)<br><br>(CONSOLIDATED) |

3:01cv452(AVC). May 5, 2003. Construed as a motion for approval of attorneys' fees and costs (document no. 43), the motion is GRANTED in part. Based on a review of the motion to compel, the accompanying affidavit, the affidavit of costs submitted in connection with the court's order of February 3, 2003, and the relevant opposition memorandum, the court awards the defendants $662.40 in attorneys fees and costs incurred in connection with the preparation of the motion to compel. Counsel for the plaintiffs shall be responsible for paying the award.
  SO ORDERED.

*Alfred V. Covello*

EXHIBIT 2