UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELIZABETH SCHILLER,[1] | : | NO: 3:01cv00452(AVC) |
| *Plaintiff* | | (ALL CASES) |
| | : | |
| JOHANNA S. GEORGIA, | | |
| *Plaintiff* | | |
| | : | |
| v. | | |
| | : | |
| CITY OF BRIDGEPORT; ET AL. | | |
| *Defendants* | : | JANUARY 3, 2004 |

**PLAINTIFFS' MOTIONS TO SET ASIDE JUDGMENT AND FOR NEW TRIAL**

Pursuant to Fed. R. Civ. Pro. 59(a), the Plaintiffs move to set aside the judgment entered on December 20, 2004, and for a new trial on all their claims as to Defendants Michael Maglione and City of Bridgeport, as follows:

1. Judgment entered on December 20, 2004, upon jury verdict for both Defendants and against both Plaintiffs on all counts;

2. Fed. R. Civ. Pro. 59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ...."

3. There was harmful and plain error in the **jury selection and composition**, to wit:

---

[1] "Schiller" used herein refers to Elizabeth O'Connell, nee Schiller.

a.  The entire jury pool, in an area of Connecticut with a sizable minority population, appeared to have only two non-White persons – one Black man and one Asian woman. Only one minority member, the Black man, was in the petit jury pool and ended up on the jury. This same problem with the jury pool selection in this same Court having been the subject of a recent prior decision by the Second Circuit, <u>U.S. v. Jackman</u>, 46 F.3d 1240 (2d Cir. 1995), assigning error under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) to the district's pool selection method. <u>See</u> <u>also</u>, <u>United States v. Osorio</u>, 801 F. Supp. 966 (D. Conn. 1992) (Daly, U.S.D.J.). The lack of minority persons in the pool should have been readily apparent to the Court and addressed by the Court to comply with the Second Circuit's ruling;

b.  The Plaintiffs submitted proposed voir dire, none of which the Court used. Even when Plaintiffs' counsel expressly asked the Court to ask two of their voir dire questions going to gender bias and retaliation, the Court did not ask what Plaintiffs proposed;

c.  The defense was improperly granted as many preemptory challenges as the Plaintiffs, when the Defendants have unity of interest, and the Plaintiffs have two separate consolidated cases with some different claims;

d.  Plaintiffs objected under <u>Batson</u> that the defense improperly and unconstitutionally excluded all but two women, and all but one working woman from the jury. <u>See</u> <u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 629-631 (1991) (Batson applies to civil cases) and <u>J.E.B. v. Alabama ex rel. T.B.</u>, 114 S. Ct. 1419, 1421, 1430 (1994) (<u>Batson</u> prohibits sex-based preemptory challenges). The Court immediately held a <u>Batson</u> "hearing" as a sidebar, which consisted of asking defense counsel why he excluded the women, to which he replied

3

that they "appeared disinterested." The Court then gave Plaintiffs' counsel *seconds* to respond and immediately ended the "hearing" be walking away onto the bench, allowing Plaintiffs no time to exercise any more of her preemptory challenges -- which she could then in effect only make in violation of Batson i.e., to the remaining jurors who were all male, on the basis of their gender, to try to compensate for the gender-biased selection. This "hearing" was plainly insufficient under Batson, and the composition of the jury was plainly unconstitutionally selected by gender to exclude those of the Plaintiff's gender from the jury;

e.  Starting at selection, the Court told the jury that these types of trials usually last only a couple of days, which was not at all the case with the two consolidated civil rights-employment discrimination cases before it. This set the tone for repeated demands by jurors to be excused, to end the case, and demands in turn by the Court to the Plaintiffs to end the case because the jury did not want to hear it. The Court removed one potential juror from the pool because he stated that he had an appointment he would like to keep, despite the fact that the person insisted that he wanted very much to serve and would try to change it or work around it. Minutes later, after jury selection ended, one selected (male) juror returned to the courtroom and stated that he had other plans and asked to be excused. The Court refused. Partway through Plaintiffs' two and half day-long case-in-chief, the Court reported to the parties that the jury was "about to mutiny" because three jurors told the Court that they did not want to hear any more of the case. Such expressions by that many jurors warranted a mistrial, but instead, the Court repeatedly told the jury the case was taking too long, that it would soon be over, that he would release them early, etc.

