UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ELIZABETH SCHILLER,** | : | **NO: 3:01cv00452(AVC)** |
| **Plaintiff** | | **(ALL CASES)** |
| | : | |
| **JOHANNA S. GEORGIA,** | | |
| **Plaintiff** | : | |
| | | |
| **v.** | : | |
| | | |
| **CITY OF BRIDGEPORT, ET AL.,** | | |
| **Defendants** | : | **JANUARY 13, 2005** |

**MOTION TO DISMISS DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES AWARD
AND REQUEST FOR RECONSIDERATION OF FEE AWARD**

The Plaintiffs in these consolidated cases seek dismissal of Defendants' Application for

Attorneys' Fees Award, as set forth below and in the accompanying Memorandum of Law:

1. The Rule 11 sanctions requests are not in proper form and are untimely;

2. The Rule 11 sanctions requests are not brought for a proper purpose;

3. The defense failed to file a proper statement of their time and costs for their fee-shifting

claims;

4. The defense states no cognizable basis for Rule 11 sanctions against Plaintiffs or their

counsel;

5. The defense states no cognizable basis for sanctions against Plaintiffs' counsel under 28

U.S.C. § 1927 (1988);

6. The civil rights fee-shifting provisions do not support an award of attorney's fees and costs

against the Plaintiffs;

7. The Application is a back-door attempt to press state law tort claims in a post-judgment fee application in federal court;

8. The Application is in the nature of a disfavored "SLAPP" action, in violation of the anti-retaliation provisions of Title VII and CFEPA and the First Amendment;

9. The fees and costs this employer is demanding from their employees would amount to a prohibited recoupment of wages in violation of Connecticut public policy;

10. This Motion to Dismiss, in the nature of a Rule 12(b)(6) Motion, addresses only whether there is jurisdiction or a cognizable post-judgment Application for fees for defense of this civil rights case. Plaintiffs have moved for an extension of time to separately address the substance or merits of the fee Application if the Application is not sooner dismissed as a matter of law; and

11. The undersigned Plaintiffs' counsel further requests that the Court reconsider its January 22, 2002, order of fees against Plaintiffs' counsel.

FOR THE PLAINTIFFS AND THEIR COUNSEL,

Dated_____          _____

Susan V. Wallace
~ Attorney at Law ~
11 Blue Orchard Drive
Middletown, CT 06457
Tel: (860) 704-0472  Fax: -0490
law4us@rcn.com
Fed Bar No. CT08134

## CERTIFICATION OF SERVICE

The undersigned counsel certifies that a copy of the foregoing "Motion to Dismiss Defendants' Application for Attorneys' Fees Award and Request for Reconsideration of Fee Award" has been served upon:

Robert B. Mitchell, Esq.
Margaret M. Sheahan, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006


on this 13th day of January, 2005, via

     X      Regular U.S. Mail, first class, postage prepaid

    ____     U.S. Priority Mail

    ____     U.S. Express Mail or other overnight mail service

    ____     Facsimile

    ____     Email

    ____     Hand-delivery


_____
 Susan V. Wallace, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ELIZABETH SCHILLER,** | : | **NO: 3:01cv00452(AVC)** |
| **Plaintiff** | | **(ALL CASES)** |
| | : | |
| **JOHANNA S. GEORGIA,** | | |
| **Plaintiff** | : | |
| | | |
| **v.** | : | |
| | | |
| **CITY OF BRIDGEPORT, ET AL.,** | | |
| **Defendants** | : | **JANUARY 13, 2005** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES AWARD
AND REQUEST FOR RECONSIDERATION OF FEE AWARD**

**I.     FACTS AND CASE BACKGROUND**

This Motion addresses only the legal propriety of a post-judgment Application for fees for defense of a civil rights case, in the nature of a Rule 12(b)(6) Motion, and does not yet the substance or merits of its contents. The substance or merits of the particular claim for fees will be addressed separately (see Plaintiff's "Motion for Enlargement of Time to File Opposition to Defendants' Application for Attorneys' Fees Award").

Defense counsel represents that their time and costs statement filed with their Application does not contain the required "one-to-one correlation of the fee billings with these particular pleadings, motions, etc." See Memorandum in Support of Defendants' Application for Attorneys' Fees Award (hereinafter, "Application"), p. 12, n. 2. They state that they will file a fee and costs statement in correct form later – beyond their deadline will has passed to file a proper and complete Application. The Application is not in the form required by Rule 11.

Again the merits of each claim for fees will be addresses later if necessary, but on its face, the

Application fails to states a claim of any sanctionable filing or conduct on the part of the Plaintiffs or

their counsel.

Despite the protestation that they are not seeking sanctions based on the fact that the Plaintiffs

lost the case (Application, p. 6), this is, of course, precisely what the defense is doing.

The defense offers this patent misrepresentation of trial testimony and of counsel's conduct:

Throughout the course of the litigation, the Plaintiffs' charges of substantive illegality, their
motion practice, discovery complaints and trial tactics progressed from the irrational through the
ridiculous on to the f [sic] absurd. This train of irrationality was crowned by assertions that the
Defendants were culpable in one witnesses' death and in Elizabeth Schiller's expressed fear that
they intended a similar fate for her. None of the nonsense spewed by the Plaintiffs or their
counsel was supported by even a microscopic scintilla of evidence; not when the complaints
were filed, not during the pre-trial phase of the case nor at trial.

As to the representation that "Elizabeth Schiller[] expressed fear that they intended a similar fate

for her": The deceased Bridgeport Fire Department employee referred to, Kathy Denton, was found dead

alone in her home. Plaintiffs and their counsel do not know why or how she died and have never

represented otherwise. Elizabeth Schiller O'Connell did not testify that she feared "a similar fate." She

testified that she feared retaliation including physical harm at work. She testified that the job is

dangerous and that given the tight reliance firefighters must have on each other or their personal safety,

she became afraid after reading threats on the internet by persons she believes are her co-workers about

"watching her back" and "being left alone," the implication being in a dangerous situation on the job.

Schiller, Plaintiff Johanna Georgia, and witness Roger Kergaravat each testified that the job is so

dangerous that one faces a risk of death especially if co-workers sabotage or refuse to help you. Roger

Kergaravat testified extensively to recently being subjected to such conduct in retaliation for his

attempts to assist the Plaintiffs with their discrimination/harassment claims. Schiller never mentioned

Kathy Denton's "fate" or death. In fact, there was no testimony that Kathy Denton is dead until the last

witness in the case, *defense* witness Nancy Petrucelli, said it.

 As to the representation that Plaintiff's counsel made "assertions that the Defendants were

culpable in one witnesses' death": Plaintiff's counsel never directly asked any witness at trial if Kathy

Denton is dead. Counsel's question, which the defense objected to repeatedly throughout the trial, was

"where is Denton?" *in terms of the job*, i.e., counsel also tried asking "Is Kathy Denton still employed by

Bridgeport Fire Department?" It is legitimate and material *to show that the last woman firefighter who

brought a Title VII suit against the City in this very Court ended up* <u>*terminated from her employment*</u>

*afterward,* but for unarticulated reasons, the Court sustained every defense objection to it. Moreover, the

fact of Denton being deceased and thus unavailable to testify was necessary to explain why she was not

there testifying for the Plaintiffs, a question the jury might obviously be asking after the defense put on

three other women firefighters denying any discrimination or harassment at work. Again, <u>Plaintiffs'

counsel never once tried to ask if Denton is dead.</u> *Defense* witness Nancy Petrucelli blurted it out in

response to the question whether Denton is still employed in the Fire Department.

 The defense complains that Plaintiff Elizabeth Schiller O'Connell failed to specifically state a

denial in her rebuttal testimony of one item of testimony by her co-worker and sister Autumn Dennerlein

(nee' Caldaroni), that Elizabeth said she wanted to win money through this lawsuit to buy a house.

Application, p. 8. This is simply not an "admission," nor an issue of a material fact, nor evidence of any

"frivolous" claim or bad faith filing, or anything that warrants sanctions. For one thing, there was no

testimony as to the manner in which any such statement might have been made or "heard," and defense

witness Nancy Petrucelli testified that when this statement was made, she, the Plaintiffs, and Ms. Dennerlein were imbibing alcohol.

Moreover, there is nothing sanctionable about a strategic decision being made not to address it so as not to contribute to distracting side issues. Rebutting Autumn Dennerlein's testimony against her sister by cross-examining her on her tangible resentment and intense anger at the fact that her recently deceased mother had left Schiller over half her estate, designated Schiller trustee of Dennerlein's children's inheritance, and specifically disinherited Dennerlein, was perfectly sound trial strategy.

Nor it there anything sanctionable about a witness forgetting when in the witness box to address a particular fact. In fact, if Schiller's silence at trial in response to these accusations of a avaricious motive in bringing this lawsuit is to be given any serious consideration as a basis for sanctions, she can easily provide an affidavit to the truth, which is that she did not make any such statement about this lawsuit and procuring "six figures for a house," or have any such motive, and that defense witnesses on this matter flatly lied under oath at trial.

Plaintiffs' counsel did not commit sanctionable misconduct by objecting and citing "perjury" to the Court upon defense counsel's eliciting of perjurious testimony by Dennerlein. This certainly was not done to "'block' Ms. Dennerlein from speaking about the Plaintiffs' money motivation issue." Application, p. 8.

Dennerlein was put on by the defense to give what they must know, or recklessly never bothered to verify, is patently perjurious testimony. To wit, the Court's directive at trial was that all documents offered in the pretrial memos and not objected to before trial are deemed admitted and need not be "offered" or authenticated in front of the jury. Yet, defense counsel went through a carefully

4

orchestrated play, handing Dennerlein a copy of a document *that was already in evidence as expressly on the record not objected to by the Plaintiffs* -- Dennerlein's prior <u>official complaint</u> to the City about rampant sex discrimination and harassment and threats and retaliation against her former spouse for reporting it.

Again, the document was in evidence, so the defense also had no reason whatsoever to ask Dennerlein to "authenticate" it. The defense also had no apparent reason to question her on its contents because the document was highly damaging to the defendants' case,[1] especially after Michael Caldaroni's earlier testimony at trial, and *the Plaintiffs had not made use of it*. Plaintiffs submit that the defense went through these motions as a ruse to try to remove the damaging document from evidence and to falsely inform the jury that the document is not what it, in fact, is.

To wit, when defense counsel handed Dennerlein the document, on cue, with great theatrics, she cried out "however did her name get on it," she has never laid eyes on this before, etc. Plaintiffs' counsel immediately objected to it as perjury and asked for a chambers conference. The Court overruled the objection and did not respond to two requests by Plaintiffs' counsel for a chambers conference.

The eliciting of this testimony is not just a matter for impeachment or of the weight of the evidence. This is a City employee pretending not to recognize an official document that she made and that the City provided to the Plaintiffs as such in discovery. It is part of several official City records,

---

[1] It documented another female firefighter's complaints of systematic ex discrimination and hostility, and claiming that nothing was done about it, and it now directly impeached the prior testimony at trial of Lt. Michael Caldaroni, i.e., that he has no recall how he came to file a sworn CHRO charge about the victimization of the women firefighters, including Dennerlein, and threats against him for reporting it, consistent with the Dennerlein document.

including of the official investigation of Donald Day, and there are witnesses to her creation and filing of it with Chief Maglione, including him.

Dennerlein went on to testify *perjuriously* that Plaintiff Schiller was removed from their mother and raised in foster care because their mother was a "child-abuser" – patent lies. In fact, their mother died only last year after a long illness in which Plaintiff Schiller took care of her. Defense counsel and City Attorney John Mitola know this because it at times interfered with scheduling discovery and was discussed in discovery and other proceedings between this Plaintiff and defense counsel and this Plaintiff when in front of defense counsel, she burst out crying on various occasions about the loss of her mother with whom she was very close. Defendant Michael Maglione knows she arranged her mother's funeral because she took leave from work with his permission for it, and the mother was married to a long-time Bridgeport Fire Chief, whom Maglione well knows from working with him for many years), and has every reason thereby to know the testimony offered on his behalf was perjurious. These were not even relevant or material facts, about the foster care, etc. The defense plainly elicited this testimony solely to denigrate Plaintiff (who had never even called her sister as a witness or attacked her in any way).

However one looks at it, this was deceitful manipulation of the evidentiary record and the Court, unfair to opposing counsel, and a highly prejudicial perjurious character assassination upon a litigant in front of a jury, and <u>Plaintiff's counsel acted correctly to try to uphold the integrity of the legal system by immediately trying to inform the Court that perjurious testimony was being provided.</u>

The defense falsely accuses Schiller's husband Terry O'Connell of perjury. At trial, defnse counsel asked him did he know that his wife "filed a sexual harassment complaint" against the U.S.

6

Postal Service (her former employer). Terry answered no. The reason he answered no is that defense counsel's question contained a false factual premise, which was that his wife had in fact filed a "sexual harassment complaint" - the proverbial "When was the last time you beat your wife" question. In fact, she had not. She testified on rebuttal that there was no "complaint" ever filed, that she merely spoke to her then-boss one time about of-color remarks to her by co-workers, one of whom she recognized was mentally impaired and likely not cognizant of the implications of his comments. She never called it "sexual harassment," and she lauded the boss in that job for putting an immediate stop to it and resolving it completely for her, which is why, she testified, she never filed any "complaint."

Is Mr. O'Connell now to be the subject of false accusations by the City for his testimony on behalf of his wife, like Mr. Kergaravat testified he has been?

As to the claims against the individual defendants, as discussed further herein, there is no basis for the assertion that suing them was sanctionable misconduct because their assets might have been sued to satisfy a judgment, or, at the same time, to the complete contrary, because the City might ultimately pay a judgment against them. No one did anything to jeopardize assets save the suit being pursued itself. Application, p. 10.

At the same time, the defense complains that the Plaintiffs reduced the litigation and the City's liability exposure(?!).[2] To wit, the voluntary dismissal of claims against Pettway is not sanctionable, nor does it afford him prevailing party status, nor can the defense make any claim as to him, as the parties executed mutual releases of all claims including for fees pertaining to the claims against Pettway.

The Plaintiffs' decisions not to serve and pursue claims against Donald Day (Application, p.

16), who, despite the Court's entry of a "dismissal" as to him, was never served process and joined in the cases, does not show bad faith. This case took several years to litigate. After some discovery and other sources of information came into the possession of Plaintiffs' counsel, it became apparent that perhaps the situation with Donald Day's conduct was not as simple as the Plaintiffs were given to believe *by the Defendants*, who seemed to have reasons independent of any sex harassment complaints to pursue adverse action against Mr. Day. At some point, a strategic decision was made not to sue Mr. Day, so Plaintiffs simply did not serve him process to join him as a party. This is not sanctionable. In addition, the defense has no claim for fees or costs as to any claims brought, or not brought, against Donald Day, because *the City and its counsel expressly refused to provide Day any defense in this matter.* However, the record shows that the allegations as to Day's conduct which were maintained through trial were not contested or were stipulated to by the defense.

Despite the above, the defense seeks sanctions for Plaintiffs' counsels' communications or association with Mr. Day. At one point, the defense made the completely unsupported and false and defamatory allegations that Plaintiffs' counsel entered into an unsavory "Mary Carter" arrangement with Day, i.e., promising to pay him in return for his giving adverse testimony against the Defendants. Similarly unfounded are the Defendants' representations about the Motions to Intervene filed by Plaintiffs' counsel on behalf of two minority firefighter organizations whose members opposed the firefighter union's Motion to Quash the Plaintiffs' subpoena for records of their discrimination complaints. What these two complaints of "litigation abuse" have in common is the color of the skin of the persons whom defense counsel attacks Plaintiffs' counsel for associating with.

---

[2] E.g., from possible separate damages claims under 42 U.S.C. § 1983 against Pettway and Day.

Beyond that, the defense proffers that the entire lawsuit was wholly frivolous, a claim that is practically indistinguishable from impermissibly seeking sanctions merely <u>because the Plaintiffs lost the case</u>. There is no support for even this vague and generalized claim; the defense failed to prevail on all but a fraction of its Motion to Dismiss Elizabeth Schiller O'Connell's Complaint; the defense failed to move to dismiss Johanna Georgia's Amended Complaint filed 3 1/2 years ago; the Plaintiffs' core claims survived Motions for Summary Judgment, and survived to jury verdict The defense also seeks sanctions for Plaintiffs' Motion for Class Certification, which was simply denied, with no finding by the Court that it was frivolous. However, the Court did <u>expressly deem a lacking of any grounds for a *defense* Motion seeking a patently unconstitutional prior restraint</u>, in the form of an unnecessary and *extraordinary* Motion for Protective Order in the form of a blanket "gag" order on everything adduced in the discovery of this case. The Defendants' sole basis for the Motion was the purported "emotionalism" and "bad press" the City believed it was getting over the disturbing conduct in its Fire Department.

