**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ELIZABETH SCHILLER, | CIVIL ACTION |
| Plaintiff, | NO. 3:01 CV-00452 (AVC) |
| JOHANNA S. GEORGIA, | CIVIL ACTION |
| Plaintiff, | NO. 3:01 CV-00717 (AVC) |
| VS. | |
| CITY OF BRIDGEPORT; DONALD DAY, IN His Official Capacity As Fire Captain And In His Personal Capacity; EARL PETTWAY, In His Official Capacity As Deputy Fire Chief And In His Personal Capacity; MICHAEL MAGLIONE, In His Official Capacity As Fire Chief And In His Personal Capacity, | (CONSOLIDATED) |
| Defendants. | January 25, 2005 |

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO SET
ASIDE JUDGMENT AND FOR NEW TRIAL

I.     **PRELIMINARY STATEMENT**

Plaintiffs have moved to set aside a judgment entered December 20, 2004 that gave

effect to a verdict rendered December 15, 2004 after a trial that spanned two calendar weeks.

Plaintiffs point to several different categories of problems with the proceedings to support

their motion.  They all, however, boil down to Plaintiffs' disagreement with findings by the

jury and rulings by the Court.  Neither separately nor together do they indicate inconsistency with substantial justice.  Only such an extreme conclusion would justify the extraordinary measure of discarding the work of the jury and subjecting the parties and the Court to an encore trial and the enormous expenditure of resources it would entail.  The trial was fair and thorough and need not be repeated.

## II.    ARGUMENT

### A.  THE STANDARD

Plaintiffs move under Fed. R. Civ. P. 59(a).  To grant a new trial under this rule, the Court must be persuaded that "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice. . . [that] the jury's verdict is against the weight of the evidence."  Schanzer v. United Technologies Corp., 120 F. Supp. 2d 200, 208 (D. Conn. 2000) (quotation marks and citations omitted).

> "It is well settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits or otherwise taking a 'second bite at the apple.' *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136,144 (2d Cir. 1998).
>
>     \*    \*    \*    \*    \*    \*    \*    \*
>
> "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant a motion when the jury's verdict is 'egregious.'" *DLC Management Corp.[v. Town of Hyde Park]*, 163 F.3d [124] at 134 [(2d Cir. 1998)].

Id.

Plaintiffs do not and cannot meet this high standard.

### B.  JURY SELECTION AND COMPOSITION WAS FAIR

Plaintiffs cite five different jury selection and composition problems.  Some are factually inaccurate and none is a valid basis for a new trial.

*Minority representation in jury pool (Plaintiffs' Motion, p.3 "3.a.")*  First, Plaintiffs claim that an "apparent" presence of only two non-White persons in the jury pool was so glaring that the District Court should have addressed it "to comply with the Second Circuit's ruling" in U.S. v. Jackman, 46 F.3d 1240 (2d Cir. 1995).  Plaintiffs' Motion, p. 3.  In fact, more than two non-White persons were in the pool from which this jury was selected.  See Juror Biographical Report, 11/23/04.

Furthermore, Plaintiffs are simply wrong in their statement that their observation of "only two non-White persons" presents the "same problem with the jury pool selection in this same Court" that was addressed in Jackman.  The nine-year-old Jackman decision states at its outset that it concerns a jury selection method "no longer in use," *id*. at 1241.  Moreover, the problem in Jackman was not the number of minorities in the pool but the method of selection for the pool's constituents and its systematic exclusion of residents of the two most heavily minority populated municipalities in the region, Hartford and New Britain.  Notably, both these cities were represented in the pool from which this jury was drawn.

Finally, Plaintiffs made no objection to the composition of the jury pool until after judgment entered.  It is too late to bring this issue forward now.  Fed. R. Civ. P. 46.

*Voir Dire question selection (Plaintiffs' Motion, p.3, "3.b.")*  Plaintiffs' second complaint about jury selection is that the judge did not choose to utilize their proposed voir dire questions.  There is no right to direct voir dire in the federal system, nor to party design of the voir dire questions.  Defendants likewise suggested questions the Court declined to use.  The questioning of prospective jurors is within the discretion of the Court.  Fed. R. Civ. P. 47.  Stephan v. Marlin Firearms Co., 353 F.2d 819 (2d Cir. 1965), cert. denied, 384 U.S. 959 (1966).