4

4. There was harmful and plain error in numerous **evidentiary rulings**, including:

a. Excluding all evidence and testimony as to any form of discrimination involving anything other than sex/gender even though such evidence was to be offered to prove this employer's pattern and practice of discrimination, its lack of a meaningful complaint policy and investigatory process, and its systematic retaliation against anyone who complains of discrimination. Thus, the type of discrimination in violation of Title VII and under the Connecticut FEPA (i.e., whether sex, race, national origin, etc.) in various incidents to be offered was not the material fact, rather, *the employer's lack of a meaningful complaint policy and its abusive treatment of employees who complain of illegal discrimination* were the operative facts that the excluded evidence was to be offered to prove. The "no race evidence" rule was carried so far as to bar Plaintiffs from eliciting testimony as to why the City may have disciplined the only firefighter it has ever disciplined for sex discrimination, which the defense held out as proof that it had and enforced a meaningful anti-discrimination and harassment complaint policy – a defense under Title VII and CFEPA which the Plaintiffs are entitled to, and must rebut to carry their burden of proof. The City was allowed to elicit evidence and testimony as to this person's misconduct, how they disciplined this person, how he avoided their investigation by medical leave, how he never worked in the Fire Department again – much of it hearsay offered to prove the truth of the matters asserted. The Court did not allow the Plaintiffs to elicit anything about any other motive the City may have had for singling out this person (Donald Day) in its whole history of numerous complaints by numerous women of sex discrimination and harassment, simply because of race – because

what Plaintiffs were trying to offer was that Mr. Day is Black and the long-time leader of a

Black firefighters association who sued the City and proved in this very Court that the City

has a pattern and practice of discriminating against minorities in its Fire Department, and that

he obtained orders from this Court that he and other Blacks and Hispanics be hired and

promoted to break the barriers to minorities existing in the Bridgeport Fire Department. *This*

*is not ancient history*, Donald Day was subjected to the disciplined while Plaintiffs were

employed, and the incident is part of their complaints herein. The excluded evidence and

testimony could have led the jury to reasonably infer that the City did not in fact discipline

Mr. Day for "sexual harassment," that it has no meaningful anti-discrimination policy, and

that it did not even aim to remedy Plaintiffs' complaints by disciplining Mr. Day;

b.  While the Court ruled pretrial that it would allow evidence and testimony as to any

discrimination and retaliation committed against *other women* in this workplace, it excluded

almost all testimony about other women as "too old," including a prior sexual harassment

and retaliation suit under Title VII and 42 U.S.C. § 1983 brought in this very Court against

the City and its Fire Chief by another female Bridgeport firefighter during the time of events

that the Plaintiffs complained of -- and settled for a substantial sum, which payment is a

*public record* of this municipality. Plaintiffs were repeatedly barred from eliciting testimony

as to why this other women is not currently employed by the Bridgeport Fire department or

appearing to testify – i.e., that subsequent to her settlement, she was found dead. Evidence of

this woman's complaints also goes to whether or not the City has had a meaningful anti-

6

discrimination and sexual harassment complaint policy. No reason was given for any of these rulings;

c.  Excluding as "hearsay" all testimony in Plaintiffs' case-in-chief as to conduct, oral and written statements by other co-workers, the Court expressly ruling that it is inadmissible unless the actors or speakers are "officers" of the City, while allowing the defense to admit their testimony and evidence about anything done and said by any City employee whom defense counsel represented to be an "officer." The Court articulated an "officer" exception to the hearsay rule. This error was repeated throughout Plaintiffs' cases-in-chief sand cost them substantial valuable witness testimony and timely and meaningful admission of evidence. It left substantial gaps in their presentations to the jury. It destroyed their cases. (The Court's rulings on its own evidentiary errors are discussed further below);

d.  Excluding all evidence and testimony as to any internet website postings; Plaintiffs were not even allowed to try to lay a foundation to try to authenticate the documents which referred to them, and was denied admission of them for the mere fact of notice that they existed, not for the truth of the matters asserted in them. Yet, the defense was permitted to offer unauthenticated internet website material, as back-handed testimony (discussing fire service safety standards) *for the truth of the matter asserted therein*, over Plaintiffs' objection;