It is grossly late to be seeking sanctions for pleadings filed several years ago, and for pleadings and discovery the Court has already acted on and did not deem frivolous or bad faith.

True, there was the order of fees against Plaintiffs' counsel over medical releases, but that was not a matter of any frivolous or bad faith pleading. The defense fails to mention the <u>multiple</u> directives and orders to it to comply with discovery, or the record showing that Plaintiffs' counsel repeatedly had to ask the Court to intervene to stop defense counsel from behaving in an extremely abusive manner.

Defense counsels' conduct included repeated walking out on depositions that took months to get their witnesses and City employees to appear for; providing document "compliance" un-indexed and

9

with requested items buried with thousands of mere copies and "filler" material, costing the Plaintiffs thousands of dollars and expending hundreds of Plaintiffs' attorney hours to sort through the haystack; verbally abusing, screaming at, pounding tables at, and expressly threatening Plaintiffs' counsel, and her clients in this case, another client who was Plaintiffs' trial witness, and a third party (a former employer of Ms. Georgia). These were not bald claims; all of this was documented[3] to the record. In a courthouse settlement conference with P.J.O. Murphy, the Court had to separate defense counsel from Plaintiffs' counsel upon one of defense counsel's angry yelling and table-pounding tirades. Upon Plaintiffs' counsel's complaints of such conduct, the Court ordered depositions to be conducted in the courthouse, where the abuses and outbursts by defense counsel continued in the presence of deponents, clients, and the court reporters.

There has been not one instance of any such conduct by Plaintiffs' counsel or even an allegation of such. It is therefore beyond "unclean hands" on the part of the defense to seek sanctions against Plaintiffs' counsel.

As to the order of fees against Plaintiffs' counsel over the medical releases, as discussed further in this Memorandum, the defense seeks sanctions and fee-shifting against the Plaintiffs for purported discovery abuses (Application at pp. 9-10), it, which are not even subject to Rule 11 and are not a basis for fee-shifting under the civil rights statutes.

Also, Plaintiffs' counsel has a good faith belief that the fee order was improvidently entered and

---

[3] Defense counsel admitted a great deal of this conduct on the record, justifying it as his having been "provoked" by Plaintiffs' counsel, and the Plaintiffs proffered an affidavit and third party witnesses' testimony for trial as to the abusive and threatening conduct of defense counsel Robert Mitchell, as constituting unlawful retaliation by the Defendants but it was all excluded upon the Defendants' Motion in Limine.

appealable.

There was delay in responding to the Defendants' requests not due to bad faith, but because of confusion, in part over how compliance with the request for medical records would be made under the Rules (there was no objection to the disclosure itself or treators being deposed, but the discovery rules do not require litigants to create new documents for discovery requests, which is what creation of medical records release forms was), and because Plaintiffs' counsel was then also working a full-time legal aid position and transitioning offices/jobs which led to problems with her mail including not getting some notices in that timeframe from the court (in the day before electronic notices) and counsel. Counsel did not know she was missing some mail until discovering after the fact that the Court initially acted on the Defendants' Motion, and counsel acted to rectify the problem at once. This falls into the "nobody's perfect" realm, nothing more.

As it turned out, there were a number of thorny issues around the scope of the releases demanded, HIPAA, etc., such that the Court eventually entered protective orders narrowing the scope of what the defense could obtain and barring public disclosure of medical information. The defense also fails to inform the Court that Plaintiffs' counsel went through extensive efforts to try to get two treators to cooperate with releasing records and information to the defense when they refused to comply despite releases and deposition notices. The bottom line is that none of this prejudiced the defense, who, no matter what they claim to have spent in attorney time *pursuing sanctions against counsel over this,* they obtained the records and information they sought in plenty of time to conduct all the depositions they wanted.

Still, the fee order entered. Plaintiffs' counsel requested a hearing but was not afforded one to

challenge the defense billings relative to the medical release issue, to show compliance and her very limited financial means against the largest law firm in this State. It has been anticipated since that the order would be appealed (counsel had no notion that the case would take another three years after that to get the case resolved).

Defense counsel now patently misrepresents in their Application that they have "reminded" Plaintiffs' counsel "of her obligation to pay" the fees re the medical release issue. Application, p. 10. This vague statement cleverly avoids the truth, which is that they have never said such a thing, and in fact, <u>declined to accept payment.</u> *On her own initiative*, Plaintiffs' counsel inquired of Attorney Robert Mitchell on two occasions, and his partner Attorney Margaret Sheahan on at least one other occasion, about submitting payment, and each time, they expressly discouraged Plaintiffs' counsel from making payment expressly stating that they <u>did not expect or want payment.</u> On one occasion, *Plaintiffs' counsel* mentioned her concern that it is a court order, and defense counsel (Mitchell) replied "We can deal with it later," and suggested payment be accomplished as an offset to settlement or damages, or waived, because the defense was satisfied in getting the medical records and acknowledged that Plaintiffs' counsel was not responsible for all the problems with getting them. Indeed, in the <u>three years</u> before the instant Application, the defense has never complained to the Court about nonpayment.

The Plaintiffs' and their counsel's conduct in the litigation presenting no basis for sanctions, the defense complains of conduct by the Plaintiffs occurring *outside the litigation and after judgment*, to wit, internal complaints that Plaintiff Elizabeth Schiller O'Connell has filed with the City. Application, p. 11. She filed these complaints of sex discrimination and harassment in compliance with the complaint policy requirement which the City represented at trial. Furthermore, the defense cannot be heard to

complain, as they steadfastly rejected repeated offers by the Plaintiffs for a consent decree or agreement with the City, whereby there would be court oversight of its Fire Department, specifically including employee discrimination complaints. The Court has no authority over this matter now, so, query, what is the purpose of the Defendants' complaints about it, other than inserting more defamatory accusations into the Court's record?

As to the fee-shifting claims, the Defendants pressed at trial that they have provided substantial relief sought by the Plaintiffs in this action, i.e., punishment of Donald Day's use of a sexist word, provision of properly fitting gear to the female firefighters, removal of pornography from the workplace, and anti-retaliation postings, and there is no evidence that the Defendants would have provided these remedies were it not for the Plaintiffs' lawsuits.

It is ironic that the City of Bridgeport vigorously argues here for the need to recoup taxpayer money for it "victimization" by two lowly women firefighters and their solo counsel, but defense counsel did expressly threaten to squash counsel like a bug.[4] Juxtaposed to the Defendants' proclaimed interest in the citizenry, the Court may take judicial notice of its docket, to wit, that in the two years since the convictions in this Court of the City's mayor and his various associates for stealing the citizens of Bridgeport blind through years of the most rank corruption, the City and its attorneys have not filed any claim for restitution or compensation from Mr. Ganim or any of his associates or enterprises, which would at least serve a legitimate purpose of punishing and deterring public corruption.

Plaintiffs and their counsel did not control how the City *chose* to litigate this case. The City seeks

---

[4] The actual words used by Attorney Robert Mitchell were (to Plaintiffs' counsel) were: "I'll squash you like the bug that you are."

what is repayment of the money that it *chose* to expend for a battle royale led by the largest law firm in this State, when it could have resolved the matter, and has always had available to it several capable, salaried in-house attorneys, one of whom, in fact, maintained an active appearance throughout the litigation.[5] It is also the City's choice to "go bare" without liability insurance.[6]

Plaintiffs and their counsel did not control the City's *choices* of how to respond to their complaints, else the Plaintiffs would have had the City expend minimal cost to provide them properly fitting uniforms and gear, alarms in habitable women's quarters, end the policy and practice of segregating and harassing women in quarters and work assignments, remove pornography from the workplace, and enforce its own anti-discrimination policies, *which would have avoided or ended the litigation years ago.*

Finally, the improper purpose of the Application is brought into focus by the fact that the defense has been demanding that the Plaintiffs quit their protected tenured municipal civil service jobs without compensation under threat of the instant fee Application if they refuse, which they did, and without Due Process for this deprivation of vested property interests. See Exh. 2 hereto. Their jobs have never been in jeopardy by any claims whatsoever of performance or conduct deficiencies.

## II.  LAW

### A.    THE RULE 11 SANCTIONS REQUESTS ARE NOT IN PROPER FORM AND ARE UNTIMELY.

The defense did not comply with the requirements for seeking sanctions under Rule 11:

---

[5] John Mitola, Esq., who withdrew just before trial so that he could testify for his clients.

[6] The City of Bridgeport is self-insured for all non-vehicular risks, even Workers' Compensation.

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5 but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Fed. R. Civ. Pro. 11(c)(1)(A).

The reason for these procedures, in particular, the 21-day notice and "safe harbor," is that the purpose of Rule 11 is <u>not to inflict retribution</u>, but to remedy missteps in litigation and deter repetition of what is remedied:

> It is clear from the language of the rule that it imposes mandatory obligations upon the party seeking sanctions, so that failure to comply with the procedural requirements precludes the imposition of the requested sanctions. <u>See</u>, <u>e.g.</u>, <u>Elliott v. Tilton</u>, 64 F.3d 213, 216 (5th Cir. 1995) ("The plain language of [Rule 11(c)(1)(A)] indicates that this notice and opportunity prior to filing is mandatory. Plaintiffs did not comply with this procedural prerequisite. Therefore, the sanction and payment of costs and attorneys' fees ordered by the district court cannot be upheld under Rule 11."); <u>accord</u> <u>Gordon v. Unifund CCR Partners</u>, 345 F.3d 1028, 1030 (8th Cir. 2003); <u>Radcliffe v. Rainbow Constr. Co.</u>, 254 F.3d 772, 789 (9th Cir. 2001); <u>AeroTech, Inc. v. Estes</u>, 110 F.3d 1523, 1528-29 (10th Cir. 1997); <u>Ridder</u>, 109 F.3d at 296; <u>Hadges v. Yonkers Racing Corp.</u>, 48 F.3d 1320, 1328 (2d Cir. 1995). In addition, the rule serves to limit the power of the district court to impose sanctions under the rule, by expressly conditioning the court's authority to impose sanctions upon compliance with the safe-harbor provisions. <u>See</u> Fed. R. Civ. P. 11(c) ("If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction . . . .") (emphasis added).

<u>Brickwood Contractors v. Datanet Engineering Inc.</u>, 369 F.3d 385, 390 (4th Cir. 2004). <u>See also</u> <u>Norsyn Inc. v. Desai</u>, 351 F.3d 825 (8th Cir. 2003) ("Having failed to file a formal motion for sanctions, Defendants were entitled to no monetary reward whatsoever.").

"A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Rule 11(c)(B)(2).

Accordingly, "[d]istrict courts may, of course, 'adopt local rules establishing timeliness standards,' for

filing and deciding Rule 11 motions." <u>Cooter and Gell</u>, 496 U.S. 384, 398 (1990), <u>quoting</u> <u>White v. New Hampshire Dept. of Employment Security</u>, 455 U.S. 445, 454 (1982). "Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely," and "[g]iven the 'safe harbor' provisions discussed below, a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)."

Comments, Rule 11, 1993 amendments.

Judge Newman explains:

Although Rule 11 contains no explicit time limit for serving the motion, the "safe harbor" provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission. <u>See</u> <u>Barber v. Miller</u>, 146 F.3d 707, 710-11 (9th Cir. 1998) (Rule 11 sanction disallowed where motion filed after complaint dismissed); <u>Ridder v. City of Springfield</u>, 109 F.3d 288, 295-97 (6th Cir. 1997) ("A party must now serve a Rule 11 motion on the allegedly offending party at least twenty-one days prior to conclusion of the case or judicial rejection of the offending contention"; Rule 11 sanction disallowed where motion filed after summary judgment motion granted); <u>DeShiro v. Branch</u>, 183 F.R.D. 281, 287-88 (M.D. Fla. 1998) (same); <u>Daliessio v. DePuy, Inc.</u>, 178 F.R.D. 451, 452 (E.D. Pa. 1998) (Rule 11 motion disallowed where motion not served on adverse party prior to entry of final judgment). The Advisory Committee on Civil Rules contemplated that Rule 11 motions would be deemed untimely if filed too late to permit correction or withdrawal, and the Moore treatise endorses this approach.

<u>In re Pennie & Edmonds LLP</u>, 323 F.3d 86, 89 (2d Cir. 2003).

Although a court may defer ruling on a Rule 11 Motion until final resolution of the case,[7] the party must have previously filed it within a reasonable time after reasonable discovery of the allegedly improper filing. <u>Muthig v. Brant Point Nantucket, Inc.</u>, 838 F.2d 600, 604 (1st Cir. 1988) (applying 1983

---

[7] And even at that, only "in order to avoid immediate conflicts of interest and to reduce the disruption created if a disclosure of attorney-client communications is needed to determine whether a violation occurred or to identify the person responsible for the violation." Comments. Rule 11 (1993 Amendment).

amended version of Rule 11); <u>Hunter v. Earthgrains Co. Bakery</u>, 281 F.3d 144, 152 (4th Cir. 2002) ("the 'safe harbor' provisions of Rule 11(c)(1)(A) preclude the serving and filing of any Rule 11 motion after conclusion of the case"); <u>Ridder v. City of Springfield</u>, 109 F.3d 288, 297 (6th Cir. 1997) (because of the requirements of Rule 11(c)(1)(A), "a party cannot wait until after summary judgment to move for sanctions under Rule 11"). The instant post-judgment request for sanctions addresses purported conduct from several months to *years* ago. There is no opportunity to remedy anything complained of, and no "safe-harbor." It runs afoul of principles of laches and mitigation of damages ("[t]he award should not provide compensation for services that could have been avoided by an earlier disclosure of evidence or an earlier challenge to the groundless claims or defenses." Comments, Rule 11, 1993 Amendments).

### B.   THE DEFNSE DOES NOT SEEK RULE 11 SANCTIONS FOR A PROPER PURPOSE.

There is no legal authority for, certainly no precedent in this Circuit, and ample legal authority against, an attorney's fees award merely for a successful defense, especially against the protected activity of civil rights actions. Rule 11 is not a fee-shifting provision.

"Rule 11 motions should not … be employed … to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, to increase the costs of litigation, to create a conflict of interest between attorney and client, or to seek disclosure of matters otherwise protected by the attorney-client privilege or the work-product doctrine." Comments, Rule 11, 1993 Amendments.

As to the prohibition on using Rule 11 **"to exact an unjust settlement,"** aside from all the litigation abuses and threats the defense has heaped on the Plaintiffs and their counsel in this case

(which will be addressed later in opposing the Application on the merits, if necessary), the defense demanded (Exh. 2 hereto) that the Plaintiffs quit their protected tenured municipal civil service jobs without compensation, or face the instant fee Application if they refuse (which they did).

Citizens enjoy special protection in bringing Title VII and § 1983 claims. The purposes of Title VII (and CFEPA) are to remedy and prevent unlawful discrimination, and to accomplish this, these laws aim to keep protected class members who complain of unlawful discrimination and harassment on the job working without retaliation for their complaints. Demanding resignation because a protected class employee tries but fails to obtain redress under these complex laws undermines this entire remedial scheme, and moreover, is *actionable retaliation* under Title VII and CFEPA, and an infringement upon fundamental federal and state Speech and Due Process rights. It also violates the prohibition in Conn. Gen. Stat. § 31-51q against employers "subject[ing] any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state."[8] Intimidating citizens from exercising their civil rights cannot be a legitimate use of Rule 11.

To wit, the instant Application is specifically directed at speech outside of and apart from any

---

[8] Conn. Gen. Stat. § 31-51q, Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights. Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.

litigation in this court. To wit, the defense attaches copies of internal complaints that Plaintiff Elizabeth (Schiller) O'Connell has filed since after trial and judgment in this matter about various workplace issues. It is her right to make such complaints under Title VII, CFEPA, and the City's policies (and it may even be her duty as a City employee to report workplace misconduct to her superiors). Moreover, these new internal complaints are just days old, so what kind of "meaningful investigation" of their merits did the defense conduct – an inquiry which is required by Title VII and CFEPA, as well as Rule 11 -- before the defense represented them to the Court as meritless and deserving of sanctions?

Similarly, the bodily injury that Johanna Georgia just suffered (incurred at the direction of one of the male officers whom she previously alleged complained had violated her rights) cannot provide a basis for Rule 11 sanctions. Application, p. 10 n. 1 (Note that Plaintiff does not agree with the version of her return to work and reinjury recited therein).

Another extraneous basis claimed for sanctions is Georgia's Bar grievance against Attorney Mitola. Such complaints are strictly protected from reprisal by him or his employer, which the instant Application, citing it as grounds for sanctions, smacks of.

It is reasonable to conclude that at least part of the purpose of the instant sanctions request is to exact an "unjust settlement," i.e., to force the Plaintiffs -- who have already lost some $20,000 in directly incurred out-of-pocket litigation costs trying to vindicate their rights, persevering through almost 5 years of litigation, as they suffered and continue to suffer the harms they complained of -- to capitulate to the demands of the defense that they quit their civil service jobs in which they have vested property interests, without compensation or Due Process, and never complain again about any

discrimination or labor rights violations by the City of Bridgeport and its officials.[9] Such a tactic is fundamentally unfair, unjust, and a perversion of the purpose of Rule 11.