*Number of defense peremptories (Plaintiffs' Motion, p.3 "3.c.")*  Plaintiffs' third complaint about jury selection is about the number of peremptory challenges allotted to the three defendants in the case at that time.  (In fact, Defendants could have expected nine under 28 U.S.C. § 1870 but agreed to six at the Court's request.)  Plaintiffs' argument that the defendants had a unity of interest ignores the fact that the individual defendants were exposed to personal liability for which they could not be indemnified by their municipal employer in that they were sued in their individual capacities for willful and intentional wrongdoing.

> The statute governing allocation of peremptory challenges in civil cases, 28 U.S.C. § 1870, "specifically leaves to the trial court's discretion the number and manner of exercise of peremptories in cases where there are '[s]everal defendants or several plaintiffs.' "  Carr v. Watts, 597 F.2d 830, 832 (2d Cir. 1979) (quoting § 1870).

Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1219 (2d Cir. 1995), mod'd on other grounds, 85 F.3d 49 (2d Cir. 1996).

*Discriminatory use of defense peremptories (Plaintiffs' Motion, p.3 "3.d.")*

Plaintiffs' fourth complaint about jury selection is that Defendants allegedly improperly used their peremptory challenges to exclude "all but two women , and all but one working woman from the jury." ***The biggest problem with this argument is that there were four women on the eight-person jury, of whom three were currently employed and the fourth was retired after a long working life***.[1]

Another dispute Defendants have with Plaintiffs' argument here is their characterization of the Court's reaction to their request for a "<u>Batson</u> hearing."  When Plaintiffs' counsel made the charge that improper discrimination motivated Defendants' use of their peremptory challenges, the Court heard counsel at side bar, first giving Plaintiffs' counsel an opportunity to explain the basis for the claim.  Plaintiffs' counsel explained that Defense counsel was only excluding women and in fact, working women, with peremptory challenges.  Defense counsel responded that Defendants had excluded several male candidates and noted that working women are not a protected class.  The Court then demanded Defendants' basis for excluding those female candidates that it had used peremptory challenges to eliminate.  A separate, non-discriminatory reason was given for each challenge, including that one woman had revealed that she was currently a plaintiff in a case for money damages, that another was apparently hostile and that this hostile candidate

---

[1]     The four female jurors who actually heard the case were Jennifer Humes, a brand manager for the Hartford Courant, Sharon Cresenzi, a certified nursing assistant, Lynann S. Raymond, a system administrator, and Muriel L. Prince, a retired baker.  See Juror Biographical Report, 11/23/04.

and another were inattentive to the whole process. Plaintiffs' counsel was asked to respond and did so. The process was sufficiently thorough and followed the teachings of Batson v. Kentucky, 476 U.S. 79 (1986) and Edmondson v. Leesville Concrete Co., Inc., 500 U.S. 614 (1991).

     *Court's causing jury restlessness (Plaintiffs' Motion, p.4 "3.e.")* Plaintiffs' fifth complaint about the jury is apparently that they were restless with the length of the proceedings and encouraged in this by the Court's statements that the case was taking too long. Defendants do not recall the Court making such statements to the jury. The Court repeatedly thanked the jury for their patience particularly when matters conducted outside their presence, but while they were in the courthouse, consumed long periods of time. The Court gave helpful advice to the parties and their counsel about his sense of the jury's level of interest and frustration at lengthy testimony[2] and courtroom behavior, using hyperbole to make his point ("about to mutiny"). The Court told counsel when he thought examination was becoming repetitive or irrelevant. This is all well within the discretion of a trial judge to control the proceedings. The jury certainly did its duty willingly and even turned down an opportunity to shorten a workday, thankful for being asked their preference but choosing to move forward. At no time did the Court take any action provocative of a negative jury reaction.

---

[2]    Plaintiffs are mistaken in claiming their case-in-chief took two and one-half days to present. It took three and one-half days.

### C. EVIDENTIARY RULINGS DID NOT UNDERMINE FAIRNESS.

Plaintiffs cite eleven different evidentiary rulings as reasons for a new trial. Again, some of these arguments mischaracterize the actual trial events and none of them indicates a miscarriage of justice.

*Excluding non-gender discrimination claims of non-parties (Plaintiffs' Motion, p.5 "4.a.")* The great weight of precedent supports this Court's decision to exclude evidence of race or ethnic discrimination to prove sex discrimination as set forth in the memorandum supporting Defendants' motion *in limine* on the point. Plaintiffs' contention that their employer lacked mechanisms by which discrimination could be meaningfully addressed does not distinguish their case from this precedent. All employment discrimination plaintiffs, whether they articulate it or not, make this claim.