e.  Admitting defense exhibits into evidence, over Plaintiffs' objection, that were never disclosed to the Plaintiffs although requested and ordered disclosed in discovery. Some were never disclosed until mid-trial, yet were admitted into the Defendants' case-in-chief, with great prejudice to Plaintiffs' ability to prepare for any substantive objections or rebuttal

thereto. Moreover, throughout the lengthy and costly discovery Plaintiffs had to repeatedly

seek (and did obtain several) orders for compliance, and sought orders for exclusion of

defense evidence offered at trial if not produced in response to discovery requests and orders;

f.    Admitting, over Plaintiffs' objection, not only undisclosed and unauthenticated contested

documents into evidence, but doing so *after the close of both parties' cases,* with no

opportunity for the Plaintiffs to examine anyone on it;

g.    Admitting Plaintiff Johanna Georgia's medical records and allowing lay testimony about

their contents and her medical condition by the City's Workers' Compensation

administration service, Berkeley Associates, who did not make the records. In support of her

retaliation and Due Process claims, Plaintiff Johanna Georgia testified that the Defendants

have refused to allow her to work her civil service job for the past three years, ordering her to

stay out of work on medical leave, in violation of her rights, causing her to incur economic

damages and emotional distress, and that the Defendants' proffered reason (that she is

medically unfit) is false and pretextual. Over her objection, the defense offered some of her

medical records, first, obtained and brought to court by private counsel retained by the City

(Pullman & Comley). Defendants and their counsel were barred from obtaining these records

in discovery in this case by prior order of this Court. Plaintiff successfully objected to the

discovery requests on grounds that it violated her privacy rights under the federal HIPAA

statute and state law. To date, Plaintiff has never given a release for her medical records and

information to the defendants or their counsel. They apparently accessed the information

through the City's third–party Workers' Compensation administrator, Berkeley Associates. It

violated HIPAA and state law for Berkley to give the records and info to anyone besides whoever is the designated medical records-keeper for the employer-City, who is <u>not</u> the Fire Chief or Pullman & Comley or even the City Attorney. HIPAA and state law specifically prohibit medical records and information used to evaluate or pay a Workers' Compensation claim from being disseminated to anyone beyond the people processing those claims, or to be used for any other purpose, including (per HIPAA) making "personnel decisions" about the subject of the records (i.e., Plaintiff Georgia). The HIPAA privacy issue was heard by the Court during discovery, and the Court entered a protective order (March 2003) requiring <u>sealed filings of anything containing or discussing the Plaintiffs' medical records and information</u>. In direct violation of the protective order, during trial, the defense filed a number of Georgia's medical records (for which there was no consent to disclosure to the defendants and their counsel) and discussed the information contained therein in an *un-sealed* amendment to their trial witness and exhibit lists. The defense was perfectly aware that these items had to be filed under seal and are protected records, as it filed any other references to Plaintiffs' medical information and records under seal right up to trial (for example, the parties' Pretrial Memorandum was filed under seal). The defense offered no justification for violating the protective order, yet the Court refused to hear Plaintiffs' objection to the unsealed filings. With the medical records, the defense disclosed never-before identified witnesses, despite discovery requests and orders therefor. The defense offered no justification for not disclosing these records and witnesses until the middle of trial, but the Court overruled Plaintiff's objections, which were that (1) this was a gross violation of her federal

9

and state statutory privacy rights; (2) the records offered were selective and misleading contested opinions, some from medical exams that were never even accepted by the Workers' Compensation Commission; (3) in allowing the records into evidence, the Court not only allowed rank hearsay in, but it *allowed the defense to put on undisclosed expert opinion contained within the reports of the treating and <u>non-treating</u> expert physicians, without these experts and their opinions ever having been disclosed*; (4) to explain or rebut them, Plaintiff would be required to put on a case-within-a-case about her whole medical history and records, which was impossible in the limited time allotted for this trial, which she had not prepared for because this case is not about any claim for damages for her physical injuries or for disability discrimination, and because she could not get her treators or experts in to render opinions at this late date; and (5) any rebuttal would require further public disclosures of her confidential medical information and records. Plaintiff was placed between a rock and hard place, and the fact is, whatever was said about her medical condition in these various reports is immaterial to rebutting this portion of her retaliation claim, which made only two factual claims: (1) that she was working light duty just fine after her injury, but because she pursued the instant lawsuit, the Defendants suddenly sent her home; and (2) the Defendants refused to return her to work at all even after her treator (Dr. Dagneault) wrote "return-to-work" notes clearing her for work over the past year. The Court allowed the medical records into evidence based on their "authentication" by the third party administrator Berkeley Associates, which was in no way qualified to authenticate them under the FRE, as it made none of the records, but merely obtained them from the doctors. Nothing was even