Fifth, it is reasonable to conclude that the defense is improperly using Rule 11 **to intimidate the Plaintiffs into withdrawing contentions that are fairly debatable.** It is reasonable to conclude that at least one goal of the defense's Application is to intimidate the Plaintiffs from proceeding to file an appeal in this action, and into withdrawing their various other claims. To wit, both Plaintiffs have pending labor grievances. Ms. Georgia has pending CHRO/EEOC Charges of disability discrimination which is just days from a Fact-finding hearing, shortly after which the Charge will be released for litigation. As the defense notes several times in its Application, as soon as Ms. Georgia returned to work, she was injured as a result of the conduct of a superior officer whose discriminatory conduct she had previously complained of, which presents at least a question of actionable retaliation and intentional co-worker injury.

Sixth, it is reasonable to conclude that the defense is improperly using Rule 11 **"to increase the costs of litigation."** Indications of this being a motive are: (1) the Defendants obtained judgment after jury trial in their favor in this employment discrimination action, an action involving complex law and facts, and which they had the opportunity to show was frivolous but did and could not before the action was sent to a jury; (2) there is little or no legal support for this type of post-judgment use of Rule 11 to punish litigants, especially in Title VII and civil rights action; (3) the Rule 11 claims were not filed at the time the alleged litigation abuses occurred, some being years earlier; (4) the Rule 11 claims are not

---

[9] Plaintiff Johanna Georgia still has a pending CHRO/EEOC charge, and both Plaintiffs still have pending grievances on other employment issues.

filed in proper form as a separate pleadings with the 21 day notice and "safe-harbor" provisions adhered to; and (5) it is readily apparent that the defense has little or no hope of recovery of a fraction of the outlandish one million dollars-plus that they demand from these two low-level employees and their solo lawyer of obviously modest means.

Added to this is the unfortunate reality that there is no effective sanction against *the defense* if they do not prevail on their Application. What deterrence is there against a large well-funded law firm filing any ill-founded sanctions and fee application, when its mere filing, no matter what its merits, (1) defames (especially here, with its many *in personam* attacks upon the Plaintiffs and their counsel) its targets on the public record; (2) inflicts economic punishment, defamation and distress upon these rank-and-file employees and their solo counsel who have but a fraction of the power and funds of Pullman & Comley and the City of Bridgeport, and (3) intimidates the Plaintiffs, their counsel, and *other citizens and lawyers* from exercising and protecting civil rights against this municipality and its law firm? The propriety of this type of "SLAPP" litigation is discussed further herein below.

This also begs the question whether the defense is improperly using Rule 11 to try **"to create a conflict of interest between attorney and client."** Plaintiffs and their counsel now need to retain counsel to fight this Application on the merits, and may need separate counsel (all to their economic punishment). Certainly, because a great deal of the Application consists of defense counsel's claims as to the purported motives, strategies, theories, and beliefs of Plaintiffs' counsel, **adequate defense of the client privilege or the work-product doctrine."** This prohibited breach of the privilege will benefit the defense with privileged information they would never be able to obtain through discovery, which they would have the advantage of for other pending and future complaints and actions.

**C.    THE DEFENSE FAILED TO FILE A PROPER STATEMENT OF TIME
      AND COSTS FOR THEIR FEE-SHIFTING CLAIMS.**

The time and costs statement does not contain the required "one-to-one correlation of the fee

billings with these particular pleadings, motions, etc." This further raises the question whether the

timekeeping was contemporaneous. Again, Plaintiffs will separately address the substance or merits of

the fee Application if it is not dismissed as a matter of law.

**D.    THE APPLICATION STATES NO COGNIZABLE BASIS FOR RULE 11
      SANCTIONS AGAINST PLAINTIFFS OR THEIR COUNSEL.**

**(1)    The defense frivolously seeks Rule 11 sanctions for discovery conduct.**

As a matter of law, to the extent that the fee Application seeks sanctions for discovery conduct

(Application at pp. 9-10), it is unfounded and frivolous, because Rule 11 does not apply to discovery.

Rule 11(c)(1)(D).

**(2)    The defense frivolously seeks Rule 11 sanctions for attorney misconduct.**

Rule 11 applies only to pleadings and other filings, and to oral representations to the court that

essentially reiterate what is set forth in signed papers, but not to attorney misconduct in general. O'Brien

v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996) (abuse of discretion to sanction counsel for an

inaccurate statement of fact in oral argument, where no nexus existed with any paper filing and counsel

was not afforded the "safe harbor"). See also United Energy Owners Comm., Inc. v. United States

Energy Management Systems, Inc., 837 F.2d 356, 364-65 (9th Cir. 1988) (sanctions not available for

attorney misconduct apart from representations in filings).

**(3)    The defense frivolously seeks Rule 11 sanctions against the Plaintiffs and their
      counsel for criticizing the conduct of public officials.**

Rule 11 is not designed to safeguard defendants from public criticism. Whitehead v. Food Max

of Miss., Inc., 277 F.3d 791 (5th Cir. 2002), and would be especially wrong here, with a public agency in a civil rights action that included viable Free Speech claims, and which was previously denied a completely frivolous Motion for a blanket "gag" order on any disclosure of any evidence of its conduct adduced in this lawsuit.

      **(4)    The defense fails to show any <u>filings</u> by the Plaintiffs that violate the standards of Rule 11(b).**

"[T]he standard certification for factual allegations under Rule 11(b)(3) is that 'there is (or likely will be) evidentiary support for the allegation, not that the party will prevail with respect to its contention.'" <u>O'Brien v. Alexander</u>, 101 F.3d 1479, 1489 (2d Cir. 1996), <u>quoting</u> Fed.R.Civ.P.11 Advisory Committee's Note (1993 Amendments). As a result, this Court is disallowed from imposing sanctions unless a particular allegation is lacking in factual support." <u>Moazed v. First Union Mortgage</u>, 3:02-CV-91(EBB) at 7 (D. Conn., March 18, 2004).

      In the Second Circuit, where a lawyer is denied "the opportunity to withdraw the challenged document pursuant to the 'safe harbor' provision of Rule 11(c)(1)(A), the appropriate standard [to judge the filing under attack] is subjective bad faith." <u>In re Pennie & Edmonds LLP</u>, 323 F.3d 86, 89 (2d Cir. 2003). "[T]he fact that the jury found against plaintiff is not proof, as a matter of law, that her pleadings" were unfounded, baseless, improper, or interposed for an improper purpose. We must be cautious not to allow an adverse jury verdict to dictate the decision on a sanctions motion, as that would amount to taxing the costs of litigation to the losing party, an approach that our legislature has not seen fit to embrace." <u>See</u> <u>Rice v. Danas, Inc.</u>, 132 N.C. App. 736 (1999) (state law wage-and-hour action, upholding denial of post-judgment Motion for Sanctions sounding very much like the instant

Application,[10] brought after a jury verdict for the defense); <u>See also</u>, <u>Lee v. Pei</u>, (91-409-P-H) (D. Me. 1994) at 17 (Exh. 1 appended hereto), <u>citing</u> <u>Martin v. Brown</u>, 151 F.R.D. 580, 586 (W.D. Pa. 1993) ("Rule 11 sanctions are inappropriate simply because an attorney, after time for discovery, is unable to produce adequate evidence to withstand a motion for summary judgment.") (internal quotation marks and citations omitted); <u>Stitt v. Williams</u>, 919 F.2d 516, 526-29 (9th Cir. 1990) (same).

There is nothing that the defense now seeks to recover fees and costs for which they could not have addressed by a timely Rule 11 (or Rule 37[11]) Motion <u>years ago, when there was a chance to remedy any "bad faith" filing</u>, and again, the failure to provide the "safe harbor" is, alone, fatal to a request for Rule 11 sanctions. The Plaintiffs are entitled to have the defense prove the more rigorous *mens rea* standard of subjective bad faith in each and every filing they seek sanctions for. <u>In re Pennie & Edmonds</u>, <u>supra</u>.

As stated, the merits of the particular fee claims will be addressed in detail if this Motion to Dismiss the Application is not granted, but on its face, the Defendants' Application based on the Plaintiffs' pleadings in their Amended Complaints is insufficient. Ultimately losing a Motion, or a

---

[10] To wit, the defendant's claims in the Motion for Sanctions in <u>Rice v. Danas, Inc.</u> were "that counsel for plaintiff commenced this action without investigating to determine whether 'it was well grounded in fact and in law'; that early in the course of litigation, information was presented to counsel for plaintiff which demonstrated the fraudulent nature of plaintiff's conduct, but counsel never investigated the information or talked with available witnesses; that counsel for plaintiff pursued the unfounded claims of plaintiff to a jury verdict, even calling plaintiff as a witness and eliciting testimony which 'any reasonable attorney experienced in civil litigation would have known to be patently false'; that counsel for plaintiff filed documents with the trial court in an effort to interfere with defendant's discovery efforts, and refused to cooperate with the efforts of defendant's counsel to carry out meaningful discovery. Defendant further alleged that the Rule 11 violations 'were the result of collaboration between plaintiff and her counsel, however her counsel's conduct was at least equal to plaintiff's.'" The employer obtained an award of costs on its *counterclaim* under North Carolina's wage-and-hour statute.

claim, or a trial, with all the variables involved therein, especially in complex civil rights claims, is not

synonymous with an utter lack of factual support for claims. Marbled Murrelet v. Babbitt, 182 F.3d

1091, 1096 (9th Cir. 1999) (claims not "automatically meritless merely because the plaintiff eventually

lost"). As a matter of law, "[w]ith regard to factual contentions, 'sanctions may not be imposed unless a

particular allegation is utterly lacking in support.'" O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir.

1996) (counsel made express misrepresentations of adjudicated facts; although it was also found to be an

abuse of discretion to sanction counsel for an inaccurate statement of fact in oral argument, where no

nexus existed with any paper filing and counsel was not afforded the "safe harbor"); Rule 11(b) (1993).

Accord, Storey v. Cello Holdings, 347 F.3d 370, 383-85 (2d Cir. 2003) (sanctions vacated as abuse of

discretion where "some of the identified factual contentions are more suspect than others" but not

"utterly lacking in support."). See also Attwood v. Singletary, 105 F.3d 610 (11th Cir. 1997) (sanctions

justified where plaintiff filed a false affidavit "in bad faith" and "[h]is actions show a history of bad faith

litigiousness and deceit," including filing over 61 suits in one courthouse alone).

As a matter of law, "to constitute a frivolous legal position for purposes of Rule 11 sanction, it

must be clear under existing precedents that there is no chance of success and no reasonable argument to

extend, modify or reverse the law as it stands." Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990).

See also, Gibson v. Chrysler Corp., 261 F.3d 927, 949 (9th Cir. 2001) (reversing the award of Rule 11

sanctions because "we recognize the difficulties faced by parties who seek to advance novel legal

arguments"); Baker v. Alderman,158 F.3d 516, 524 (11th Cir. 1998) ("[T]he purpose of Rule 11 is to

---

[11] Rule 37(a)(4)(A) provides in relevant part that "If the motion is granted . . . the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion . . . to pay to the

deter frivolous lawsuits and not to deter novel legal arguments or cases of first impression."); <u>Peloza v. Capistrano Unified School District</u>, 37 F.3d 517, 524 (9th Cir. 1994) (no sanctions for dismissed complaint raising questions of first impression); <u>United States v. Alexander</u>, 981 F.2d 250, 253 (5th Cir. 1993) ("Parties who argue points of first impression in a circuit are not ordinarily the recipients of Rule 11 sanctions order.").

Here, the Plaintiffs' core claims under Title VII, CFEPA, and 42 U.S.C. § 1983 survived a Motion to Dismiss and Motions for Summary Judgment, and nothing they filed was dismissed or denied upon any finding or evidence that it was "frivolous" or in filed or maintained in (subjective) bad faith.

<u>As a matter of law</u>, sanctions are not warranted for Plaintiffs' failed "disparate impact" theory under Title VII (and CFEPA). Dec. on SJ, Nov. 3, 2004, at 15 (Covello, U.S.D.J.). Summary judgment was granted on grounds that supporting facts did not qualify for recovery as part of a "continuing violation" beyond the statute of limitations, a theory which is always subject to case-by-case, act-by-act application. The Court heard the Defendants' claims about timeliness on their earlier Motion to Dismiss as to Schiller's complaint, and declined to grant them in their entirety. The defense could have moved three years ago to dismiss Johanna Georgia's similar claims they believed to be untimely under Rule 12(b)(6), but chose not to, nor did they bring  a Rule 11 Motion against Georgia before the case went to judgment, which would have afforded her a "safe harbor" to fix any pleading defects.

There may be some confusion, in that <u>the Court expressly vacated its prior January 22, 2002 ruling in this case</u> applying a continuing violations theory to deny dismissal of certain facts from Schiller's Amended Complaint,[1] and it also appears to Plaintiffs' counsel that the Court generally

moving party the reasonable expenses incurred in making the motion . . . ."

reconsidered Schiller's stricken (untimely) fact allegations in deciding summary judgment (?). Dec. on SJ, Nov. 3, 2004, at 16 (Covello, U.S.D.J.). Albeit, if there was any confusion as to what was in or out of the complaint, the failure of *either side's counsel* to bring it to the Court's attention was inadvertence, not bad faith, much less *subjective* bad faith. In the end, the defense cannot be heard to complain of any harm, as "disparate impact" is merely a theory of recovery under Title VII and CFEPA. These causes of action against the same defendant, providing the same relief, remained intact though verdict under alternative theories of disparate treatment, sexual harassment and retaliation.

As a matter of law, sanctions are not warranted for Elizabeth Schiller O'Connell's dismissed federal Due Process claim pursuant to 42 U.S.C. § 1983.[12] The court granted summary judgment on the basis that she failed to provide sufficient evidence from which a jury could find a property deprivation. It was undisputed that each Plaintiff is a tenured civil service employee with a vested property interest in her job and earnings from it. Both Plaintiffs claimed the loss of earnings opportunities and experience from not being permitted to work in all firehouses and all shifts, which results in loss of overtime and compensatory time opportunities and "acting officer" assignments and pay to which they were entitled by union contract. The Court found this was not enough for a jury to find a property deprivation.

At the same time, the Court found sufficient evidence of a property deprivation for part of Johanna Georgia's Due Process claim to go to the jury. Georgia was ordered to stay out of work on

---

[12] Schiller's Due Process claim in Count One of her Amended Complaint was alleged to be based on the refusal to hire her with the first hiring class of the 1997-98 hire list, which claim was stricken on summary judgment as untimely as discussed above herein, and the "systematic, institutionalized violations of the civil rights of female firefighters," including the unequal assignments and earnings opportunities afforded to female firefighters which she alleged in her Facts.

extended medical leave, and, like Schiller, received her base pay, and like Schiller, was denied overtime

and compensatory time opportunities and "acting officer" assignments and pay. The difference was that

Schiller got to earn <u>some</u> overtime and comp time; thus, <u>the distinction was a matter of the total dollars,</u>

<u>not the fact of the deprivation of income itself.</u> This was close question, and there was a good faith basis

for believing that a jury could have found a property deprivation to both Plaintiffs.

    <u>As a matter of law</u>, sanctions are not warranted for Plaintiffs' claims in their Amended

Complaints under 42 U.S.C. §§ 1985(3) and 1986.[13] The § 1986 claims were merely derivative of the §

1985(3) claims and were disposed of on that basis. Summary judgment was granted as to the § 1985(3)

claims based on the Court's finding that there was no evidence of a conspiracy. In fact, evidence was

presented in opposition to summary judgment, so that what the Court actually found was that there was

*insufficient* evidence from which a jury could reasonably find a conspiracy to violate civil rights.

Especially with the difficulty in proving conspiracy, this does not represent frivolous or bad faith filings.

    <u>As a matter of law</u>, sanctions are not warranted for Plaintiffs' state law claims for common law

breach of the covenant of good faith and fair dealing, and for violations of their rights under article first,

§ 20 of the Connecticut Constitution, over which the Court simply declined to exercise supplemental

jurisdiction for the articulated reason that each presented a <u>novel question of state law</u>.[14]

    <u>As a matter of law</u>, sanctions are not warranted for Plaintiffs' claims under article first, §§ 1, 8

---

[13] Dec. on SJ, Nov. 3, 2004, at 40-41 (Covello, U.S.D.J.).

[14] Dec. on SJ, Nov. 3, 2004, at 43-44, 47-48 (Covello, U.S.D.J.).

and 10 of the state constitution.[15] The Court granted summary judgment merely for <u>inadequate pleading.</u>

Defectively pleaded claims should not have been disposed of on summary judgment under Rule 56 on the eve of trial, but rather, should have fallen under Rule 12(b)(6), which would have afforded the Plaintiffs the opportunity to re-plead to cure the defects or deficiencies. The defense cannot be heard to complain now, as they could have moved to dismiss three years ago under Rule 12(b)(6), and as stated above, they did not afford the Plaintiffs the "safe harbor" to fix these pleading defects before filing for *post-judgment* sanctions.