Plaintiffs also claim they needed to prove racism was an ulterior motive of the Fire Department's punishment (as Plaintiffs expressly requested) of Donald Day, the officer who uttered the despicable slur against female firefighters. As Plaintiffs put it, they wished to suggest to the jury "that the City did not in fact discipline Mr. Day for 'sexual harassment,' . . ., and that it did not even aim to remedy Plaintiffs' complaints by disciplining Mr. Day." The contention alone proves the correctness of the exclusion ruling. The introduction of the sensitive subject of race could well have emotionally swayed the jury to ignore the corrective action taken to remedy the gender hostile environment Plaintiffs and others sought to have cured. Plaintiffs hoped to distract the jury from their proper task of determining whether any problem of sex discrimination that might have existed had been remedied. Motivation for the

remedy is irrelevant to this case.  Any claim of unlawful motive in Mr. Day's treatment belongs to Mr. Day.

       *Evidence of other sex discrimination complaints (Plaintiffs' Motion, p.6 "4.b.")* Plaintiffs **did** introduce evidence of sex discrimination complaints of other women firefighters, for example, through the testimony of Ina Anderson and Cindy Mattera.  Their primary complaint now is the Court's declining to permit them to introduce evidence of a deceased female firefighter's complaint.[3]  Since that matter was settled without any admission of liability by the City, the contents of the complaint were probative of nothing other than old allegations incapable of cross-examination.  The fact that a case is filed and/or is settled does not resolve issues of guilt or innocence in any way whatsoever. See Fed. R. Ev. 408; see also, Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc., 687 F.2d 563, n.10 (2d Cir. 1982). The complaint's contents are inadmissible hearsay; the fact of its filing, completely irrelevant to these Plaintiffs' claims.  The Court could not properly have decided otherwise.

       *Hearsay exclusion of testimony about statements of non-officer coworkers (Plaintiffs' Motion, p.7 "4.c.")* Testimony about an out-of-court statement offered to prove the truth of the statement is the very definition of hearsay.  Fed. R. Ev. 801 (c).  Therefore, Plaintiffs had to satisfy some exception to the hearsay prohibition or show that the testimony was in fact

---

[3]   Defendants would like to put to rest once and for all the disturbing implications that the death of this firefighter, Kathy Denton, was somehow caused by the City.  Exhibit 1 is the death certificate of Ms. Denton which clearly shows that she was not found dead in her home but died in a hospital from natural causes many days after being admitted.

not hearsay to overcome a hearsay objection.  Fed. R. Ev. 802.  Admissions of a party against interest offered by the party's opponent are not hearsay.  Fed. R. Ev. 801(d)(2).  To fit a non-officer co-worker's out of court statement into this exception, Plaintiffs would have had to make a showing that the statement was adopted by the party (Fed. R. Ev. 801(d)(2)(B)), was authorized by the party (Fed. R. Ev. 801(d)(2)(C)) or concerned a matter within the scope of their agency or employment (Fed. R. Ev. 801(d) (2) (D)).  Plaintiffs cannot fairly demand a new trial because hearsay evidence they could not qualify as non-hearsay or within an exception was excluded.

Plaintiffs apparently argue that their hearsay should have been admitted because the Court improperly admitted testimony and other evidence of out-of-court statements of Bridgeport Fire Department officers.  Of course, if a new trial were granted, Plaintiffs' hearsay evidence would still need to be excluded.  The legitimate question to be posed here, then would be whether any defense evidence was improperly admitted and if so, was that error harmful and further, sufficiently serious to undermine the substantial justice of the verdict.

Defendants believe that each bit of evidence it offered that might fit Plaintiffs' argument here was or could have been admitted properly either on the grounds that it was not hearsay because it was not offered for the truth of its content but the fact of its occurrence, U.S. v. Aspinall, 389 F.3d 332, 340 (2d Cir. 2004), or that it qualified as a prior consistent statement to rebut an inference of recent fabrication or improper motive (Fed. R. Ev. 801(d)(1)(B)); or that it fell within a recognized exception to the hearsay ban as a present

sense impression (Fed. R. Ev. 803 (1)), state of mind (Fed. R. Ev. 803 (3)), record of regularly conducted activity (Fed. R. Ev. 803 (6)) or a public record or report (Fed. R. Ev. 803 (8)).