10

filed under notary seal or the like from the doctor's offices. The Court then allowed Berkley personnel to testify to their content and Plaintiffs' medical condition and to why the City kept her out of work – even though Berkley purportedly had nothing to do with the decision to keep her out of work, being only a Comp payment administration service. No medical treator or expert ever testified in Court, and the records never having been part of this case by prior Court order, Plaintiff had no opportunity to examine the doctors who made them. All of this was erroneous admission of hearsay offered to prove the truth of the matters asserted in them, i.e., that the defendants did not retaliate because Plaintiff's work capacity and medical condition was as poor as the doctors opined it to be in the records. It was unfairly prejudicial to the Plaintiff Georgia, and to her co-plaintiff Schiller's retaliation claim as well (i.e., on the City's pattern and practice of retaliating by various means against those who complain of discrimination and harassment);

h.  Denying Plaintiffs' request for a jury view of the City's firehouses which were the subjects of their claims, and overruling Plaintiffs' objections to admission of numerous photographs of the premises offered by the defense. The photographs are of premises controlled by the City, of areas the Plaintiffs and their counsel had no access to (like some of the men's living quarters), are misleading because they purport to depict numerous areas of firehouses not even the subject of Plaintiff's complaints and do not depict the premises as they actually existed at relevant times or currently, and were admitted along with explanatory labels on the backs made by unknown persons, without any proper authentication. Plaintiffs testified that

11

they did not even recognize some of the areas depicted. Plaintiffs were denied any ability to examine the maker(s) of the photographs and the labels;

i. Excluding all evidence of the threats made by defense counsel Robert Mitchell to Plaintiffs' female counsel, to material witness Firefighter Cindy Mattera (a female BFD employee who is also complaining of sex discrimination, harassment and retaliation for having tried to complain), and to a female former employer of Johanna Georgia (who avers in sworn affidavit being subjected to demands by Mitchell that she give him negative testimony about Plaintiff's character). All of this was material evidence of retaliation and the lack of meaningful anti-discrimination and harassment complaint policies and practices (see Plaintiffs' Objection to the defendants' Motion in Limine);

j. Defense witness Autumn Dennerlein, *nee* Caldaroni, Plaintiff Schiller's own sister, was put on by the defense to give what they must know, or recklessly never bothered to verify, is patently perjurious testimony. Defense counsel elicited perjury from this witness in order to remove a document from evidence that defense counsel apparently decided was too damaging after testimony of Autumn's former husband, Lt. Michael Caldaroni. To wit, the Court's directive at trial was that all documents offered in the pretrial memos and not objected to before trial are deemed admitted and need not be "offered" or authenticated in front of the jury. Yet, defense counsel went through a carefully orchestrated play, opening with the scene of the early-30's year old Firefighter Dennerlein asking the Court -- and the Court allowing her -- to "bring her knitting" onto the stand with her – a prop to "soften" her for jury sympathy. Defense counsel handed her a copy of a document *that was already in*