     <u>As a matter of law</u>, sanctions are not warranted for Plaintiffs' claims under article first, § 4[16] of the Connecticut Constitution, relying on its prior decision in another case, <u>Ward v. Housatonic Area Regional Transit Dist.</u>, 154 F. Supp.2d 339, 356 (D. Conn. 2001) (denying a right of action for money damages for violations of the cited rights under the state constitution).

     Plaintiff brought and maintained the claims under <u>Binette v. Sabo</u>, 244 Conn. 23, 48 (Conn. 1998), in which the Connecticut Supreme Court held that "whether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis." The single Connecticut decision cited by the Court for its denial of the right of action in <u>Ward</u> is <u>Kelley Property Development, Inc. v. Lebanon</u>, 226 Conn. 314, 339 (1993). However, the reason the Connecticut Supreme Court declined to find a cause of action under these provisions of the state constitution in <u>Kelly</u> was essentially a failure to exhaust administrative remedies (the zoning

---

[15] Dec. on SJ, Nov. 3, 2004, at 42-43 (Covello, U.S.D.J.).

[16] Dec. on SJ, Nov. 3, 2004, at 42 (Covello, U.S.D.J.).

appeals process), which is inapposite to the instant case wherein the Plaintiffs exhausted their administrative process before filing suit. Another factor the state court relied upon in denying Kelley a private right of action was that "the existing remedies … are particularly appropriate in light of the fact that the (town) officials whose conduct allegedly violated Kelley's state constitutional rights are not professionals but are laypersons with little or no technical expertise" (Id., 341) – a factor neither cited nor relevant to the instant cases. With such debatable precedent, and consistent with the principal articulated by the Court in the instant case in declining to exercise jurisdiction over unsettled state law claims, the issue ought not to have been disposed of on the merits by the federal trial court, and in doing so, the Court did not find the Plaintiffs' pursuit of the claim so utterly unfounded as to warrant sanctions.

As a matter of law, sanctions are not warranted for Plaintiffs' common law claims for intentional infliction of emotional distress,[17] disposed of on summary judgment for failure of evidence of "extreme or outrageous" conduct. The Court relied on its prior decision in Minor v. Cheshire, 126 F.2d 184 (D. Conn. 2000), affirming dismissal of a common law emotional distress claim, as establishing a *state law* rule that conduct constituting intentional sex discrimination and sexual harassment and hostility are not, as a matter of law, "extreme or outrageous" for purposes of common law intentional infliction of emotional distress.

This is inconsistent with the Court's *denial of summary judgment on the Title VII and CFEPA sexual harassment and hostile environment claims* herein, as *those claims require a showing of what is essentially "extreme and outrageous" conduct*, i.e., that "the workplace is permeated with

---

[17] Dec. on SJ, Nov. 3, 2004, at 46 (Covello, U.S.D.J.).

'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Howley v. Stratford, 217 F.3d 141 (2d Cir. 2000) (vacating this Court's grant of summary judgment dismissing for "insufficient evidence" similar intentional infliction of emotional distress and Title VII sexual harassment and hostile environment claims by a female firefighter against the municipality bordering Bridgeport, Connecticut), quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted); Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). See also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("**conduct must be extreme** to amount to a change in the terms and conditions of employment" [emphasis added]); Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989). "Extreme and outrageous" acts being sufficiently made out for other claims in this action, the intentional infliction of emotional distress claims requiring the same conduct cannot reasonably be deemed frivolous or pursued in bad faith.

As a matter of law, there can be no sanctions for suing Maglione merely because the City "readily admitted that he was acting as its employee and agent at all times relevant to this suit":

> Assuming for the moment that [Plaintiff's] claims against [the individual employee] had factual merit … the mere fact that [Plaintiff's counsel] refused to release [the individual defendant] from this action does not amount to a Rule 11 violation. If [Plaintiff's] allegations of tortious conduct on the part of [the individual defendant] were correct, [the individual defendants'] would have been individually liable for that conduct. See Restatement (Second) of Agency 343 (1958). Although [the employer] would likely be jointly and severally liable for [the individual defendants'] torts, see, e.g., id. 248, Rule 11 did not require [Plaintiff's counsel] to release an individual tortfeasor who retained personal liability, id. 217 B, 359, even though his principal agreed to assume responsibility for his actions. Had the plaintiff been able to prevail on his claims against [the individual tortfeasor], [Plaintiff's counsel] could have looked to both [the employer] and [the individual defendant] to satisfy the judgment.

31

<u>Lee v. Pei</u>, 91-409-P-H at 20, n. 5 (D. Me. 1994) (see Exh. 1 hereto), <u>citing</u> <u>Muthig</u>, <u>supra</u>.

<u>As a matter of law</u>, Plaintiffs' voluntarily dismissal by agreement of their claims against Earl Pettway and their decision not to pursue claims against Donald Day do not demonstrate bad faith, much less *subjective* bad faith, else the result would be sanctioning the Plaintiffs for <u>reducing</u> the litigation.

### E.   STATUTORY FEE-SHIFTING PROVISIONS DO NOT SUPPORT AN AWARD OF ATTORNEY'S FEES AND COSTS AGAINST THE PLAINTIFFS.

### (1)   CFEPA does not provide for fee-shifting against a non-prevailing plaintiff.

The defense can cite no authority for fees and costs under the fee-shifting provisions of Connecticut's Fair Employment Practice Act (CFEPA). Although the burdens of proof and damages provisions of CFEPA in terms of calculating caps or determining what constitutes back pay are generally construed consistently with Title VII, in the absence of any expression of "reverse fee shifting" in the state statute, or any clearly articulated state public policy supporting what would be a serious substantial expansion of the scope and applicability of a punitive measure to a state remedial statute, the federal court should decline to do so.

### (2)   Standard; fee-shifting against non-prevailing plaintiffs in civil rights cases generally disfavored.

The "American rule" is that each party pays its own way in litigation, except in the narrow exceptions created by the few statutes that shift fees for public policy purposes. <u>Key Tronic Corp. v. United States,</u> 511 U.S. 809, 819 n. 13 (1994); <u>Alyeska Pipeline Co. v. Wilderness Society</u>, 421 U.S. 240, 247 (1975); <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714, 718 (1967).

There is no *carte blanche* to award fees against unsuccessful civil rights VII plaintiffs. Fee to

punish plaintiffs' defalcations are perhaps more properly sought under Rule 11 instead of the fee-shifting provisions of the Civil Rights Act of 1991, codified at 42 U.S.C. § 1981a and 42 U.S.C. § 1988. Accordingly, in Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978), the Court warned against the "temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation," carefully limiting fee-shifting against unsuccessful plaintiffs to instances of litigation that is unquestionably "frivolous, unreasonable, or without foundation." Id.

The defense overstates its case under Christiansburg. "Although the text of the [Title VII] does not distinguish between prevailing plaintiffs and prevailing defendants, the Supreme Court has held that a defendant is not entitled to an award of fees on the same basis as a prevailing plaintiff." AFSCME v. County of Nassau, 96 F.3d 644, 650-51 (2d Cir. 1996), cert. denied, 117 S. Ct. 1107 (1997), citing Christiansburg, 434 U.S. at 418-19, 98 S. Ct. at 699:

> The Court articulated "two strong equitable considerations" for permitting routinely an award of fees to prevailing plaintiffs that "are wholly absent" when a defendant prevails. Id. at 418, 98 S. Ct. at 699. First, "the plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'" Id. (quoting Newman v. Piggie Park Enters., 390 U.S. 400, 402, 88 S. Ct. 964, 966, 19 L. Ed.2d 1293 (1968)). "Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." Id. Mindful of those distinctions, the Court held that a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. Id. at 421, 98 S. Ct. at 700. Finally, the Court warned district courts to avoid "engag[ing] in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." Id. at 421-22, 98 S. Ct. at 700.

> … We have indicated in particular cases what is meant by "frivolous, unreasonable, or without foundation." In Gerena-Valentin v. Koch, 739 F.2d 755, 756-57 (2d Cir. 1984), the plaintiff claimed that two municipal employees conspired to keep him off the ballot in an election for

New York City councilman, in violation of the Voting Rights Act, 42 U.S.C. Section(s) 1973 et seq. Applying the Christiansburg standard, we approved a fee award to the prevailing defendants because the plaintiff had already litigated the issue (unsuccessfully) in state court, and because "at no time . . . did [the plaintiff] attempt to produce any evidence whatsoever in support of his retaliation and conspiracy claim." Id. at 761. In Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 246 (2d Cir. 1985), a general contractor charged the City of New York and others with violating the antitrust and civil rights laws by prohibiting it from contracting with other companies "engaged in City-financed reconstruction projects." The effect of the City's action was to put the plaintiff-contractor out of business. Id. Again applying Christiansburg, we approved a fee award to the defendant because the plaintiff "could not point to a deprivation of any single right conferred by federal law or the . . . Constitution," and had unsuccessfully challenged the City's action in state court. Id. at 252. And in Faraci v. Hickey-Freeman Co., 607 F.2d 1025, 1027-29 (2d Cir. 1979), we approved a fee award against a Title VII plaintiff where the evidence of non-discrimination was "uncontradicted." See also Harbulak v. County of Suffolk, 654 F.2d 194, 196-98 (2d Cir. 1981) (approving fee award against Title VII plaintiff who alleged police officer violated his right to privacy by reaching into his car to serve summons); Prate v. Freedman, 583 F.2d 42, 47-48 (2d Cir. 1978) (approving fee award against Title VII plaintiffs where "there was little or no chance that they would be permitted to attack [a prior consent decree and] judgment through a new suit").

AFSCME v. County of Nassau, supra.

As in AFSCME v. County of Nassau, the Plaintiffs here "asserted claims that were actionable under Title VII and had not previously been litigated, and offered proof as to each element of each claim," but the employer ultimately prevailed. "[T]hat alone is insufficient to justify an award of fees under the Christiansburg standard," because, after reviewing all the circumstances of this case and the proof introduced at trial, taken together" the plaintiff's case cannot be deemed "frivolous, unreasonable, or without foundation." AFSCME v. County of Nassau, supra.

Moreover, the defense brings their fee-shifting claim together with their request for Rule 11 sanctions, such that the two claims are virtually indistinguishable. However, statutory fee-shifting and Rule 11 sanctions have different prerequisites and purposes.

To wit, the civil rights statutes are intended to punish and deter unlawful discrimination,

harassment, retaliation for complaints of the same, or intentional deprivations of known federal rights committed by certain narrow classes of persons set forth in the pertinent statutes, i.e., "employers," "employment agencies," and "labor organizations" under Title VII, and persons "acting under color of state law" under 42 U.S.C. § 1983, et seq. Plaintiffs can only obtain the benefit of fee-shifting under these statutes by having affirmatively proven a substantive civil rights claim. What basis, then, exists for one of the person or entities *against whom these laws are directed* to use these laws to obtain the relief of attorney's fees and costs *without any proof of any substantive violation of their civil rights*?

To wit, a wholly different purpose is ascribed to the fee-shifting provisions in the civil rights statutes. They were enacted as incentives to the private Bar to act as "private attorneys general," "vindicating a policy that Congress considered of the highest priority," (Newman v. Piggie Park Enterprises, 390 U.S. 400, 402 (1968)), aiding traditionally unpopular causes and clients by leveling the playing field, overcoming the imbalance of power and means between individual citizens and vastly more funded, powerful, and well-represented employers and government agencies and officials. Turning this remedial tool on individual citizens who try to avail themselves of what Congress gave them, but who simply fail in that endeavor would contravene this remedial scheme:

> "Because Congress intended to 'promote the vigorous enforcement of the provisions of Title VII,' a district court must exercise caution in awarding fees to a prevailing defendant in order to avoid discouraging legitimate suits that may not be 'airtight.'"

EEOC v. Bruno's Restaurant, 13 F.3d 285, 287 (9th Cir. 1993), quoting Christiansburg, 434 U.S. at 422.

The way that the defense would have the Court distort the fee-shifting provisions of the civil rights statutes would only result in error or an abuse of discretion, for using the fee-shifting provisions of the civil rights statutes against plaintiffs as punishment for failed, weak, or anything short of plainly

completely frivolous litigation circumvents the more appropriate remedies and safeguards for addressing

such conduct, i.e., Rules 11 and 37, and state common law causes of action for "vexatious litigation" and

"abuse of process." The effects of circumventing the "safe harbor" are addressed further herein. It is

unfair and senseless to order post-judgment fee-shifting as a remedy for purported discovery abuses after

the discovery proceeded under the Court's direction, with a number of detailed discovery conferences

and orders, none of which led to any court findings of bad faith by the Plaintiffs or misconduct by their

counsel, and indeed, even Rule 11 leaves discovery abuses to the Court's separate discretion to control

*under the discovery rules*.[18]

     In addition, while Rule 11 provides sanctions against both litigants and their attorneys, <u>fee-shifting is only available against the litigants.</u> As discussed further below, with the exception of clearly

completely frivolous or fraudulent litigation, the use of fee-shifting to punish citizens for failed civil

rights claims carries with it the danger of chilling the exercise of civil rights, a hefty price to pay for

satisfying the questionable aims of a powerful defendant, the largest municipality in Connecticut, one of

the largest cities (aside from the major metropolises) in the nation.

     **(3)    The defense fails to set forth a cognizable basis for awarding them the remedy of fee-shifting.**

     Another problem created by instant Application for both sanctions and the remedy of fee-shifting

is that, because the defense did not afford Plaintiffs the "safe harbor," that Rule 11 would require that

any filing for which sanctions are sought have been filed or maintained in *subjective* bad faith. <u>In re</u>

---

[18] Save for the Order assessing fees against Plaintiffs' counsel early in the litigation in the medical release form issue, which did not prejudice the defense in any way.

Pennie & Edmonds LLP, 323 F.3d 86 (2d Cir. 2003). If the defendants' Rule 11 claims are to be

considered at all without the "safe harbor" and in the improper form in which they are made, interwined

as they are so as to be virtually indistinguishable from the fee-shifting claims, and fee-shifting being

sought for the same reasons that identical Rule 11 sanction of fees and costs are sought, then <u>fairness</u>

<u>dictates that the *subjective* bad faith standard under Rule 11 apply to the fee-shifting claims as well.</u> <u>See</u>

<u>Forsberg v. Pacific Northwest Bell Tel. Co.</u>, 840 F.2d 1409, 1422 (9th Cir. 1988) (applying the same

"frivolous, unreasonable, or without foundation" standard to request for claims for Rule 11 sanctions

and for fee-shifting under 42 U.S.C. S 2000e-5(k)).[19]

First, it is not clear that the Defendants are "prevailing parties" under <u>Buckhannon Board & Care</u>

<u>Home, Inc. v. W. Va. Dep't of Health and Human Res.</u>, 532 U.S. 598 (2001). As set forth above in the

Facts section of this Memorandum, the Defendants claim to have provided substantial relief sought by

the Plaintiffs by this action. This is not the entirety of what was sought, but the Plaintiffs consider it a

significant victory and vindication, and the defense points to <u>no evidence that these things would have</u>

<u>happened were it not for Plaintiffs' lawsuit</u>, *ergo*, the Plaintiffs actually could be considered "prevailing

parties." <u>Roberson v. Giuliani</u>, 346 F.3d 75 (2d Cir. 2003).

Second, as discussed herein above pertaining the Rule 11 sanctions claims, the defense cannot

make a showing that the Plaintiffs acted in *subjective* bad faith, nor even in objective bad faith, to

warrant fee-shifting against them under <u>Christiansburg</u>. They offer no "evidence developed during the

course of litigation that should have put the Plaintiffs and their counsel on notice that any particular

---

[19] The same standard for fee-shifting for Title VII claims under <u>Christiansburg</u> applies to claims under 42 U.S.C.
§ 1983, <u>et</u> <u>seq</u>. <u>AFSCME v. County of Nassau</u>, 96 F.3d 644, 650-51 (2d Cir. 1996), <u>cert</u>. <u>denied</u>, 117 S. Ct. 1107

claim was frivolous." Marbled Murrelet v. Babbitt, supra, citing Christiansburg at 421. There was no

court ruling in the course of the litigation that the Plaintiffs' claims were frivolous.