*Website postings (Plaintiffs' Motion, p7 "4.d.")*  Plaintiffs were repeatedly instructed by the Court as to the necessary evidence to establish the authenticity of their website evidence.  Recognized exceptions to the hearsay rule authorize the admission of the website material on fire service safety standards:  state of mind (motive) (Fed. R. Ev. 803 (3)), the record of regularly conducted activity and the commercial publications exceptions (Fed. R. Ev. 803 (6) and (17)), both established by the testimony of a fire officer.

*Evidence allegedly undisclosed despite discovery requests (Plaintiffs' Motion, p 7 "4.e.")*  Plaintiffs fail to identify the material they reference, making assessment of this claim difficult.  Nevertheless, Defendants point out that rebuttal evidence may be used without disclosure in a pretrial memorandum; that Plaintiffs failed to examine all materials made available for their inspection during discovery; and that the Court permitted amendment to the pretrial disclosures of evidence by both sides before and during trial.

*Evidence admitted after the parties rested (Plaintiffs' Motion, p.8 "4.f.")*  The Court reserved decision on some objections to documentary evidence to make more efficient use of the jury's time.  Plaintiffs were made aware of Defendants' proffer of the documents in question well before the close of the defense's case and the start of their rebuttal.  They had the opportunity to argue on the question and to seek an earlier ruling if the admission would

have changed strategy or tactics.  Their choice not to do so then is not a legitimate reason to retry this case.

   *Plaintiff Georgia's Workers' Compensation Administrators' File (Plaintiffs' Motion, p.8 "4.g.")*  Plaintiffs are mistaken that the documents in question were made public prior to their use at trial.  The supplement to the Defendants' list of exhibits was filed without  the attached exhibits.  The authentication of the file as being that information available to the City and its agents in determining whether or not Plaintiff Georgia could return to work was proper.  The purpose of the evidence was not to establish any medical truth about Plaintiff Georgia's condition but to establish what conclusions had been communicated to the Defendant City on which it based its judgment not to return her to duty.  Plaintiffs argue that they should have been permitted to characterize a doctors' note requiring severe restriction of Plaintiff Georgia's physical activities as a "return to work" note while Defendants should not have been permitted to show the jury the actual content of the information available to the decision-makers.  Calling the Court's refusal to let Plaintiffs carry out this deception a miscarriage of justice is completely illogical.

   *Denial of Plaintiffs' request for the jury to view the firehouses (Plaintiffs' Motion, p.11 "4.h.")*  It is within the discretion of the Court to determine whether the costly and time-consuming prospect of a jury's touring ten different premises in a distant city is necessary.  The denial of this request was not error.  The admission of the photographs authenticated by a person present when they were taken and able to swear that they accurately represented what they purported to represent was entirely proper.  Kleveland v. U.S., 345 F.2d 134, 136

(2d Cir. 1965).  The contention that Plaintiffs lacked access to the premises for the purpose of making their own photographs is false.  Exhibit 2 to this memorandum is comprised of copies of multiple invitations to Plaintiffs to schedule such access, to which Plaintiffs failed to respond.

_Exclusion of "evidence" of Defense counsel misconduct (Plaintiffs' Motion, p.12 "4.i.")_  This Court has viewed Plaintiffs' proffered evidence on this topic and Defendants' refutation of it and correctly granted Defendants motion _in limine_ on the subject.

_Autumn Dennerlein's testimony (Plaintiffs' Motion, p.12 "4.j.")_  Defense counsel deny the malicious accusations that they suborned perjury.  Plaintiffs' counsel's lack of comprehension of the litigation process, the rules of evidence and elementary courtroom protocol, and her willingness to assert as fact the wildest speculation, continue to be stunning, despite their relentless display for some five years of torturous dealings.

Plaintiffs are incorrect in their assertion that all exhibits listed in the pretrial memo were automatically admitted if no objection were filed against them.  The Court did not eliminate the need for counsel to offer exhibits for admission.  The instruction was that offering an exhibit would constitute an assertion that one's opponent had a copy of the exhibit and had made no objection to it.  Thus, Plaintiffs are wrong about how the exhibit that was the "2326" complaint Autumn Dennerlein made about Captain Day's offensive utterance came into evidence (marked as Defendants' Exhibit #44).  They are nevertheless correct that it was in evidence when Ms Dennerlein testified.  (It was admitted with a group

of documents about the Day investigation during the defense direct examination of Earl

Pettway, Assistant Chief, retired.)