12

*evidence as expressly on the record not objected to by the Plaintiffs* -- Dennerlein's prior official complaint to the City about rampant sex discrimination and harassment and threats and retaliation against her former spouse for reporting it. Not only did defense counsel have no reason whatsoever to ask Autumn to "authenticate" the document or to question her on its contents because the document was damaging to the defendants' case, because it documented another female firefighter's complaints of systematic ex discrimination and hostility, and nothing done about it, and now directly impeached the prior testimony at trial of <u>Lt.</u> Michael Caldaroni, i.e., that he has no recall  how he came to file a sworn CHRO charge about *the victimization of the women firefighters, including Autumn*, and *threats against him for reporting it*, <u>just as Autumn's statement in the subject document records</u>. *But the Plaintiffs had not made use of it,* so why raise it -- except to do what was done -- *remove it from the record.* To wit, *w*hen defense counsel handed Dennerlein the document, on cue, with great theatrics, she cried out "however did her name get on it," she has never laid eyes on this before, etc. Plaintiffs' counsel immediately objected to it as perjury and asked for a chambers conference. The Court overruled the objection and did not respond to the request for a chambers conference. The eliciting of this testimony is not just a matter for impeachment or the weight of the evidence. This is a City employee pretending not to recognize an official document that the City provided to the Plaintiffs as such, as the witness's statement in response to discovery for it, it is part of several official City records, and there are witnesses to her creation and filing of it with Chief Maglione, including him. It was clearly a ruse to get the document out of evidence after Michael Caldaroni's testimony. The document being

13

deemed in without objection, the defense had no ability to "withdraw" it from evidence, but the Court apparently allowed him to do so. Dennerlein went on to testify perjuriously that Plaintiff Schiller was removed from their mother and raised in foster care because their mother was a "child-abuser" – patent lies. Their mother died only last year after a long illness in which Plaintiff Schiller took care of her. Defense counsel and City Attorney John Mitola know this because it at times interfered with scheduling discovery and was discussed in discovery and other proceedings between this Plaintiff and defense counsel and this Plaintiff when in front of defense counsel, she burst out crying on various occasions about the loss of her mother with whom she was very close. Maglione knows she arranged her mother's funeral because she took leave from work with his permission for it. The mother was married to a long-time Bridgeport Fire Chief, whom Maglione well knows from working with him for many years), and so has every reason to know the testimony offered on his behalf was perjurious – else his Fire Chief so utterly abandoned his daughters to an abusive women who lost them to foster care and no one ever noticed where they went all these years, yet these two children grew up to go to work with their father. Plaintiff's counsel immediately objected on grounds of perjury and given how highly prejudicial this testimony was, asked for a chambers conference out of the jury's hearing. The Court completely ignored counsel's request, and the testimony continued. It was perjury, plain and simple, and defense counsel had every reason to know it was, else he failed to do any check whatsoever of his facts before he orchestrated it. Moreover, Dennerlein's statements as to Plaintiff being the product of a foster home (a complete lie) and child abuse (a complete lie) and that Plaintiff fabricated her

14

lawsuit claims to extort money from the City are collateral, immaterial, and never should have been let in, as improper character evidence. The Court allowed Plaintiffs' counsel only limited cross-examination of this witness and refused counsels' request for re-cross. The impression to the jury was that this witness needed the protection, even by the Court, from the Plaintiff, designed only to cast denigration on the Plaintiff, who never called her sister as a witness or attacked her in any way. Dennerlein committed more than one act of perjury, and defense counsel had every reason to know it, else counsel failed to do any check whatsoever of his facts before he orchestrated it, which is equally unethical. However one looks at it, this was deceitful manipulation of the evidentiary record and the Court, unfair to opposing counsel, and a highly prejudicial perjurious character assassination upon Plaintiff, and once counsel cited perjury, the Court had an affirmative obligation to protect the integrity of the legal system by immediately dealing with the issue in meaningful manner outside the jury's presence;

k.  As to character evidence against Plaintiff Johanna Georgia, after similar patently false trashing testimony by another female firefighter (Firefighter Nancy Petrucelli, who like Dennerlein was, is also married to a male BFD officer) that Plaintiff Johanna Georgia fabricated her lawsuit claims to extort money from the City and is a liar. This was a highly prejudicial perjurious character assassination on the Plaintiff, and the Court would not allow Georgia to have a rebuttal witness (who runs a shelter for the poor that Plaintiff has volunteered at for many years) to testify to anything about Georgia's conduct or reputation in the community that might refute the vicious lies the defense offered about her.