Even courts that have entertained fee-shifting against an unsuccessful plaintiff in civil rights

cases have declined to do so where, as here, the plaintiff survived dispositive motions on the merits or

made out a *prima facie* case. See, e.g., Sassower v. Field,[20] 973 F.2d 75 (2nd Cir. 1992), cert. denied,

113 S. Ct. 1879 (1993) ("outcome of the lawsuit adverse to the plaintiffs is an insufficient basis to

require them to pay defendants' attorney's fees under the Fair Housing Act"); EEOC v. Consolidated

Serv. Sys., 30 F.3d 58, 59 (7th Cir. 1994) (the "frivolous" standard is much more stringent than merely

"not substantially justified"); Walker v. NationsBank of Florida, 53 F.3d 1548, 1559 (11th Cir. 1995)

(award of attorney's fees improper where defendant's two summary judgment awards were denied and

plaintiff established *prima facie* case at trial); EEOC v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1572

(11th Cir. 1993) (award of attorney's fee improper where plaintiff established *prima facie* case); Busby

v. City of Orlando, 931 F.2d 764, 787 (11th Cir. 1991) (award of attorney's fees improper in close legal

_____

(1997), and cases discussed therein.

[20] The reasons that the Court *excluded* from its basis for the sanctions in Sassower are the operative facts that
militate against sanctions in the instant cases: "In the pending case … the essential issue was not whether the
plaintiffs were credible in their account of the factual circumstances; it was whether the defendants' explanations
for their actions were legitimate or pretextual. There is no finding that the plaintiffs did not believe that they had
been the victims of discrimination. Moreover, though there were various disputes as to some details of the
dealings between the plaintiffs and the defendants, there was no finding that the plaintiffs' had given a false
account of the basic facts alleged to support an inference of discriminatory motive. Nor is this a case where the
trial judge expressed the view that no reasonable jury could have found in plaintiffs' favor but reserved ruling on
a motion for a directed verdict and submitted the case to the jury simply to have a verdict in the event that a court
of appeals might have disagreed with his subsequent ruling to set aside a plaintiffs' verdict, had one been
returned. In these circumstances, to award defendants their attorney's fees simply because the jury found in their
favor and the trial judge found the verdict overwhelmingly supportable risks imposing too great a chilling effect
upon the prosecution of legitimate civil rights lawsuits."

issue, such that even the appellate panel could not reach unanimous decision).

Again, Plaintiffs' withdrawal of their claims against Earl Pettway with mutual releases, and their decision not to pursue Donald Day is not bad faith, much less *subjective* bad faith.

In the few cases upholding fee-shifting to the defense under Christiansburg – as opposed to Rule 11 sanctions – the evidence of bad faith was blatant and indisputable. To wit, there were prior specific findings that plaintiff's case lacked any merit whatsoever, such as the failure to even make out even a *prima facie* case, such as not even bothering to respond at all to dispositive motions, after counsel expressly represented to the court that he had evidence to support plaintiff's single claim, and clearly brought the case with knowledge "from the moment he began representing Plaintiff that his claim was meritless" (Turner v. Sungard Business Systems, Inc., 91 F.3d 1418, 1420, 1422 (11th Cir. 1996)); or where the plaintiff withheld information from the court that he was previously determined not indigent (Dawson v. Lennon, 797 F.2d 934 (11th Cir. 1986)); or where, "after a civil rights bench trial where the plaintiff's testimony was found to have been 'an unmitigated tissue of lies'" (Carrion v. Yeshiva University, 535 F.2d 722, 728 (2d Cir. 1976). Such is not the conduct of the Plaintiffs or their counsel.

The purported "avaricious" motive of the Plaintiffs in pursuing this most emotionally painful and costly legal action for some five years, seeking such minimal cost relief as the provision of women's sized firefighting gear and removal of pornography from their workplace, is not a basis for fee-shifting. The crux of this claim is that because Elizabeth Schiller O'Connell did not specifically deny her sister and co-worker Autumn Dennerlein's testimony that she (Schiller) said she wanted to get "six figures" and "a house" by this lawsuit, Schiller not only "admitted" making the statement, but also admitted that the Plaintiffs fabricated their entire lawsuit. Aside from the obvious "tissue of lies" forming this

proposition, a party is not required to rebut every item of defense testimony at trial, or to rebut testimony in any particular fashion, under pain of sanctions; Schiller's mere inadvertent omission of a specific denial of this one item in her brief rebuttal is not an admission that she said it, and attacking Dennerlein's credibility by cross-examination eliciting the reasons for her venom toward her sister was perfectly legitimate strategy. Even if Schiller had said such a thing and the Plaintiffs are shameless mercenaries, it is a patently frivolous basis for using the fee-shifting provisions of the civil rights laws to punish them further than their loss of the case.

### F. THE DEFENSE STATES NO COGNIZABLE BASIS FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL UNDER 28 U.S.C. § 1927 (1988).

28 U.S.C. § 1927 (1988) permits imposition of fees upon "[a]ny attorney or other person admitted to conduct cases in any court of the United States" who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927 is directed at bad faith, vexatious, wanton, or oppressive conduct by attorneys,[21] not lay parties. Chambers v. NASCO, Inc., 501 U.S. 32 (1991).

Much of the argument above as to why Rule 11 sanctions and fee-shifting are not warranted apply equally to the claim for statutory sanctions.[22] Even with their "spin" on the various litigation actions herein, the defense can show no conduct by Plaintiffs' counsel deserving of post-judgment sanctions. In Sassower v. Field, supra, a disbarred attorney, with a notorious history of misconduct in the state and federal courts, acting pro se, steadfastly refused to appear for her deposition or to make any

---

[21] As stated above, if the Application is not dismissed for failure to state any cognizable claim for sanctions or fees, Plaintiffs' counsel will be retaining counsel and make the lengthy address required to justify every action taken on behalf of the Plaintiffs in these cases that is under attack in the Defendants' post-judgment Application.

[22] Again, the merits of each particular claim as to each incident the defendants cite will be addressed later if this Motion to Dismiss is not granted.

discovery compliance without court orders, filed multiplicious motions for reconsideration of nearly

every ruling she failed to prevail on, "attempted to communicate directly with the defendants rather than

through counsel in order to force through their settlement demands," and a host of other acts not

engaged in by the undersigned Plaintiffs' counsel. Even with such bizarre and egregious conduct, the

Court did not impose the sanctions without plenty of prior warning ("Repeatedly throughout the

litigation, the District Judge cautioned the plaintiffs that their vexatious and harassing conduct, if

continued, was likely to incur monetary sanctions at the conclusion of the case." Id.).

In the instant action, the Court was very involved with managing the discovery and various

Motions that the defense now, only post-judgment, seeks sanctions over. The Court never issued any

warning of future sanctions for any misconduct by Plaintiffs' counsel, *because there was none.*

True, there was an order of fees against Plaintiffs' counsel over the medical release confusion,

but the defense fails to mention the multiple directives and orders to them to comply with Plaintiffs'

discovery. As set forth above in the Facts, defense counsel makes the patently misrepresentation in their

Application that they have been demanding payment from Plaintiffs' counsel, when at no time have

defense counsel or their clients ever demanded payment, and in fact they repeated declined to accept

payment.

The defense also makes the bald and utterly false accusation that Plaintiffs' counsel made

accusations in this lawsuit that the Defendants murdered the late female firefighter Kathy Denton. The

only "proof" they offer is their own gross misrepresentation of trial testimony.

Then there was the defense Motion falsely accusing Plaintiffs' counsel of having a "Mary

Carter" agreement to pay former Bridgeport Fire Captain Donald Day to testify against the Defendants.

41

<u>See</u> Facts above. There was zero evidence provided for that as well, in fact, Mr. Day gave sworn

testimony denying any agreement of any kind, yet the defense refused to withdraw or correct the

pleading. Plaintiffs' counsel, who is not only a member of the Connecticut Bar in good standing, but

also a Commissioned senior officer of the U.S. Army holding a security clearance, is seriously defamed

by the largest law firm in Connecticut accusing her of such serious misconduct on the record of the

federal court.

   The instant fee Application is just another vehicle for defense counsels' defamatory accusations

and *in personam* attacks. They open the pleading with the following: "Throughout the course of the

litigation, the Plaintiffs' charges of substantive illegality, their motion practice, discovery complaints

and trial tactics progressed from the irrational through the ridiculous on to the f [sic] absurd." Such

statements add nothing substantive to the Court's ability to divine the facts, and "have the appearance of

a personal attack against [Plaintiffs and their counsel], and perhaps more broadly, against activist

attorneys who represent unpopular clients or causes." <u>Hadges v. Yonkers Racing Corp.</u>, 48 F.3d at 1328

(vacating Rule 11 sanctions against the plaintiff and his champion, the late William Kunstler). <u>Whatever</u>

<u>low regard defense counsel holds opposing counsel in, it is not a basis for sanctions.</u>

   These personal attacks by defense counsel should bear no credibility, considering the

documentation in the record of Plaintiffs' counsel's repeated appeals to the Court for protection from the

recalcitrant, disruptive and abusive conduct of defense counsel, which included defense counsel's

repeated walking out on depositions that took months to get their witnesses and City employees to

appear for; verbally abusing, screaming at, pounding tables at, and expressly threatening Plaintiffs'

counsel, and her clients in this case, another client who was Plaintiffs' trial witness, and a third party (a

former employer of Ms. Georgia). One day in the courthouse, the Court had to separate defense counsel from Plaintiffs' counsel upon one of defense counsel's angry yelling and table-pounding tirades, and eventually ordered depositions to be conducted in the courthouse, where the abuses and outbursts by defense counsel continued, in the presence of deponents, clients, and the court reporters.

Defense counsel actually admitted a great deal of this misconduct on the record, expressly justifying it orally and in pleadings as caused by "provocation" by Plaintiffs' counsel. What that "provocation" was is entirely unclear, aside from pursuing this lawsuit for her clients. Clearly, there was never even a suggestion that Plaintiffs' counsel behaved in like manner to defense counsel.

Plaintiffs' counsel is not making bald accusation; counsel has proffered the Court transcripts, and an affidavit and third party witnesses' testimony for trial as to the abusive and threatening conduct of defense counsel Robert Mitchell, at the least constituting unlawful retaliation against the Plaintiffs for pursuing their civil rights claims. The point in raising defense counsel's conduct is not to throw out counter-allegations or to attempt to "justify" any purported misconduct by Plaintiffs' counsel. The point is that <u>there must be some notion of "clean hands" on the part of the defense for the demand for over a million dollars in sanctions to be given serious consideration.</u>

### G.     THE APPLICATION IS A BACK-DOOR ATTEMPT TO PRESS STATE LAW TORT CLAIMS THROUGH A POST-JUDGMENT FEE APPLICATION IN FEDERAL COURT.

Given the law on fee-shifting and the absence of any proper Rule 11 Motion (see discussion above), the instant defense Application is nothing more than a back-door claim for vexatious litigation or abuse of process. Indeed, the defense repeatedly charges exactly such conduct. Application, pp. 6, 7,

17, 18. These claims belong, if anywhere, in a tort action in Connecticut Superior Court, not on a post-judgment fee application in the federal court.

Entertaining these claims in the guise of a post-judgment fee application deprives the Plaintiffs and their counsel of the Due Process they would be entitled to in any action commenced in the ordinary course by Summons and Complaint, i.e., of adequate time to retain counsel, to perhaps invoke insurance coverage, and to file thorough responsive motions or an answer to a plain statement of facts, and discovery into the facts underlying the complaint. The lack of discovery in the limited process for hearing a post-judgment fee application is particularly prejudicial to the Plaintiffs, as the Application sets forth many new post-judgment facts and documents.

> **H.   THE FEE APPLICATION IS IN THE NATURE OF A DISFAVORED "SLAPP," IN VIOLATION OF THE ANTI-RETALIATION PROVISIONS OF TITLE VII AND CFEPA AND THE FIRST AMENDMENT.**

"'[F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government.'" Johnson v. Ganim, 342 F.3d 105, 114-15 (2d Cir. 2003), quoting Pappas v. Guiliani, 290 F.3d 143, 146 (2d Cir. 2002).

Based on prior threats uttered by defense counsel, previously reported to the Court, Plaintiffs and their counsel have reasonable suspicion that the instant fee Application is in the nature of a "SLAPP,"[23] brought at least in part to deter the Plaintiffs from appealing in this action, to redirect their limited resources and attorney's time toward responding to the Application, to intimidate the Plaintiffs into not

---

[23] "Strategic Lawsuit Against Public Participation." The moniker has become generally applied to actions brought by corporations and governmental entities against citizens in order to punish and deter the pursuit of legal action in matters of public interest, such as the elimination of unlawful discrimination and sexual harassment of female municipal firefighters.

uttering any more complaints about violations of their civil rights in their employment by the City, to

force them to quit their jobs, to deter other protected class employees from complaining and seeking

legal redress, and to deter Plaintiffs' counsel from pursuing any more legal actions against the City on

behalf of *other* minority and female employees and citizens.

     EEOC instructs that its "anti-retaliation provisions are exceptionally broad":

> They make it unlawful "to discriminate" against an individual because of his or her protected
> activity.  This is in contrast to the general anti-discrimination provisions which make it unlawful
> to discriminate with respect to an individual's "terms, conditions, or privileges of employment."
> The retaliation provisions set no qualifiers on the term "to discriminate," and therefore prohibit
> any discrimination that is reasonably likely to deter protected activity. They do not restrict the
> actions that can be challenged to those that affect the terms and conditions of employment. Thus,
> a violation will be found if an employer retaliates against a worker for engaging in protected
> activity through threats, harassment in or out of the workplace, or any other adverse treatment
> that is reasonably likely to deter protected activity by that individual or other employees.

> This broad view of coverage accords with the primary purpose of the anti-retaliation provisions,
> which is to "[m]aintain[] unfettered access to statutory remedial  mechanisms." Regardless of the
> degree or quality of harm to the particular complainant, retaliation harms the public interest by
> deterring others from filing a charge.  An interpretation of Title VII that permits some forms of
> retaliation to go unpunished would undermine the effectiveness of the EEO statutes and conflict
> with the language and purpose of the anti-retaliation provisions.

EEOC Guidance No. 915.003. See also, footnotes therein.[24]

---

[24] "Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996) (`[t]here is nothing in the law of retaliation that
restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing
a complaint'); Passer v. American Chemical Society, 935 F.2d 322, 331 (D.C. Cir. 1991) (Section 704(a) broadly
prohibits an employer from discriminating against its employees in any way for engaging in protected activity and
does not `limit its reach only to acts of retaliation that take the form of cognizable employment actions such as
discharge, transfer or demotion') … For examples of cases finding unlawful retaliation based on adverse actions
that did not affect the terms or conditions of employment, see Hashimoto [v. Dalton, 118 F.3d [671] at 675-76
[(9th Cir. 1997)] (retaliatory job reference violated Title VII even though it did not cause failure to hire); Berry v.
Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996) (instigating criminal theft and forgery charges against
former employee who filed EEOC charge found retaliatory); Passer, 935 F.2d at 331 (canceling symposium in
honor of retired employee who filed ADEA charge found retaliatory)." EEOC Guidance No. 915.003, footnotes.