Plaintiffs are wrong in their assertion that Ms. Dennerlein's denial of the complaint

was orchestrated; defense counsel were quite surprised by her failure to recognize it.

Plaintiffs are wrong in their assertion that only perjury can explain her surprising testimony.

Perjury, of course, requires knowing false testimony, and is not committed by mistake or

through confusion.  U.S. v. Dunnigan, 507 U.S. 87 (1993); Thomas v. St. Francis Hosp. and

Medical Center, 184 F.R.D. 38, 39 (D. Conn. 1998), aff'd, 198 F.3d 235 (2d Cir. 1999).

Plaintiffs are also wrong in their assertion that the exhibit was withdrawn from

evidence.  (Defendants' counsel did tell the Court that the exhibit would be withdrawn if the

Court wished, but did not move for this.  In fact, Defendants moved the exhibit into evidence

as it showed an example of the Fire Department's correction of a problem of which a female

firefighter had complained.)  The jury got that document with the others when they

deliberated.  See Exhibit 3, Court's record of admitted defense exhibits.

Plaintiffs' Motion discusses other supposedly false testimony by Ms. Dennerlein and

accuses Defendants of knowingly eliciting it.  Some of this discussion seems to be based on

the inaccurate premise that Ms. Dennerlein denied the fact that her mother (who was also

Plaintiff Schiller's mother) died recently, when in fact she merely denied knowing when her

mother had died.  This and other testimony that Plaintiffs now claim is false and was elicited

at trial by Defendants with knowledge of its falsehood (about the circumstances of Plaintiff

Schiller's custodial situation in childhood and the reasons for their mother's testamentary

13

decisions) was in fact elicited by Plaintiffs on cross-examination or raised in re-direct

examination in order to allow the witness to complete the picture Plaintiffs' counsel had

begun to paint with limited inquiry into personal matters.  Defendants agree it was a door that

would better have remained closed; but Plaintiffs having opened it, their disappointment at

what they disclosed by doing so does not entitle them to a new trial.

In any event, the potential for perjury having been committed at a trial does not

require a new trial when the question is fairly before the jury for a credibility determination.

Sorlucco v. New York City Police Dept., 971 F.2d 864, 874-5 (2d Cir. 1992).

*Character evidence about Plaintiff Georgia (Plaintiffs' Motion, p.15 "4.k.")*

Plaintiffs argue that Nancy Petrucelli's testimony that portrayed Plaintiff Georgia in a bad

light was negative "character" evidence.  To the contrary, it was fact testimony about specific

statements Plaintiff Georgia had made respecting this very litigation and its subject and the

motive for pursuing it.  It was properly admitted.  By contrast, Plaintiffs' witness who

worked with Ms. Georgia in a charitable organization was a classic character witness offered

to show, in Plaintiffs' Motions very words, "Georgia's conduct [and] reputation in the

community."  This is the very definition of inadmissible character evidence.  Fed. R. Ev.

404(a).

## D.  ABUSES OF DISCRETION

Plaintiffs again choose eleven different arguments in this category to argue that a new

trial is warranted.  These arguments are as riddled with factual inaccuracy and legal error as

the preceding ones.

*Exhibit notebooks (Plaintiffs' Motion, p.16 "5.a.")*  In a pretrial conference, the Court stressed to both sides that the jury's ease and convenience should be given great and constant consideration.  Saving their time and making the courtroom experiences as smooth and straightforward as possible for them by having witnesses ready to enter the box as quickly as possible and copying exhibits for them in advance were among the Court's suggestions.  On further discussion of the latter idea, the Court told the parties that a practice he had seen successfully used was the creation of a notebook of copies of exhibits marked for identification that each juror could use to find admitted exhibits at the appropriate time. Defendants followed this suggestion.  Plaintiffs chose to distribute a folder for each juror to hold Plaintiffs' exhibits, copies of which were distributed to them by Plaintiffs' counsel at various times throughout the trial.  The Court instructed the jury as to the proper use of the materials provided to them.  Both Defendants' binders and Plaintiffs' folders remained at all times in the jury box.  When the jury was excused for breaks, meals or for the day during trial, they took only their own notes with them, not the exhibit copies.  At the time the jury retired for deliberation, they were given the original exhibits only.  The notebooks never went into the jury room.  The only problem that arose with this system redounded to Defendants' detriment, not Plaintiffs'.  It involved an exhibit Plaintiff distributed to the jury before moving its admission to which Defendants had a filed objection.  On discovery that the jury had reviewed the document while the parties argued its admission at a side bar, Defendants withdrew their objection.