5.  There were harmful **<u>abuses of discretion</u>** in the conduct of the trial, to wit:

a.  Allowing the defense to provide each juror with an individual notebook containing copies of all the Defendants' proposed evidence from the start of trial, regardless of whether it was admitted, excluded, or even offered into evidence;

b.  Unreasonably limiting the testimony of the Plaintiffs in their case in chief, repeatedly making such comments to and before the jury such as that the case was "taking longer than usual," repeatedly during direct examination of the Plaintiffs if "this witness is done," when the witness would be done and the like, while allowing the defense some six hours of cross-examination of one of the Plaintiffs (Georgia) alone;

c.  For the cross-examination of Plaintiff Johanna Georgia, the Court ordered Plaintiff's counsel not to stand and indicate "objection" aloud in the usual manner, but to instead remain seated and raise her hand for every objection. In the large Courtroom One in Hartford where Plaintiff's table is a considerable distance from the witness box, with the jury sitting between, and the judge sitting up and behind the witness box viewing a computer text screen throughout the testimony, this meant that the Plaintiff/witness had to keep her eyes on her counsel across the room to see if there was an objection before she made each answer. Because the judge was not viewing counsel, the witness then had to orally tell the judge "there's an objection" as the jury looked back and forth. Only when the judge then "called on" Plaintiff's counsel could counsel state the objection. This occurred numerous times, making it unnecessarily and unfairly difficult for the Plaintiff and her counsel to concentrate on her testimony under difficult and long cross-examination, and creating an unfairly

16

prejudicial negative impression of the Plaintiffs, their counsel, and their case, as compared to the defense, who were not subjected to any of these restrictions on their objections;

d. Although the Court later acknowledged that it did commit error in its pervasive exclusions of Plaintiffs' proffered testimony and evidence as "hearsay," as Plaintiffs' counsel tried to inform the Court of the error as it happened – *while defense counsel did not act ethically to point out the plain error to the Court, and instead sought to obtain the advantage of it and to compound it by telling the Court that there is an "officer hearsay exception" in sexual harassment cases* – the Court admonished Plaintiffs' counsel for not accepting rulings, allowed defense counsel to laugh out loud and make rude, sarcastic and expressly negative comments casting aspersion upon the person of Plaintiffs' counsel, her skill and knowledge, the Court responding to it by telling colloquy with defense counsel like "I know," "I agree," all in the presence of the jury;

e. The court repeatedly directed Plaintiff's counsel in front of the jury not to make any more objections, directing instead that her objections were noted for future questions, whether or not the questions were the same or the objection was the same. Plaintiff had to repeatedly tell the Court that there were sometimes different objections to different questions, and in any event any objections need to be clearly stated as to each question to make a clear record. The Court did not restrict defense counsel's numerous objections in this manner;

f. At one point (outside the jury's presence), the Court informed Plaintiffs' counsel that she was "admonished" not to "interrupt" with objections to defense counsel's examinations. Plaintiffs' counsel responded to the admonishment by informing the Court, as she had tried at

17

numerous points throughout the trial, that some of the instances of her "interrupting" to make objections occurred when witnesses would rapidly start to answer on the heels of opposing counsel's rapid questioning. Because the court allowed such answers to stand when once they got out, no matter whether there was an objection, there was no way for counsel to interpose an objection without talking at the same time as defense counsel – who could have been instructed not to interrupt the objections;

g.  Also in response to the admonishment to stop "interrupting" with objections, Plaintiff's counsel told the Court she could not always hear the colloquy between the Court and defense counsel across the large courtroom with ventilation fans blowing, poorly placed speakers, as defense counsel kept his back to Plaintiffs' table and persisted in speaking, quite uncharacteristically for him, a low voice, no matter how many times Plaintiffs' counsel said on the record that she could not hear him speaking so low, and counsel could not always see the judge's or counsel's lips moving either. The Court's response was that Plaintiffs' counsel could sit behind the witness box to hear testimony. However, at that location, counsel could not observe the witness's face, could not access her materials, documents and notes, or communicate with her clients back at Plaintiffs' table. Moreover, standing up or raising her hand or calling out objections would have to be done behind the bench and right next to the jury, which she was already admonished for "annoying" with objections. Defense counsel was never placed in such an awkward position. All that had to be done to avoid this was to have defense counsel speak up, or use a microphone at table and podium right in front of the

jury and witness box, or turn to the side when speaking – which Plaintiff was repeatedly instructed to do so that defense counsel could hear her;