Accordingly, a growing majority of courts considering the question are deeming employer

"counter" actions following employees' employment discrimination cases to fall within the realm of

unlawful retaliation.[25] Mirroring the "bad faith" requirement for Rule 11 sanctions, the prevailing rule in

---

[25] "Numerous district courts have held that the filing of a lawsuit or a counterclaim motivated by retaliation against an employee can serve as a basis for a retaliation claim under Title VII. See, e.g., Hernandez v. Data Sys. Int'l, Inc., No. 02-2193-JWL, __ F. Supp. 2d __, 2003 WL 21355928, at *16 (D. Kan. June 10, 2003) ("retaliatory civil litigation can constitute an adverse employment action for purposes of a retaliation claim"); Gliatta v. Tectum, Inc., 211 F. Supp. 2d 992, 1009 (S.D. Ohio 2002) ("this Court concludes that the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee"); Ward v. Wal-Mart Stores, Inc., 140 F. Supp. 2d 1220, 1230-31 (D.N.M. 2001) (holding that employer's filing of appeal of former employee's claim for unemployment benefits less than a month after he engaged in protected activity "raises the inference of a retaliatory motive sufficient to establish a causal connection" for a Title VII retaliation claim); Outback Steakhouse, 75 F. Supp. 2d at 1231; Jones v. Ryder Services Corp., No. 95 C 4763, 1997 WL 158329, at *5 (N.D. Ill. Mar. 31, 1997) (denying summary judgment to employer where employer withdrew plaintiff's workers' compensation settlement offer in retaliation for filing EEOC charges); Cozzi v. Pepsi-Cola General Bottlers, Inc., No. 96 C 7228, 1997 WL 312048, at *3, 74 FEP Cases (BNA) 321, 323 (N.D. Ill. June 6, 1997) (holding that filing of retaliatory lawsuit constituted "adverse employment action" under Title VII, but dismissing suit on other grounds); Shafer v. Dallas County Hosp. Dist., No. CA 3-96-CV-1580-R, 1997 WL 667933, at *4, 76 FEP Cases (BNA) 1555, 1560 (N.D. Tex. Oct. 21, 1997) ("It is well established that filing a retaliatory lawsuit may be actionable under Title VII."); Harmar v. United Airlines, Inc., No. 95 C 7665, 1996 WL 199734, at *1 (N.D. Ill. Apr. 23, 1996); Urquiola v. Linen Supermarket, Inc., No. 94-14-CIV-ORL-19, 1995 WL 266582, at *1 (M.D. Fla. Mar. 23, 1995); EEOC v. Levi Strauss & Co., 515 F. Supp. 640, 643-44 (N.D. Ill. 1981); EEOC v. Virginia Carolina Veneer Corp., 495 F. Supp. 775, 778 (W.D. Va. 1980) ) [(employer's defamation suit against employee for statements made to EEOC is retaliatory)] … The courts have similarly recognized retaliation claims under other labor, employment, and civil rights statutes based on lawsuits or counterclaims against the plaintiff(s). See, e.g., Bill Johnson's Restaurants, 461 U.S. at 743-44 (employer's lawsuit against employees for assertion of labor rights constituted retaliation under the NLRA); Gill v. Rinker Materials Corp., 91 FEP Cases (BNA) 179, 182-83 (E.D. Tenn. 2003) (ADA and ADEA retaliation claims for filing bad faith counterclaim against employee); Zhu v. Countrywide Realty, Co., Inc., 165 F. Supp. 2d 1181, 1199 (D. Kan. 2001) (filing for "petition for a restraining order roughly three weeks after plaintiff filed her HUD complaint raises an inference of causation" under anti-retaliation provision of Fair Housing Act); Blistein v. St. Johns College, 860 F. Supp. 256, 268 (D. Md. 1994) (filing counterclaim against employee, including counterclaim for breach of contract, stated a claim for retaliation under the ADEA. However, the Fifth Circuit recently rejected this approach, in a case where the former employer brought a counterclaim for theft (of building materials) against a terminated employee." Katz, Debra S. and Kabat, Alan R., Retaliation in the Workplace, ALI-ABA (2003). See also, Sahli v. Bull HN Information Systems, Inc., 437 Mass. 696 (2002) (while rejecting claim that employer's action for declaratory judgment that plaintiff's age discrimination complaint was barred by an earlier release is retaliatory, because First Amendment and state constitution guarantee right to seek redress of grievances through the courts, also holding that these rights do not extend to "sham" litigation, i.e., litigation motivated by a desire to interfere with protected rights); Beckham v. Grand Affair of N.C., Inc., 671 F. Supp. 415,

these decisions is that the employer who wishes to pursue an employee who brought a claim against it has the burden of proving, by <u>demonstrable good faith</u>, that its action is not retaliatory, i.e., the employer must have an articulable basis in law and fact, tantamount to proof that it would have brought its claim even if the employee had made no claims against it.

There is no such showing here. The Defendants' claims are completely derivative of Plaintiffs' claims, and their long repose in seeking sanctions, only to do so without even filing a proper Rule 11 Motion or fee claim, militates against any credibility to their claims of being the victims of a lawsuit that was entirely frivolous from its inception and maintained in bad faith.

The fact that the defense coupled the fee demands with completely unwarranted demands that the Plaintiffs quit their tenured civil service jobs upon express threat of the instant fee Application also militates strongly against any award to the Defendants.

To wit, "[t]he mere fact of government employment does not result in the evisceration of an employee's First Amendment rights. <u>Hale v. Mann</u>, 219 F.3d 61, 70 (2d Cir. 2000) (<u>quoting</u> <u>Connick v. Myers</u>, 461 U.S. 138, 140 [] (1983)); <u>Lewis v. Cohen</u>, 165 F.3d 154, 158 (2d Cir. 1999) ('It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment.') (citation omitted). '[F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government.' <u>Pappas v. Guiliani</u>, 290 F.3d 143, 146 (2d Cir. 2002)." <u>Johnson v. Ganim</u>, 342 F.3d 105, 114-15 (2d Cir. 2003) (City of Bridgeport's unlawful retaliation against employee exercising

419 (W.D.N.C. 1987) (employer's institution of criminal prosecution of former employee who filed claim with EEOC is retaliatory). The Fifth Circuit stands alone, based on its unique requirement, *opposite of the law of the*

protected speech to make complaints against the City). The use of fee-shifting to punish citizens for

failed civil rights claims carries with it a grave danger of chilling the exercise of speech, resort to the

legal system, and other civil rights -- a hefty tax upon Justice.

"Whether an employee's speech addresses a matter of public concern must be determined by the

content, form, and context of a given statement, as revealed by the whole record":

> Moreover, without disclosures by law enforcement insiders such as Dillon**,** willing to report their
> well-founded beliefs of the existence of wrongdoing by fellow law enforcement officers, such
> corruption is most difficult to detect, prove or prevent. As such, the Court accords this speech
> extremely high value in conducting the balancing test, the restraint of which is to be justified
> only by proof that serious, pressing needs of the employer public agency are or will be seriously
> compromised or threatened. See Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878, 128 L.
> Ed.2d 686; c.f. Snepp v. United States, 444 U.S. 507, 100 S. Ct. 763, 62 L. Ed.2d 704 (1980).

Dillon v. Bailey, 45 F. Supp.3d 167, ___ (D. Conn. 1999), quoting Connick v. Myers, 461 U.S. 138,
146-47 (1983).

**I.    THE FEES AND COSTS THIS EMPLOYER IS DEMANDING FROM ITS
EMPLOYEES VIOLATE THE PUBLIC POLICY AGAINST RECOUPMENT OF
WAGES.**

The public policy of Connecticut bars schemes by which employers recoup wages from their

employees, in order to prevent anything resembling slavery or indentured servitude. Accordingly, it has

long been held at common law that, absent fraud or theft, a master cannot sue his servant. To the

contrary, the master was always responsible to care for the basic well-being of his servant in order to

maintain a viable workforce. See, e.g., Murray v. Paramount Petroleum & Products Co., Inc., 101 Conn.

238 (1924). These public policies have been codified in a number of Connecticut statutes, such as the

---

*Second Circuit*, that retaliation claims must involve an "ultimate employment decision."[25] Hernandez v. Crawford,
321 F.3d 528, 529-30 (5th Cir. 2003) (per curiam).

Workers' Compensation Act, Conn. Gen. Stat. § 31-49[26] (requiring the master to provide his servant

with "fit and competent persons" as co-workers, and "to exercise reasonable care in the appointment or

designation of … a fit and competent person" as management), and Conn. Gen. Stat § 31-51hh

prohibiting schemes to circumvent these requirements by, in effect, recouping the costs for fulfilling

these duties from wages. [27]

What the Defendants' Application seeks is tantamount to recouping wages from a

"whistleblower" who makes a good faith report that simply does not result in any consequence to the

employer, or from a Workers' Compensation claimant who fails to prove entitlement to benefits claimed

for an injury. This is not the purpose of Rule 11, 28 U.S.C. § 1927 (1988), or the civil rights statutory

fee-shifting provisions.

## III.    CONCLUSION

The problems created by the instant Application, when there is no cogent legal basis for

awarding fees and costs to the Defendants, and ample public policy, justice interest, or good conscience

---

[26] Conn. Gen. Stat. § 31-49, "Care required of a master for his servant's safety": "It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work and fit and competent persons as his colaborers and to exercise reasonable care in the appointment or designation of a vice-principal and to appoint as such vice-principal a fit and competent person. The default of a vice-principal in the performance of any duty imposed by law on the master shall be the default of the master."

[27] See Conn. Gen. Stat § 31-51hh, prohibiting employers from seeking reimbursement from their employees "for any loss or shortage incurred in the course of the employer's business as a result of any wrongdoing on the part of a customer"; § 31-51r prohibiting "employment promissory notes" that require an employee to pay the employer a sum of money if the employee leaves the employment before the passage of a stated period of time; § 31-40o, prohibiting employers from adverse actions including depriving an employee of pay or benefits for having exercised statutory rights to protection from toxic materials at work; § 31-51m, the "Whistleblower" Act, prohibiting employer from adverse actions including docking wages of employees for reporting of the employer's illegal activities or unethical practices.

militating against it. The Defendants may seek recourse under state law in the Connecticut Superior Court for the sum of their claims, which they plainly state are for "vexatious litigation" and "abuse of process."[28]

Ironically, and sadly for Justice, the subject "fee Application" is a prime example of the bad faith filings and conduct that Rule 11 and 28 U.S.C. § 1927 (1988) are aimed at curtailing.

As a matter of law, the Defendants' Application for Attorneys' Fees Award must be dismissed and no sanctions or fees imposed on Plaintiffs or their counsel.

In light of all that has occurred in this case, the undersigned counsel further requests that the Court reconsider its January 22, 2002, order of fees against Plaintiffs' counsel. It is a small measure to provide some redress for the unfounded demand for sanctions against counsel in the instant fee Application.


**FOR THE PLAINTIFFS AND THEIR COUNSEL,**


Dated_____                    _____
                                       Susan V. Wallace
                                       ~ *Attorney at Law* ~
                                       11 Blue Orchard Drive
                                       Middletown, CT 06457
                                       Tel: (860) 704-0472  Fax: -0490
                                       law4us@rcn.com
                                       Fed Bar No. CT08134

---

[28] Plaintiffs and their counsel are not suggesting nor conceding that the defense ultimately has any colorable tort claim.

**CERTIFICATION OF SERVICE**

The undersigned counsel certifies that a copy of the foregoing "Memorandum of Law in Support of Motion to Dismiss Defendants' Application for Attorneys' Fees Award and Request for Reconsideration of Fee Award" has been served upon:

Robert B. Mitchell, Esq.
Margaret M. Sheahan, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006


on this 13th day of January, 2005, via

    X     Regular U.S. Mail, first class, postage prepaid

   _____     U.S. Priority Mail

   _____     U.S. Express Mail or other overnight mail service

   _____     Facsimile

   _____     Email

   _____     Hand-delivery


_____
 Susan V. Wallace, Esq.

Page 1                                                            **EXHIBIT 1**

```
DISTRICT OF MAINE PATRICK LEE,      )
                                    )
     Plaintiff                      )
                                    )
v.                                  )          Civil No. 91-409-P-H
                                    )
KERLIN PEI, et al.,                       )
                                    )
     Defendants                           )
```

MEMORANDUM DECISION AND ORDER
ON DEFENDANTS' MOTIONS FOR RULE 11 SANCTIONS

In this derivative action brought by Patrick Lee on behalf of Leader Simulation, Inc. (``LSI'') against Kerlin Pei, H. Michael Swartz and Maine Yankee Atomic Power Co. (``Maine Yankee''), summary judgment was granted for Pei and Swartz on all counts of the complaint and for Maine Yankee on all counts but one, a breach of contract claim. Order (Docket No. 82). Summary judgment was later granted for Lee on the remaining breach of contract claim against Maine Yankee for $3,400 in stipulated damages. Stipulation (Docket No. 87); Order on Defendant Maine Yankee's Motion for Summary Judgment on Count III (Breach of Contract) (Docket No. 86). Final judgment was entered accordingly. Judgment (Docket No. 89). Lee commenced an appeal of the adverse summary judgment determinations on May 25, 1993, see Notice of Appeal (Docket No. 88), but eventually dropped it voluntarily, effective August 25, 1993, see Order of United States Court of Appeals for the First Circuit (Docket No. 90).

This case having been concluded, the defendants now move for sanctions for the wrongful pursuit of this action in violation of Rule 11 of the

Federal Rules of Civil Procedure. A hearing on this matter was held before

me on December 15, 1993. Evidence was presented by the parties and their

attorneys. The parties waived any privilege or work product objections.

Instead of holding

    Page 2

oral argument on the matter after receipt of the evidence, pursuant to a

request of attorney Cackett I asked that the parties file post-hearing

briefs by January 21, 1994. The defendants filed their briefs in a timely

manner. Despite specifically requesting the right to do so, attorney Cackett

never submitted a

post-hearing brief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

    This Rule 11 proceeding marks the culmination of a long, litigious

relationship between Dr. Patrick Lee and Kerlin Pei, which over time

expanded to envelop Maine Yankee and H. Michael Swartz. The two adversaries,

Lee and Pei, started out as software engineers and business associates with

Singer-Link, the company that in 1986 built and installed a control room

simulator at Maine Yankee's Wiscasset, Maine nuclear power plant. The

simulator is a training device on which operators respond to various control

room conditions simulated by the computer. The simulator requires continuing

software maintenance and engineering services.

    Following the installation of the Maine Yankee simulator in 1986, Lee

and Pei left Singer-Link and started LSI, a Maryland corporation. LSI's

2

business was to provide software and engineering services for control room simulators. LSI obtained the contract to furnish Maine Yankee with simulator software maintenance and engineering services. Pursuant to this contract, which was renewed annually, LSI supplied all simulator services for Maine Yankee from 1986 through November 1989. Pei, the resident LSI engineer for the Maine Yankee contract, was on site at the Wiscasset plant almost continuously from the inception of the contract through its termination.

### A. The Maryland Litigation

In May 1989 Lee and Pei became embroiled in a Maryland lawsuit involving a dispute over ownership of LSI. Pei alleged that Lee had reneged on a 1986 oral agreement to issue Pei fifty

Page 3

percent of LSI's stock and had instead issued that stock to his wife, Poa Lung Che. In October 1989 an equity proceeding was held before the Circuit Court for Montgomery County, Maryland. The court found that Pei was a fifty percent owner of LSI pursuant to the 1986 agreement. In December 1989 a hearing was held on the proposed remedies. On January 4, 1990 the court ordered a recision of Poa Lung Che's shares and the issuance of 6,000 shares to Pei so as to provide equal stock ownership. The court also appointed a receiver for LSI.

After posting bond to defer stock transfer until final resolution of the case, Lee appealed the circuit court's decision to the Court of Special Appeals. The appeals court affirmed on April 26, 1991. See Lee v. Pei, No. 421 (Md. Ct. Spec. App., April 26, 1991) (unreported). Lee sought review

3

from the Court of Appeals, Maryland's highest court, but certiorari was denied. Despite the denial of certiorari, and hence the resolution of the Maryland action, Lee still refused to issue Pei his LSI shares. Facing a motion for contempt, Lee issued 6,000 shares to Pei in October 1991. This, however, was not the end of the Maryland matter. The damages phase of the litigation had not yet been concluded. Lee and Pei finally reached an oral agreement on the damages issue on July 23, 1993, one business day before a damages hearing was set to begin. The parties executed a mutual release on August 8, 1993.

### B. The Maine Litigation

Meanwhile, back in Maine, Maine Yankee got wind of the LSI intracorporate dispute by July 1989. Up to this point Maine Yankee had been completely satisfied with LSI's contractual services. Defendant Swartz, who was Maine Yankee's supervisor of the simulator group, sought and received assurances from Lee that this dispute would not affect LSI's services to Maine Yankee. On November 14, 1989, however, Pei resigned from LSI, effective November 24, 1989. Pei had been the only LSI software engineer on site since the installation of the simulator and was intimately familiar with its operation. On November 25, 1989, Pei, on behalf of his new company, PrimeTech Simulation,

Inc., submitted a proposal for the Maine Yankee simulation contract. At a

Page 4

meeting held on December 4, 1989, Lee offered to supply a replacement engineer but Maine Yankee declined this offer. Because Pei was so familiar

4

with its system, Maine Yankee decided to reevaluate its simulator service
needs. By letter dated December 21, 1989, Maine Yankee terminated the 1986
LSI contract. Maine Yankee then began to accept proposals for a new
simulation services contract. In addition to the proposal already submitted
by Pei, Maine Yankee received bids from LSI and another consultant. Maine
Yankee eventually awarded the 1990 simulation services contract to
PrimeTech, Pei's company.

On December 13, 1991, nearly two years after the termination of the
LSI contract, and while
the damages phase of the Maryland litigation was still pending, Lee, on
behalf of LSI, filed suit in this court against Pei, Maine Yankee and
Swartz. The complaint asserted the following claims: tortious interference
with economic relations (Count I); tortious interference with prospective
advantage (Count
II); breach of contract (Count III); breach of implied covenant of good
faith and fair dealing (Count IV); slander per se (Count V); breach of
employee fiduciary duties (Count VI); breach of stockholder fiduciary duties
(Count VII).

The gravamen of Lee's complaint is that Pei sought to harm LSI and
that Maine Yankee and Swartz cooperated in his efforts. See Second Amended
Complaint (Docket No. 32) 23-24. Specifically, Lee claimed that Maine
Yankee, Swartz and Pei ``knowingly and willfully interfered'' with LSI's
economic relationships ``by actively encouraging LSI's current clients and
customers to discontinue business relationships with LSI'' (Count I 36);

5

``intentionally and improperly interfered'' with LSI's prospective contractual relationships ``through their malicious communications of untruthful and scandalous allegations'' (Count II 38-39); ``combined and conspired'' to breach the implied covenant of good faith and fair dealing in the LSI contract (Count IV 45); and ``maliciously and willfully communicated unfounded rumors and untruths'' about LSI (Count V 49). Lee also asserted that Maine Yankee ``knowingly and willfully'' breached its contract with LSI (Count III 41), and that Pei willfully breached his fiduciary duties owed to LSI, both as an employee and stockholder, by usurping a corporate opportunity, namely, the Maine

    Page 5

Yankee service contract, and by damaging LSI's goodwill (Counts VI & VII). All counts except for the breach of contract claim requested damages upwards of half a million dollars. For the breach of contract claim against Maine Yankee, Lee demanded compensatory damages totalling $24,916.68.