*Limiting Plaintiffs' testimony in their case in chief (Plaintiffs' Motion, p.16 "5.b.")*

Rule 403 grants the Court discretion to exclude repetitive testimony in order to avoid "delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Ev. § 403. The Court is also afforded great latitude in acting as may be necessary to retain control of the proceedings and to ensure that trial moves along in an orderly fashion to a conclusion that allows the jury to reach a dispassionate verdict on the merits. The trial Court questioning counsel as to the likely conclusion of a witness's examination is an ordinary and proper part of this courtroom management process. The same is true of a trial Court's suggesting that a particular examination has been too lengthy or repetitive. Nothing more occurred in this case. As such, the Court acted well within the proper scope of its case management power.

*Objections during cross-examination of plaintiff Georgia (Plaintiffs' Motion, p.16 "5.c.")* Plaintiffs' description of the Court's instruction that Plaintiffs' counsel indicate objections by raising her hand omits the circumstances leading up to it. During the first forty minutes of this particular cross-examination, Plaintiffs' counsel unsuccessfully objected to virtually every question, generally making the same objection that the Court had overruled just seconds earlier. The Court informed Plaintiffs' counsel that her continuing objection to a particular line of questioning was noted as were the Court's overruling of it and Plaintiffs' exception. This had little impact on Plaintiffs' counsel and the pace of objections was not perceptibly slowed by this. Moreover, the objections were often begun before the question was completed and generally consisted of lengthy exhortations clearly directing the witness of the dangers to her case posed by her potential answers or the theme Plaintiffs' strategy

required to be emphasized. The Court's earlier attempt to restore order by instructing counsel to wait for the conclusion of the question before interposing an objection and to confine her interjections to saying, "objection," and identifying the underlying rule of evidence had been unavailing. Only when those efforts failed to permit the cross-examination to proceed at all cogently did the Court direct Plaintiffs' counsel to raise her hand with her objections.

*Court's tolerance of and joining in Defense counsel's inappropriate courtroom behavior toward Plaintiffs' counsel (Plaintiffs' Motion, p. 17 "d"; p. 19, "5.j.")* This argument is difficult to follow but it appears Plaintiffs allege that Defendants attempted to mislead the Court on the question of a hearsay exception, that Defense counsel abusively criticized Plaintiffs' counsel's skill, knowledge and personal appearance in the presence of the jury and that the Court joined in such behavior in the presence of the jury. Colloquy on some of Plaintiffs' baseless objections, most memorably repeated fanciful accusations of Defendant misconduct of many descriptions, did include observations of the ignorance and inattention they betrayed. This was fair comment in the presence of the jury to counteract the contemporaneous improper conduct by Plaintiffs' counsel.

The Court gave instructions on its rules for the use of documents for impeachment purposes to counsel on multiple occasions, beginning at the pretrial conference. Plaintiffs' counsel did not follow them. Moreover, Plaintiffs' counsel repeatedly attempted to impeach trial testimony with deposition transcripts of non-contradictory statements. Objections and expressions of the unfairness of this tactic are natural and appropriate in such circumstances.

*Court's reaction to some of Plaintiffs' objections as being continuing (Plaintiffs' Motion, p. 17 "5.e.")* Plaintiffs' own description of this supposed "abuse of discretion" and their correction of the harm they allege it caused shows that there is nothing here to warrant a new trial.

*Court's admonishment of Plaintiffs' counsel (Plaintiffs' Motion, p. 17 "5.f.")* This citation of supposed abuse of discretion is contrary to reality. Plaintiffs' counsel was admonished not just to cease her interruption of opposing counsel. She was admonished to cease her interruption of opposing counsel, the **witnesses and the Judge.** This followed days of all participants in the trial experiencing Plaintiffs' counsel commencing to speak while a witness (often answering a question Plaintiffs' counsel had asked) or defense counsel or the Judge was speaking, more than once causing the court reporter to throw up her hands to alert the Court that she was unable to record the proceedings.