h.  Plaintiff's counsel was in fact forced to sit right in the jury box in order to be able to view some demonstrations by the defense that were conducted across from the jury with the back of the demonstrative boards placed toward Plaintiff's table, so there was no other place to view them but the jury box or the bench. Defense counsel was never placed in such an awkward position. All that had to be done to avoid this was to have defense counsel place the boards further back or closed to the bench facing the jury and Plaintiff's table.;

i.  Instructing the Plaintiffs and their witnesses to strictly and narrowly answer only the questions asked of them on direct and cross examination, while allowing defense witnesses to speak freely on cross-examination, making lengthy explanations and colloquy about other matters when asked direct and narrow "yes or no" questions on cross-examination. The Court repeatedly directed Plaintiffs and their witnesses to answer "yes or no" to defense counsel's cross-examination even when they indicated they could not accurately make such a narrow response, then refused several requests by Plaintiff's counsel for instructions to defense witnesses to similarly confine their testimony on cross-examination;

j.  The Court also allowed defense counsel to laugh out loud and make negative comments casting aspersion upon the person of Plaintiffs' counsel and her skill and methods, the Court not only allowing it, but engaging in colloquy with defense counsel like "I know," "I agree," in repeatedly stopping Plaintiff's attempts to impeach witnesses by commenting that Plaintiffs' counsel was not conducting impeachment examination correctly, all in the

presence of the jury (when in fact the Court did not always appear to be aware of the foundational testimony having already been elicited). All of this created an unfairly prejudicial negative impression of the Plaintiffs, their counsel, and their case, as compared to the defense; and

k.  In this sex discrimination case, the Court referred to Plaintiffs' counsel throughout only as "Madam" and to the Plaintiffs as "these ladies" and "lady firefighters" (instead of "firefighters") in front of the jury, from jury selection to verdict. Male defense counsel was referred to throughout as "Counsel." This set the tone for the jury, for how they should perceive the Plaintiffs as equal peers in a traditionally male-only job, their counsel, as an equally competent peer to male opposing counsel, impacting how seriously the jury should take Plaintiffs' claims of unequal treatment compared to men in their job.

6.   As to the Court's numerous erroneous "hearsay" rulings throughout Plaintiffs' case-in-chief, the Court expressly informed counsel after the jury was excused after 5:00 p.m. one evening near the close of Plaintiffs' case-in-chief that after researching the basis for its rulings, it found that it had committed plain error. The Court expressly informed Plaintiff's counsel that her clients could have a mistrial granted if they wished, or that the Court would try to fix the error by *sua sponte* or on motion *reopening* Plaintiffs' cases to allow them to putting on witnesses, documents, or affidavits, *as Plaintiffs' counsel deemed best*. There was discussion of how to do this, and Plaintiff's counsel noted that she could not reconstruct all the erroneous rulings out of thin air, and asked that the court reporter mark the transcript for the objections and erroneous rulings so that Plaintiff's counsel and the Court could determine how much there was, and whether and how it would be feasible to get the evidence before the

jury, given that some witnesses were now unavailable, and the Court was keeping such a tight schedule, and the error was so pervasive -- or whether a mistrial was warranted. There was to be further discussion in the morning. The next morning, the Court held no conference with Plaintiffs' counsel, and simply came on the bench at 9:30 a.m., stated that the error was harmless, the Court would not allow reopening of Plaintiffs' case-in-chief, and that the Plaintiffs could put on their excluded evidence *only by calling rebuttal witnesses*. Plaintiffs' counsel objected that rebuttal would be by definition limited to what the defense put on for a case, which might not include what was excluded from Plaintiffs' cases, that their witnesses (whom the City did not excuse from work like it did for its own witnesses, or who had other jobs they had to attend) could not easily be brought back on short notice, especially as no one knew when rebuttal would occur, and counsel could not simply recreate all the holes in the case without some list as from the transcript. Moreover, the effect would be disjointed, confusing, and never the same impact as the case-in-chief should rightfully have been presented to the jury. The Court could have recessed to allow time to do this in an orderly fashion, but instead did not allow Plaintiff's counsel tot reviews any part of the transcript that the Court reviewed to find the error harmless, and allowed no time for Plaintiffs' *solo* counsel to do anything to prepare for such a massive undertaking in the middle of a tightly time-driven trial;