    Page 6

                        Maine Yankee and Swartz

    Once discovery was underway, it quickly became apparent that Lee lacked any evidence to support the strong allegations he had made against Maine Yankee and Swartz, other than the breach of contract claim. For example, at his deposition on November 2, 1992, Lee testified that he had no information that Maine Yankee or Swartz interfered with any of LSI's clients, as alleged in Count I of his complaint, other than Maine Yankee itself. Lee Deposition Vol. I pp. 100-05. Lee also testified that he had no

6

information that Maine Yankee or Swartz interfered with any of LSI's
prospective contracts, as alleged in Count II of his complaint, other than
the prospective Maine Yankee contract. Id. at 103-05.

As for the conspiracy to breach the implied covenant of good faith, as
alleged in Count IV of his complaint, Lee based this claim on the fact that
Pei had a ``very good relationship'' with Swartz; that Maine Yankee did not
give LSI the opportunity to prove that it could continue to perform the 1986
contract if renewed; that Swartz said he would give LSI a chance to work on
future projects but never did; and that Swartz spoke directly to individual
engineers about future projects. Id. at 107-10. As for slanderous comments
made by Maine Yankee or Swartz, as alleged in Count V of his complaint, Lee
testified that Maine Yankee and Swartz were ``very negative about LSI'' and
had sided with Pei in the dispute. Id. at 87, 88, 92. Lee stated, however,
that the only ``negative'' comments by Maine Yankee and Swartz of which he
was personally aware involved nothing more than their expression of concern
about whether the Maryland dispute would affect LSI's ability to service the
existing contract. Id. at 62-70, 99. Moreover, his knowledge of Maine
Yankee's and Swartz's ``negative'' attitude towards LSI consisted of hearsay
statements and suspicions that certain things were said and done. Id. at 80-
99, 112-14. Lee, however, never uncovered through discovery, as he had
hoped, any documentary evidence revealing a concerted effort by Pei, Swartz
and Maine Yankee to harm LSI. Repeated communications from Maine Yankee and
Swartz made clear that they had provided Lee with all requested information
and that

7

Page 7

there was no hidden story, as Lee apparently had thought. See, e.g,
Affidavit of Charles A. Harvey, Jr. (Docket No. 54); Letter of Charles A.
Harvey, Jr., (attachment to Docket No. 77). Counsel for Maine Yankee also
wrote to Lee's counsel to put them on notice that Maine Yankee considered
the case meritless and would seek sanctions if it was forced to incur
further expenses. Attachment to Maine Yankee's Rule 11 Hearing Exh. 1 (July
24, 1992 letter of Charles A. Harvey, Jr.).

### 2. Pei

Discovery also produced no admissible evidence to support Lee's
allegations against Pei. Lee's assertions against Pei were based primarily
on hearsay statements. For example, Lee testified that other engineers had
told him that ``Pei said a lot of bad things about me to the customer,''
meaning Maine Yankee. Lee Deposition Vol. I pp. 92, 106. Lee, however, never
took the depositions of any of those individuals who purportedly heard Pei
slander LSI. As for the interference with economic relationship and
prospective advantage claims, as asserted in Counts I and II, Lee testified
that Pei had called some other utilities, Taiwan Power Company and General
Public Utilities, and made negative statements about the Maryland lawsuit
and Lee's personal business. Id. at 101-02. Yet, again, no admissible
evidence of these statements was ever produced.

Page 8

### 3. Summary Judgment and Beyond

Following the close of discovery, on April 26, 1993 Judge Hornby granted the defendants' motions for summary judgment on all counts but the breach of contract claim. Order (Docket No. 82). The court cited the lack of any factual support, and in some instances legal support, for all but one of the plaintiff's seven counts. Id. The court noted that the only evidence to support any wrongdoing on the part of any of the defendants was inadmissible hearsay statements recounted in Lee's affidavit and depositions. Id. at 3-4, 6. Despite abundant time to do so, however, Lee never took the depositions of any of these purported witnesses, nor did he obtain affidavits from them. Id. 3-4. The discovery deadline expired on December 7, 1992 and Lee made no motion for an extension. Id. Consequently, in the absence of any factual support for his allegations, or any excuse for failing to furnish such support, the court granted summary judgment on all counts except for his breach of contract claim. As for that claim, the court later granted Lee summary judgment, ruling that Maine Yankee had failed to give LSI the required sixty days notice before termination. Order on Defendant Maine Yankee's Motion for Summary Judgment on Count III (Breach of Contract) (Docket No. 86). The parties stipulated that the damages resulting from Maine Yankee's breach totalled $3,400, including prejudgment interest. Stipulation (Docket No. 87).

Despite the complete lack of admissible factual support for his allegations, and the want of any hope of obtaining such evidence given the expiration of the discovery deadline, on May 25, 1993 Lee filed a notice of appeal of the court's adverse summary judgment determinations. Notice of

9

Appeal (Docket No. 88). This appeal was untimely, however, since the final judgment of this court had yet to be entered. Judgment (Docket No. 89). On July 12, 1993 the First Circuit ordered Lee to show cause why it should not dismiss the appeal as premature. On July 26, 1993 Lee filed a memorandum to show cause. On August 13, 1993, the date on which the appellate briefs of Pei, Swartz and Maine Yankee were all due, Lee filed a voluntary dismissal of the appeal. The First Circuit issued an order dismissing the appeal with prejudice on August 25, 1993. Order of United

    Page 9

States Court of Appeals for the First Circuit (Docket No. 90). The defendants' motions for sanctions followed shortly thereafter. Motion of H.M. Swartz and Maine Yankee Atomic Power Company for Sanctions Pursuant to F.R.Civ.P. 11 (Docket No. 91) (filed September 27, 1993); Motion of Kerlin Pei for Sanctions Against Thomas E. Cackett, Esq., Pursuant to F.R.Civ.P. 11 (Docket No. 94) (filed Oct C.

                    C. The Rule 11 Hearing

    At a hearing on the defendants' motions for sanctions, attorney Cackett, Lee's lead counsel in both the Maine and Maryland litigation, testified about his investigation into the alleged events and actions that gave rise to the complaint in this case. Attorney Cackett, who lives and practices in Maryland, first became involved with LSI and Lee in January 1990. Transcript p. 77. In March 1990, after long hours of discussion with Lee, Cackett became interested in what happened to Pei in Maine and what happened to the Maine Yankee contract. Id. Lee informed him that Pei had

10

received the 1990 simulation services contract with Maine Yankee, this being the same contract that LSI had had for the previous four years. Id. at 78. Through communications with Maine Yankee, he attempted to determine Pei's status at Maine Yankee, as employee or subcontractor. Id. He never requested any documents from Maine Yankee, however. Id. at 17. At this time the only potential cause of action against Maine Yankee Cackett was aware of was a breach of contract claim. Id. at 78-79.

On July 22, 1991, before the Maine action was filed, Cackett began discussing with Maine Yankee, through Mary Ann Lynch, Maine Yankee's general counsel, his concerns that Maine Yankee had breached the 1986 LSI contract by failing to give proper notice. Id. at 79; Maine Yankee's Exh. 5 (May 31, 1991 Cackett letter). Cackett sought damages of $21,666, covering the two month period required by the notice provision of the contract. Transcript p. 79. With interest, this figure totalled $24,916.68. See Maine Yankee's Exh. 3 (Cackett notes); Plaintiff's Exh. 1 (Lynch notes). Lynch testified that this figure was acceptable to Maine Yankee. Transcript pp. 5-6.

Page 10

In addition to the money damages, however, as a precondition to settling this dispute, Cackett insisted that Maine Yankee assist Lee in ``getting'' Pei, that is, cooperate in Lee's upcoming Maine litigation against Pei. Id. at 6; Plaintiff's Exh. 1 (``$24,916.68 plus coop. in LSI lawsuit in ME against Kerlin.''). Lynch rejected this condition, informing Cackett that if Maine Yankee settled the suit it wanted to be finished with this dispute. Transcript p. 6. She also noted that Maine Yankee had recently contracted

11

with Pei to perform its software simulation services. Id. No further
settlement negotiations took place until after Lee filed the Maine lawsuit.
Id. at 6-7.

During the time that Cackett was negotiating with Maine Yankee, he was
also interviewing a number of individuals who were employees of LSI and were
assigned job responsibilities at the Maine Yankee site. Id. at 80. He spoke
with Han Hsu, K.C. Lea, Kam Chan, David Shee, as well as his client, about
their knowledge and observations of the actions of Pei, Swartz and other
individuals from Maine Yankee. Id. at 80-96. These individuals told Cackett
that during the spring and summer of 1989 Pei, in front of Maine Yankee
representatives, was accusing Lee of dishonesty, criticizing LSI and saying
that LSI would be out of business by the end of the year. Id. at 88-89, 91,
93. Cackett was also told that Pei had stated that he would take over the
simulation services contract in 1990. Id. at 90, 91, 93. As for Maine Yankee
personnel, Cackett was told that ``there was a change in attitude'' by
Swartz towards LSI, id. at 89, that Swartz and Pei had a personal
relationship, id. at 91, and that Swartz did not react to the assertions Pei
made against LSI, id. Also, when Lee asked Swartz about any problems with
Pei, Swartz responded that nothing was wrong. Id. at 95-96.

After learning this information, Cackett concluded that Maine Yankee
and Pei were ``likely'' involved in a conspiracy to harm LSI. See Maine
Yankee's Exh. 5 (May 31, 1991 letter). He further concluded that ``we would
have to file suit versus Maine Yankee to be able to get documentation, etc.,
regarding the suspicions that we had about the activities that were taking

12

place there.'' Transcript p. 97. He hoped to show through Maine Yankee documentation that it was wrongfully cooperating with Pei to allow him to take over the simulator service contract. Id. at 98.

Page 11

What Cackett was looking for was ``some memorandum or notation possibly from Mr. Swartz'' predating Pei's November 1989 resignation indicating Maine Yankee's consideration of awarding the service contract to Pei. Id. 99-100. Although he had no direct information that this was actually the case, Cackett believed that ``in fact there was something being hidden.'' Id. at 100. Cackett filed suit because he wished to conduct discovery to reveal documentation that would ``hopefully either illuminate or dispel the concerns which under[lie] the filing of the lawsuit.'' Id. at 101. He could think of no other way he could gain access to those alleged hidden documents other than though the discovery process. Id. at 104.

Unfortunately for Cackett, however, ``[discovery] did not result in any relevant documents that substantiated our case.'' Id. As for the individuals who had first engendered his suspicions, Cackett never attempted to depose any of them, although he knew he had mechanisms available to compel their testimony during the discovery period. Id. at 105-06. Cackett thought he could prevail by subpoenaing them to testify at trial, rather than at deposition. Id. at 105. He thought that their live testimony at trial would be more valuable to the case. Id.

III. RULE 11

13

Rule 11 requires an attorney to sign every pleading, motion or other

paper filed with the court. Fed. R. Civ. P. 11 (1983 amended version).1 The

attorney's signature constitutes a certification that the attorney has read

the filing, and that to the best of the signer's knowledge, information, and

belief formed after reasonable inquiry it is well grounded in fact and is

warranted by existing law or a good faith argument for the extension,

modification, or reversal of existing law, and that it is not interposed for

any improper purpose, such as to harass or to cause unnecessary delay or

needless increase in the cost of litigation.

1 The parties agree that the 1983 amended version of Rule 11 applies to this
proceeding, not the recently adopted 1993 version, which became effective
December 1, 1993, because the alleged sanctionable conduct occurred prior to
December 1, 1993. See Transcript pp. 114-16; see also Silva v. Witschen, No.
93-1720, 1994 WL 86217 at *2 (1st Cir. Mar. 24, 1994).

    Page 12

Id. If a submission to the court is signed in violation of the rule, the

court shall impose upon the signing attorney or the represented party, or

both, an appropriate sanction, which may include reasonable attorney fees.

Id.

    The purpose of Rule 11 is obvious -- to discourage dilatory and

abusive litigation tactics and to curtail frivolous claims and defenses. See

Fed. R. Civ. P. 11 advisory committee's notes (1983 amendments). The rule

contains two separate grounds for sanctions: the ``reasonable inquiry''

clause and the ``improper purpose'' clause. Lancellotti v. Fay, 909 F.2d 15,

19 (1st Cir. 1990). The reasonable inquiry prong polices groundless or

frivolous filings; the improper purpose prong guards against those pleadings

14

that, while perhaps not devoid of all merit, are nevertheless filed for some malign purpose. Id. at 18-19. At its core, Rule 11 imposes an affirmative duty on attorneys to investigate their clients' claims before submitting any filings to the court and to reassess those claims throughout the litigation. Kale v. Combined Ins. Co. of America, 861 F.2d 746, 758 (1st Cir. 1988). While bad faith clearly justifies sanctions, it is not a prerequisite for a Rule 11 violation. Lancellotti, 909 F.2d at 19. The standard is instead one of due diligence and objective reasonableness under the circumstances. Mariani v. Doctors Assoc., Inc., 983 F.2d 5, 7 (1st Cir. 1993); Navarro-Ayala v. Nunez, 968 F.2d 1421, 1425 (1st Cir. 1992). A good faith but unreasonable belief that a claim is legally and factually supported will therefore not protect an attorney from Rule 11 sanctions. Cruz v. Savage, 896 F.2d 626, 633 (1st Cir. 1990). In measuring an attorney's conduct, the court should avoid using the wisdom of hindsight and should evaluate the reasonableness of the conduct at the time the attorney acted. Id.

The rule also imposes a continuing obligation on an attorney to ensure that the proceedings do not continue without an adequate factual or legal basis. Id.; Kale, 861 F.2d at 758. If, for example, an attorney actively pursues a claim after facts indicating that it is groundless have come to light, this continued prosecution amounts to a violation of the rule. See Muthig v. Brant Point Nantucket, Inc., 838 F.2d 600, 604-06 (1st Cir. 1988). If, on the other hand, an attorney abandons a claim, which when first asserted had a sufficient factual basis, with reasonable promptness after

Page 13

discovering that the claim lacks factual merit, no Rule 11 violation has

occurred. See Pathe Computer Control Sys. Corp. v. Kinmont Indus., Inc., 955

F.2d 98-99 (1st Cir. 1992).

Once a Rule 11 violation is found, the court is bound to impose some

sanction. Figueroa-Ruiz v. Alegria, 905 F.2d 545, 548 (1st Cir. 1990). The

court, however, has broad discretion to fashion an appropriate sanction for

the violation. Mariani, 983 F.2d at 7. In tailoring the sanction to the

particular violation, it is important to remember that Rule 11 sanctions

generally serve two main purposes: deterrence and compensation. Navarro-

Ayala, 968 F.2d at 1427. When a sanction is designed to be compensatory,

compensation should be awarded for ``the fair value of response costs

reasonably incurred'' as a result of the sanctionable conduct. Id.

IV. DISCUSSION

The defendants assert that the conduct of the plaintiff and attorney

Cackett in this suit violated both prongs of Rule 11, that is, the

``reasonable inquiry'' clause and the ``improper purpose'' clause. See

generally Defendants' Post-Hearing Briefs (Docket Nos. 106, 107). In their

respective Rule 11 motions, Maine Yankee and Swartz seek sanctions against

the plaintiff generally, while Pei seeks sanctions solely against attorney

Cackett. Id. Though Lee, as a represented party, is himself subject to

sanctions for filings signed in violation of the rule, see Fed. R. Civ. P.

11 (1983 version), I find that the ultimate Rule 11 responsibility in this

case lies with attorney Cackett, who was the person responsible for the

prosecution of both the Maryland and Maine actions and the principal

signatory and advocate of the numerous filings in this case.2 See

2 I note that the original complaint in this action, filed on December 13,
1991, was not signed by Cackett, though it lists him as being of counsel.
Complaint (Docket No. 1). Cackett was not at that time admitted to practice
before this court. Within a week, however, he filed a signed affidavit in
support of the plaintiff's motion to allow him to appear pro hac vice.
Affidavit of Thomas E. Cackett (Docket No. 3). A short time later, on
January 2, 1992, an amended complaint signed by Cackett was filed.
Plaintiff's First Amended Complaint (Docket No. 4). From that point forward,
January 2, 1992 through May 5, 1993, virtually all of the documents filed in
pursuit of this case were signed by Cackett. I note that a few
nonsubstantive filings were signed by local counsel only. The defendants,
however, have not asserted that any of these filings, taken alone,
constitute a Rule 11 violation on the part of local counsel.