*Difficulty in hearing defense counsel and seeing demonstrations  (Plaintiffs' Motion, p. 18-19 "5.g." and "5.h.")* The acoustics of Courtroom One equally affected all present. Defense counsel just as frequently asked Plaintiffs' counsel to turn or speak more loudly to be more audible as Plaintiffs' counsel asked Defense counsel. As the Court informed all counsel, moving to another location to improve the ability to hear was an option for all. This was not limited to sitting behind the witness box, which Plaintiffs' Motion explains they found unsatisfactory, but expressly included the jury box itself, which Plaintiffs' counsel and Defendants' counsel both did at various times during trial. Of course, as to demonstrations, the challenge for both sides was to make them visible to the jury, **the judge** and opposing

counsel. Plaintiffs' suggestion (belatedly made in a motion for a new trial) to position demonstrations with their back to the bench would not have accommodated the judge. Plaintiffs moreover waived any objection this situation might have warranted by failing to make it at trial. Hardy v. Saliva Diagnostic Systems, Inc., 52 F. Supp. 2d 333, 340 (D. Conn. 1999). The circumstances described in these paragraphs are simply trivial annoyances, if that, and certainly not the stuff on which new trials are granted.

_Instructing Plaintiffs' but not Defendants' witnesses to conform the scope of their answers to the questions (Plaintiffs' Motion, p. 19 "5.i.")_ Plaintiffs' bald statement of this supposed problem without reference to any particular witness or area of testimony prevents specific response. Suffice it to say that Defendants were conscious of no advantage they enjoyed from a disparity in such instructions and recall no narrative responses by their witnesses that went challenged but unchecked.

_Methods of address by the Court (Plaintiffs' Motion, p.20 "5.k.")_ The Court referred to all female persons as "ladies" and used the mode of address "Madam" for all female persons in its presence, including Plaintiffs, their counsel, Defendants' co-counsel, the court reporter, the courtroom clerk and the Court's own law clerk. This show of courtesy and respect did not harm Plaintiffs or their case. There was no diminutive or pejorative connotation in the practice. Male witnesses in the Court's presence were unfailingly addressed as "Sir" and Defense lead counsel was occasionally called Mr. Mitchell or Sir, as well as Counsel. It is far-fetched to suggest that the jury was swayed against Plaintiffs by the fine manners of the Court.

## E.  ERROR REGARDING HEARSAY OBJECTIONS

Plaintiffs Motion suggests (at p. 21-22) that the Court admitted far-reaching error on a large number of hearsay objection rulings.  This is not the case.  What the Court noted was that it had granted some hearsay objections erroneously, because in the context of a hostile environment case some statements that might otherwise be hearsay could in fact be evidence of statements contributing to the environment itself – verbal acts.  The Court did mention Plaintiffs' counsel's option to move for mistrial.  ***Plaintiffs counsel expressly stated her desire not to have the case mistried.***

All counsel and the Court discussed with the court reporter the options for reviewing the record to identify the scope of the problem.  Before the next day's proceedings, the Court undertook the review itself, determined that the instances were not so numerous and serious as to avoid correction in the current proceedings and advised all counsel that, during their rebuttal case, Plaintiffs could offer any evidence incorrectly excluded on this basis, ***without regard to the normal restriction of the scope of rebuttal to those matters raised in the Defendants' case in chief.***  Plaintiffs' counsel thereafter expressly questioned the impact the customarily limited scope of rebuttal would have on the ability to correct the errors and was very clearly told again that this restriction was lifted in order to permit the introduction of any such evidence thus excluded.  In fact, Plaintiffs' rebuttal case included additional testimony by Terrance O'Connell (Plaintiff Schiller's husband) to introduce such evidence.

Any error the Court committed was amply corrected in a manner Plaintiffs appeared to approve and did not render the proceedings unfair or the verdict unreliable.  See  Tesser v.

<u>Board of Educ.</u>, 370 F.3d 314, 322 (2d Cir. 2004); <u>Saleh v. City of Buffalo</u>, 80 Fed.

Appx.119, 2003 WL 22490186 (2d Cir. 2003).

F. <b>JURY CHARGES</b>

Plaintiffs argue here (Plaintiffs' Memo, p. 22) that the Court did not accept all their

suggested jury charges. The Court was not required to do so. The Court did not accept all

Defendants' suggested jury charges, either and, in fact, relied on its own draft rather than any

party's, undertook significant discussion with counsel prior to finalizing the charge, and gave

both parties fair notice of what the charge would include prior to closing argument. The

Court's process in devising its charge is not grounds for a new trial so long as the charge

itself is fair.