7.      It was harmful and plain error for the Court **not to grant a mistrial *sua sponte*, and to deny Plaintiffs' subsequent Motion for Mistrial**, which was expressly requested on the record based upon the pervasive evidentiary errors throughout Plaintiffs' case-in-chief, upon the Court's express offer of a mistrial, upon the Court's refusal to allow reasonable and adequate remediation of its errors, and upon the Court's reports to counsel that jurors did not want to hear any more of the cases;

21

8.   There was harmful and plain error in the **<u>jury charges</u>**, in what was given and what was not given. The day before the jury was charged, a chambers charging conference was held in which the parties were given the Court's proposed charges. Plaintiff's counsel made a number of particular objections and requests for charges and amendments thereto pursuant to proposed charges which they (Plaintiffs) had filed with the Court before and during trial. The Court took some of Plaintiff's requests and objections at the charging conference "under advisement," so that Plaintiffs' counsel was not told what the Court decided to charge until the Court provided the parties with a new version the next day, just minutes before proceedings resumed with some final testimony, followed immediately by the time to object to the proposed charges, which directly proceeded to the actual jury charging. This afforded almost no time to review the charges and form proper objections, and the claims and charges were lengthy and complex, and the set of charges to be actually given to the jury <u>differed substantially</u> from what was reviewed, requested, and granted in the charging conference. Plaintiffs' counsel objected on the record as best she could with the minimal time allotted to review the redrafted charges, and made requests for certain omitted instructions, including but not limited to motivating factor and pretext under Title VII, the use of evidence presented by each Plaintiff to decide her and her co-plaintiffs' claims especially of a hostile work environment under Title VII and CFEPA and for pattern and practice under 42 U.S.C. § 1983;

9.   There was harmful and plain error in the **<u>jury interrogatories</u>**, in what was given and what was not given. The Plaintiffs submitted proposed jury interrogatories which were not used. The Court held no conference on it, and instead provided counsel the jury questionnaire shortly before

deliberations started, with no chance to object or change it. The questionnaire was misleading and incomplete on the law, especially under Title VII;

10.  In sum, it cannot be said that the Plaintiffs had a fair trial. Much of their best evidence and witnesses was excluded or barred, they did not have a jury of their peers, the instructions and jury interrogatories were incomplete and confusing as to how to decide use the evidence of the work environment and City practices presented by each Plaintiff for the other's case. The defense was allowed broad leeway to admit hearsay, undisclosed and unauthenticated documents, and contested evidence after the close of testimony:

  a.  The verdict and judgment thereon are against the clear weight of the evidence. There was underlined uncontested evidence of the disparate treatment in uniforms, firehouses (where women cannot even work in one at all and have limited access to all the others), etc., and sexual harassment with all the offensive sexual content and hard core pornography, some even being made in this municipal workplace. If the rest of Plaintiff's excluded evidence had been allowed in, the evidence would have compelled a verdict against the defense of a "meaningful" anti-discrimination and harassment complaint policy;

  b.  The verdict and judgment thereon are based on false evidence, to wit, there was perjury and every defense witness and hostile witness, most of them of *officer rank*, was impeached with prior sworn or official statements or testimony. In contrast, the Plaintiff and their witnesses were not impeached or shown to be less than truthful – except being name-called liars -- a single time;

  c.  For all the above reasons, the verdict and judgment thereon are a miscarriage of justice.

**WHEREFORE**, the Plaintiffs move to have the Judgment set aside and for a new trial on all their claims as to Defendants Michael Maglione and City of Bridgeport.

**FOR THE PLAINTIFFS,**

Dated _____                          _____
                                        Susan V. Wallace
                                        *~ Attorney at Law ~*
                                        11 Blue Orchard Drive
                                        Middletown, Connecticut 06457
                                        Tel: (860) 704-0472  Fax: -0490
                                        law4us@rcn.com
                                        Fed Bar No. CT08134

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing "Plaintiffs' Motion to Set Aside Judgment and For New Trial" has been served upon:

Robert B. Mitchell, Esq.
Margaret M. Sheahan, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006

on this 3rd day of January 2005 via:

    __X__    Regular U.S. Mail, first class, postage prepaid

    _____    U.S. Priority Mail

    _____    U.S. Express Mail or other overnight mail service

    _____    Facsimile

    _____    Email

    _____    Hand-delivery


_____
  Susan V. Wallace, Esq.