     Page 14

Taylor v. United States, 151 F.R.D. 389, 397-98 n.14 (D. Kan. 1993)

(``Ideally, Rule 11 sanctions should fall upon the individual responsible

for the filing of the offending document[s].'') (internal quotation marks

and citations omitted). Accordingly, I will address this discussion of Rule

11 compliance to attorney Cackett only. I will consider each defendant

separately.

                              A. Pei

     Defendant Pei first contends that it is clear that Lee's suit against

him was factually unfounded from its inception and designed to create

harassment and stress. I disagree. I find that Cackett conducted a

reasonable prefiling inquiry indicating a sufficient factual basis to assert

an action against Pei, at least at the time when he filed the complaint.

Cackett's prefiling inquiry consisted of interviewing various engineers who

had allegedly heard Pei denigrate and threaten Lee and LSI in front of Maine

Yankee and state that he would take the 1990 simulation services contract. Cackett also knew that Pei allegedly called two utility companies and criticized Lee and LSI. Moreover, Cackett was aware that Pei was eventually awarded the 1990 service contract, submitting his proposal on behalf of his new company, PrimeTech, just one day after resigning from LSI. This fact, combined with what he had been told by the other engineers, arguably provides some evidence to suggest that Pei may have engaged in conduct that breached some fiduciary duty owed to LSI. I find that all of this evidence, though not very strong, is enough to avoid fact-based sanctions, at least with respect to the initiation of the Maine action. See Kinmont Indus. Inc., 955 F.2d at 98; Muthig, 838 F.2d at 605-06.

Pei further notes that Cackett's actions in the Maine suit seemingly mirror adverse developments in the Maryland litigation. From this Pei would have the court infer that Lee brought this suit for an improper purpose, that is, to apply pressure upon him to coerce a favorable settlement in the Maryland litigation. Again, I cannot agree. Because Lee's claims against Pei appeared to have an adequate factual basis in their own right, at least when filed, I cannot say that

Page 15

this action was initiated for an improper purpose. See Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990). Otherwise, any time parallel litigation is ongoing the plaintiff in the later suit would face Rule 11 accusations of bringing the second suit for coercive purposes regardless of the validity of the plaintiff's claim. While this may be true

18

in some cases, where the second action is not baseless I am reluctant to infer that the action was brought for an improper purpose in the absence of strong evidence of bad faith. See Chambers v. Nasco, Inc., 111 S. Ct. 2123, 2133 n.10 (1991) (relationship between bad faith and improper purpose); Townsend, 929 F.2d at 1362 (relationship between frivolousness and improper purpose); Marrero Rivera v. Department of Justice of Commonwealth of P.R., 821 F. Supp. 65, 74 (D.P.R. 1993) (relationship between bad faith and improper purpose).

No such proof has been provided here. The fact that Cackett's actions in the Maine litigation correspond to negative developments in the Maryland litigation, though perhaps circumstantial evidence hinting at an improper purpose, does not by itself establish malign intent on the part of Cackett. In addition, Cackett's prefiling comments to Maine Yankee about cooperating to ``get'' Pei related to the upcoming Maine litigation, not the Maryland litigation. I therefore find insufficient proof to support a determination that Lee's Maine action against Pei was brought for the improdn. Moreover, I note that during the damages phase of the Maryland litigation and before the initiation of the Maine action, Pei himself, through his Maryland counsel, suggested that Cackett go file a separate action against him in Maine, rather than reopening parts of the Maryland case, if he wanted to raise issues surrounding the Maine Yankee contract. See Plaintiff's Exh. 2 at 11. This invitation was not accompanied by any warning that such an action would be viewed as groundless. Pei cannot have it both ways, first suggesting the filing of a Maine action and then claiming it is improper once filed.

19

Finally, Pei asserts that even if Lee's suit was not baseless or improper when filed, Cackett should have known that there was no support for Lee's allegations once discovery was completed. Cackett's continued pursuit of this action, says Pei, violated his Rule 11 obligation to ensure that the

Page 16

action did not continue without an adequate factual basis. Here I agree with Pei. While Lee's claims against Pei may have had a sufficient factual basis to support the initiation of this action, no admissible evidence to support any of these claims had been developed by the close of discovery on December 7, 1992. See Scheduling Order (Docket No. 36). Lee's allegations against Pei were based primarily on the reports of engineers assigned to the Maine Yankee facility. Though he had the legal mechanisms to do so, Cackett never deposed any of the numerous individual engineers who purportedly provided him with the factual information that justified the filing of this action. Nor did he ever move for an extension of the discovery deadline before it expired. Consequently, at the end of discovery no evidence other than inadmissible hearsay existed to support Lee's allegations against Pei.

Nonetheless, from December 7, 1992 through April 2, 1993 Cackett continued to vigorously pursue this action against Pei and continued to submit signed filings that, at that stage of the factual basis since they lacked any evidentiary support. For example, on January 15, 1993, Cackett filed a statement of material facts, in opposition to Pei's motion for summary judgment, asserting factual issues that had no evidentiary support. See Plaintiff's Supplemental Statement of Material Facts in Dispute (Docket

20

No. 66).3 These unfounded factual allegations were also asserted in

Cackett's memorandum in opposition to Pei's motion for summary judgment,

filed on January 8, 1993. See Plaintiff's Memorandum in Support of Its

Opposition to Defendant Kerlin Pei's Motion for Summary Judgment (Docket No.

61). Cackett also submitted a pretrial brief on April 2, 1993 restating all

of his original claims against Pei and asserting triable issues with respect

to Pei. See

3 For example, in the supplemental statement of material facts Cackett
asserted that ``Pei made repeated, negative and adverse comments and
communications to Maine Yankee officials and employees while still employed
by LSI . . . .'' ( 3); ``Pei communicated with on-site LSI co-worker [sic]
who indicated that Pei was planning and already confident that he would
personally assume LSI's then-current simulation contract.'' 4; ``Pei
communicated to other LSI current customers damaging and negative statements
intended to undermine LSI's relationship with these customers.'' 7; ``Pei
continued this tortious activity intending to interfere with LSI's on-going
contractual relationships even after his resignation from LSI.'' 9; ``Pei
communicated negative and damaging information regarding LSI to prospective
customers of LSI.'' 10; and ``Pei communicated slanderous statements
directed towards LSI and Dr. Lee.'' 13. Aside from the hearsay statements of
Lee, the evidentiary record contained no factual support for any of these
charges.

     Page 17

Plaintiff's Pre-Trial Memorandum (Docket No. 80).4 I find that the

submission of these filings violated Cackett's Rule 11 obligation to ensure

that the proceedings not continue without an adequate factual basis. See

Cruz, 896 F.2d at 633; Muthig, 838 F.2d at 606.

     I note that this is not a situation where Cackett was merely unable to

produce sufficient evidence to avoid summary judgment. See, e.g., Martin v.

Brown, 151 F.R.D. 580, 586 (W.D. Pa. 1993) ("Rule 11 sanctions are

inappropriate simply because an attorney, after time for discovery, is
unable to produce adequate evidence to withstand a motion for summary
judgment."') (internal quotation marks and citations omitted); see also
Stitt v. Williams, 919 F.2d 516, 526-29 (9th Cir 1990). Rather, Cackett
never even attempted to produce such evidence. Although he claims to have
been unable to obtain voluntary affidavits from any of the various engineers
in order to oppose Pei' summary judgment motion, see Affidavit of Patrick
Lee (Docket No. 69), Cackett never sought to compel their deposition
testimony during the discovery period. (Lee's affidavit lists as many as six
individuals who allegedly had information about his claims. See id. at 4-5.)

     Whether this failure was due to inexperience, incompetence,
inadvertence or conscious design is immaterial. See Cruz, 896 F.2d at 631.
The crucial point is that Cackett undertook no discernible effort prior to
the close of discovery to establish the factual predicate for Lee's charges
against Pei. Yet, despite the total lack of evidentiary support for Lee's
allegations, and Cackett's obvious knowledge of such a deficiency, following
the close of discovery Cackett continued

4 For example, the final pretrial memorandum contains the following
``Statement of Plaintiff's Claim'': Plaintiff asserts that the Defendants
cooperated in an effort to interfere, obstruct and divert contracts
belonging to Leader Simulation, Inc. to a separate entity wholly owned by
Defendant, Kerlin Pei. Plaintiff further asserts that in the process of
interfering, obstructing and diverting Leader Simulation's contracts and
rightful expectations of continuing contractual and economic relationships,
the Defendants further endeavored to discredit Leader Simulation, its
officers and employees in knowingly disseminating untruthful and vicious
allegations regarding the ability of Leader Simulation and its employees to
continue to provide quality services under the then-current and prospective
nuclear simulation and engineering contracts.

Page 18

vigorously to pursue Lee's claims against Pei and to assert strong allegations that he knew no longer had an adequate factual basis. It is this conduct, as reflected in his post-discovery filings, that violated the rule.

### B. Maine Yankee and Swartz

Defendants Maine Yankee and Swartz contend that, aside from the breach of contract claim, the remaining claims against them are factually frivolous and that, in any event, the entire suit was brought for an improper purpose. I agree. The breach of contract claim to one side, the crux of Lee's other charges against Maine Yankee and Swartz is that they colluded with Pei to harm LSI. There is absolutely no factual basis for this contention. The most that can be said, based on the various hearsay statements from former LSI engineers, is that Maine Yankee and Swartz were concerned about the rift between Lee and Pei and its possible effect on LSI's service. Lee's deposition bore this out. Any reasonable prefiling inquiry, assumedly involving an interview of Lee, the complainant, would have revealed the total lack of support for any claim that Maine Yankee or Swartz was part of concerted effort to harm LSI. See Ryan v. Clemente, 901 F.2d 177, 179-180 (1st Cir. 1990). Indeed, Cackett does not seem to dispute this. As Cackett admitted at the Rule 11 hearing, his ``conspiracy'' case against Maine Yankee and Swartz was based on nothing more than his suspicions that they had secretly cooperated with Pei and that they had said certain negative things about LSI. This he hoped to prove through discovery but never did.

Cackett's speculation that Maine Yankee and Swartz had conspired to harm LSI, however, fails to satisfy his prefiling duty to verify that Lee's claims were based in fact. Rule 11 requires more than speculations, suspicions or hunches to justify the filing an action. See, e.g., Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992); Nault's Auto. Sales, Inc. v. American Honda Motor Co., 148 F.R.D. 25, 36 (D.N.H. 1993); Multi-M Int'l, Inc. v. Paige Medical Supply Co., 142 F.R.D. 150, 152 (N.D. Ill. 1992); Gutierrez v. City of Hialeah, 729 F. Supp. 1329, 1333 (S.D. Fla. 1990). The rule does not support a ``shoot-first-ask-questions-later'' approach to

Page 19

litigation. If Cackett was suspicious about Maine Yankee's and Swartz's relationship with Pei, he certainly had options available other than filing suit to confirm or disprove them. For example, after bringing suit against Pei, Cackett could have deposed Maine Yankee and Swartz or compelled the production of certain documents that he thought might substantiate his suspicions. See Fed. R. Civ. P. 30(b)(6), 45(d)(1). (I note that such documents do not in fact exist. See Affidavit of Charles A. Harvey, Jr. (Docket No. 54).)

The fact that Lee prevailed on his breach of contract claim (Count III) does not preclude a finding of a Rule 11 violation for Cackett's pursuit of this action. See Dodd Ins. Servs., Inc. v. Royal Ins. Co. of America, 935 F.2d 1152, 1158 (10th Cir. 1991). In his complaint, Lee demanded $24,916.68 for the remaining sixty days of the contract. Second

24

Amended Complaint (Count III). Lee eventually stipulated that the proper amount of damages for the breach, following Judge Hornby's summary judgment decision, was far less, $3,400. Stipulation (Docket No. 87).

Before suit was filed, however, Maine Yankee was willing to pay the original demand, $24,916.68, but Cackett refused to accept this unless Maine Yankee would also help Lee ``get'' Pei in the Maine action. Because Maine Yankee was willing to pay for the remaining time on the contract, no legitimate basis remained for Cackett's filing of the breach of contract claim, the one legitimate count, thus leaving only the unsupported conspiracy allegations. Given Cackett's improper precondition to settlement, I can only infer that the real reason for bringing this action against Maine Yankee and Swartz, with all of its baseless allegations of a joint effort to harm LSI, was to exert pressure on Pei through Maine Yankee in Lee's action against Pei. See Townsend, 929 F.2d at 1365 (``A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose.'').

In short, therefore, I conclude that Cackett's filing of this frivolous, baseless action against Maine Yankee and Swartz violated Rule 11. Allegations that Maine Yankee and Swartz were cooperating to harm LSI are based on nothing but Cackett's own speculation. This violated the ``reasonable inquiry'' clause. Moreover, I find that the real reason Cackett brought this action in the

Page 20

25

first place was for leverage in the Maine action against Pei. This violated
the                              VI. CONCLUSION

     Rule 11 sanctions, as a formal castigation of professional conduct,
are not to be levied lightly. On the record before me, however, I am
constrained to conclude that attorney Cackett violated his Rule 11
obligations, first, by filing and improperly pursuing a frivolous action
against Maine Yankee and Swartz and, second, by continuing to pursue a
factually unsupported action against Pei after the close of discovery. As a
sanction I order attorney Cackett to pay the reasonable response costs
incurred by the defendants resulting from the sanctionable conduct. Navarro-
Ayala, 968 F.2d at 1427.

     At the Rule 11 hearing Maine Yankee testified that it spent somewhat
more than $55,000 in legal fees for its defense and the defense of Swartz,
its employee. See Transcript p. 8. Cackett has not questioned the
reasonableness of these fees, and in the absence of such objection I
consider the claimed fees to be reasonable. Accordingly, I award Maine
Yankee and Swartz $30,000. This figure represents the difference between
their reasonable attorney fees ($55,000+) and the amount Maine Yankee was
willing to pay for the breach of contract claim ($24,916.68). I find that
this figure fairly compensates Maine Yankee and Swartz for their reasonable
response costs for defending against this baseless action.

5 Defendant Swartz also contends that the plaintiff's action against him
individually violated Rule 11. Swartz argues that Maine Yankee readily
admitted that he was acting as its employee and agent at all times relevant
to this suit, see Maine Yankee's Exh. 1 at 5, and thus Cackett had no basis
for naming or retaining him as an individual defendant. Assuming for the

moment that Lee's claims against Swartz had factual merit, which of course
they do not, I find that the mere fact that Cackett refused to release
Swartz from this action does not amount to a Rule 11 violation. If Lee's
allegations of tortious conduct on the part of Swartz were correct, Swartz
would have been individually liable for that conduct. See Restatement
(Second) of Agency 343 (1958).Although Maine Yankee would likely be jointly
and severally liable for Swartz's torts, see, e.g., id. 248, Rule 11 did not
require Cackett to release an individual tortfeasor who retained personal
liability, id. 217 B, 359, even though his principal agreed to assume
responsibility for his actions. Had the plaintiff been able to prevail on
his claims against Swartz, Cackett could have looked to both Maine Yankee
and Swartz to satisfy the judgment.


     Page 21

     As for Pei, he claims to have spent between $28,000 and $30,000 in

legal fees in defending against the Maine action. See Transcript p. 40.

Again, Cackett never questioned the reasonableness of this amount, nor did

he question any of the listed expenses in Pei's itemization of attorney

fees. See Pei's Exh. 1. Based on his itemized attorney fees, id., which I

have reviewed carefully, I award Pei $7,500. I find that this figure fairly

compensates Pei for his reasonable response costs for defending against this

factually unsupported action following the close of discovery.

     I note that these awards do not include attorney fees spent defending

against Lee's aborted appeal, since this court lacks jurisdiction to award

such sanctions under Rule 11. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,

405-09 (1990).

Dated at Portland, Maine this 8th day of April, 1994.

_____

David M. Cohen United States

Magistrate Judge


27

**EXHIBIT B**

From:"Mitchell, Robert B." <rbmitchell@pullcom.com>
To:"'law4us@rcn.com'" <law4us@rcn.com>
CC:"Sheahan, Margaret M." <msheahan@pullcom.com>
Subject:Schiller v. City of Bridgeport
Date:Thu, 16 Dec 2004 11:33:59 -0500

Dear Susan:
        The conclusion of the trial presents another point in time when this
whole dispute might be resolved..  If your clients are interested, I would be
willing to approach the City and Chief Maglione about Defendants signing full
releases of any claims that they might have against your clients for costs, fees
and/or compensatory damages in return for your clients agreeing to: (1) accept
the jury's verdict; and (2) resign from the BFD.  I have no authority to offer
this kind of a resolution, but, as I said, I would be willing to approach the
Defendants about it if you and your clients are interested.
                                Bob Mitchell