The particular charges that Plaintiffs argues were improperly omitted did not render

the charge unfair. Plaintiffs argue that the Court failed to charge the jury on motive under

Title VII. However, the Court did, at page 8 of its charge, instruct the jury that Title VII

liability attached if the Plaintiffs' sex was "a motivating factor" in an adverse action taken

against either of them by Defendants. This is the correct formulation of the intent element of

a Title VII violation in the disparate treatment theory. The use of the indefinite article "a" in

the phrase alerts the jury to the limited finding required regarding the role of the protected

characteristic in the contested employment decision.

Plaintiffs also argue that the court should have instructed the jury regarding "pretext."

This, however, would require the Court to have delved into the burden shifting formula of

McDonnell Douglas[4], which the Second Circuit Court of Appeals has expressly found to be error.  Gordon v. New York City Bd. of Educ., 232 F.3d 111 (2d Cir.  2000).  Not only was the Court's failure to give the instruction Plaintiffs now say entitles them to a new trial actually correct; an opposite action by the Court would have been plain error.  Sanders v. New York City Human Resources Admin., 361 F.3d 749, 758 (2d Cir. 2004)

Plaintiffs' Memo's final specific assignment of error on the jury instructions is the failure of the Court to specifically advise the jury that each Plaintiff could rely on evidence presented with respect to the other's claims to establish her own hostile environment and Section 1983 claims.  The Court's instructions nowhere suggested otherwise and the description of the need for a custom, policy or practice to support the 1983 claims and the severe or pervasive nature of the hostile environment burden could not support a different conclusion by the jury.

## G.  JURY INTERROGATORIES

Without explaining how, Plaintiffs' Motion (at p. 22-23) baldly asserts that the Jury Interrogatories were misleading and argues that the Court's failure to use those suggested by Plaintiffs or to confer with the parties or invite objection or discussion of the form before providing it to the jury was error.  The Court was not required to use any jury interrogatories whatever let alone one written or blessed in advance by either party.  Moreover, the verdict

---

[4]    McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)

form clearly followed the unobjectionable instructions and could only have been helpful to the jury.

H.  **WITNESS CREDIBILITY**

At p. 23-24, Plaintiffs' Motion recapitulates most of the preceding points and concludes that the totality of its arguments show that the conduct of the trial meets the tough standard of Fed. R. Civ. P. 59(a).  As explained above, Defendants disagree totally.  One new issue is introduced here, though that bears additional comment.  Plaintiffs argue that "every defense witness and hostile witness, most of them of *officer rank*, was impeached with prior sworn or official statements or testimony.  In contrast, the Plaintiff and their witnesses were not impeached or shown to be less than truthful . . . ."  *Id at p.23 "b."*  Aside from the fact that this statement is a shameful fiction, the jury alone can determine witness credibility.  Plaintiffs clearly disagree with the jury's judgment in these matters, but that disagreement cannot justify throwing out the verdict.  Travel Center of Fairfield County, Inc. v. Royal Cruise Line Ltd., 154 F. Supp. 2d 281, 290 (D. Conn. 2001), aff'd, 43 Fed. Appx. 461, 2002 WL 1990584 (2d. Cir. 2002).

**III.    CONCLUSION**

For all the foregoing reasons, Defendants contend that Plaintiffs' Motion To Set Aside Judgment And For New Trial should be denied.

By:     /s/ Margaret M. Sheahan
        Margaret M. Sheahan, ct05862
        Robert B. Mitchell, ct02662
For:    Pullman & Comley, LLC
        850 Main Street, P.O. Box 7006
        Bridgeport, CT  06601-7006
        (203) 330-2000
        Facsimile (203) 576-8888

        ATTORNEYS FOR:
        CITY OF BRIDGEPORT,
        EARL PETTWAY and
        MICHAEL MAGLIONE

## <u>CERTIFICATION</u>

Pursuant to Fed. R. Civ. P. 5 (b), I hereby certify that, on the 25th day of January, 2005, a copy of the foregoing was forwarded by first class mail, postage pre-paid, to all counsel and <u>pro</u> <u>se</u> parties of record.


Susan V. Wallace
11 Blue Orchard Drive
Middletown, CT 06457




/s/ Margaret M. Sheahan
Margaret M. Sheahan



BPRT/67551.1/MMS/546057v1

25